# Exhibit A

1   JOHN T. JASNOCH (CA 281605)
    SCOTT+SCOTT
2   ATTORNEYS AT LAW LLP
    600 W. Broadway, Suite 3300
3   San Diego, CA 92101
    Telephone: 619-233-4565
4   Facsimile: 619-233-0508
    Email: jjasnoch@scott-scott.com
5
      – and –
6
    THOMAS L. LAUGHLIN, IV
7   RHIANA SWARTZ
    The Helmsley Building
8   230 Park Avenue, 17th Floor
    New York, NY 10169
9   Telephone: 212-223-6444
    Facsimile: 212-223-6334
10  Email: tlaughlin@scott-scott.com
            rswartz@scott-scott.com
11
    *Counsel for Plaintiff*
12

**FILED**
**SAN MATEO COUNTY**

JUL **0 3** 2018

Clerk of the Superior Court
By _____
              DEPUTY CLERK

**FILED BY FAX**

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                          COUNTY OF SAN MATEO

15                                              Case No. **18 C I V 0 3 4 6 1**

| | |
|---|---|
| 16  AVNER GREENWALD, Individually and on Behalf of All Others Similarly Situated, | |
| 17                                           Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933** |
| 18              v. | |
| 19  RIPPLE LABS, INC., a Delaware Corporation, XRP II, LLC, a South Carolina Limited Liability Company, BRADLEY GARLINGHOUSE, | **JURY TRIAL DEMANDED** |

15
16   AVNER GREENWALD, Individually and on
     Behalf of All Others Similarly Situated,
17                                      Plaintiff,

                v.
18
19   RIPPLE LABS, INC., a Delaware Corporation,
     XRP II, LLC, a South Carolina Limited Liability
20   Company, BRADLEY GARLINGHOUSE,
     CHRISTIAN LARSEN, RON WILL,
21   ANTOINETTE O'GORMAN, ERIC VAN
     MILTENBURG, SUSAN ATHEY, ZOE
22   CRUZ, KEN KURSON, BEN LAWSKY,
     ANJA MANUEL, and TAKASHI OKITA,

23                                    Defendants.

Case No.

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES ACT
OF 1933**

**JURY TRIAL DEMANDED**

18 – CIV – 03461
CMP
Complaint
1244161

24

25

26

27

28

                              COMPLAINT

1   Plaintiff Avner Greenwald ("Plaintiff"), individually and on behalf of all others similarly
2   situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to
3   Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation
4   conducted by and through Plaintiff's attorneys, which included, among other things, a review of
5   Securities and Exchange Commission ("SEC") filings and commentary, publicly available reports and
6   information, analyst and media reports, and other commentary analysis. Plaintiff's investigation into the
7   matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within
8   the custody and control of, the Defendants. Plaintiff believes that substantial additional evidentiary
9   support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

10   **NATURE AND SUMMARY OF ACTION**

11      1.   Plaintiff brings this securities class action under §§5, 12(a)(1), and 15 of the Securities
12   Act of 1933 (the "Securities Act") against (1) Ripple Labs, Inc. ("Ripple Labs" or the "Company");
13   (2) Ripple Labs' wholly owned subsidiary, XRP II, LLP ("XRP II"); and (3) certain of Ripple Labs'
14   controlling senior executives and directors (collectively, the "Individual Defendants"). Plaintiff alleges
15   that Defendants sold unregistered securities to investors in violation of the Securities Act. Defendants
16   are liable in their capacities as issuers, statutory sellers, and/or direct or indirect offerors of XRP.

17      2.   Plaintiff brings this action on behalf of all investors who purchased Ripple tokens
18   ("XRP" or "Ripples") on or after July 3, 2015 and were damaged thereby.

19      3.   XRP qualify as securities under Section 2(a)(1) of the Securities Act, 15 U.S.C.
20   §77b(a)(1). The purchase of XRP constitutes an investment contract as XRP purchasers, including
21   Plaintiff, provided consideration (in the form of fiat, *i.e.*, U.S. dollars or other cryptocurrencies) in
22   exchange for XRP. XRP is in investment in a common enterprise and purchasers reasonably expected to
23   derive profits from their ownership of XRP. Defendants promoted this profit motive as a reason to
24   purchase XRP.

25      4.   No registration statements have been filed with the SEC or have been in effect with
26   respect to the XRP offerings alleged herein.

27

28

5.      All 100 billion XRP in existence were created out of thin air by Ripple Labs.[1]  Twenty billion XRP, or 20% of all XRP in existence, were given to the individual founders of Ripple Labs, including Defendant Chris Larsen, and the remaining 80 billion were retained by Ripple Labs.

6.      Defendants have since earned massive profits by selling the retained XRP to the public, without complying with federal securities laws, in what is essentially an ongoing initial coin offering ("ICO").  Like an initial public offering ("IPO"), in an ICO, digital assets are sold to consumers in exchange for legal tender or other cryptocurrencies (most often Bitcoin and Ethereum).

7.      Defendants sell XRP from the retained supply and use the proceeds from the sales to fund Company operations.

8.      In order to increase demand for XRP, and thereby increase the profits derived by selling XRP, Defendants portray XRP as a good investment, solicit sales, express optimistic price predictions, and conflate Ripple Labs' enterprise customer programs with usage and value of XRP.  Ripple Labs greatly increased these efforts to push XRP on the general public in recent years.

9.      These solicitation efforts were conducted by interstate means, as were the sales of XRP.

**JURISDICTION AND VENUE**

10.     The Court has subject matter jurisdiction over this action pursuant to the California Constitution, Article VI, §10 and Section 22 of the Securities Act, 15 U.S.C. §77v.  The claims alleged herein arise under §§5, 12(a)(1), and 15 of the Securities Act.  *See* 15 U.S.C. §§77e, 77l, and 77o. Section 22 of the Securities Act, 15 U.S.C. §77v(a), expressly states that "[e]xcept as provided in section 77p(c) of this title, no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."  Section 77p(c) refers to "covered class action[s] brought in any State court involving a covered security, as set forth in subsection (b)," and subsection (b) of §77p in turn includes within its scope only covered class actions "based upon the

---

[1]     This is unlike other cryptocurrencies like Bitcoin and Ethereum that are "mined" by those validating transactions on their networks.

1  statutory or common law of any State or subdivision thereof." *See* 15 U.S.C. §77p. This is an action
2  asserting only federal law claims. Thus, this action is not removable to federal court.

3       11.    Venue is proper in this jurisdiction pursuant to the provisions of California Code of
4  Civil Procedure §395(a) because certain Defendants reside in San Mateo County.

5       12.    This Court has personal jurisdiction over Defendants as a result of acts of Defendants
6  occurring in and/or aimed at the state of California in connection with Defendants' unregistered
7  offer and sale of securities in violation of §§5, 12(a)(1), and 15 of the Securities Act.

