# EXHIBIT B

1  ROBBINS ARROYO LLP
   BRIAN J. ROBBINS (190264)
2  STEPHEN J. ODDO (174828)
   ERIC M. CARRINO (310765)
3  600 B Street, Suite 1900
   San Diego, CA 92101
4  Telephone: (619) 525-3990
   Facsimile: (619) 525-3991
5  E-mail: brobbins@robbinsarroyo.com
        soddo@robbinsarroyo.com
6        ecarrino@robbinsarroyo.com

7  Attorneys for Plaintiff

8  [Additional Counsel on Signature Page]

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    COUNTY OF SAN MATEO

11  VLADI ZAKINOV, Individually and on      )  Case No.  18CIV02845
    Behalf of All Others Similarly Situated, )
12                                           )  CLASS ACTION
                        Plaintiff,           )
13                                           )  COMPLAINT FOR VIOLATIONS OF
          v.                                 )  CALIFORNIA CORPORATIONS CODE
14                                           )
    RIPPLE LABS INC.,                        )
15  XRP II, LLC,                             )
    BRADLEY GARLINGHOUSE, and                )
16  DOES 1-25, Inclusive,                    )
                                             )
17                        Defendants.        )  DEMAND FOR JURY TRIAL
                                             )
18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

**FILED**
SAN MATEO COUNTY
JUN 05 2018
Clerk of the Superior Court
By
        DEPUTY CLERK

18 – CIV – 02845
CMP
Complaint
1189879

## INTRODUCTION

1.   Plaintiff, individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of media and reports about the Company and Company press releases against defendants Ripple Labs Inc. ("Ripple" or the "Company"), its wholly owned subsidiary XRP II, LLC ("XRP II"), and Ripple's Chief Executive Officer, Bradley Garlinghouse ("Garlinghouse"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## SUMMARY OF THE ACTION

2.   Plaintiff brings this class action on behalf of all California citizens who purchased or otherwise acquired Ripple tokens ("XRP") issued and sold by defendants.

3.   XRP, despite its name as a "token," is actually a security under California law. In particular: (i) Ripple uses the funds it raised from the sale of XRP to fund its business ventures; (ii) the Company indiscriminately offers XRP for sale to the public at large; (iii) plaintiff and the Class (as defined herein) are effectively powerless to control the success of Ripple and XRP; and (iv) plaintiff and the Class members' investment is substantially at risk and is without any security.

4.   As a result, defendants were required to register XRP when offering or selling it. They did not. Instead, they made a series of improper statements which drove up the price of XRP, allowing defendants to obtain greater returns on their XRP sales.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction over the causes of action asserted herein pursuant to the California Constitution, Article VI, section 10, because this case is a cause not given by statute to other trial courts.

6.   The violations of law complained of herein occurred in California and in large part in this County.  More, certain of the defendants reside in San Mateo County.

7.   This Court has personal jurisdiction over each of the defendants named herein because they conduct business, were citizens of, or took steps to conduct the initial coin offering ("ICO") in California.

8.   Venue is proper because the defendants' wrongful acts arose in and emanated from, at least in part, this County.  The violations of law complained of herein occurred in this County.  Further, certain of the defendants live in or conduct business in this County.

9.   This Court also has personal jurisdiction over Defendants because they reside or have their principal places of business in California.

## THE PARTIES

**Plaintiff**

10.   Plaintiff Vladi Zakinov is a citizen of California.  Plaintiff purchased XRP in January 2018 and was damaged thereby.

**Defendants**

11.   Defendant Ripple is a corporation with principal executive offices located at 315 Montgomery Street, 2nd Floor, San Francisco, California.  Ripple operates RippleNet, a global payments network based on blockchain technology.  Through RippleNet, banks and payment providers can use the digital asset XRP to process, clear, and settle financial transactions in real-time worldwide.

