1  PETER B. MORRISON (SBN 230148)
   peter.morrison@skadden.com
2  VIRGINIA F. MILSTEAD (SBN 234578)
   virginia.milstead@skadden.com
3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Suite 3400
4  Los Angeles, California 90071
   Telephone: (213) 687-5000
5  Facsimile:  (213) 687-5600

6  JOHN NEUKOM (SBN 275887)
   john.neukom@skadden.com
7  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   525 University Avenue, Suite 1400
8  Palo Alto, California 94301
   Telephone: (650) 470-4500
9  Facsimile:  (650) 470-4570

10 Attorneys for Defendants
   Ripple Labs Inc., XRP II, LLC, Bradley
11 Garlinghouse, Christian Larsen, Ron Will,
   Antoinette O'Gorman, Eric van Miltenburg,
12 Susan Athey, Zoe Cruz, Ken Kurson, Ben
   Lawsky, Anja Manuel, and Takashi Okita
13

14              UNITED STATES DISTRICT COURT

15         FOR THE NORTHERN DISTRICT OF CALIFORNIA

16
   AVNER  GREENWALD,  individually  and  on   )   CASE NO.: 4:18-cv-04790-PJH
17 behalf of all others similarly situated,    )
                                               )   **(1) MEMORANDUM OF POINTS AND**
18                              Plaintiff,      )   **AUTHORITIES IN OPPOSITION TO**
                                               )   **PLAINTIFF'S MOTION TO REMAND;**
19            v.                                )
                                               )   **(2) DECLARATION OF VIRGINIA F.**
20 RIPPLE LABS INC., et al.,                    )   **MILSTEAD IN SUPPORT THEREOF**
                                               )   **(filed under separate cover); and**
21                              Defendants.     )
                                               )   **(3) [PROPOSED] ORDER (filed under**
22                                             )   **separate cover).**
                                               )
23                                             )   Date:      October 24, 2018
                                               )   Time:      9:00 a.m.
24                                             )   Courtroom: 3
                                               )   Judge:     Hon. Phyllis J. Hamilton
25
26
27
28

OPPOSITION TO MOTION TO REMAND                              4:18-cv-04790-PJH

1

## **TABLE OF CONTENTS**

ISSUES TO BE DECIDED ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................... 1

I.      PRELIMINARY STATEMENT ....................................................... 1

II.     FACTUAL BACKGROUND ........................................................... 3

III.    DEFENDANTS PROPERLY REMOVED THIS ACTION PURSUANT TO CAFA ................................................................ 5

IV.     NEITHER SECTION 22(a) NOR LUTHER PREVENTS REMOVAL HERE ........................................................................ 7

        A.      Luther Is Not Binding Because It Did Not Consider Alienage Jurisdiction ............................................... 7

                1.      Alienage Jurisdiction Rests On Uniquely Federal Concerns .............. 8

                2.      CAFA And This Case Directly Implicate The Concerns Underlying Alienage Jurisdiction ..................................... 10

                3.      The Policies Behind Alienage Jurisdiction Render Luther Inapposite ................................................ 14

        B.      The Plain Language Of CAFA Permits Removal Despite Section 22(a) ......................................................... 17

        C.      Luther Was Wrongly Decided And Should Be Limited Or Reconsidered ........................................ 20

V.      PLAINTIFF'S ARGUMENTS ABOUT EFFICIENCY DO NOT JUSTIFY REMAND .......................................................... 23

VI.     CONCLUSION .............................................................................. 24

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2

### CASES

3  17th Street Associates, LLP v. Markel International Insurance Company,
        373 F. Supp. 2d 584 (E.D. Va. 2005) ........................................................ 9, 10, 14
4
   Blausey v. United States Trustee,
5        552 F.3d 1124 (9th Cir. 2009) ...................................................................... 22

6  California Public Employees' Retirement System v. WorldCom, Inc.,
        368 F.3d 86 (2d Cir. 2004) ................................................................ 18, 19, 21
7
   Cobalt Partners, LP v. Sunedison, Inc.,
8        No. C 16-02263 WHA,
         2016 WL 4488181 (N.D. Cal. Aug. 26, 2016) ................................................ 16
9
   Coffey v. Ripple Labs Inc.,
10       No. 18-cv-03286-PJH,
         2018 WL 3812076 (N.D. Cal. Aug. 10, 2018) ........................................... passim
11
   Commodity Futures Trading Commission v. McDonnell,
12       287 F. Supp. 3d 213 (E.D.N.Y. 2018),
         reconsideration denied, No. 18-CV-361,
13       2018 WL 3435047 (E.D.N.Y. July 16, 2018) ................................................... 4

14 Cyan, Inc. v. Beaver County Employees Retirement Fund,
        138 S. Ct. 1061 (2018) ................................................................................... 7
15
   Dart Cherokee Basin Operating Co. v. Owens,
16       135 S. Ct. 547 (2014) ............................................................................... 1, 20

17 Duncan v. Walker,
        533 U.S. 167 (2001) ..................................................................................... 18
18
   Favour Mind Ltd. v. Pacific Shoes, Inc.,
19       No. 98 Civ. 7038 (SAS),
         1999 WL 1115217 (S.D.N.Y. Dec. 7, 1999) ........................................ 9, 12, 14
20
   FDIC v. Countrywide Financial Corp.,
21       No. 11-CV-10400-MRP-MANx,
         2012 WL 12897152 (C.D. Cal. Mar. 20, 2012) .............................................. 19
22
   Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc.,
23       Nos. 10-3039 SC, 10-3045 SC,
         2010 WL 5394742 (N.D. Cal. Dec. 20, 2010) ................................................ 17
24
   Holt v. Noble House Hotels & Resort, Ltd.,
25       No. 17cv2246-MMA (BLM),
         2018 WL 539176 (S.D. Cal. Jan. 23, 2018) ..................................................... 7
26
   Jordan v. Nationstar Mortgage LLC,
27       781 F.3d 1178 (9th Cir. 2015) ...................................................................... 20

28 JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,
        536 U.S. 88 (2002) ......................................................................................... 9

ii

Katz v. Gerardi,
    552 F.3d 558 (7th Cir. 2009) ............................................................. 17,  21, 22, 23

Koehler v. Bank of Bermuda (New York), Ltd.,
    229 F.3d 187 (2d Cir. 2000).................................................................................... 9

Life of the South Insurance Co. v. Carzell,
    851 F.3d 1341 (11th Cir. 2017) ............................................................................ 10

Luther v. Countrywide Home Loans Servicing LP,
    533 F.3d 1031 (9th Cir. 2008) ...................................................................... passim

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,
    547 U.S. 71 (2006)................................................................................................ 12

Morrison v. National Australia Bank Ltd.,
    561 U.S. 247 (2010)........................................................................................ 12, 16

New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4,
    581 F. Supp. 2d 581 (S.D.N.Y. 2008)............................................................ passim

Pacific Life Insurance Co. v. J.P. Morgan Chase & Co.,
    No. SA CV 03-813GLT(ANX),
    2003 WL 22025158 (C.D. Cal. June 30, 2003) ................................................... 19

Passarella v. Ginn Co.,
    637 F. Supp. 2d 353 (D.S.C. 2009)........................................................... 21, 22, 23

Phillips Petroleum Co. v. Shutts,
    472 U.S. 797 (1985)............................................................................................. 11

Public Employees' Retirement System of Mississippi v. Morgan Stanley,
    605 F. Supp. 2d 1073 (C.D. Cal. 2009) ............................................................... 20

Radzanower v. Touche Rosss & Co.,
    426 U.S. 148 (1976)................................................................................... 15, 16, 17

Standard Fire Insurance Co. v. Knowles,
    568 U.S. 588 (2013)............................................................................................... 2

United States. v. Curtiss-Wright Export Corp.,
    299 U.S. 304 (1936)............................................................................................... 3

United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial &
    Service Workers International Union v. Shell Oil Co.,
    602 F.3d 1087 (9th Cir. 2010) ............................................................................... 2

In re Vivendi Universal, S.A.,
    242 F.R.D. 76 (S.D.N.Y. 2007),
    aff'd, 838 F.3d 223 (2d Cir. 2016)....................................................................... 11

**STATUTES**

15 U.S.C. § 77b(a)(7)............................................................................................... 10

15 U.S.C. § 77p(f)(3) .......................................................................................... 7, 17

1   15 U.S.C. § 77v(a) ........................................................................................ 1, 7

2   15 U.S.C. § 77z-1(a)(1) ..................................................................................... 12

3   28 U.S.C. § 1332 ......................................................................................... passim

4   28 U.S.C. § 1441 ................................................................................. 18, 19, 22

5   28 U.S.C. § 1453 ......................................................................................... passim