8       13.    This Court also has personal jurisdiction over Defendants because they reside in or
9  have their principal places of business in California.

10                        **PARTIES**

11       14.    Lead Plaintiff Avner Greenwald is an individual and a resident of Israel. Plaintiff
12  bought and sold XRP in both USD and Bitcoin between December 14, 2017 and May 12, 2018, and
13  suffered losses on those investments as a result of the scheme alleged herein.

14       15.    Defendant Ripple Labs, Inc. is a Delaware corporation with its principal place of
15  business at 300 Montgomery Street, 12th Floor, San Francisco, California. Ripple Labs operates
16  RippleNet, a global payments network based on blockchain technology. Through RippleNet, banks
17  and payment providers can use XRP to process, clear, and settle financial transactions in real-time
18  worldwide. Ripple Labs created XRP and, at all relevant times, solicited purchases of XRP by
19  Plaintiff and the Class for its own benefit and the benefit of its executives and owners.

20       16.    Defendant XRP II, LLC is wholly owned subsidiary of Ripple Labs. XRP II is a
21  South Carolina limited liability company with its principal place of business in San Francisco,
22  California. XRP II sold XRP and solicited the purchases of XRP by Plaintiff and the Class for its
23  own benefit and the benefit of its parent, Ripple Labs, and its executives and owners.

24       17.    Defendant Bradley Garlinghouse ("Garlinghouse") is the Chief Executive Officer
25  ("CEO") of Ripple Labs and has been since January 2017. Garlinghouse was Ripple Labs'
26  President and Chief Operating Officer from April 2015 through December 2016. Garlinghouse is a
27  California citizen and a resident of San Mateo County. Garlinghouse exercised control over Ripple

28

1  Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the
2  public.

3        18.     Defendant Christian (Chris) Larsen ("Larsen") is Executive Chairman of Ripple
4  Labs' Board of Directors and has been since January 2017.  Larsen is also a co-founder of Ripple
5  Labs and a former CEO of Ripple Labs (through December 2016).  Larsen exercised control over
6  Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of
7  XRP to the public.

8        19.     Defendant Ron Will ("Will") is Chief Financial Officer of Ripple Labs and has been
9  since November 2017.  Will exercised control over Ripple Labs and directed and/or authorized,
10  directly or indirectly, the sale and/or solicitation of XRP to the public.

11        20.     Defendant Antoinette O'Gorman ("O'Gorman") is Chief Compliance Officer of
12  Ripple Labs.   O'Gorman exercised control over Ripple Labs and directed and/or authorized,
13  directly or indirectly, the sale and/or solicitation of XRP to the public.

14        21.     Defendant Eric van Miltenburg ("van Miltenburg") is Senior Vice President for
15  Business Operations of Ripple Labs.  Van Miltenburg exercised control over Ripple Labs and
16  directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

17        22.     Defendant Susan Athey ("Athey") is a Director of Ripple Labs.  As a Director, Athey
18  exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale
19  and/or solicitation of XRP to the public.

20        23.     Defendant Zoe Cruz ("Cruz") is a Director of Ripple Labs.  As a Director, Cruz
21  exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale
22  and/or solicitation of XRP to the public.

23        24.     Defendant Ken Kurson ("Kurson") is a Director of Ripple Labs.  As a Director,
24  Kurson exercised control over Ripple Labs and directed and/or authorized, directly or indirectly,
25  the sale and/or solicitation of XRP to the public.

26
27
28

25.     Defendant Ben Lawsky ("Lawsky") is a Director of Ripple Labs.  As a Director, Lawsky exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

26.     Defendant Anja Manuel ("Manuel") is a Director of Ripple Labs.  As a Director, Manuel exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

27.     Defendant Takashi Okita ("Okita") is a Director of Ripple Labs.  As a Director, Okita exercised control over Ripple Labs and directed and/or authorized, directly or indirectly, the sale and/or solicitation of XRP to the public.

28.     The defendants referred to in ¶¶17-27 are referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.     The Background of XRP**

29.     Unlike cryptocurrencies such as Bitcoin and Ethereum, which are mined by those validating transactions on their networks, all 100 billion XRP in existence were created out of thin air by Ripple Labs in 2013.  Twenty billion XRP, or 20% of the total XRP supply, were given to the individual founders of Ripple Labs,[2] with the remaining 80 billion retained by Ripple Labs.

30.     As for 80 billion XRP held by Ripple Labs, the plan was to sell them and use the proceeds to fund and improve Company operations, including the XRP ledger network.

31.     Ripple Labs' own wiki notes that "Ripple Labs sells XRP to fund its operations and promote the network.  This allows Ripple Labs to have a spectacularly skilled team to develop and promote the Ripple protocol and network."[3]

32.     In the first quarter of 2018, "market participants purchased $16.6 million [of XRP] directly from XRP II, LLC," XRP II also "sold $151.1 million worth of XRP" on exchange.[4]

---

[2]     Defendant Chris Larsen received 9.5 billion XRP.

[3]     Ripple credits, https://wiki.ripple.com/Ripple_credits#XRP funds the development and promotion of the protocol and the network (last visited June 29, 2018).

33.     Ripple Labs' primary business involves the operation of an open ledger protocol, payment, and exchange network. The native cryptocurrency for Ripple Labs' exchange network is XRP. Thus, XRP is both an investment in the Company (as sales are used to fund Company operations with the expectation that such investments in the Company will increase the value of XRP) and an investment in itself (with the expectation that the value of XRP will increase), as well as a means of exchange promoted by Ripple Labs.

34.     Ripple Labs' exchange network is based around the XRP Ledger. The XRP Ledger consists of many servers, called nodes, which accept and process transactions. Client applications sign and send transactions to nodes, which then relay these candidate transactions throughout the network for processing. Transactions are then verified and become part of the XRP Ledger through a consensus process. Every XRP transaction must be made through Ripple Labs' XRP Ledger, which is maintained by Defendants. In order to open an account on the XRP Ledger, users must maintain a minimum account balance of 20 XRP. In addition, each time a transaction is made in XRP, there is a transaction cost to users.

35.     Ripple Labs' founders and other Company insiders have also profited individually from their XRP holdings. In January 2018, Ripple co-founder Defendant Larsen was named one of the richest people in the United States, with an estimated net worth of $59.9 billion, primarily due to the increase in value in XRP and his personal ownership of billions of XRP and his significant stake in the Company.[5]

36.     Defendants have control over how many XRP are in the market.

37.     No registration statement has been filed for XRP with the SEC and no registration statement is in effect for XRP.

---

[4]     Q1 2018 XRP Markets Report, https://ripple.com/insights/q1-2018-xrp-markets-report/ (last visited June 29, 2018).

[5]     https://www.cnbc.com/2018/01/04/ripple-co-founder-is-now-richer-than-the-google-founders-on-paper.html (last visited on June 29, 2018).

**B. Defendants Solicit XRP Sales**

38.     From 2013 to the present, Defendants and their affiliates have been engaged in an ongoing scheme to sell XRP to the general public.