12.   Defendant XRP II is a limited liability company and a wholly owned subsidiary of Ripple.  Its principal place of business is in San Francisco, California.  XRP II sold XRP and solicited the purchases of XRP from plaintiff and the Class for its own benefit and the benefit of its parent, Ripple, and its executives and owners, such as defendant Garlinghouse

13.   Defendant Garlinghouse is Ripple's Chief Executive Officer and has been since January 2017 and a director and has been since at least July 2017.  Defendant Garlinghouse was also Ripple's President and Chief Operating Officer from April 2015 to December 2016.  Defendant Garlinghouse is a California citizen and a resident of San Mateo County.

1   14.   The true names and capacities of defendants sued herein under California Code of

2   Civil Procedure section 474 as Does 1 through 25, inclusive, are presently not known to plaintiff,

3   who therefore sues these defendants by such fictitious names.  Plaintiff will seek to amend this

4   complaint and include these Doe defendants' true names and capacities when they are

5   ascertained.  Each of the fictitiously named defendants is responsible in some manner for the

6   conduct alleged herein and for the injuries suffered by the Class.

7
## RIPPLE INDISCRIMINATELY OFFERS XRP TO THE PUBLIC
8
## AT LARGE, WHICH PLAINTIFF AND THE CLASS INVESTED
## IN WITH AN EXPECTATION OF PROFIT
9

10   15.   Ripple sells XRP through exchanges and directly to investors.  The Company lists

11   the various exchanges on which investors can purchase XRP on its website, and for some

12   provides step by step purchasing directions.

13   16.   Plaintiff and the Class invested fiat and other digital currencies, such as Bitcoin

14   and Ethereum, to purchase XRP.

15   17.   Plaintiff used Ethereum to purchase XRP.  In particular, plaintiff purchased 162

16   XRP at $1.4337 and 57 XRP at $1.365 on January 11, 2017, and 299 XRP at a price of $1.0923

17   on January 27, 2018.  Plaintiff has not sold any of his XRP.

18   18.   Plaintiff and the Class invested in XRP with the expectation that XRP would

19   increase in value and result in a profit.  As explained below, defendants have promoted XRP and

20   conflated the value of XRP with its other software efforts.

21
## RIPPLE USES PLAINTIFF AND THE CLASS MEMBERS' UNSECURED PASSIVE
22
## INVESTMENTS TO FUND THE COMMON ENTERPRISE

23   19.   Ripple concedes that it "sells XRP to fund its operations and promote the

24   network.  This allows Ripple [] to have a spectacularly skilled team to develop[] and promote the

25   Ripple protocol and network."  Ripple sold nearly $92 million worth of XRP in the fourth quarter

26   of 2017 alone.  On information and belief, the sale of XRP substantial dwarfs any other source of

27   revenue for the Company.

28

1    20.    In addition, plaintiff and the Class members' investment is entirely passive.
2  Plaintiff and the Class have no ability to control the direction of the Company or the
3  development of the XRP Ledger (described in more detail below). Rather, it is through the
4  efforts of defendants that plaintiff expected to make a profit on his investment. In particular, the
5  efforts of defendants to maintain and push the adoption of XRP and the XRP Ledger, of which
6  they have near complete control, is explained below.

7    21.    Plaintiff and the Class members' investment in XRP is unsecured and at risk of
8  loss at all times, largely depending on defendants' actions. If defendants fail to create an
9  adequate market for XRP, inadequately or incorrectly manage the XRP Ledger, or there is a loss
10 of confidence in Ripple's management by the general market, plaintiff and the Class members'
11 investment in XRP will likely lose money.

## THE VALUE OF XRP IS DERVIVED FROM DEFENDANTS' EFFORTS
## ON BEHALF OF THE COMMON ENTERPRISE

### XRP's Value Is a Result of Defendants' Efforts

### Defendants Control Both the Supply of XRP in the Market and the XRP Ledger

16   22.    Since its creation, defendants have focused on how to create, maintain, and
17 increase the value of XRP. First, they focused on limiting the supply of XRP while also
18 increasing its usage. Defendants created all 100 billion XRP at one time. XRP is currently the
19 third largest coin by market capitalization, with a market capitalization of approximately $24
20 billion.

21   23.    Ripple provided its founders with twenty billion XRP and held onto the rest.
22 defendants' plan was to sell the other eighty billion XRP in basically a never ending ICO. In
23 particular, Ripple put fifty-five billion XRP into an escrow account and has the ability to sell up
24 to one billion XRP a month.