6   28 U.S.C. § 1711 ............................................................................................... 12

7   28 U.S.C. § 1714 ............................................................................................... 12

8   U.S. Constitution, article III, § 2 ....................................................................... 8

9   Pub. L. No. 109-2, 119 Stat. 4, § 2 .................................................................. 10

10                              **OTHER AUTHORITIES**

11   Debra Lyn Bassett, U.S. Class Actions Go Global:  Transnational Class Actions and
12        Personal Jurisdiction, 72 Fordham L. Rev. 41 (2003) ......................................... 11

     E. Merrick Dodd, Jr., Amending the Securities Act—The American Bar Ass'n Committee's
13        Proposals, 45 Yale L. J. 199 (1935)................................................................. 15

14   Felix Frankfurter, Distribution of Judicial Power of Federal and State Courts, 13 Cornell L.
15        Q. 499 (1928) ....................................................................................................... 16

     James M. Landis, Legislative History of the Securities Act of 1933, 28 Geo. Wash. L. Rev.
16        29 (1959) ................................................................................................................ 16

17   2 McLaughlin on Class Actions § 12:6 (14th ed. 2017) ................................... 22

18   15 Moore's Federal Practice - Civil § 102.73 (2018) ....................................... 10

19   16 Moore's Federal Practice - Scope of Removal § 107.9[1][b] (2018) ........................ 20

20

21

22

23

24

25

26

27

28

1   Defendants Ripple Labs Inc. ("Ripple"), XRP II, LLC ("XRP II"), Bradley Garlinghouse,

2  Christian Larsen, Ron Will, Antoinette O'Gorman, Eric van Miltenburg, Susan Athey, Zoe Cruz,

3  Ken Kurson, Ben Lawsky, Anja Manuel, and Takashi Okita (collectively, "Individual Defendants,"

4  and with Ripple and XRP II, "Defendants") respectfully submit this Opposition to Plaintiff's

5  Motion to Remand ("Motion" or "Mot.") (ECF No. 15).

6   **ISSUES TO BE DECIDED**

7   1.   Whether Plaintiff's Motion should be denied because this action, asserting claims

8  under the Securities Act of 1933, was properly removed under alienage provisions of the Class

9  Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1453?

10   2.   Whether Plaintiff's Motion should be denied because the decision in <u>Luther v.</u>

11  <u>Countrywide Home Loans Servicing LP</u>, 533 F.3d 1031 (9th Cir. 2008), upon which Plaintiff

12  principally relies, (i) is distinguishable, as the instant case invokes alienage jurisdiction while

13  <u>Luther</u> only involved minimal diversity; and/or (ii) should be limited or reconsidered because it is

14  clearly irreconcilable with the United States Supreme Court decision in <u>Dart Cherokee Basin</u>

15  <u>Operating Co. v. Owens</u>, 135 S. Ct. 547 (2014), and/or subsequent court of appeals and district

16  court authority?

17   3.   Whether Section 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

18  § 77v(a), bars removal under CAFA of international class actions asserting only violations of the

19  Securities Act?

20   **MEMORANDUM OF POINTS AND AUTHORITIES**

21  **I.   PRELIMINARY STATEMENT**

22   This putative class action ("Action") concerns Defendants' alleged sales of a virtual

23  currency—XRP—"to the general public through global, online cryptocurrency exchanges."

24  (Compl. ¶ 79 (ECF No. 1-1).)  Raising a misguided theory that XRP is a "security" under federal

25  securities law, Plaintiff, a citizen of Israel who allegedly engaged in unspecified purchases and

26  sales of XRP between December 14, 2017 and May 12, 2018 (Compl. ¶ 14), filed this Action in the

27  Superior Court of California, County of San Mateo.  Plaintiff alleges violations of the registration

28  requirements of the federal Securities Act purportedly on behalf of a global class comprised of all

OPPOSITION TO MOTION TO REMAND                                    4:18-cv-04790-PJH

1    purchasers of XRP since July 3, 2015.  (Compl. ¶ 2.)  Because this far-reaching, international class

2    action is exactly the type of litigation for which Congress sought to ensure a federal forum through

3    CAFA, Defendants removed this Action to this Court pursuant to CAFA's express provisions.

4    (ECF No. 1); see 28 U.S.C. §§ 1332(d), 1453(b); Standard Fire Ins. Co. v. Knowles, 568 U.S. 588,

5    595 (2013) (observing that CAFA's "primary objective" was to ensure "'Federal court

6    consideration of interstate cases of national importance'").[1]

7         Plaintiff does not, and cannot, dispute that the requirements for CAFA removal are satisfied

8    here.  CAFA confers federal jurisdiction and authorizes removal if the class has more than 100

9    members, at least one member of a plaintiff class is a citizen of a foreign country or a citizen of a

10   different state from a defendant, and the amount in controversy exceeds $5 million.  See United

11   Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Shell

12   Oil Co., 602 F.3d 1087, 1089 (9th Cir. 2010); 28 U.S.C. §§ 1332(d), 1453(b).  This Action,

13   purportedly brought on behalf of "thousands" across the world and placing at least $167.7 million

14   in controversy, satisfies CAFA's requirements.  (Compl. ¶¶ 52, 89.)

15        Instead, Plaintiff argues that Luther v. Countrywide Home Loans Servicing LP, 533 F.3d

16   1031 (9th Cir. 2008), concluded that Section 22(a) of the Securities Act ("Section 22(a)"), which

17   bars removal of cases arising under the Securities Act, "trumps" CAFA's express grant of removal

18   authority and forecloses removal of any case alleging violations of the Securities Act, no matter

19   what the statutory basis for removal.  (Mot. 3:1.)  Plaintiff is wrong.  Luther involved a removal

20   based on minimum diversity jurisdiction under CAFA, where the only policy informing the court's

21   reasoning was CAFA's provision for "removal of high-dollar class actions."  Luther, 533 F.3d at

22   1034.  However, this Action invokes minimum *alienage* jurisdiction—jurisdiction arising because

23   Plaintiff and members of the class are citizens of foreign countries and some Defendants, as

24   alleged, are citizens of California, while Plaintiff fails to allege the citizenship of several

25   Defendants.  28 U.S.C. § 1332(d)(2)(B).  Luther did not address the interplay between CAFA's

26   alienage jurisdiction provision and Section 22(a) and Plaintiff cites *no case* where a foreign citizen

27   invoked Section 22(a)'s removal bar to prevent removal of a case based on alienage jurisdiction.

28   _____

[1] All emphasis is added and citations are omitted unless otherwise indicated.

1      As explained below, Part IV.A.1, alienage jurisdiction is analytically distinct from diversity

2 jurisdiction and rests on separate and important foreign policy concerns.  Both the historical

3 purpose of alienage jurisdiction and the purpose of CAFA in expanding it are to ensure a federal

4 forum for actions involving foreign citizens.  Such actions, especially the far-reaching class actions

5 covered by CAFA, inherently affect foreign relations and are therefore of national, not local,

6 importance.  See United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 317 (1936) (holding

7 that the federal government has the sole power to affect foreign relations).  This Action in

8 particular, involving "issues of first impression regarding the federal securities laws applicability to

9 a nascent technology," Coffey v. Ripple Labs Inc., 2018 WL 3812076, at *7 (N.D. Cal. Aug. 10,

10 2018), raised on behalf of alleged purchasers of XRP around the world—including in countries that

11 are developing their own laws to address virtual currencies—squarely raises the foreign relations

12 concerns at the heart of alienage jurisdiction.  Luther did not present or address the circumstance

13 where the distinct federal policies of alienage jurisdiction would be frustrated by application of

14 Section 22(a).  As such, neither its reasoning nor its holding forecloses removal here.

15      Aside from Luther's interpretation of the Section 22(a) removal bar, Plaintiff has provided

16 no other basis for remanding this Action.  As this Court recently concluded in its thorough analysis

17 in Coffey, the plain language of CAFA's removal statute includes only three express, specific, and

18 enumerated exceptions to removal authority.  See Coffey, 2018 WL 3812076, at *6-10.  CAFA

19 thus prohibits removal only of cases falling within one of those three exceptions, id., none of which

20 applies here.  The reasoning of this Court's decision in Coffey on this score is fully applicable here.

21      Finally, should the Court nonetheless find that Luther governs (it should not), Defendants

22 respectfully submit that the decision in Luther is clearly irreconcilable with subsequent United

23 States Supreme Court and other court of appeal and district court decisions.  Luther, therefore,

24 should be limited to the narrow question it addressed—whether cases asserting only Securities Act

25 claims can be removed under CAFA's minimal diversity provisions—or Luther should be

26 reconsidered.  The Court should deny Plaintiff's Motion.

27 **II.   FACTUAL BACKGROUND**

28      Defendant Ripple was incorporated in Delaware and is currently headquartered in San

1    Francisco, California.  (Compl. ¶ 15.)  "Ripple provides one frictionless experience to send money

2    globally using the power of blockchain.  By joining Ripple's growing, global network, financial

3    institutions can process their customers' payments anywhere in the world instantly, reliably and

4    cost-effectively.  Banks and payment providers can use the digital asset XRP to further reduce their

5    costs and access new markets."  (Ex. 1.)[2]  Defendant XRP II is a subsidiary of Ripple, also

6    headquartered in San Francisco, California.  (Compl. ¶ 16.)  The Individual Defendants are alleged

7    to be directors and officers of Ripple.  (Id. ¶¶ 17-27.)