39.     Ripple Labs dedicates an entire section of its website to providing advice on "How to Buy XRP." This section provides links to online exchanges and instructions on "[h]ow to buy XRP" on those exchanges.[6] It also has a section titled "Market Performance" which proclaims that Ripple Labs is "committed to the long term health and stability of XRP markets."[7]

40.     Ripple Labs also consistently promotes the availability of XRP on exchanges. For example, on May 18, 2017, its Senior Vice-President for Business Development, Patrick Griffin, tweeted a link to the Kraken exchange with the caption: "Kraken Introduces New Fiat Pairs for XRP Trading! USD, JPY, CAD, EUR @ Ripple."[8]

41.     Similarly, on or about December 21, 2017, Ripple Labs tweeted in Japanese that XRP was now available on over 50 exchanges.[9] That tweet linked to an article on Ripple Labs' website which described XRP as "the fastest and most scalable [digital] asset on the market."[10] It continued, "[t]he market is taking notice of XRP's speed, reliability and scalability – which has strengthened the demand for XRP and where it's listed. In fact, we're proud to announce that XRP has gone from being listed on six exchanges earlier this year to more than 50 worldwide." The article also links to a number of online exchanges where XRP can be purchased, and states that "XRP's long-term value is determined by its utility – including its ability to help financial institutions source liquidity for payments into and out of emerging markets."

---

[6]     XRP Buying Guide, https://ripple.com/xm/buy-xrp/ (last visited on June 29, 2018).

[7]     Market Performance, https://ripple.com/xrp/market-performance/ (last visited on June 29, 2018)

[8]     @patgriffin9, https://twitter.com/patgriffin9/status/865251321867231233 (last visited on June 29, 2018).

[9]     @Ripple, https://twitter.com/Ripple/status/943999526783905792 (last visited on June 29, 2018).

[10]    XRP Now Available on 50 Exchanges Worldwide, https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/ (last visited on June 29, 2018).

42.   Ripple Labs also hosts conferences to generate interest in XRP.   For example, between October 16 and October 18, 2017, it hosted a conference named "Swell" in Toronto. Ripple Labs acknowledged that "[a]nticipation around the event spurred a meaningful spike in XRP, pushing it up 100 percent[.]"[11]

43.   On the same day, CoinDesk, a subsidiary of Digital Currency Group, which has an ownership interest in Ripple Labs, published an article titled "Ripple Price Passes Historic $1 Milestone."[12]   This was just one of many instances in which Ripple Labs would promote price movements of XRP.

44.   Ripple Labs' promotion of XRP's price reached new highs in December 2017.   In one instance, Ripple's XRP product manager retweeted a tweet exclaiming: "Wow, XRP at all-time high!  Forget about bitcoin, *we're all in on XRP*!"  (Emphasis added.)[13]

45.   Around that same time, on or about December 7, 2017, Ripple Labs announced that it had placed "55 billion XRP in a cryptographically-secured escrow account to create certainty of XRP supply at any given time."[14]  It had been previously announced in May 2017 that this would happen along with a limited distribution schedule.   This was done to limit the available supply of XRP and drive price appreciation, which allowed Defendants to maximize profits from XRP sales. The December 7, 2017 announcement stated:

> By securing the lion's share of XRP in escrow, people can now mathematically verify the maximum supply that can enter the market.  While Ripple has proved to be a responsible steward of XRP supply for almost five years – and has clearly demonstrated a tremendous track record of investing in and supporting the XRP

---

[11]   14Q3 2017 XRP Markets Report, https://ripple.com/xrp/q3-2017-xrp-markets-report/ (last visited on June 29, 2018).

[12]   Ripple Price Passes Historic $1 Milestone, https://www.coindesk.com/ripple-price-passes-historic-1-milestone/ (last visited on June 29, 2018).

[13]   @warpaul, https://twitter.com/yoshitaka_kitao/status/940785785925709829 (last visited on June 29, 2018).

[14]   https://ripple.com/insights/ripple-escrows-55-billion-xrp-for-supply-predictability (last visited on June 29, 2018).

ecosystem – this lockup eliminates any concern that Ripple could flood the market, which we've pointed out before is a scenario that would be bad for Ripple![15]

46.    The article contained a button to allow readers to share it on Twitter with the caption "Game changer for $XRP! 55 billion XRP now in escrow."[16]  Ripple also promoted this article through its own tweet, which proclaimed:  "55B $XRP is now in escrow.  Interested in what this means for $XRP markets?"[17]  Garlinghouse was even more enthusiastic, tweeting:  "Boom! 55 B $XRP now in escrow.  Good for supply predictability and trusted, healthy $XRP markets.  Glad to finally let this #cryptokitty out of the bag!"[18]

47.    Ripple's public commitment to limit the supply of XRP had its intended effect.  In the weeks that followed, the price of XRP rapidly increased, from approximately $0.22 per token on December 7, 2017 to $3.38 per token on January 7, 2018.[19]

48.    Ripple Labs' CEO, Brad Garlinghouse, has also been a vocal advocate for investing in XRP. In a December 14, 2017 interview with Canada's Business News Network ("BNN"), when asked if he is personally invested in XRP, the CEO stated "I'm long XRO, I'm very, very long XRP as a percentage of my personal balance sheet." He continued, stating that he is "not long some of the other [digital] assets, because it is not clear to me what's the real utility, what problem are they really solving."  And ended by reiterating "if you're solving a real problem, if it's a scaled problem, then I think you have a huge opportunity to continue to grow that.  We have been really fortunate obviously, *I remain very, very, very long XRP*, there is an expression in the industry HODL, instead of hold, its HODL . . . I'm on the HODL side" (emphasis added).

---

[15]    *Id.*

[16]    *Id.*

[17]    https://twitter.com/Ripple/status/938933967956389889.

[18]    https://twitter.com/bgarlinghouse/status/938933791145336832?lang=en.

[19]    XRP would subsequently lose nearly all its value in just over three months, falling to a low of approximately $0.48 per token on April 6, 2018.

49.     Later that same day, Garlinghouse tweeted: "Bloomberg welcomes $XRP to @theterminal and gets it right – #2 market cap behind $BTC at ~$80BB!"[20]

50.     About a week later, on or about December 22, 2017, Garlinghouse tweeted an article titled "Bitcoin Is So 2017 as Ripple Soars at Year End," with the caption "I'll let the headline speak for itself. $xrp."[21]

51.     On or about January 17, 2018, Garlinghouse tweeted a CNBC article titled "Ripple is sitting on close to $80 billion and could cash out hundreds of millions per month-but it isn't," with the caption "A good read on why fostering a healthy $XRP ecosystem is a top priority at @Ripple."

52.     However, the reality was that Ripple Labs was doing exactly that – cashing out. Defendants sold at least $167.7 million worth of XRP between January 1, 2018 and March 31, 2018.