25   24.    Ripple's control over XRP's supply is different than other popular
26 cryptocurrencies, such as Bitcoin. One of the hallmarks of a cryptocurrency is that control of the
27 currency is supposedly "decentralized." In contrast to a governmental system, where, for
28 example in the United States, the Federal Reserve system controls the supply of currency,

1  cryptocurrencies work through distributed ledger technology, which has no central administrator

2  or centralized data storage.  It is the ledger of a cryptocurrency that can record transactions

3  between two parties.  This instant creation of the XRP security, which its set cap, stands in stark

4  contrast to other well-known cryptocurrencies, such as Bitcoin, which are constantly being

5  "mined."[1]

6        25.    Ripple created and continues to work on the XRP Ledger, in which XRP's

7  adoption and value depends.  The XRP Ledger, as opposed to Bitcoin, is not decentralized, as

8  Ripple basically admits.  The Company has a multiple page explanation on "The XRP Ledger

9  Consensus Process" on its website.  There, Ripple explains how the "nodes" of the network share

10  information about candidate transactions, which validates the transactions.  Unlike Bitcoin or

11  Ethereum, which is open to the world, the XRP Ledger nodes "evaluate proposals from a specific

12  set of peers, called chosen validators [also known as Uniduq Node Lists ("UNLs")]."  These

13  UNLs are chosen by Ripple itself based on what it deems "trusted," meaning nodes that will not

14  collude.

15        26.    In its long discussion of the XRP Ledger Consensus Process, Ripple never calls

16  XRP decentralized, though it does confusingly say the ledger consists of "distributed" servers.

17  Rather, it claims to have come up with a plan "to increase decentralization and ensure that no

18  single entity has operational control of the XRP Ledger."  While the XRP Ledger could one day

19  be decentralized, it is not currently.  Instead, Ripple admits that "Beyond our work on

20  decentralization, we have also focused on refining and improving the XRP Ledger Consensus

21  Protocol, the algorithm underlying the XRP Ledger."

22        27.    On February 6, 2018, BitMEX ran an article titled "The Ripple Story," in the

23  wake of XRP's substantial increase in value.  In short, the researchers found that "the default

24  behaviour of Rippled nodes effectively hands full control over updating the ledger to the

25  Ripple.com server" and that "More significant than the disputes is the fact that the Ripple system

26

27  [1] Mining is when transactions are verified and added to the public ledger, known as a blockchain,

28  as a means through which new bitcoin are released.

1  appears for all practical purposes to be centralised and is therefore perhaps devoid of any
2  interesting technical characteristics, such as censorship resistance, which coins like Bitcoin may
3  have...."

4      28.    BitMEX explained in reasoning that led it to conclude that the XRP Ledger is
5  centralized:

6      In January 2018, the BitMEX Research team installed and ran a copy of Rippled
7      for the purpose of this report. The node operated by downloading a list of five
       public keys from the server v1.ripple.com, as the screenshot below shows. All
8      five keys are assigned to Ripple.com. The software indicates that four of the five
       keys are required to support a proposal in order for it to be accepted. Since the
9      keys were all downloaded from the Ripple.com server, Ripple is essentially in
       complete control of moving the ledger forward, so one could say that the system
10     is centralised. Indeed, our node indicates that the keys expire on 1 February 2018
11     (just a few days after the screenshot), implying the software will need to visit
       Ripple.com's server again to download a new set of keys.
12

13     29.    Further, Ripple publishes a quarterly report detailing its efforts grow the "XRP
14 ecosystem." In its report for the second quarter of 2017, the Company admitted that it continues
15 to work on the XRP Ledger. In particular, it stated, "[m]ost importantly, we are accelerating the
16 pace of *our investment* in the XRP Ledger to build on its speed, uptime, and scalability, to
17 ensure XRP is the most trusted enterprise-grade digital asset."

18     30.    Thus, defendants control both the supply of XRP and the ledger on which it is
19 based.