8          Virtual currencies are generally defined as "'digital assets used as a medium of exchange.'"

9    Commodity Futures Trading Comm'n v. McDonnell, 287 F. Supp. 3d 213, 218 (E.D.N.Y. 2018).

10   "They are stored electronically in 'digital wallets' and exchanged over the internet through a direct

11   peer-to-peer system" called a "blockchain."  Id.  As one court, concluding that a virtual currency is

12   a "commodity" (not a security) within the regulatory purview of the Commodity Futures Trading

13   Commission, described it:

14              The "blockchain" serves as a digital signature to verify the exchange.
                "The public nature of the decentralized ledger allows people to
15              recognize the transfer of virtual currency from one user to another
                without requiring any central intermediary in which both users need
16              to trust."  Some experts believe blockchain technology underlying
                virtual currencies will serve to "enhance [future] economic
17              efficiency" and have a "broad and lasting impact on global financial
                markets in payments, banking, securities settlement, title recording,
18              cyber security and trade reporting and analysis."

19   Id. (alteration in original).  The digital asset XRP, which Ripple customers consisting of banks and

20   payment providers can use as a "reliable, on-demand option to source liquidity for cross-border

21   payments" (Ex. 2), is built on open-source blockchain technology and is a form of virtual currency.

22   In fact, both the U.S. Department of Justice and the Financial Crimes Enforcement Network, a

23   bureau of the U.S. Department of Treasury, have previously concluded that XRP is a virtual

24   currency subject to Bank Secrecy Act regulations.  (Ex. 3 ¶¶ 17-19.)

25         Plaintiff alleges Ripple created 100 billion XRP in 2013 and that "[f]rom 2013 to the

26   present" Defendants have "engaged in an ongoing scheme to sell XRP to the general public."

27

28   [2] All references to "Ex." refer to exhibits attached to the Declaration of Virginia F. Milstead, filed
     concurrently herewith.

OPPOSITION TO MOTION TO REMAND                                          4:18-cv-04790-PJH

1    (Compl. ¶¶ 29, 38.)   Plaintiff further alleges that "Defendants sold XRP to the general public

2    through global, online cryptocurrency exchanges" and that "XRP can be bought or sold on over 50

3    exchanges."   (Id. ¶ 79.)   Between December 14, 2017 and May 12, 2018, Plaintiff allegedly

4    "bought and sold XRP in both USD and Bitcoin" in unspecified transactions.   (Id. ¶ 14.)   Plaintiff

5    does not allege that he lacked information about the nature of these transactions or that Defendants'

6    alleged activities were in any way inconsistent with the Department of Justice and Department of

7    Treasury's prior determinations involving XRP.   Nevertheless, Plaintiff claims that he was

8    somehow injured because Defendants were allegedly required to register XRP as a "security" with

9    the Securities & Exchange Commission ("SEC") but failed to do so. (Id. ¶ 37.)

10          On July 3, 2018, Plaintiff filed this putative class action in the Superior Court of California,

11   San Mateo County, the fourth of its kind, purportedly on behalf of "all investors who purchased"

12   XRP "on or after July 3, 2015 and were damaged thereby."   (Id. ¶ 2.)   Plaintiff alleges that

13   Defendants violated Sections 5, 12(a)(1), and 15 of the Securities Act—statutes respectively

14   governing the registration and sale of securities and imposing "control person" liability on violators

15   of securities laws.   (Id. ¶¶ 94-110.)   Plaintiff seeks, among other things, rescission of all XRP

16   purchases, damages, and a constructive trust over the proceeds of Defendants' alleged sales of

17   XRP.   (Id. at 21.)   On August 8, 2018, Defendants timely removed this Action to this Court

18   pursuant to CAFA.

19   **III.     DEFENDANTS PROPERLY REMOVED THIS ACTION PURSUANT TO CAFA**

20          CAFA amended the diversity and alienage jurisdiction statute by adding 28 U.S.C.

21   § 1332(d) and created a separate statutory provision authorizing removal of class actions meeting

22   the requirements of Section 1332(d).   See 28 U.S.C. § 1453(b).   Under CAFA, a putative class

23   action may be removed to the appropriate federal district court if (1) the action purports to be a

24   "class" action brought on behalf of 100 or more members; (2) any member of a class of plaintiffs is

25   a citizen of a state different from any defendant, or any member of a plaintiff class is a citizen of a

26   foreign country and any defendant is a citizen of a state (or vice versa); and (3) the amount in

27   controversy exceeds $5 million.   See 28 U.S.C. §§ 1332(d)(2), (d)(5)(B), 1453(b).   In his Motion,

28   Plaintiff does not dispute that this Action meets every one of these three requirements.

1       ***Class Exceeds 100 Members.***  First, this is an alleged class action brought on behalf of over

2   100 members.  Plaintiff purports to assert claims on behalf of a "class" consisting of "thousands of

3   members."  (Compl. ¶¶ 87, 89.)  That well exceeds the requirements of CAFA.  <u>See</u> 28 U.S.C.

4   § 1332(d)(1)(B), (5)(B).

5       ***Alienage.***  Second, alienage jurisdiction exists (i.e., at least one class member plaintiff is a

6   foreign citizen and at least one defendant is a U.S. citizen), which satisfies Section 1332(d)(2).  On

7   the one hand, at least three of the Defendants are allegedly citizens of California.  (Compl. ¶¶ 15-

8   27.)  On the other hand, there are members of the putative class who are citizens of foreign

9   countries.  Plaintiff himself is a resident and citizen of Israel.  (Compl. ¶ 14; <u>see also</u> Mot. 5:1-11

10  (acknowledging Plaintiff's foreign citizenship).)

11       Plaintiff purports to bring this Action on behalf of an international class.  The Complaint

12  describes a putative class of "all persons or entities who purchased XRP from July 3, 2015 through

13  the present" without any geographic limitation.  (Compl. ¶ 87.)  The Complaint further alleges that

14  Defendants have sold XRP to putative class members on "global, online cryptocurrency

15  exchanges," which are accessible on the internet and therefore throughout the U.S. and the world.

16  (Compl. ¶¶ 78-79; <u>see also</u> <u>id.</u> ¶ 41 (describing "50 worldwide" exchanges).)  Additionally, the

17  Complaint alleges that "[b]y way of the internet, including Ripple Labs' website, Twitter, and the

18  over 50 cryptocurrency exchanges that trade XRP, interstate means are used in connection with the

19  offer and sale of XRP."  (Compl. ¶ 77.)  Given these allegations, it is clear that the putative class

20  includes citizens of foreign countries, including Plaintiff himself, satisfying CAFA's alienage

21  requirements.  <u>See</u> 28 U.S.C. § 1332(d)(2)(B).

22       ***Amount in Controversy.***  Third, this Action meets CAFA's amount-in-controversy

23  requirement of $5 million. 28 U.S.C. § 1332(d)(6).  Among other things, Plaintiff seeks the

24  rescission of Defendants' alleged sales of XRP to putative class members (Compl. at 21(C)) and

25  alleges that in the first quarter of 2018 alone, "Defendants sold at least $167.7 million worth of

26  XRP." (Compl. ¶ 52.)  If all such sales were rescinded, the amount in controversy would exceed

27  $5 million.  While Defendants strongly deny that Plaintiff or any putative class members are

28  entitled to recover any amount (or any other relief), Plaintiff plainly seeks to recover an aggregate

1   amount over $5 million.  See also Compl. at 21(G) (seeking constructive trust); Compl. ¶ 52

2   ($167.7 million); Holt v. Noble House Hotels & Resort, Ltd., 2018 WL 539176, at *4 (S.D. Cal.

3   Jan. 23, 2018) (considering amount over which plaintiff sought a constructive trust and

4   disgorgement in assessing amount in controversy).

5       **Exceptions.**  None of the exceptions to removal set forth in CAFA applies to bar removal

6   here.  This Action does not (i) involve a "covered security," as defined by 15 U.S.C. § 77p(f)(3);

7   (ii) relate to the internal affairs or governance of a corporation and arise under the laws of the state

8   in which such corporation was formed; or (iii) relate to the rights, duties, and obligations relating to

9   or created by or pursuant to any security.  See 28 U.S.C. § 1453(d)(1)-(3).

10  **IV.   NEITHER SECTION 22(a) NOR LUTHER PREVENTS REMOVAL HERE**

11      **A.   Luther Is Not Binding Because It Did Not Consider Alienage Jurisdiction**

12      Plaintiff argues that, even though this Action meets the requirements for removal under

13  CAFA, Section 22(a) nevertheless bars removal.  (Mot. 2-3.)  Section 22(a) provides for concurrent

14  jurisdiction in state and federal courts over alleged violations of the Securities Act.  See 15 U.S.C.