53.     Given its reliance on sales of XRP to fund its operations, it is unsurprising that Ripple Labs' aggressively markets XRP to drive demand, increase the price of XRP, and consequently, its own profits.

54.     Defendants' advertising and social media postings also conflate adoption and use of Ripple Labs' xCurrent and xVia enterprise solutions with adoption and use of XRP, even though they often have little to no correlation and do not involve the XRP Ledger.  Defendants do this to drive demand for XRP and thereby maximize profits from XRP sales.

55.     According to its site, "xCurrent is Ripple's enterprise software solution that enables banks to instantly settle cross-border payments with end-to-end tracking.  Using xCurrent, banks message each other in real-time to confirm payment details prior to initiating the transaction and to confirm delivery once it settles."[22]

---

[20]     @bgarlinghouse, https://twitter.com/bgarlinghouse/status/941375649549246464 (last visited on June 29, 2018).

[21]     @bgarlinghouse, https://twitter.com/bgarlinghouse/status/944325730338357248 (last visited on June 29, 2018).

[22]     Process Payments, xCurrent, https://ripple.com/solutions/process-payments/ (last visited on June 29, 2018).

56.     xCurrent doesn't operate on the same technology as XRP or even require the use of XRP.  In short, there is no reason to believe that adoption of xCurrent would correlate in any way with adoption of XRP.

57.     Nor does use of Ripple Labs' xVia product require adoption of XRP.  Ripple Labs states that its xVia product is "for corporates, payment providers and banks who want to send payments across various networks using a standard interface."[23]

58.     Ripple Labs nevertheless conflates the adoption of xCurrent and xVia with the adoption of XRP.

59.     Another of Ripple Labs' enterprise solutions, xRapid, which does use XRP, is also used to drive XRP sales (xRapid, along with xCurrent and xVia, are together referred to herein as "Ripple Labs' Enterprise Solutions").

60.     Indeed, Ripple Labs regularly promotes its improvements to the XRP ecosystem, which are intended to increase demand for XRP and thus potential returns for XRP investors.  For example, in describing the reasons behind the dramatic price appreciation of XRP during the fourth quarter of 2017, Ripple specifically cited as of "particular importance," the Company's various business initiatives, including: (i) Ripple's partnership with American Express/Santander; (ii) Ripple's activation of the previously discussed escrow of XRP to limit periodic offers and distributions; and (iii) a Japanese/Korean banking consortium backed by the Company.[24]  In the report, Ripple stated that its "consistent and steadfast support of XRP is a major advantage as the payments industry continues to seriously consider it as an alternative liquidity solution."[25]

61.     A November 2015 white paper by the Company highlighted "XRP's Role on Ripple and the Internet of Value" and how the Company's technologies could turn a "Spark to a Wildfire"

---

[23]     Send Payments, xVia, https://ripple.com/solutions/send-payments/ (last visited on June 29, 2018).

[24]     Q4 2017 XRP Markets Report, https://ripple.com/insights/q4-2017-xrp-markets-report/.

[25]     *Id.*

by increasing liquidity and efficiencies for cross-border transactions for the Company's banking clients.  A February 2016 white paper followed up on those purported "network effects," claiming that the use of the Ripple network at XRP would increase banks' returns on investment by improving the global payment infrastructure.

62.    In addition, on March 20, 2017, Ripple Labs retweeted a Bloomberg article regarding adoption of Ripple Labs Enterprise Solutions, proclaiming "Ripple is the only company in this space with real customers who are really in production."[26]

63.    The price of XRP increased rapidly following this tweet and on March 24, 2017 Ripple Labs tweeted: "The price of #XRP continues to surge showing that people are looking for #bitcoin alternatives."[27]

64.    On April 26, 2017, Ripple Labs tweeted a link to an article on its own site, proclaiming "#Ripple welcomes 10 additional customers to our #blockchain #paymentsnetwork."[28] Neither this tweet nor the article it linked to informed readers that the blockchain payments network did not refer to the XRP Ledger, but rather Ripple's xCurrent enterprise solution.

65.    Just days later, on May 3, 2017, with the price of XRP continuing to rise, Ripple Labs tweeted: "#Ripple adoption is sparking interest in XRP 'which has had an impressive rally in the last months' via @Nasdaq."[29]

66.    Articles such as "Ripple XRP price picks up pace as demand for xVia API increases" have made the direct connection between the price of XRP and the adoption of the Company's

---

[26]    @Ripple, https://twitter.com/Ripple/status/844009778309357568 (last visited on June 29, 2018).

[27]    @Ripple, https://twitter.com/Ripple/status/845347809830195200 (last visited June 29, 2018).

[28]    @Ripple, https://twitter.com/Ripple/status/857267304618278912 (last visited June 29, 2018).

[29]    @Ripple, https://twitter.com/Ripple/status/859904105916923904 (last visited June 29, 2018).

1  Enterprise Solutions.[30]  Ripple itself has made this link, for example tweeting on May 16, 2017: "The
2  appeal that Ripple has towards traditional financial institutions is a big advantage it has over Bitcoin."[31]

3       67.    On June 29, 2017, Ripple Labs tweeted a clip of an interview its CEO Brad
4  Garlinghouse gave on CNBC with the caption: "#XRP-up 4000% this year-has shown the market
5  favors a real use case for #digitalassets . . . ."[32]  In that interview, Garlinghouse proclaims that
6  "digital assets are in a position to be more valuable than gold," and describes XRP as "solving a
7  real-world use case, it's not just about speculators."

8       68.    On September 11, 2017, Garlinghouse stated in an interview with CNBC: "People are
9  looking at the success Ripple has been having as a company, ***and I think that's increased the value of***
10  ***XRP***."[33]  (emphasis added).  He continued by stating that Ripple wants "to keep focusing on making
11  XRP a valuable payments tool, and that value will increase accordingly," and he was "voting with my
12  . . . pocketbook on the future increased value of cryptocurrencies."[34]

13       69.    On November 27, 2017, Garlinghouse tweeted "Ripple & $XRP are giving business
14  'what they want in a #blockchain,'" along with a link to a Motley Fool tweet.[35]  That Motley Fool
15  tweet in turn stated that "AmEx and Banco Santander will use Ripple's blockchain network for
16  instant intl. fund transfers.  ***Could be a big deal for Ripple's XRP cryptocurrency***.  $ASP $SAN"
17  (emphasis added.)[36]

18

---

19  [30]    https://globalcoinreport.com/ripple-xrp-price-picks-up-pace-as-demand-for-xvia-api-increases/.
20  [31]    @Ripple, https://twitter.com/Ripple/status/864635614020251649.
21  [32]    @Ripple, https://twitter.com/Ripple/status/880532198025121793 (last visited June 29, 2018).
22  [33]    htpps://www.cnbc.com/2017/09/11/ripple-ceo-brad-garlinghouse-on-bitcoin-and-xrp.html    (last
23  visited June 29, 2018).
24  [34]    *Id.*
25  [35]    @bgarlinghouse, https://twitter.com/bgarlinghouse/status/935225940845711366 (last visited on
     June 29, 2018).
26  [36]    @themotleyfool, https://twitter.com/themotleyfool/status/934850515640471553 (last visited on
27  June 29, 2018).