20  **Defendants' Efforts to Market and Increase the Value of XRP**

21     31.    In addition, defendants control the value of XRP by continuously touting it in the
22 press and obscuring the role of the security. In the press release announcing the formation of the
23 escrow account, Ripple stated that:

24     [The] move underscores Ripple's commitment to building XRP liquidity and a
       healthy and trusted market. Long term, the value of digital assets will be
25     determined by their utility. XRP has emerged as the only digital asset with a clear
       intuitional use case designed to solve a multitrillion-dollar problem—the global
26     payment and liquidity challenges that banks, payment providers and corporates
27     face.
28

- 6 -

32.     Discussing the escrow account, defendant Garlinghouse stated that, "Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity.  We engage in distribution strategies that we expect will result in a strengthening XRP exchange rate against other currencies." Defendant Garlinghouse continued:

> [W]e have heard concerns in the market about uncertainty surrounding our ongoing XRP distribution. The root of this uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time—a scenario that would be bad for Ripple!  Our self-interest is aligned with building and maintaining a healthy XRP market.

33.     In addition to limiting supply of XRP, defendants also attempted to build demand for the security by aggressively marketing it.  Ripple's website contains a page on "How to Buy XRP," which has links to various exchanges on which a person can buy XRP and even a "How to" on certain of those pages.

34.     There is also a page on Ripple's website dedicated to XRP's market performance. The page boldly stated that the Company is "committed to the long term health and stability of XRP markets."  The page also displays Ripple's market capitalization and the value of each XRP security in U.S. Dollars.

35.     Defendants have also conflated the Company's software products with XRP in order to increase the value of XRP.  Ripple develops software for financial institutions and payment providers that attempt, among other things, to minimize liquidity costs, known as xCurrent, xRapid, and xVia.  xCurrent is "Ripple's enterprise software solution that enables banks to instantly settle cross-border payments with end-to-end tracking.  Using xCurrent, banks message each other in real-time to confirm payment details prior to initiating the transaction and to confirm delivery once it settles."  xVia "is for corporates, payment providers and banks who want to send payments across various networks using a standard interface."  Neither xCurrent nor xVia require the use of XRP.[2]

---

[2] The only product that actually needs XRP is xRapid.  xRapid is supposedly "for payment providers and other financial institutions who want to minimize liquidity costs while improving their customer experience.  Because payments into emerging markets often require pre-funded

36.     For instance, on June 28, 2017, defendant Garlinghouse participated in an interview on CNBC.  During the interview, defendant Garlinghouse discussed why XRP was "a more stable digital asset."   In among other things, defendant Garlinghouse highlighted the payment technology that Ripple was working on.  In doing so, defendant Garlinghouse again conflated the value of XRP with software Ripple was developing.   To make matters worse, Ripple than retweeted a portion of that interview that was originally tweeted by the CNBC reporter.

37.     During a Bloomberg News Network interview, defendant Garlinghouse stated that "the reason why XRP has performed so well this year, we're solving a real problem, it's a multitrillion-dollar problem around cross-border payments.  There is a lot of friction, its very slow its expensive, we're working with the institutions to deliver on that, so people have gotten excited.  We now have over 100 customers we've announced publicly."  This discussion, of course, conflated XRP, the security, with the customers using Ripple's products.  Defendant Garlinghouse doubled down on this confusion later in the interview, stating "at the end of the day the value of digital assets will be driven by their utility.  If they are solving a real problem, and that problem has scale, and that problem, you know there is real value there, then there will be demand for the tokens and the price will go up.  For XRP we have seen because *it's required,* it's something that can really reduce the friction, and we're talking about a multitrillion-dollar problem in how cross-border payments flow.  And so, I think if you drive real utility, yes there's going to be demand for that."  "XRP is up 100x this year, and I think it's because the problem we are solving people realize is a real problem, it's a big problem."

38.     Articles about Ripple's software products often cause a rise in the price of XRP, even though the two are not linked.  Defendants have fostered this confusion through their own statements and "retweets."  For instance, on May 3, 2017, Ripple quote tweeted an article from Nasdaq.com, stating "Ripple adoption is sparking interested in XRP, 'which had an impressive local currency accounts around the world, liquidity costs are high. xRapid dramatically lowers the capital requirements for liquidity."