15  § 77v(a).  It further provides, "no case arising under [the Securities Act] and brought in any State

16  court of competent jurisdiction shall be removed to any court of the United States."  15 U.S.C.

17  § 77v(a).  Plaintiff offers no textual analysis to explain why Section 22(a) provides an exception to

18  removal authority under CAFA.  Plaintiff's sole argument is that the decision of the United States

19  Court of Appeals for the Ninth Circuit in Luther v. Countrywide Home Loans Servicing LP, 533

20  F.3d 1031 (9th Cir. 2008), compels remand.  (Mot. 2:22-4:18.)[3]

21      In Luther, the plaintiff asserted claims only under the Securities Act.  See Luther, 533 F.3d

22  ---

[3] Plaintiff also argues that Cyan, Inc. v. Beaver County Emps. Ret. Fund, 138 S. Ct. 1061 (2018),
23  which concluded that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") did not
    provide a basis for removal of actions asserting solely Securities Act claims, somehow supports
24  remand here because "CAFA was not even raised as a potential source of defeating the removal
    ban" in Cyan.  (Mot. 2:12-16, 3 n.3.)  However, this Court previously concluded that Cyan has "no
25  bearing on removability under CAFA."  Coffey, 2018 WL 3812076, at *3.  Furthermore, contrary
    to Plaintiff's argument, Cyan's silence concerning CAFA is not "notabl[e]."  (Mot. 3 n.2.) The
26  defendants in Cyan **did not remove the action at all**; their argument was about the concurrent
    jurisdiction provision in Section 22(a).  The Court addressed removability under SLUSA only
27  because the federal government raised it as amicus curiae, and there is no reason the federal
    government would have raised removability under CAFA in that context.  See Cyan, 138 S. Ct. at
28  1069.  Cyan involved "covered securities" under SLUSA and thus fell within one of CAFA's
    express **exceptions to removal**.  Id. at 1076-78.

1  at 1032-33.  The court held that a class action brought in state court alleging only violations of the

2  Securities Act was not removable even though it met the requirements of CAFA because the

3  removal bar in Section 22(a) trumped CAFA.  Id. at 1034.  However, Luther involved a removal

4  based on minimum diversity between citizens of the United States.  See Luther, 533 F.3d at 1033-

5  34.  The Luther court did not address the situation where, as here, Defendants removed based on

6  CAFA *alienage* jurisdiction because the plaintiff was a citizen of a foreign country purporting to

7  sue on behalf of a worldwide class.  (See Compl. ¶¶ 14, 79; see also supra Part III.)  Indeed,

8  Plaintiff identifies *no case* (and Defendants have been unable to locate any) in which a foreign

9  citizen invoked Section 22(a)'s removal bar to prevent removal of a case based on alienage

10  jurisdiction.

11  Alienage jurisdiction implicates uniquely federal policy considerations that are present in

12  this case and that were not present in Luther.  The Luther court did not consider alienage

13  jurisdiction or its policy rationale when rendering its opinion, and, as a result, Luther's reasoning is

14  inapplicable.  Thus, while Defendants acknowledge that in Coffey, this Court stated that removal

15  based on a "Securities Act claim satisfying CAFA's requirements" was "likely a losing proposition

16  under Luther," Coffey, 2018 WL 3812076, at *4, Defendants respectfully submit that Luther is

17  distinguishable from this particular Action because Luther did not involve, and therefore did not

18  consider, alienage jurisdiction.  As such, Luther does not answer the question of whether Section

19  22(a) bars removal *here*.  Luther's holding should remain limited to its facts and should not be

20  expanded to the distinct circumstance of alienage jurisdiction.[4]

21  **1.  Alienage Jurisdiction Rests On Uniquely Federal Concerns**

22  Article III, Section 2 of the United States Constitution provides federal courts with

23  jurisdiction to hear cases and controversies between "a State, or the Citizens thereof, and foreign

24  States, Citizens or Subjects."  U.S. Const., art. III, § 2.  Although this so-called "alienage

25

_____

26  [4] Plaintiff also cites this Court's statement during argument on the plaintiff's motion to remand in Coffey that if the plaintiff had alleged solely claims arising out of the Securities Act, the Court
27  would have remanded the action.  (Declaration of John T. Jasnoch in Support of Plaintiff's Motion to Remand ("Jasnoch Decl.") Ex. A at 28:17-19.)  However, in Coffey, Defendants did not argue, and the Court did not consider, whether a removal based on alienage jurisdiction would affect its
28  analysis of whether Luther was binding.  See generally Coffey, 2018 WL 3812076.

OPPOSITION TO MOTION TO REMAND                                   4:18-cv-04790-PJH

1  jurisdiction" has often been coupled with diversity jurisdiction—both alienage and diversity

2  jurisdiction are included in the same statutory provision, 28 U.S.C. § 1332—"more exacting

3  scrutiny of the historical context in which alienage jurisdiction was conceived reveals that the

4  rationale underpinning [alienage] is distinct from diversity jurisdiction and that its purpose is to

5  protect peculiarly federal interests that federal courts were specifically designed to adjudicate."

6  17th St. Assoc., LLP v. Markel Int'l Ins. Co., 373 F. Supp. 2d 584, 603 (E.D. Va. 2005).

7      In particular, "during and after the Revolution, state courts were notoriously frosty to

8  British creditors trying to collect debts from American citizens," potentially in violation of the

9  1783 Treaty of Paris, which caused protests from the British Secretary of State.  JPMorgan Chase

10  Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88, 94-95 (2002).  "This penchant of the

11  state courts to disrupt international relations and discourage foreign investment led directly to the

12  alienage jurisdiction provided by Article III of the Constitution."  Id.  "[A]lienage jurisdiction was

13  necessary to 'avoid controversies with foreign powers' so that a single State's courts would not

14  'drag the whole community into war.'"  Id. at 96.

15      Reflecting the importance of these policies, the very first Congress enacted an alienage

16  jurisdiction statute.  See Traffic Stream, 536 U.S. at 96.  "In short, the Founding Generation

17  prioritized providing a federal forum in cases involving alien litigants because it was viewed as

18  central to the success and stability of the new Republic."  17th Street, 373 F. Supp. 2d at 604.

19  "[W]hile diversity jurisdiction guarantees non-diverse litigants a tribunal free from actual and

20  perceived prejudice, alienage jurisdiction additionally protects the Nation's economic and political

21  security and advances international comity and tranquility."  Id. at 605.

22      Modern authorities recognize that the original and distinct purpose of alienage jurisdiction

23  has endured.  See, e.g., Traffic Stream, 536 U.S. at 96; 17th Street, 373 F. Supp. 2d at 605 ("The

24  importance of these goals has only increased with time as both international relations and global

25  trade have become more complex and our nation has assumed a central role in both." (quoting

26  Koehler v. Bank of Bermuda (N.Y.) Ltd., 229 F.3d 187, 193 (2d Cir. 2000) (Sotomayor, J.,

27  dissenting))); Favour Mind Ltd. v. Pac. Shoes, Inc., 1999 WL 1115217, at *9 (S.D.N.Y. Dec. 7,

28  1999) ("Alienage jurisdiction recognizes that foreign states are prone to hold the nation as a whole

9

responsible for the treatment of [their] citizens.  Accordingly, legal actions involving citizens of a foreign state ought to be heard in a federal court which is more accountable to the nation than to regional political interests."); 15 Moore's Federal Practice - Civil § 102.73 (2018) ("Alienage jurisdiction was intended to provide the federal courts with a form of protective jurisdiction over matters implicating international relations, in which the national interest is paramount," including when "entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level.").  In fact, at least one court has concluded that because alienage jurisdiction "involves a peculiarly federal interest," it warrants "the elimination of the general presumption" against removal.  17th Street, 373 F. Supp. 2d at 602.

> **2.  CAFA And This Case Directly Implicate The Concerns Underlying Alienage Jurisdiction**

The purposes animating the inclusion of alienage jurisdiction in Article III of the Constitution are equally relevant when interpreting the expansion of alienage jurisdiction under CAFA.  See Life of the S. Ins. Co. v. Carzell, 851 F.3d 1341, 1347 (11th Cir. 2017) (discussing original purpose behind alienage jurisdiction—"to promote international relations by assuring other countries that litigation involving their nationals will be treated at the national level"—in the context of interpreting CAFA).  Just as it did with diversity jurisdiction, CAFA loosened the requirements for alienage jurisdiction for class actions involving more than $5 million and 100 putative class members to require only minimal, rather than complete, foreign citizenship among the parties.  Thus, CAFA authorizes original jurisdiction and removal whenever "any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State."  28 U.S.C. §§ 1332(d)(2)(B), 1453(a).  Congress's stated goals for CAFA are consistent with the federal policies underlying alienage jurisdiction:  to prevent individual state courts from making judgments that bind the entire country, to facilitate interstate (including international) commerce, and to "restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance."  Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4, § 2(a)(4)(C), (b)(2), (b)(3); cf. 15 U.S.C. § 77b(a)(7) (defining "interstate commerce" to include commerce with foreign countries).