28

70.     Similarly, on December 14, 2017, Ripple Labs tweeted: "The Japan Bank Consortium launched a Ripple pilot with two large Korean Banks -- the first time money moves from Japan to Korea over RippleNet."[37]  On that same day, Ripple Labs tweeted "@garlinghouse [its CEO's twitter handle] on why crypto prices will be driven by real utility, the multi-trillion $ problem @Ripple is solving and why $XRP will come out on top."[38]

71.     Ripple Labs would later acknowledge that "neither the AMEX news nor the Korean bank initiative involved XRP."

72.     Nevertheless, this tweet linked to a BNN interview with Mr. Garlinghouse, in which he says:

> The reason why XRP has performed so well this year, we're solving a real problem, it's a multi-trillion dollar problem around cross-border payments.  There is a lot of friction its very slow its expensive, we're working with the institutions to deal with that, so people have gotten excited.  We now have over 100 customers we've announced publicly.

He continues,

> [A]t the end of the day the value of digital assets will be driven by their utility.  If they are solving a real problem, and that problem has scale, and that problem, you know there is real value there, then there will be demand for the tokens and the price will go up.  For XRP we have seen because *its required*, its something that can really reduce the friction, and we're talking about a multi-trillion dollar problem in how cross-border payments flow.  And so, I think if you drive real utility, yes there's going to be demand for that.  *XRP is up 100x this year*, and I think it's *because the problem we are solving people realize is a real problem, it's a big problem*.

(Emphasis added.)

73.     On January 4, 2018, following XRP's rapid price increase, The *New York Times* published an article by Nathaniel Popper titled: "Rise of Bitcoin Competitor Ripple Creates Wealth to Rival Zuckerberg."[39]  Mr. Popper tweeted a link to this article with the caption: "On the rise of

---

[37]     @Ripple, https://twitter.com/Ripple/status/941501026267316224 (last visited on June 29, 2018).

[38]     @Ripple, https://twitter.com/Ripple/status/941352005058011137 (last visited on June 29, 2018).

[39]     @nathanielpopper, "Rise of Bitcoin Competitor Ripple Creates Wealth to Rival Zuckerberg," NY TIMES (Jan. 4, 2018).

Ripple. If this is a tulip fever, the fever has spread to chrysanthemums and poppies"[40]. He further

commented, "I've asked several people close to banks if banks are indeed planning to begin using

Ripple's token XRP, in a serious way, which is what investors seem to assume when they buy in at

the current XRP prices. This is a sampling what I heard back:

- Actual use of XRP by banks is not something I've heard about, I find the run up absolutely bluffing, as do all the blockchain folks I know at large Fis.
- XRP isn't used for anything. The hope is that someday it will be by banks, but there really aren't banks signaling that yet.
- I would be surprised if there have been any real bank transactions done with it (outside of maybe test transactions), despite people making claims to the contrary.
- It's not clear to me why XRP would be used by banks at all. XRP could potentially be adopted by consumers as a payment rail, although they don't yet have meaningful traction in that regard.
- I haven't seen a sufficiently large catalyst in the fundamentals of Ripple to justify a greater than 10x move in the price of $XRP in the last month.
- In a few years we're going to look back on 2017 and think WTF were we thinking."[41]

74.     Defendant Garlinghouse publicly responded to this, tweeting: "Over the last few

months I've spoken with ACTUAL banks and payment providers. They are indeed planning to use

xRapid (our XRP liquidity product) in a serious way . . . ." He follows up stating, "I don't think

you want to hear about validation for XRP. The @NYTimes should be above spreading

anonymous FUD."[42]     FUD, which stands for fear, uncertainty, and doubt, is an expression

frequently used among crypto-investors to deride or undermine criticism of an asset.

75.     On January 4, 2018, Ripple's XRP product manager also attacked Mr. Popper,

tweeting: "Do you think I left #Bitcoin and joined @Ripple to build bank software? Think again.

---

[40]     @nathanielpopper, https://twitter.com/bgarlinghouse/status/949129952716234752 (last visited on June 29, 2018).

[41]     @nathanielpopper, https://twitter.com/bgarlinghouse/status/949129952716234752 (last visited on June 29, 2018).

[42]     @nathanielpopper, https://twitter.com/bgarlinghouse/status/949129952716234752 (last visited on June 29, 2018).

1  $XRP."[43]  This tweet linked to a Ripple Labs tweet stating that "3 of the top 5 global money
2  transfer companies plan to use XRP in payment flows in 2018. Even more in the pipeline."

3      76.    In January 2018, Ripple Labs touted "a partnership with MoneyGram – one of the
4  world's largest money transfer companies – to use xRapid and XRP for near real-time cross-border
5  payments. In addition, there are a number of other xRapid deals at various stages of completion in
6  the pipeline." It also stated that it wanted "to build the necessary markets infrastructure for
7  eventual direct usage of XRP by financial institutions." Defendant Garlinghouse commented on
8  this partnership, saying: "And to be clear: @MoneyGram announcement is one step in a marathon
9  ahead to truly make $XRP the global liquidity solution for payment providers and banks."[44]

10      77.    By way of the internet, including Ripple Labs' website, Twitter, and the over 50
11  cryptocurrency exchanges that trade XRP, interstate means are used in connection with the offer
12  and sale of XRP.

13      **C. XRP Is a Security**

14      78.    Plaintiff and the Class invested fiat, including U.S. dollars, and other digital
15  currencies, such as Bitcoin and Ethereum, to purchase XRP.

16      79.    Defendants sold XRP to the general public through global, online cryptocurrency
17  exchanges. XRP can be bought or sold on over 50 exchanges.

18      80.    Every purchase of XRP by a member of the public is an investment contract.

19      81.    Under Section 2(a)(1) of the Securities Act, a "security" is defined to include an
20  "investment contract." 15 U.S.C. § 77b(a)(1). An investment contract is "an investment of money
21  in a common enterprise with profits to come solely from the efforts of others." *S.E.C. v. W.J.*
22  *Howey Co.*, 328 U.S. 293, 301 (1946). Specifically, a transaction qualifies as an investment
23  contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a

24

25  [43]    @Warren Paul Anderson, https://twitter.com/warpaul (last visited on June 29, 2018).

26  [44]    @bgarlinghouse, https://twitter.com/bgarlinghouse/status/951461582424358912 (last visited on
27  June 29, 2018).