1  rally in the last two months.'"  The quoted article discussed how financial institutions were

2  adopting Ripple's software products, which "in turn, has sparked interest in Ripple's digital

3  currency."  Instead of explaining the difference, defendants, in quote tweeting the article,

4  continued to give off the incorrect impression about the link between the products and security.

5      39.     Similarly, on May 16, 2017, Ripple tweeted a quote from an article about XRP's

6  market capitalization, stating, "The appeal that Ripple has towards traditional financial

7  institutions is a big advantage it has over Bitcoin."  However, this article confused Ripple's

8  software solutions with the value of XRP, a confusion fostered by Ripple's quoted tweet.

9      40.     Defendants fought back against articles and writers that attempted to unlink XRP

10  from Ripple's other products.  On January 4, 2018, *The New York Times* published an article by

11  Nathaniel Popper ("Popper") titled: "Rise of Bitcoin Competitor Ripple Creates Wealth to Rival

12  Zuckerberg."

13      41.     Popper tweeted a follow-up about his article, stating, "over the last day, I've asked

14  several people close to banks if banks are indeed planning to begin using Ripple's token, XRP, in

15  a serious way, which is what investors seem to assume when they buy in at the current XRP

16  prices.  This is a sampling of what I heard back:

17  •  Actual use of XRP by banks is not something I've heard about, I find the
18     run up absolutely baffling, as do all the blockchain folks I know at large
       FIs.

19  •  XRP isn't used for anything.  The hope is that someday it will be by banks,
20     but there really aren't banks signaling that yet.

21  •  I would be surprised if there have been any real bank to bank transactions
22     done with it (outside of maybe test transactions), despite people making
       claims to the contrary.

23  •  It's not clear to me why XRP would be used by banks at all.  XRP could
24     potentially be adopted by consumers as a payment rail, although they don't
       yet have meaningful traction in that regard.

25  •  I haven't seen a sufficiently large catalyst in the fundamentals of Ripple to
26     justify a greater than 10x move in the price of $XRP over the last month.

27  •  In a few years we're going to look back on 2017 and think WTF were we
28     thinking."

42.     Defendant Garlinghouse responded by tweeting: "Over the last few months I've spoken with ACTUAL banks and payment providers.  They are indeed planning to use xRapid (our XRP liquidity product) in a serious way...."  Ripple's XRP product manager, tweeted: "Do you think I left #Bitcoin and joined @Ripple to build bank software?  Think again.  $XRP."

43.     Accordingly, as shown above, the defendants acted on behalf of the common enterprise, with the expectation of increase the value of XRP, and thus causing a profit.

### CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this class action individually and on behalf of all California citizens who purchased or otherwise acquired XRP from January 1, 2013 to the present (the "Class").  Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

45.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  XRP owners and other members of the Class may be identified from records maintained by Ripple and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.

46.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct, as complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

48.     There are no unique defenses that may be asserted against plaintiff individually, as distinguished from the other members of the Class.  Plaintiff has no interest that is in conflict with, or is antagonistic to, the interests of the members of the Class, and has no conflict with any

1  other members of the Class. Plaintiff has retained competent counsel experienced in securities,

2  consumer protection, and Class action litigation to represent himself and the Class.

3      49.     Common questions of law and fact exist as to all members of the Class and

4  predominate over any questions solely affecting individual members of the Class. Among the

5  questions of law and fact common to the Class are:

6              (a)    whether XRP are securities;

7              (b)    whether defendants violated the California Corporations Code; and

8              (c)    to what extent the members of the Class have sustained damages and the

9  proper measure of damages.

10     50.     A class action is superior to all other available methods for the fair and efficient

11 adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

12 the damages suffered by individual Class members may be relatively small, the expense and

13 burden of individual litigation make it impossible for members of the Class to individually

14 redress the wrongs done to them. There will be no difficulty in the management of this action as

15 a class action.

16                          **FIRST CAUSE OF ACTION**

17  **Against All Defendants and Does 1-25 for the Unregistered Offer and Sale of
    Securities in Violation of California Corporations Code Sections 25110 and 25503**

18

19     51.     Plaintiff incorporates by reference and realleges each and every allegation

20 contained above, as though fully set forth herein.