Indeed, as the court in New Jersey Carpenters Vacation Fund v. HarborView Mortgage

OPPOSITION TO MOTION TO REMAND                                    4:18-cv-04790-PJH

Loan Trust 2006-4, 581 F. Supp. 2d 581, 583-84 (S.D.N.Y. 2008), noted, CAFA expanded jurisdiction not only for national class actions, but also for those that are "international in scope." As such, a "large, non-local securities class action dealing with a matter of national importance, the mortgage-backed securities crisis that is currently wreaking havoc with the national and ***international*** economy," was "exactly the type of case CAFA was concerned about." HarborView, 581 F. Supp. 2d at 587-88; see also id. at 585 (concluding that removal was appropriate under CAFA because the plaintiff's claims addressed "an issue of national, if not ***global***, importance").[5]

This Action squarely implicates the original purposes of alienage jurisdiction and CAFA's extension of it.  An international class action necessarily implicates foreign relations because it "requires an examination of potential international law and treaty obligations, a careful evaluation of the laws of the countries involved, and an examination of the potential cultural, linguistic, and logistical implications."  See Debra Lyn Bassett, U.S. Class Actions Go Global:  Transnational Class Actions and Personal Jurisdiction, 72 Fordham L. Rev. 41, 44 (2003).  For example, if a class is ultimately certified, the resulting judgment should preclude future claims by class members, including claims brought in foreign courts.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 805, 808 (1985).  However, whether and under what circumstances foreign courts will recognize the preclusive effect of a U.S. class action judgment is questionable.  See In re Vivendi Universal, S.A., 242 F.R.D. 76, 93-96 (S.D.N.Y. 2007) (collecting cases and examining the preclusive effect of U.S. judgments in various foreign courts).  If certified, this Action could thus raise conflicts with foreign countries regarding the ability of U.S. courts (even more so a California state court) to bind absent class members.  See Bassett, supra, at 81 (noting that "[c]arelessness and overreaching in asserting jurisdiction over foreign citizens [through the class action device] may cause offense or resentment in foreign countries").  Such complex considerations of foreign law and policy weigh in favor of adjudication in federal, not state, court.

Moreover, federal courts have robust procedural protections for absent class members that

---

[5] Plaintiff asks this Court to ignore HarborView because its conclusion—that cases asserting only Securities Act claims were removable under CAFA—is supposedly inconsistent with Luther. (Mot. 5 n.7.)  However, neither Luther nor Plaintiff disputes the HarborView court's explanation of the purposes behind CAFA.

1   California state court lacks.   In particular, CAFA itself provides "stricter scrutiny of counsel,

2   awards, and settlements."   HarborView, 581 F. Supp. 2d at 584; see also 28 U.S.C. §§ 1711-1715

3   (provisions of CAFA providing protections for class members).   For example, Section 1714 of

4   CAFA prohibits approval of "a proposed settlement that provides for the payment of greater sums

5   to some class members than to others solely on the basis that the class members to whom the

6   greater sums are to be paid are located in closer geographic proximity to the court"—a provision

7   that explicitly prevents prejudice to foreign citizens.   28 U.S.C. § 1714.   Also, the Private

8   Securities Litigation Reform Act ("PSLRA"), which applies to this Action, provides (i) a procedure

9   by which putative class members are notified of the suit and given an opportunity to seek

10  appointment as "lead plaintiff;" (ii) qualifications for the "lead plaintiff," appointment by the court

11  of the "lead plaintiff," and approval of his or her selection of counsel; (iii) a prohibition of the lead

12  plaintiff recovering more than the rest of the class; (iv) pubic filing of settlements; (v) limitations

13  on attorneys' fees; and (vi) particular notice requirements for any settlement.   See 15 U.S.C. § 77z-

14  1(a)(1) (applying these provisions to any class action brought pursuant to the Federal Rules of Civil

15  Procedure and arising under the Securities Act).   The availability of these protective procedures in

16  federal court enhances fairness to foreign class members, furthering the aim of alienage jurisdiction

17  of avoiding harm to foreign relations from state-court adjudication.   See Favour Mind, 1999 WL

18  1115217, at *9 (noting that alienage jurisdiction is intended to avoid a negative effect on foreign

19  relations from perceptions of unfair treatment of foreign citizens).[6]

20      Furthermore, the subject matter of this Action—raising "issues of first impression regarding

21  the federal securities laws applicability to a nascent technology," Coffey, 2018 WL 3812076, at

22  *7—squarely implicates foreign relations.   Courts have recognized that application of U.S.

23  securities laws to foreign investors raises issues for foreign relations.   See Morrison v. Nat'l

24  Australia Bank Ltd., 561 U.S. 247, 269-70 (2010) (describing complaints from foreign

---

25  [6] Even though these provisions are designed to protect the absent class members that Plaintiff
26  proposes to represent, Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006),
    Plaintiff wishes to avoid them by suing in state court.   This provides yet another reason that the
27  policies of CAFA are implicated here:  the "careful[] craft[ing]" of a complaint "to solely allege
    claims under the [Securities] Act to be able to invoke its anti-removal provision" and to "avoid
28  federal jurisdiction is one of the problems explicitly identified and targeted by CAFA."
    HarborView, 581 F. Supp. 2d at 586 n.7.

OPPOSITION TO MOTION TO REMAND                                              4:18-cv-04790-PJH

1  governments regarding "interference with foreign securities regulation" should U.S. securities law

2  apply to foreign transactions).  Here, countries throughout the world are currently considering how

3  and whether to regulate virtual currencies.  (See, e.g., Ex. 4 (comparing regulations in 130

4  countries).)  For example, the Israel Securities Authority, in Plaintiff's home country, recently

5  issued an interim report examining "the application of the Securities Law for offers and issuances

6  to the public in Israel based on Distributed Ledger Technology."  (Ex. 5 at 3.)  The report made

7  multiple recommendations depending on the type of virtual currency involved.  (Id. at 14.)  One of

8  its aims was to "increase certainty concerning the application of the Securities Law to the sector,

9  which is vital to both the development of the industry in Israel and the continuation of investors'

10 trust in the capital market."  (Id. at 9.)

11         As alleged, the putative class in this case includes foreign plaintiffs who purchased XRP on

12 foreign exchanges, including the named plaintiff who is from Israel and has not indicated where in

13 the global market he purchased XRP, despite undoubtedly being in possession of such facts.  It is

14 indisputable that countries have taken different approaches towards regulating virtual currencies,

15 and a determination in this case, especially as applied to foreign plaintiffs and foreign exchanges,

16 could conflict with the frameworks in one or more other countries.[7]  Accordingly, any decision

17 concerning whether XRP is a "security" could significantly disrupt the regulatory processes and

18 regimes in multiple countries.  For example, a decision that conflicts with Israel's developing

19 regulations would, at a minimum, disrupt the "certainty" that Israeli authorities are attempting to

20 create and circumvent Israel's right to protect its own citizens as it sees fit.  (Id. at 9.)  If the

21 California court decides that XRP is a security (and it should not), such a decision would likely

22 negatively affect the future availability and value of XRP in foreign countries, including in

23 countries that welcome the use of virtual currencies and do not treat them as securities.  (See, e.g.,

24 Ex. 6 (describing Thai SEC regulations that find cryptocurrencies are not securities).)  Indeed,

25 many countries may not welcome the application of United States law to virtual currencies because

---

26 [7]  Plaintiff suggests his own Complaint may be subject to dismissal to the extent it "addresses
   'international transactions.'"  (Mot. 5:8-10.)  Defendants agree and do not concede that the
27 Securities Act applies to Plaintiff's or any other foreign citizen's purchase of XRP.  However, for
   purposes of this Motion, Defendants assume that the Court would apply the Securities Act in the
28 matter Plaintiff seeks.

1    they could and have taken the position that such regulation disrupts innovation and economic

2    growth within their borders.  In sum, because any substantive decision in this putative international

3    class action could affect foreign relations, consistent with the purpose of alienage jurisdiction, the

4    Action should remain in federal court.

5         Any argument that alienage jurisdiction is primarily intended to protect foreign *defendants*

6    or that the Court should defer to Plaintiff's choice of forum is misplaced.  Alienage jurisdiction

7    originated from concerns that foreign governments perceived that their citizens, suing as *plaintiffs*

8    in state court, were not receiving justice—it was not about protecting foreign defendants.  (See

9    supra Part IV.A.1.)  Moreover, it is irrelevant that Plaintiff, although a foreign citizen, apparently

10   wishes to proceed in California state court.  For one thing, Plaintiff wishes to represent a class of

11   citizens from around the world, who may well prefer a federal forum.  More fundamentally, the

12   purpose of alienage jurisdiction is to protect "peculiarly federal interests that federal courts were

13   specifically designed to adjudicate" in order to ensure "economic and political security and

14   advance[] international comity and tranquility."   17th Street, 373 F. Supp. 2d at 603-05.  These

15   overarching, uniquely federal concerns outweigh Plaintiff's individual desire to litigate in state

16   court and confirm that the Action should not be remanded.  See Favour Mind, 1999 WL 1115217,

17   at *9 ("The drafters' worry that foreigners not suffer prejudice in state courts reflected their

18   concern that such prejudice might harm foreign relations; avoiding prejudice to the individual

19   foreigners themselves was not an independent concern"); see also Coffey, 2018 WL 3812076, at *7

20   (quoting Senate Report on CAFA that concluded that cases that "involve more people, more

21   money, and more interstate commerce ramifications" belong in federal court).