28

1  reasonable expectation of profits; (4) to be derived from the entrepreneurial or managerial efforts of

2  others. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852-53 (1975). This

3  definition embodies a "flexible rather than a static principle, one that is capable of adaptation to

4  meet the countless and variable schemes devised by those who seek the use of the money of others

5  on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of

6  compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in

7  our commercial world fall within the ordinary concept of a security.'" *Howey*, 328 U.S. at 299.

8  Accordingly, in analyzing whether something is a security, "form should be disregarded for

9  substance," and the emphasis should be "on economic realities underlying a transaction, and not on

10  the name appended thereto." *Forman*, 421 U.S. at 849.

11    82.    Plaintiff and the Class were investing in a common enterprise with a reasonable

12  expectation of profits when they invested in XRP.

13    83.    The profits of Plaintiff and the Class are intertwined with the fortunes of Ripple

14  Labs. Ripple Labs concedes that it "sells XRP to fund its operations and promote the network.

15  This allows Ripple Labs to have a spectacularly skilled team to develop and promote the Ripple

16  protocol and network."[45]

17    84.    Notably, the SEC has already concluded that virtual currency substantially similar to

18  XRP are "securities and therefore subject to the federal securities laws." As stated by the SEC,

19  "issuers of distributed ledger or blockchain technology-based securities must register offers and

20  sales of such securities unless a valid exemption applies."[46]

21    85.    No such valid exemption from registration requirements exists for XRP.

22    86.    The current SEC Chairman, Jay Clayton, III, recently said, "I have yet to see an ICO

23  that doesn't have a sufficient number of hallmarks of a security."[47]

24
25  [45]    Ripple credits, https://wiki.ripple.com/Ripple credits#XRP (last visited on June 29, 2018).

26  [46]    Press Release: *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities*, SEC (July 25, 2017), https://www.sec.gov/news/press-release/2017-131.
27  [47]    Dave Michaels and Paul Vigna, "SEC Fires Warning Shot Against Coin Offerings," WALL STREET JOURNAL (Nov. 9, 2017).

28

## CLASS ACTION ALLEGATIONS

87.    This suit is brought as a class action pursuant to Section 382 of the California Code of Civil Procedure, on behalf of a Class of all persons or entities who purchased XRP from July 3, 2015 through the present.  Excluded from the Class are Defendants; the officers and directors of the Company and XRP II at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

88.    Plaintiff reserves the right to amend the Class definition if further investigation and/or discovery indicate that the Class definition should be modified.

89.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class.  The members of the proposed Class may be identified from records maintained by the Company and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

90.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

91.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

92.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether XRP are securities under the Securities Act;

(b)    whether the sale of XRP violates the registration requirements of the Securities Act; and

(c)    to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Unregistered Offering and Sale of Securities in Violation of
Sections 5 and 12(a)(1)of the Securities Act
(Against All Defendants)**

94.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this complaint, and further alleges as follows:

95.     Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interest commerce for the purpose of sale or for delivery after sale.

96.     XRP are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

97.     Plaintiff and members of the Class purchased XRP securities.

98.     No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.  No exemption to the registration requirement applies.

99.     SEC Rule 159A provides that, for purposes of Section 12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller.  17 C.F.R. § 230.159A(a).  The Securities Act in turn defines "issuer" to include every person who issues or proposes to issue any security.  15 U.S.C. § 77b(a)(4).  Ripple Labs and XRP II are issuers of XRP.

100.    The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and

did so for financial gain. *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21 & 647 (1988)*; accord, e.g.*, *Steed Finance LDC v. Nomura Sec. Int'l, Inc.* No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).   That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner.   *Pinter v. Dahl*, 486 U.S. 622, 647 (1988); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988).   Ripple Labs, XRP II, and the Individual Defendants are all statutory sellers.

101.   By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

102.   As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and the Class have suffered damages in connection with their XRP purchases.

### SECOND CAUSE OF ACTION

### Violation of Section 15 of the Securities Act
### (Against Ripple Labs and the Individual Defendants)

103.   Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference, each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

104.   This Count is asserted against Defendants Ripple Labs and the Individual Defendants (collectively, the "Control Person Defendants") under Section 15 of the Securities Act, 15 U.S.C. §77o.

105.   The Control Person Defendants, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act.   The Control Person Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of XRP securities as described herein.

106.   The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of XRP II, through ownership of voting securities, by contract, subscription agreement, or otherwise.

107.   The Control Person Defendants also have the power to direct or cause the direction of the management and policies of Ripple Labs.

108.   The Control Person Defendants, separately or together, have sufficient influence to have caused XRP II and/or Ripple Labs to submit a registration statement.

109.   The Control Person Defendants, separately or together, jointly participated in Ripple Labs' and/or XRP II's failure to register XRP.

110.   By virtue of the conduct alleged herein, the Control Person Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Declaring this action to be a proper class action and certifying Plaintiff as Class representative;

B.   Declaring that Defendants offered and sold unregistered securities in violation of Sections 5(a), 12(a), and 15 of the Securities Act;

C.   Awarding Plaintiff and the other members of the Class rescission of their XRP purchases;

D.   Awarding Plaintiff and the other members of the Class compensatory damages;

E.   Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

F.   Requiring an accounting of all remaining assets and funds raised by Defendants through the sale of XRP;

G.   Imposing a constructive trust over the assets and funds raised by Defendants through the sale of XRP;

H.   Enjoining and restraining Defendants from violating the securities laws through the continued unregistered sale of XRP; and

1     I.     Awarding Plaintiff and the other members of the Class such other and further relief as the

2  Court may deem just and proper.

3

4  DATED: July 3, 2018                  SCOTT+SCOTT ATTORNEYS AT LAW LLP

5

6                                   JOHN T. JASNOCH (CA 281605)
7                                   600 W. Broadway, Suite 3300
                                   San Diego, CA 92101
8                                   Telephone: 619-233-4565
                                   Facsimile: 619-233-0508
9                                   Email: jjasnoch@scott-scott.com

10                                 SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                 THOMAS L. LAUGHLIN, IV (*Pro Hac Vice*
11                                 forthcoming)
                                 RHIANA SWARTZ
12                                 The Helmsley Building
                                 230 Park Avenue, 17th Floor
13                                 New York, NY 10169
                                 Telephone: 212-223-6444
14                                 Facsimile: 212-223-6334
                                 Email: tlaughlin@scott-scott.com
15                                      rswartz@scott-scott.com

16                               *Counsel for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
John T. Jasnoch (281605)
Scott+Scott Attorneys at Law LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
TELEPHONE NO.: 619-233-4565    FAX NO.: 619-233-0508
ATTORNEY FOR *(Name):* Plaintiff Avner Greenwald

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Southern Branch (Hall of Justice)

**CASE NAME:**
Greenwald v. Ripple Labs, Inc.

**FOR COURT USE ONLY**

**FILED**
SAN MATEO COUNTY

JUL 03 2018

Clerk of the Superior Court
By
DEPUTY CLERK

CASE NUMBER:
**18 CIV 03461**

18-CIV-03461
CCCS  Civil Case Cover Sheet
1244163

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☑ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