21     52.     This Cause of Action is brought pursuant to California Corporations Code

22 sections 25110 and 25503, on behalf of the Class, against all defendants.

23     53.     XRP are securities within the meaning of the California Corporations Code.

24     54.     No registration statements have been filed with any state or federal government

25 entity or have been in effect with respect to any of the offerings alleged herein.

26     55.     Defendants and each of them, by engaging in the conduct described above within

27 California, directly or indirectly, sold and offered to sell the unregistered securities.

28

56. Plaintiff and members of the Class purchased XRP securities from defendants.

57. By reason of the foregoing, each of the defendants have violated sections and 25110 and 25503 of the California Corporations Code.

58. As a direct and proximate result of defendants' unregistered sale of securities, plaintiff and members of the Class have suffered damages in connection with their respective purchases of XRP securities.

## SECOND CAUSE OF ACTION
### Against Defendants Ripple, Garlinghouse, and Does 1-25
### for Violation of Section 25504 of the California Corporations Code

59. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60. This Cause of Action is brought pursuant to California Corporations Code section 25504, on behalf of the Class, against all defendants.

61. Defendants Ripple and Garlinghouse were control persons within the meaning of section 25504 of the California Corporations Code. In particular, defendant Ripple was a control person by virtue of agency and ownership of XRP II. Defendant Garlinghouse was a control person by virtue of his position as an officer of Ripple and/or authorized representative of the other defendants. Defendants Ripple and Garlinghouse each had the power and influence and exercised the same to cause the unlawful offer and sale of XRP securities as described herein.

62. Defendants Ripple and Garlinghouse, separately or together, have sufficient influence to have caused XRP II and/or Ripple to submit a registration statement.

63. Defendants Ripple and Garlinghouse, separately or together, jointly participated in, and/or aided and abetted, XRP II and/or Ripple failure to register XRP.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment on his behalf and that of the Class as follows:

A. Under section 382 of the California Code of Civil Procedure, certifying this as a Class action, appointing plaintiff as a Class representative under California Rule of Court 3.764,

1   and appointing plaintiff's counsel as Class counsel;

2           B.      Awarding damages in favor of plaintiff and the Class against all defendants,

3   jointly and severally, in an amount to be proven at trial, including interest thereon;

4           C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in

5   this action, including counsel fees and expert fees;

6           D.      Awarding rescission or a rescissory measure of damages; and

7           E.      Awarding equitable, injunctive or other relief, including disgorgement or

8   restitution, as deemed appropriate by the Court.

9                                   **JURY DEMAND**

10          Plaintiff demands trial by jury.

11  Dated: June 5, 2018                          ROBBINS ARROYO LLP
12                                               BRIAN J. ROBBINS
                                                 STEPHEN J. ODDO
13                                               ERIC M. CARRINO

14
15                                               BRIAN J. ROBBINS
16
                                                 600 B Street, Suite 1900
17                                               San Diego, CA 92101
                                                 Telephone: (619) 525-3990
18                                               Facsimile: (619) 525-3991
                                                 E-mail: brobbins@robbinsarroyo.com
19                                                       soddo@robbinsarroyo.com
                                                         ecarrino@robbinsarroyo.com
20
21                                               ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
22                                               SHAWN A. WILLIAMS (213113)
                                                 Post Montgomery Center
23                                               One Montgomery Street, Suite 1800
                                                 San Francisco, CA  94104
24                                               Telephone: (415) 288-4545
                                                 Facsimile: (415) 288-4534
25                                               E-mail: shawnw@rgrdlaw.com

26                                               DAVID C. WALTON (167268)
                                                 BRIAN O. O'MARA (229737)
27                                               BRIAN E. COCHRAN (286202)
28                                               655 West Broadway, Suite 1900

- 13 -
CLASS ACTION COMPLAINT

San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
E-mail: davew@rgrdlaw.com
        bomara@rgrdlaw.com
        lolts@rgrdlaw.com
        bcochran@rgrdlaw.com

Attorneys for Plaintiff

1268543

CLASS ACTION COMPLAINT