22         **3.     The Policies Behind Alienage Jurisdiction Render Luther Inapposite**

23         The presence of alienage jurisdiction under CAFA, and its implications for foreign relations

24   issues, make Luther distinguishable from this case.  The Luther court was not asked to consider,

25   and did not consider, the "peculiarly federal interest[s]" alienage jurisdiction raises, 17th Street,

26   373 F. Supp. 2d at 602, or the effect on Section 22(a) of CAFA's extension of alienage jurisdiction.

27   Rather, Luther considered only whether Section 22(a) barred removal of a securities case where the

28   action was removed based on the minimal diversity provisions of CAFA.  The Luther court applied

1  the maxim of statutory interpretation "that a statute dealing with a narrow, precise, and specific

2  subject is not submerged by a later enacted statute covering a more generalized spectrum." Luther,

3  533 F.3d at 1034.  It reasoned that the removal bar in Section 22(a) was "more specific" than the

4  authorization of removal in CAFA because Section 22(a) "applies to the narrow subject of

5  securities cases" whereas CAFA applies to a "generalized spectrum" of "high-dollar class actions

6  involving diverse parties." Id. at 1032, 1034.

7        Had the Luther court addressed the interaction between Section 22(a) and CAFA in light of

8  the peculiarly federal policies raised by alienage jurisdiction—the situation presented here—it

9  would have reached the opposite result.  In applying the canon of statutory construction that the

10  more specific statute controls the more general, overlapping statute, Luther relied on Radzanower

11  v. Touche Rosss & Co., 426 U.S. 148 (1976).  Luther, 533 F.3d at 1034.  In Radzanower, the

12  Supreme Court considered two venue provisions—the venue provision in the National Bank Act,

13  which allows national banking associations to be sued only in the district where they are

14  established, and the venue provision in the Securities Exchange Act of 1934 ("Exchange Act"),

15  which allows suits wherever the defendant may be found.  Radzanower, 426 U.S. at 149-50.  In

16  concluding that the later-enacted and more general Exchange Act did not impliedly repeal the more

17  specific National Bank Act, the Court considered the different policies behind the enactments.  Id.

18  at 155-56.  Enforcing the National Bank Act's narrower venue provision would serve its purpose of

19  preventing inconvenience to banks and would not "'unduly interfere' with the operation" of the

20  Exchange Act.  Id. at 156.

21        Here, the opposite is true—enforcing Section 22(a)'s removal bar will not further its

22  purpose and will "unduly interfere" with alienage jurisdiction, confirming that this Action should

23  not be remanded.  The purpose of Section 22(a)'s removal bar was to ensure that local plaintiffs

24  had access to a local courthouse.  See E. Merrick Dodd, Jr., Amending the Securities Act—The

25  American Bar Ass'n Committee's Proposals, 45 Yale L. J. 199, 224 (1935) ("The principal

26  objections to permitting removal is that there are a relatively small number of federal trial courts,

27  and that to allow defendants to remove all cases to the federal courts would enable them in many

28  instances to remove the case to a point remote from the plaintiff's home and inconvenient for

15

1  him."). Justice Felix Frankfurter, one of the principal architects of the Securities Act, wrote a few

2  years before the Securities Act was enacted that removal bars were desirable "whenever federal

3  rights arise out of transactions which are dominantly local and readily lend themselves to state

4  remedies."  Felix Frankfurter, <u>Distribution of Judicial Power of Federal and State Courts</u>, 13

5  Cornell L. Q. 499, 517 (1928); <u>see also</u> James M. Landis, <u>Legislative History of the Securities Act

6  of 1933</u>, 28 Geo. Wash. L. Rev. 29, 33, 36-37 (1959) (describing Justice Frankfurter's role with

7  respect to the Securities Act).  Here, this lawsuit is not "dominantly local" at all.  Rather, it

8  involves a plaintiff seeking to assert claims on behalf of a putative international class, concerning

9  an issue of first impression—whether a virtual currency, XRP, is a security—a question that

10  policymakers around the world are currently debating about virtual currencies generally.  <u>Cf.</u>

11  <u>Morrison</u>, 561 U.S. at 268-69, 272 (observing that the Securities Act does not apply to sales outside

12  of the United States and referencing recent trend of securities class actions brought on behalf of

13  foreign investors).  Thus, applying the removal bar and litigating this Action in state court would in

14  no way further the purpose of Section 22(a).

15      However, application of the removal bar here would "unduly interfere" with the operation

16  of alienage jurisdiction under CAFA.  <u>Radzanower</u>, 426 U.S. at 156.  CAFA's purpose was to

17  ensure a federal forum for large putative international class actions affecting foreign relations and

18  interstate commerce.  Applying Section 22(a)'s removal bar to such actions, like this one, would

19  close the federal courts to cases concerning foreign citizens and the interests of foreign nations—

20  exactly the type of matters that Congress, through CAFA's provision for alienage jurisdiction,

21  determined should be adjudicated in a federal forum.  <u>See</u> <u>Coffey</u>, 2018 WL 3812076, at *7

22  (observing that application of Section 22(a) to bar CAFA removal "would significantly expand the

23  types of class actions exempt from removal under § 1453").  Accordingly, not only did <u>Luther</u> not

24  address removal under CAFA's alienage provision at all, but if it had, the <u>Luther</u> court very likely

25  would have reached a different conclusion based on the reasoning it employed in that case.  <u>See</u>

26  <u>Cobalt Partners, LP v. Sunedison, Inc.</u>, 2016 WL 4488181, at *6 (N.D. Cal. Aug. 26, 2016)

27  (distinguishing <u>Luther</u> in concluding that 28 U.S.C. § 1452, providing for removal of cases related

28  to bankruptcy proceedings, trumped Section 22(a) because "even if our court of appeals were to

OPPOSITION TO MOTION TO REMAND                                                      4:18-cv-04790-PJH

1   conclude that Section 22(a) *is* more specific than Section 1452(a)," it would conclude that "such an

2   interpretation should be avoided under <u>Radzanower</u> because it would 'interfere with the operation

3   of the Bankruptcy Code, especially in large chapter 11 cases") (alteration in original); <u>Federal</u>

4   <u>Home Loan Bank of San Francisco v. Deutsche Bank Sec., Inc.</u>, 2010 WL 5394742, at *6 (N.D.

5   Cal. Dec. 20, 2010) (distinguishing <u>Luther</u> because application of Section 22(a) to cases removed

6   under Section 1452(a) would "unduly interfere" with its operation).

7   **B.    <u>The Plain Language Of CAFA Permits Removal Despite Section 22(a)</u>**

8   Plaintiff has identified no basis for remanding this Action other than his overly broad

9   interpretation of <u>Luther</u>.  Thus, to determine whether this Action is removable under CAFA, the

10  Court should employ the same reasoning it recently employed in <u>Coffey</u>.  In <u>Coffey</u>, this Court

11  concluded that, notwithstanding Section 22(a), CAFA permits removal of an action that includes

12  both state law claims and claims under the Securities Act.  In so concluding, the Court began with

13  the plain language of CAFA.  <u>Coffey</u>, 2018 WL 3812076, at *6.  As the Court observed, CAFA's

14  removal provision, Section 1453(b), provides:

15          [a] class action [meeting the requirements of Section 1332(d)] may
            be removed to a district court of the United States in accordance with
16          section 1446 . . . without regard to whether any defendant is a citizen
            of the State in which the action is brought . . . by any defendant
17          without the consent of all defendants.