2. This case ☑ is ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties   d. ☑ Large number of witnesses
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☑ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☐ punitive

4. Number of causes of action *(specify):* There are two: 15 U.S.C. sections 77l and 77o

5. This case ☑ is ☐ is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 3, 2018

John T. Jasnoch
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

FILED BY FAX

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the*
*  case involves an uninsured*
*  motorist claim subject to*
*  arbitration, check this item*
*  instead of Auto)*

**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or*
*  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil*
*  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer*
*    or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally*
*  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent*
*  domain, landlord/tenant, or*
*  foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal*
*  drugs, check this item; otherwise,*
*  report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex*
*  case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-*
*    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified*
*  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-*
*    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified*
*  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

AVNER GREENWALD, Individually and on Behalf of All Others
Similarly Situated

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

RIPPLE LABS, INC., a Delaware corporation, XRP II, LLC, a South
Carolina Limited Liability Company, BRADLEY GARLINGHOUSE,

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

# FILED
## SAN MATEO COUNTY

JUL 0 3 2018

Clerk of the Superior Court

By _____
DEPUTY CLERK

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* San Mateo Superior Court | CASE NUMBER: *(Número del Caso):* **18 C I V 0 3 4 6 1** |
|---|---|
| 400 County Center, Redwood City, CA 94063 | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

John T. Jasnoch, 600 W. Broadway, Suite 3300, San Diego, CA 92101; 619-233-4565/

| DATE: JUL 0 3 2018 *(Fecha)* | **RODINA M. CATALANO** Clerk, by _____, *(Secretario)* | Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

18 – CIV – 03461
SUM
Summons Issued / Filed
1244164

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 *www.courtinfo.ca.gov* |
|---|---|---|

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Greenwald v. Ripple Labs, Inc., et al. | 18CIV03461 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

CHRISTIAN LARSEN,  RON WILL, ANTOINETTE O'GORMAN, ERIC VAN MILTENBURG, SUSAN ATHEY, ZOE CRUZ, KEN KURSON, BEN LAWSKY, ANJA MANUEL, and TAKASHI OKITA,

Defendants.

| | Page | 2 | of | 2 |
|---|---|---|---|---|

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**



| Attorney or Party without Attorney (Name/Address) | FOR COURT USE ONLY |
|---|---|
| John T. Jasnoch (281605)<br>SCOTT+SCOTT ATTORNEYS AT LAW LLP<br>600 W. Broadway, Suite 3300<br>San Diego, CA 92101<br>Telephone: 619-233-4565<br>State Bar No.: 281605<br>Attorney for: Plaintiff | **FILED**<br>SAN MATEO COUNTY<br><br>JUL 03 2018<br>Clerk of the Superior Court<br>By _____<br>DEPUTY CLERK |

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN MATEO
400 COUNTY CENTER
REDWOOD CITY, CA 94063

Plaintiff
AVNER GREENWALD

Defendant
RIPPLE LABS, INC. et al.

| Certificate Re: Complex Case Designation | Case Number:<br>18 CIV 03461 |
|---|---|

FILE BY FAX

## This certificate must be completed and filed with your Civil Case Cover Sheet if you have checked a Complex Case designation or Counter-Designation

1. In the attached Civil Case Cover Sheet, this case is being designated or counter-designated as a complex case [or as not a complex case] because at least one or more of the following boxes has been checked:

   ☑ Box 1 – Case type that is best described as being [or not being] provisionally complex civil litigation (i.e., antitrust or trade regulation claims, construction defect claims involving many parties or structures, securities claims or investment losses involving many parties, environmental or toxic tort claims involving many parties, claims involving mass torts, or insurance coverage claims arising out of any of the foregoing claims).

   ☐ Box 2 – Complex [or not complex] due to factors requiring exceptional judicial management

   ☐ Box 5 – Is [or is not] a class action suit.

2. This case is being so designated based upon the following supporting information [including, without limitation, a brief description of the following factors as they pertain to this particular case: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions



18-CIV-03461
CRCCD
Certificate Re: Complex Case Designation
1244168

pending in one or more courts in other counties, states or countries or in a federal court;
(6) whether or not certification of a putative class action will in fact be pursued; and (7)
substantial post-judgment judicial supervision]:

(1), (2), (3), (4) and (6), this is a securities class action under the Securities Act of 1933 that

charges a company and certain of its officers and directors with unregistered sale of

securities to investors in violation of the Securities Act.  Defendants will obtain separate

counsel, and there will be a large number of witnesses and a substantial amount of

documentary evidence.  Plaintiff will seek class certification.


*(attach additional pages if necessary)*


3.     Based on the above-stated supporting information, there is a reasonable basis for the complex
       case designation or counter-designation [or noncomplex case counter-designation] being made
       in the attached Civil Case Cover Sheet.


*****


I, the undersigned counsel or self-represented party, hereby certify that the above is true and correct
and that I make this certification subject to the applicable provisions of California Code of Civil
Procedure, Section 128.7 and/or California Rules of Professional Conduct, Rule 5-200 (B) and San
Mateo County Superior Court Local Rules, Local Rule 2.30.


Dated: 07/03/18


John T. Jasnoch

[Type or Print Name]                            [Signature of Party or Attorney For Party]

NOTICE OF CASE MANAGEMENT CONFERENCE

*Avner Greenwald*

vs.

*Ripple Labs, Inc. & Fat,*

**FILED**
SAN MATEO COUNTY
JUL 0 3 2018
Clerk of the Superior Court
By
DEPUTY CLERK

18-CIV-03461
NCMC
Notice of Case Management Conference
1244169

Case No: **18 C I V 0 3 4 6 1**

Date: **NOV. 0 1 2018**

Time 9:00 a.m.

Dept. **21**        --on Tuesday & Thursday

Dept. _____        --on Wednesday & Friday

You are hereby given notice of your Case Management Conference. The date, time and department have been written above.

1.  In accordance with applicable California Rules of the Court and local Rules 2.3(d)1-4 and 2.3(m), you are hereby ordered to:

    a) Serve all named defendants and file proofs of service on those defendants with the court within 60-days of filing the complaint (CRC 201.7).

    b) Serve a copy of this notice, Case Management Statement and ADR Information Sheet on all named parties in this action.

    c) File and serve a completed Case Management Statement at least 15-days before the Case Management Conference [CRC 212(g)]. Failure to do so may result in monetary sanctions.

    d) Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 212(f) no later than 30-days before the date set for the Case Management Conference.

2.  If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned. The Order to Show Cause hearing will be at the same time as the Case Management Conference hearing. Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.