18  <u>Id.</u> at *6.  Under Section 1453(d), CAFA excepts certain class actions from removal that "solely"

19  involve a claim: (1) concerning a "covered security," as defined by 15 U.S.C. § 77p(f)(3); (2)

20  relating to the internal affairs or governance of a corporation and arise under the laws of the state in

21  which such corporation was formed; or (3) relating to the rights, duties, and obligations relating to

22  or created by or pursuant to any security.  <u>See</u> 28 U.S.C. § 1453(d)(1)-(3).  "[R]ead as a whole,

23  CAFA's plain language 'creates original jurisdiction for and removability of <u>all</u> class actions that

24  meet the minimal requirements and do not fall under one of the limited exceptions.'"  <u>Coffey</u>, 2018

25  WL 3812076, at *7 (quoting <u>HarborView</u>, 581 F. Supp. 2d at 584); <u>see also</u> <u>Katz v. Gerardi</u>, 552

26  F.3d 558, 562 (7th Cir. 2009) (concluding that claims falling within the exceptions are not

27  removable, but "[o]ther securities class actions are removable if they meet the requirements of"

28  CAFA).  It is undisputed that none of CAFA's three limited exceptions applies here.

1      In Coffey, the Court rejected the plaintiff's invitation to read a fourth exception into Section

2  1453 for cases falling within the removal bar in Section 22(a).  See Coffey, 2018 WL 3812076, at

3  *8.  In doing so, the Court compared CAFA's Section 1453 to the general removal statute, Section

4  1441(a), which provides:  "***Except as otherwise provided by Act of Congress***, any civil action

5  brought in a State court of which the district courts of the United States have original jurisdiction,

6  may be removed . . . ."  28 U.S.C. § 1441(a).  "Both prior to and after CAFA's enactment in 2005,

7  courts have interpreted § 1441(a)'s broad except clause as a reference to antiremoval provisions in

8  other federal statutes."  Coffey, 2018 WL 3812076, at *8 (collecting cases).

9      Significantly, however, "[d]espite knowing exactly how to make a removal provision

10  subordinate to antiremoval statutes, Congress chose not to do so for § 1453."  Coffey, 2018 WL

11  3812076, at *8.  "Instead, Congress chose to enumerate only three specific exceptions to removal

12  under § 1453."  Id.  "The absence of § 1441(a)'s except clause, or anything even resembling it,

13  weighs heavily against reading such a broad exception into § 1453."  Id.  This is especially so

14  given that the specific exceptions in Section 1453(d) pertain to certain types of securities claims.

15  "That Congress considered and excepted one part of the Securities Act but did not reference

16  § 22(a), strongly suggests that the court should not read additional Securities Act exceptions into

17  CAFA."  Id. at *9.

18      Moreover, any interpretation under which Section 22(a) barred removal under CAFA, even

19  though CAFA has no "except" clause, would render the "except" clause in Section 1441(a)

20  superfluous.  See Duncan v. Walker, 533 U.S. 167, 174 (2001) (noting rule of statutory

21  interpretation against treating "statutory terms as surplusage").  As this Court observed in Coffey:

22  "if § 1441(a)'s except clause is to be taken seriously, then it should not be read into every [other]

23  removal statute" because it would "render[] the except clause entirely superfluous."  Coffey, 2018

24  WL 3812076, at *9.  "By contrast, if [the court] give[s] effect to every clause in Section 1441(a),

25  the statutory conflict between [§ 1453(b)] and Section 22(a) dissolves."  Id. (alteration in original)

26  (quoting California Pub. Emps.' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 106 (2d Cir. 2004)).

27      Likewise, Section 1453(b) "itself becomes largely superfluous if it is read to include

28  § 1441(a)'s exception."  Coffey, 2018 WL 3812076, at *10.  Section 1332(d)(2) grants courts

1    original jurisdiction over class actions satisfying CAFA's requirements.  28 U.S.C. § 1332(d)(2).

2    Thus, "an action satisfying CAFA's diversity requirements could be removed pursuant to

3    § 1441(a)," but this "would subject the removal to § 1441(a)'s except clause and the entire array of

4    federal antiremoval statutes," including § 22(a)'s removal bar.  Coffey, 2018 WL 3812076, at *10.

5    "If Congress wanted that result, it could have omitted § 1453(b) entirely.  Instead, Congress

6    enacted an entirely different removal provision that does not include anything resembling

7    § 1441(a)'s broad except clause."  Id.  Thus, the text and structure of CAFA confirm that Congress

8    did not intend for Section 22(a)'s removal bar to apply to cases removed pursuant to CAFA.

9         Although the Court in Coffey was considering an action that asserted both state law and

10   Securities Act claims, the Court's reasoning applies with equal force here, where only Securities

11   Act claims are asserted.  Indeed, in other cases interpreting the interplay between Section 22(a) and

12   other removal statutes, courts employing reasoning similar to that of the Court in Coffey concluded

13   that actions asserting only Securities Act claims were removable.  For example, in WorldCom, the

14   court concluded that an action asserting only Securities Act claims was removable, notwithstanding

15   Section 22(a)'s removal bar, pursuant to "related to" bankruptcy jurisdiction in 28 U.S.C. § 1452.

16   WorldCom, 368 F.3d at 106. The court reasoned:

17             [W]hen an anti-removal provision such as Section 22(a) is invoked,
             the threshold question is whether removal is being effectuated by
18           way of the general removal statute, 28 U.S.C. § 1441(a), or by way
             of a separate removal provision that "grants *additional* removal
19           jurisdiction in a class of cases which would not otherwise be
             removable under the prior grant of authority."  If removal is being
20           effectuated through a provision that confers *additional* removal
             jurisdiction, and that provision contains no exception for
21           nonremovable federal claims, the provision should be given full
             effect.
22
     Id. at 107 (emphasis in original); see also Pac. Life Ins. Co. v. J.P. Morgan Chase & Co., 2003 WL
23
     22025158, at *2 (C.D. Cal. June 30, 2003) ("Section 22(a) proscribes removal based on federal
24
     question jurisdiction under 28 U.S.C. section 1441(a), but does not prevent removal based on other
25
     grounds."); FDIC v. Countrywide Fin. Corp., 2012 WL 12897152, at *1-2 (C.D. Cal. Mar. 20,
26
     2012) (concluding that Section 22(a) did not bar removal pursuant to pre-2011 version of Section
27
     1441(b)).  As this Court confirmed in Coffey, the plain language of CAFA provides such
28
     "additional" removal jurisdiction, and actions removable under CAFA—like the instant Action—

                                                   19

1   are not subject to removal bars such as Section 22(a).

2     In his Motion, Plaintiff does not address the plain language of CAFA or the Court's

3   reasoning in <u>Coffey</u>.   The Court's recognition in <u>Coffey</u> that Section 1453 should be "'read

4   broadly, with a strong preference that interstate class actions should be heard in a federal court,'"

5   <u>Coffey</u>, 2018 WL 3812076, at *7—unlike <u>Luther</u>'s wooden application of the Section 22(a)

6   removal bar—properly respects the purpose of alienage jurisdiction and confirms that this Action

7   should remain in federal court.

8     **C.**  <u>**Luther Was Wrongly Decided And Should Be Limited Or Reconsidered**</u>

9     If the Court nonetheless concludes that <u>Luther</u> applies, Defendants respectfully submit that,

10   in light of subsequent developments, <u>Luther</u> should be limited to its facts and not expanded to bar

11   the removal of international class actions, or it should be reconsidered.   Indeed, the author of the

12   district court opinion affirmed by the Ninth Circuit in <u>Luther</u>, the Honorable Mariana Pfaelzer,

13   observed in a later case, "Defendants appear to have nonfrivolous arguments for a change in law

14   due to post-<u>Luther</u> developments."   <u>Pub. Emps. Ret. Sys. of Miss. v. Morgan Stanley</u>, 605 F. Supp.

15   2d 1073, 1075 n.1 (C.D. Cal. 2009).   Such arguments are equally present here.

16     To begin, "part of <u>Luther</u>'s reasoning has been undermined by the Supreme Court's

17   decision in" <u>Dart Cherokee Basin Operating Co., LLC v. Owens</u>, 135 S. Ct. 547, 551 (2014).

18   <u>Coffey</u>, 2018 WL 3812076, at *4.   As this Court explained, "[t]he <u>Luther</u> court relied on the Ninth

19   Circuit's general rule that 'removal statutes are strictly construed against removal,' and that 'any

20   doubt is resolved against removability.'"   <u>Id.</u>   However, in <u>Dart Cherokee</u>, the Supreme Court

21   concluded that "'no antiremoval presumption attends cases invoking CAFA, which Congress

22   enacted to facilitate adjudication of certain class actions in federal court.'"   <u>Coffey</u>, 2018 WL

23   3812076, at *4 (quoting <u>Dart Cherokee</u>, 135 S. Ct. at 554).   As such, the Ninth Circuit has

24   "recognized that <u>Dart Cherokee</u> undermines <u>Luther</u>'s reasoning on that point."   <u>Id.</u> (citing <u>Jordan v.</u>

25   <u>Nationstar Mortg. LLC</u>, 781 F.3d 1178, 1183 n.2 (9th Cir. 2015)).   "And one [other] authority has

26   suggested that <u>Dart Cherokee</u>'s 'assertion that no antiremoval presumption applies to cases

27   removed under CAFA,' calls into question <u>Luther</u>'s holding regarding § 22(a) and § 1453."   <u>Id.</u>

28   (quoting Moore et al., 16 <u>Moore's Federal Practice - Scope of Removal</u> § 107.91[1][b] (2018)).