3.  Continuances of Case Management Conferences are highly disfavored unless good cause is shown.

4.  Parties may proceed to an appropriate dispute resolution process ("ADR") by filing a Stipulation to ADR and Proposed Order (see attached form). If plaintiff files a Stipulation to ADR and Proposed Order electing to proceed to judicial arbitration, the Case Management Conference will be taken off the court calendar and the case will be referred to the Arbitration Administrator. If plaintiffs and defendants file a completed stipulation to another ADR process (e.g., mediation) 10-days prior to the first scheduled Case Management Conference, the Case Management Conference will be continued for 90-days to allow parties time to complete their ADR session. The court will notify parties of their new Case Management Conference date.

5.  If you have filed a default or a judgment has been entered, your case is not automatically taken off Case Management Conference Calendar. If "Does", "Roes", etc. are named in your complaint, they must be dismissed in order to close the case. If any party is in bankruptcy, the case is stayed only as to that named party.

6.  You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

7.  The Case Management judge will issue orders at the conclusion of the conference that may include:

    a) Referring parties to voluntary ADR and setting an ADR completion date;

    b) Dismissing or severing claims or parties;

    c) Setting a trial date.

8.  The Case Management judge may be the trial judge in this case.

For further information regarding case management policies and procedures, see the court's website at: www.sanmateocourt.org

*Telephonic appearances at case management conferences are available by contacting CourtCall, LLC, an independent vendor, at least five business days prior to the scheduled conference (see attached CourtCall information).*



**ERIOR COURT OF SAN MATEO COUNTY**
Civil Department
400 County Center, Redwood City, CA 94063
(650) 261-5100
www.sanmateocourt.org

| AVNER GREENWALD<br>Plaintiff (s)<br><br>vs.<br><br>RIPPLE LABS, INC., A DELAWARE<br>CORPORATION<br>Defendant (s) | **Notice of Complex Case Status Conference**<br><br>Case No.: 18-CIV-03461      Date:  **9/5/2018**<br>Time:  **9:00 AM**<br>Dept. PJ |
|---|---|

Title: **AVNER GREENWALD  VS.  RIPPLE LABS, INC., A DELAWARE CORPORATION, ET AL**

You are hereby given notice of your Complex Case Status Conference.  The date, time and department have been written above.  At this conference, the Presiding Judge will decide whether this action is a complex case within the meaning of California Rules Court ("CRC"), Rule 3.400, subdivision (a) and whether it should be assigned to a single judge for all purposes.

1. In accordance with applicable **San Mateo County Local Rule 2.30**, you are hereby ordered to:
   a. **Serve** copies of this notice, your Civil Case Cover Sheet, and your Certificate Re: Complex Case Designation on all named parties in this action no later than service of your first appearance pleadings.
   b. **Give reason notice** of the Complex Case Status Conference to all named parties in this action, even if they have not yet made a first appearance or been formally served with the documents listed in subdivision (a). Such notice shall be given in the same manner as required for an ex parte application pursuant to CRC 3.1203.

2. **If you fail to follow the orders above, you are ordered to show cause why you should not be sanctioned.  The Order to Show Cause hearing will be at the same time as the Complex Cause Status Conference.  Sanctions may include monetary, evidentiary or issue sanctions as well as striking pleadings and/or dismissal.**

3. An action is provisionally a complex case if it involves one or more of the following types of claims: (1) antitrust or trade regulation claims; (2) construction defect claims involving many parties or structures; (3) securities claims or investment losses involving many parties; (4) environmental or toxic tort claims involving many parties; (5) claims involving massive torts; (6) claims involving class actions; or (7) insurance coverage claims arising out of any of the claims listed in subdivisions (1) through (6).   The Court shall treat a provisionally complex action as a complex case until the Presiding Judge has the opportunities to decide whether the action meets the definition in CRC 3.400(a).

4. Any party who files either a Civil Case Cover Sheet (pursuant to CRC 3.401) or counter or joinder Civil Case Cover Sheet (pursuant to CRC 3.402, subdivision (b) or (C)), designating an action as a complex case in Items 1,2 and/or 5, must also file an accompanying Certificate Re: Complex Case Designation in the form prescribed by the Court. The certificate must include supporting information showing a reasonable basis for the complex case designation being sought.  Such supporting information may include, without limitation, a brief description of the following factors as they pertain to the particular action: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues' (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions pending in one or more courts in other counties, states or countries or in a federal court; (6) whether or not certification of a putative class action will in fact be pursued; and (7) substantial post-judgment judicial supervision.

For further information regarding case management policies and procedures, see the court website at
www.sanmateocourt.org

* Telephone appearances at Complex Case Status Conference are available by contacting CourtCall, LLC, and independent vendor, at least 5 business days prior to the scheduled conference.

### CLERK'S CERTIFICATE OF MAILING

I hereby certify that I am the clerk of this court, not a party of this cause; that I served a copy of this notice on the below date, by placing a copy thereof in separate sealed envelopes addressed to the address shown by the records of this court as set forth above, and by then sealing said envelopes and depositing same, with postage fully pre-paid thereon, in the United States Mail at Red wood City, California.

Date: 7/5/2018

Rodina M. Catalano,
Court Executive Officer/Clerk

By: _____

Antonio Geronimo,
Deputy Clerk

Copies mailed to:

JOHN T JASNOCH
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 W BROADWAY STE 3300
SAN DIEGO CA  92101


9/5
pjlm

**CORRECTED**
## SUMMONS
### (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

RIPPLE LABS, INC., a Delaware corporation, XRP II, LLC, a South
Carolina Limited Liability Company, BRADLEY GARLINGHOUSE,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

AVNER GREENWALD, Individually and on Behalf of All Others
Similarly Situated

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

# FILED
### SAN MATEO COUNTY

JUL 0 6 2018

Clerk of the Superior Court
By _____
                    DEPUTY CLERK

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information
below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy
served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your
case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts
Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask
the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property
may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney
referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate
these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center
(www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and
costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a
continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta
corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar
en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta.
Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la
biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte
que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le
podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de
remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un
programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services,
(www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el
colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre
cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que
pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: San Mateo Superior Court | CASE NUMBER: |
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* |
| 400 County Center, Redwood City, CA 94063 | 18CIV03461 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
John T. Jasnoch, 600 W. Broadway, Suite 3300, San Diego, CA 92101, 619-233-4565

| DATE: | | Clerk, by | | , Deputy |
| *(Fecha)* JUL 0 6 2018 | RODINA M. CATALANO | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

18 – CIV – 03461
SUM
Summons Issued / Filed
1248641

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)

☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 |
| Judicial Council of California | | www.courtinfo.ca.gov |
| SUM-100 [Rev. July 1, 2009] | | |

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Greenwald v. Ripple Labs, Inc., et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

CHRISTIAN LARSEN, RON WILL, ANTOINETTE O'GORMAN, ERIC VAN MILTENBURG, SUSAN ATHEY, ZOE CRUZ, KEN KURSON, BEN LAWSKY, ANJA MANUEL, and TAKASHI OKITA,

Defendants.

Page 2 of 2

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

## ADDITIONAL PARTIES ATTACHMENT
### Attachment to Summons