OPPOSITION TO MOTION TO REMAND          4:18-cv-04790-PJH

1   That Luther's reasoning has been undermined by the Supreme Court is another reason to conclude

2   that the Luther court would not reach the same result if presented with the question raised here.

3           Moreover, shortly after the Ninth Circuit decided Luther, the Court of Appeals for the

4   Seventh Circuit considered the exact same issue as Luther—the removability of Securities Act

5   claims pursuant to CAFA—and reached the opposite conclusion, holding that such actions *are*

6   removable.  See Katz, 552 F.3d at 558.  In an opinion authored by Judge Easterbrook, the court

7   began by noting that "[u]sually the older law"—Section 22(a)—"yields to the newer"—CAFA.  Id.

8   at 561.  Discussing the reasoning in Luther, the court noted that the "[t]he canon favoring

9   preservation of specific statutes arguably affected by newer, but more general, statutes works when

10  one statute is a subset of the other."  Id.  However, "§ 22(a) of the [Securities] Act is not a subset"

11  of CAFA.  Id.  The court reasoned:

12              Section 22(a) covers only securities actions, but it includes all
                securities actions—single-investor suits as well as class actions,
13              small class actions as well as large multi-state ones.  [CAFA], by
                contrast, covers only large, multi-state class actions.  Is the
14              [Securities] Act more specific because it deals only with securities
                law, or is [CAFA] more specific because it deals only with
15              nationwide class actions?  There is no answer to such a question,
                which means that the canon favoring the specific law over the
16              general one won't solve our problem.

17  Id. at 561-62.  Other courts have also rejected the view that Section 22(a) is a more specific statute.

18  See, e.g., WorldCom, 368 F.3d at 101-02 (rejecting argument that Section 22(a) is more specific

19  than Section 1452, which permits removal of actions related to bankruptcy proceedings,

20  concluding, "Section 22(a) does not cover only a subset of the universe of claims that are 'related

21  to' a bankruptcy case; rather it applies to numerous claims that are in no way 'related to' a

22  bankruptcy, just as Section 1452(a) applies to numerous claims that are not brought under the

23  [Securities] Act"); Passarella v. Ginn Co., 637 F. Supp. 2d 353, 354 (D.S.C. 2009) (citing Katz and

24  concluding that the "cannon of statutory construction" on which Luther relied "is not particularly

25  useful" in determining whether CAFA or removal bar in ILSA is more specific); HarborView, 581

26  F. Supp. 2d at 586 (rejecting Luther's conclusion that Section 22(a) was more specific than CAFA

27  because both statutes were "specific and narrowly-tailored").  As Professor Joseph M. McLaughlin

28  observed in his treatise, Luther "offered no reasons to support its assertion that the [Securities] Act

21

1   was [] more specific" than CAFA.  2 McLaughlin on Class Actions § 12:6 (14th ed. 2017).

2        Because Luther improperly assumed that the Securities Act is more specific than CAFA,

3   Luther wrongly applied the "basic principle of statutory construction that a statute dealing with a

4   narrow, precise, and specific subject is not submerged by a later enacted statute covering a more

5   generalized spectrum."  Luther, 533 F.3d at 1034 (citation omitted).  In reality, that principle has

6   no application to Section 22(a) and CAFA.

7        Subsequent authorities have also confirmed that Luther's conclusion that Section 22(a)

8   provides an "express exception to removal" contradicts the plain language of CAFA.  Luther, 533

9   F.3d at 1034.  To begin with, as noted above, unlike Section 1441(a), which permits removal

10  "[e]xcept as otherwise expressly provided by Act of Congress," 28 U.S.C. § 1441(a), CAFA's

11  removal statute contains no such general exception, 28 U.S.C. § 1453.  This alone demonstrates

12  that Congress did not intend Section 22(a) to provide an exception to CAFA removal—a point

13  Luther did not address.  See Coffey, 2018 WL 3812076, at *9; HarborView, 581 F. Supp. 2d at 587

14  ("Had Congress wanted to treat CAFA like the general removal statute of § 1441(a) and leave

15  intact other statutory regimes, it could have easily done so."); Passarella, 637 F. Supp. 2d at 355

16  (observing that Section 1453 does not include a "qualification on the ability to remove an action").

17        Additionally, the express language of CAFA instructs how CAFA "applies to corporate and

18  securities actions."  Katz, 552 F.3d at 562.  CAFA contains specific, narrowly enumerated

19  exceptions to removal jurisdiction (none of which applies here) for certain securities class

20  actions—those "concerning a covered security," relating to the internal affairs of a corporation, or

21  relating to the rights, duties, and obligations relating to or created by or pursuant to any security.

22  Id.; see also 28 U.S.C. § 1453(d)(1)-(3).  "This [list of exceptions] tells us all we need to know."

23  Katz, 552 F.3d at 562.  Claims falling within the three enumerated exceptions are not removable;

24  "[o]ther securities class actions are removable if they meet the requirements of" CAFA.  Id.  In

25  other words, the presence of these narrow, enumerated exceptions contradicts any assertion that

26  other, unstated exceptions also exist.  See Blausey v. United States Tr., 552 F.3d 1124, 1133 (9th

27  Cir. 2009) ("The general rule of statutory construction is that the enumeration of specific

28  exclusions from the operation of a statute is an indication that the statute should apply to all cases

1  not specifically excluded."). To read CAFA's categorical right of removal as subject to an

2  unstated, overarching exception for actions that include Securities Act claims "would be to make

3  most of § 1453(d) pointless." <u>Katz</u>, 552 F.3d at 562.

4      Other courts considering the interplay between CAFA and antiremoval statutes have

5  reached the same conclusion as the Seventh Circuit in <u>Katz</u>. <u>See</u> <u>Passarella</u>, 637 F. Supp. 2d at 355

6  ("CAFA is the more recently enacted statute; it provides a right to removal for qualifying class

7  actions; and it spells out three exceptions to its grant of a right of removal. . . . [T]here is little

8  guesswork in surmising that Congress intends some substantial revisions when it grants a

9  categorical right to removal and provides for only limited, specific exceptions"); <u>HarborView</u>, 581

10 F. Supp. 2d at 587 ("CAFA's sole limitations are those exclusively listed in the defined

11 exceptions."). Post-<u>Luther</u> developments have repeatedly called into question the validity of its

12 holding. Therefore, that holding should be limited or reconsidered, and this international class

13 action should be removable under CAFA.

14 **V.    PLAINTIFF'S ARGUMENTS ABOUT EFFICIENCY DO NOT JUSTIFY REMAND**

15     Plaintiff argues that "Defendants' removal has delayed this case from properly proceeding

16 in state court and threatens to undermine judicial economy" because the similarities between this

17 Action and two state court actions require coordination. (Mot. 5-6.) As established above,

18 Defendants are entitled to the federal forum because this Action meets the requirements for

19 removal under CAFA. Plaintiff cites no authority for the proposition that notions of "judicial

20 economy" or the need for coordination could somehow nullify Defendants' statutory right to

21 removal.

22     In any event, Plaintiff's purported desire for "judicial economy" is belied by the fact that

23 Plaintiff chose to file his Action months after three similar actions had been filed. When Plaintiff

24 filed his Action, it was duplicative of the <u>Coffey</u> action, which had been removed a month earlier

25 and was then pending before this Court. There would be no need for "coordination" if Plaintiff had

26 not chosen to file an extra suit. If Plaintiff and his counsel were truly interested in avoiding

27 delay—as opposed to attempting to evade the procedural protections of CAFA and the PSLRA—

28 they could have refrained from filing their Motion, and this Action would be proceeding apace.

23

OPPOSITION TO MOTION TO REMAND                                    4:18-cv-04790-PJH

1       Finally, Plaintiff's contention that "[n]otably, Defendants did not seek to remove <u>Zakinov</u>

2   and <u>Oconer</u> to this Court," to the extent it is intended to suggest that the instant Action was not

3   properly removed, is misleading.  (Mot. 6:6-7.)   The <u>Zakinov</u> and <u>Oconer</u> actions assert only

4   California state law claims and are brought solely on behalf of California citizens against

5   Defendants who are alleged to be California citizens.  (Jasnoch Decl. Exs. B, C.)  Thus, neither the

6   alienage nor the minimum diversity requirements of CAFA are satisfied, in contrast to <u>Coffey</u> and

7   the instant Action, and there is no basis for removing <u>Zakinov</u> or <u>Oconer</u>.  The fact that Defendants

8   are facing duplicative litigation, including some actions that are not removable, cannot deprive

9   Defendants of their statutory right to a federal forum where it exists, as here.

10  **VI.   <u>CONCLUSION</u>**

11      For the reasons stated herein, this Court should deny Plaintiff's Motion.

12  DATED: September 21, 2018

13                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

14                    By:           */s/Peter B. Morrison*

                            Peter B. Morrison

15                         Attorneys for Defendants

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO REMAND                           4:18-cv-04790-PJH