PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
VIRGINIA F. MILSTEAD (SBN 234578)
virginia.milstead@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

JOHN NEUKOM (SBN 275887)
john.neukom@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile:  (650) 470-4570

Attorneys for Defendants
Ripple Labs Inc., XRP II, LLC, Bradley
Garlinghouse, Christian Larsen, Ron Will,
Antoinette O'Gorman, Eric van Miltenburg,
Susan Athey, Zoe Cruz, Ken Kurson, Ben
Lawsky, Anja Manuel, and Takashi Okita

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

AVNER GREENWALD, individually and on
behalf of all others similarly situated,

                                   Plaintiff,

          v.

RIPPLE LABS INC., et al.,

                                   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: 4:18-cv-04790-PJH

**DECLARATION OF VIRGINIA F.
MILSTEAD IN SUPPORT OF
DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION TO REMAND**

Date:         October 24, 2018
Time:         9:00 a.m.
Courtroom: 3
Judge:        Hon. Phyllis J. Hamilton

1    1.    I am an attorney admitted to practice before the courts of the State of California and

2 have been admitted to this Court.  I am counsel in the law firm of Skadden, Arps, Slate, Meagher &

3 Flom LLP, which is counsel of record for Defendants Ripple Labs Inc. ("Ripple"), XRP II, LLC

4 ("XRP II"), Bradley Garlinghouse, Christian Larsen, Ron Will, Antoinette O'Gorman, Eric van

5 Miltenburg, Susan Athey, Zoe Cruz, Ken Kurson, Ben Lawsky, Anja Manuel, and Takashi Okita

6 (collectively "Defendants") in the above-captioned matter.  I submit this declaration in support of

7 Defendants' Opposition to Plaintiff's Motion to Remand.  This declaration is based on my own

8 personal knowledge, and if called upon to do so, I could and would testify competently thereto.

9    2.    Attached as **Exhibit 1** is a true and correct copy of the "Learn About Ripple" page

10 available on Ripple's website at https://ripple.com/company/.

11    3.    Attached as **Exhibit 2** is a true and correct copy of the "XRP" page available on

12 Ripple's website at https://ripple.com/xrp/.

13    4.    Attached as **Exhibit 3** is a true and correct copy of Attachment A: Statement of Facts

14 and Violations to the 2015 Settlement Agreement between Financial Crimes Enforcement Network

15 ("FINCEN") and Ripple, available on FINCEN's website at

16 https://www.fincen.gov/sites/default/files/shared/Ripple_Facts.pdf.

17    5.    Attached as **Exhibit 4** is a true and correct copy of a June 2018 report titled "Regulation

18 of Cryptocurrency Around the World," prepared by the staff of the Law Library of Congress, Global

19 Legal Research Directorate, available at https://www.loc.gov/law/help/cryptocurrency/cryptocurrency-

20 world-survey.pdf.

21    6.    Attached as **Exhibit 5** is a true and correct copy of a March 2018 report titled "The

22 Committee to Examine the Regulation of Decentralized Cryptographic Currency Issuance to the

23 Public, Interim Report," prepared by the Israel Securities Authority, available at

24 http://www.isa.gov.il/sites/ISAEng/1489/1513/Documents/DOH17718.pdf.

25    7.    Attached as **Exhibit 6** is a true and correct copy of a June 11, 2018 article titled

26 "Thailand SEC Legalizes 7 Cryptocurrencies With Regulations," written by Sheenam Khuttan,

27 available at https://kryptomoney.com/thailand-sec-legalizes-7-cryptocurrencies-regulations/.

28

DECLARATION OF VIRGINIA F. MILSTEAD                                    4:18-cv-04790-PJH

1   I declare under penalty of perjury under the laws of the State of California and the United

2   States of America that the foregoing is true and correct.

3   Executed on September 21, 2018 in Los Angeles, California.

4

5

6   By: _____ */s/ Virginia F. Milstead*_____
                    Virginia F. Milstead

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF VIRGINIA F. MILSTEAD                                    4:18-cv-04790-PJH

# Exhibit 1

Company - Learn About Ripple | Ripple

 

# Our Company

Enabling the world to move value like it moves information today

Contact Us

## Overview

Ripple provides one frictionless experience to send money globally using the power of blockchain. By joining Ripple's growing, global network, financial institutions can process their customers' payments anywhere in the world instantly, reliably and cost-effectively. Banks and payment providers can use the digital asset XRP to further reduce their costs and access new markets.

With offices in San Francisco, New York, London, Sydney, India, Singapore and Luxembourg, Ripple has more than 100 customers around the world.

## Leadership

Ripple's leaders bring together decades of experience in technology, financial services and compliance.



Brad
Garlinghouse
CEO



Marcus Treacher
SVP of Customer
Success



Antoinette
O'Gorman
Chief Compliance
Officer



David Schwartz
Chief Cryptographer



Stefan Thomas
CTO



Cory Johnson
Chief Market
Strategist



Asheesh Birla
SVP of Product



Ron Will
CFO

See full leadership team

# Investors

Investors include globally recognized venture capital firms and strategic investors.

    

    

# Board of Directors

Ripple's Board of Directors lend their deep experience in finance, policy and regulation in advising Ripple.

   

  

See Board of Directors

# Giving Back

Ripple is committed to connecting global communities through programs that support innovation and education.

 

See our causes

# Ripple is Hiring

Build the future of payments with us.

Join Our Team

## Resources

XRP Overview
How to Buy XRP
Insights
Collateral
Press Center

## Regulators

Compliance
Policy Framework

## Support

FAQ
Contact Us
Developer Center
Ripple Forum

## About

Our Company
Careers
RippleNet Committee
SBI Ripple Asia
Xpring

© 2013 - 2018 Ripple, All Rights Reserved.   Terms   Privacy

English    中文    日本語    한국어

Exhibit 2



Built for enterprise use, XRP offers banks and payment providers a reliable, on-demand option to source liquidity for cross-border payments.

XRP vs. Others

# Use Cases

BANKS

Using XRP, banks can source liquidity on demand in real time without having to pre-fund nostro accounts.

XRP | Ripple

PAYMENT PROVIDERS

Payment Providers use XRP to expand reach into new markets, lower foreign exchange costs and provide faster payment settlement.

# Benefits

# Fast

Payments settle in 4 seconds.

# Scalable

XRP consistently handles 1,500 transactions per second, 24x7, and can scale to handle the same throughput as Visa.*

*Source: 50,000 transactions per second, as of July 15, 2017



# Distributed

Open-source technology, built on the principles of blockchain with a growing set of validators.



# Stable

XRP's five-year track record of stable technology and governance makes it ready for institutional and enterprise use.

stableEstablishedin 2012Dedicated team of world-class engineersNegligible energy consumptionAll ledgers closedwithout issuesince inception29+ Million

# XRP Price and Volume

For more metrics, see XRP Market Performance.

XRP PRICE TODAY



USD

30-DAY XRP VOLUME









FEATURES

Democratizing Global Payments: xRapid's Cost Savings and Benefits



VIEWS

Why Open Protocols Are the First Step in the Distributed Ledger Movement



NEWS

Ripple CEO at Money20/20 Europe: Blockchain Hype Outpaces Reality

RIPPLE NEWSLETTER

Get the latest in blockchain and banking delivered to your inbox.

**XRP News**          **Ripple Insights**

# Learn More About XRP

For institutional XRP purchases or questions.

Contact Us

## Resources

XRP Overview
How to Buy XRP
Insights
Collateral
Press Center

## Regulators

Compliance
Policy Framework

## Support

FAQ
Contact Us
Developer Center
Ripple Forum

## About

Our Company
Careers
RippleNet Committee
SBI Ripple Asia
Xpring

© 2013 - 2018 Ripple, All Rights Reserved.     Terms     Privacy

English     中文     日本語     한국어

# Exhibit 3

## ATTACHMENT A:  STATEMENT OF FACTS AND VIOLATIONS

### I.    INTRODUCTION AND BACKGROUND

1.      Ripple Labs Inc. ("Ripple Labs") is a corporation registered in Delaware and headquartered in San Francisco, California.  NewCoin, Inc. and OpenCoin, Inc. ("OpenCoin") are the predecessors of Ripple Labs.

2.      Ripple Labs facilitated transfers of virtual currency and provided virtual currency exchange transaction services.

3.      The currency of the Ripple network, known as "XRP," was pre-mined.  In other words, unlike some other virtual currencies, XRP was fully generated prior to its distribution.   As of 2015, XRP is the second-largest cryptocurrency by market capitalization, after Bitcoin.

4.      XRP Fund II, LLC, a wholly-owned subsidiary of Ripple Labs, was incorporated in South Carolina on July 1, 2013.  On July 2, 2014, XRP Fund II changed its name to XRP II, LLC.  During a portion of the relevant timeframe, the entity was named XRP Fund II, LLC, but it will be referred to as XRP II throughout this document.

### II.    LEGAL FRAMEWORK

5.      The U.S. Attorney's Office for the Northern District of California ("U.S. Attorney's Office") is a component of the Justice Department.   The Financial Crimes Enforcement Network ("FinCEN") is a bureau within the Department of Treasury. The Bank Secrecy Act and its implementing regulations require Money Services Businesses ("MSBs") to register with FinCEN by filing a Registration of Money Services Business ("RMSB"), and renewing the registration every two years.  *See* 31 U.S.C. § 5330; 31 C.F.R. § 1022.380.  Operation of an MSB without the appropriate registration also violates federal criminal law.  *See* 18 U.S.C. § 1960(b)(1)(B).  This is a requirement separate and apart from state licensing requirements, if any, that may be required by law.

6.      On March 18, 2013, FinCEN released guidance clarifying the applicability of regulations implementing the Bank Secrecy Act, and the requirement for certain participants in the virtual currency arena to register as MSBs under federal law.  *See* FIN-2013-G0001, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013) (the "Guidance").  Among other things, the Guidance defines two categories of participants in the virtual

currency ecosystem: "exchangers" and "administrators."  The Guidance states that exchangers and administrators of virtual currencies are money transmitters (a type of MSB) under FinCEN's regulations, and therefore are required to register with FinCEN as money service businesses.

7.      Specifically, the Guidance defines an exchanger as a person or entity "engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency."  The Guidance also defines an administrator of virtual currency as a person or entity "engaged as a business in issuing (putting into circulation) a virtual currency, and who has the authority to redeem (to withdraw from circulation) such virtual currency."

8.      Both exchangers and administrators are MSBs that must register with FinCEN unless they fall within an exemption.  And regardless of whether they have registered as required, MSBs are subject to certain additional requirements under the Bank Secrecy Act and its implementing regulations.

9.      The Bank Secrecy Act and its implementing regulations require MSBs to develop, implement, and maintain an effective written anti-money laundering ("AML") program that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities.  *See* 31 U.S.C. §§ 5318(a)(2) and 5318(h); 31 C.F.R. § 1022.210.

10.     Under the Bank Secrecy Act, an MSB is required to implement an AML program that, at a minimum: (a) incorporates policies, procedures and internal controls reasonably designed to assure ongoing compliance; (b) designates an individual responsible for assuring day to day compliance with the program and Bank Secrecy Act requirements; (c) provides training for appropriate personnel including training in the detection of suspicious transactions; and (d) provides for independent review to monitor and maintain an adequate program. 31 C.F.R. §§ 1022.210(d).

11.     Further, an MSB must report transactions that the MSB "knows, suspects, or has reason to suspect" are suspicious, if the transaction is conducted or attempted by, at, or through the MSB, and the transaction involves or aggregates to at least $2,000.00 in funds or other assets. 31 C.F.R. § 1022.320(a)(2).  A transaction is "suspicious" if the transaction: (a) involves funds derived from illegal activity; (b) is intended or conducted in order to hide or disguise funds or assets derived from illegal activity, or to disguise the ownership, nature, source, location, or control of funds or assets derived from illegal activity; (c) is designed, whether through structuring or other means, to evade any requirement in the Bank Secrecy Act or its implementing regulations; (d) serves no business or apparent lawful purpose, and the MSB knows of

no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or (e) involves use of the MSB to facilitate criminal activity. *Id.*

12.     As part of their risk assessment and risk mitigation plans, MSBs are required to implement Know-Your-Customer/Know-Your-Counterparty procedures. Such procedures allow the MSB to assess the risk involved in providing account-based or transactional services to customers based on their identity and profile, and to comply with their AML Program requirements regarding foreign agents or foreign counterparties. *See* FinCEN Interpretive Release 2004-1, Anti-Money Laundering Program Requirements for Money Service Businesses With Respect to Foreign Agents or Foreign Counterparties, 69 Fed. Reg. 74,439 (Dec. 14, 2004).

13.     Financial institutions, including MSBs, are also subject to the Funds Transfer Rule, 31 C.F.R. § 1010.410(e), which provides that (subject to certain exceptions) for individual transactions of $3,000.00 or above, the transmitting financial institution must obtain, verify, and keep key information (set forth in the regulation) from the transmitting party (the transmittor). If acting as an intermediary financial institution, it must obtain and keep key information (the transmittal order received) from the transmittor's financial institution. And, if acting as the financial institution for the recipient of the funds, the financial institution must obtain, verify, and keep key information (also set forth in the regulation) from the recipient. The same financial institution may be acting as both transmittor's and recipient's financial institution.

14.     Similarly, financial institutions, including MSBs, are subject to the Funds Travel Rule, 31 C.F.R. § 1010.410(f), which provides that (subject to certain exceptions) for individual transactions of $3,000.00 or more, the transmittor's financial institution must pass on key information from the transmittor and the transaction to any intermediary financial institution; if acting as the intermediary financial institution, it must pass on this information to the recipient's financial institution. And, if acting as the recipient's financial institution, it must receive, evaluate, and store this information received from the intermediary or the transmittor's financial institution.

15.     The FinCEN registration requirement and other requirements of the Bank Secrecy Act are independent obligations. An MSB's failure to register with FinCEN does not relieve an MSB of its obligations under the Bank Secrecy Act and implementing regulations. Nor does an MSB's registration with FinCEN mean that the MSB has fulfilled all of its requirements under the Bank Secrecy Act and regulations. In other words, an MSB might have complied with the Bank Secrecy Act and implementing regulations, but failed to register as an MSB with FinCEN. Likewise, an entity might

3

have registered as an MSB with FinCEN, but not have complied with the Bank Secrecy Act and implementing regulations.

### III.    VIOLATIONS

**A.    Ripple Labs's Operation as a Money Services Business in March-April 2013**

16.    Ripple Labs has previously described itself in federal court filings and in a sworn affidavit as "a currency *exchange service* providing on-line, real-time currency trading and cash management . . . . Ripple facilitates the transfers of electronic cash equivalents and provides virtual currency exchange transaction services for transferrable electronic cash equivalent units having a specified cash value." *See Ripple Labs, Inc. v. Lacore Enterprises, LLC*, Motion for Preliminary Injunction, 13-cv-5974-RS/KAW (N.D. Cal. 2013) (emphasis added).

17.    From at least March 6, 2013, through April 29, 2013, Ripple Labs sold convertible virtual currency known as "XRP."

18.    Ripple Labs was not registered with FinCEN as an MSB while engaging in these sales.

19.    As described in Paragraphs 6 and 7 above, on March 18, 2013, FinCEN released guidance that clarified the applicability of existing regulations to virtual currency exchangers and administrators.  Among other things, this Guidance expressly noted that such exchangers and administrators constituted "money transmitters" under the regulations, and therefore must register as MSBs.

20.    Notwithstanding the Guidance, and after that Guidance was issued, Ripple Labs continued to engage in transactions whereby it sold Ripple currency (XRP) for fiat currency (*i.e.*, currency declared by a government to be legal tender) even though it was not registered with FinCEN as an MSB.  Throughout the month of April 2013, Ripple Labs effectuated multiple sales of XRP currency totaling over approximately $1.3 million U.S. dollars.

21.    During the time frame that it was engaged in these sales and operated as a money transmitter, Ripple Labs failed to establish and maintain an appropriate anti-money laundering program.  Ripple failed to have adequate policies, procedures, and internal controls to ensure compliance with the Bank Secrecy Act and its implementing regulations.  Moreover, Ripple Labs failed to designate a compliance officer to assure compliance with the Bank Secrecy Act, had no anti-money laundering training in place, and failed to have any independent review of its practices and procedures.

**B.      XRP II's Program and Reporting Violations**

22.     On July 1, 2013, Ripple Labs incorporated a subsidiary, XRP Fund II, LLC ("XRP Fund II"), now known as XRP II, LLC, in South Carolina.  XRP II was created to engage in the sale and transfer of the convertible virtual currency, XRP, to various third parties on a wholesale basis.  XRP II sold XRP currency in exchange for fiat currency in much the same way that Ripple Labs had previously done from March through April 2013.  In other words, XRP II replaced Ripple Labs as a seller of XRP.

23.     By on or about August 4, 2013, XRP II was engaged in the sale of XRP currency to third-party entities.

24.     On September 4, 2013, XRP II registered with FinCEN as an MSB.

25.     As of the date XRP II engaged in sales of virtual currency to third parties in exchange for value, XRP II became subject to certain requirements under the Bank Secrecy Act and its implementing regulations, as described in Paragraphs 5 through 15 above. XRP II was required to have an effective written AML program, to implement that program, and to have an anti-money laundering compliance officer.

26.     Notwithstanding these requirements, despite engaging in numerous sales of virtual currency to third parties, XRP II failed to have an effective, written AML program. For example:

   a)   It was not until September 26, 2013, that XRP II developed a written AML program.  Prior to that time, XRP II had no written AML program;

   b)   It was not until late January 2014 that XRP II hired an AML compliance officer, some six months after it began to engage in sales of virtual currency to third parties;

   c)   XRP II had inadequate internal controls reasonably designed to ensure compliance with the Bank Secrecy Act;

   d)   XRP II failed to conduct an AML risk assessment until March 2014;

   e)   XRP II did not conduct training on its AML program until nearly a year after beginning to engage in sales of virtual currency, by which time Ripple Labs was aware of a federal criminal investigation; and

f) XRP II did not conduct an independent review of its AML program until nearly a year after it began to engage in sales of virtual currency, by which time Ripple Labs was aware of a federal criminal investigation.

27. Further, from the date XRP II began engaging in sales of virtual currency to third parties, XRP II was required to report transactions that it knew, suspected, or had reason to suspect were suspicious and where the transactions or attempted transactions involved or aggregated to at least $2,000.00 in funds or other assets. *See* 31 C.F.R. § 1022.320(a)(2).

28. In addition to XRP II's lack of an effective AML program, XRP II also engaged in a series of transactions for which it either failed to file, or untimely filed, suspicious activity reports. For example:

a) On September 30, 2013, XRP II negotiated an approximately $250,000.00 transaction by email for a sale of XRP virtual currency with a third-party individual. XRP II provided that individual with a "know your customer" ("KYC") form and asked that it be returned along with appropriate identification in order to move forward with the transaction. The individual replied that another source would provide the XRP virtual currency and did not "require anywhere near as much paperwork" and essentially threatened to go elsewhere. Within hours, XRP II agreed by email to dispense with its KYC requirement and move forward with the transaction. Open source information indicates that this individual, an investor in Ripple Labs, has a prior three-count federal felony conviction for dealing in, mailing, and storing explosive devices and had been sentenced to prison, *see United States v. Roger Ver,* CR 1-20127-JF (N.D. Cal. 2002);

b) In November 2013, XRP II rejected an approximately $32,000.00 transaction because it doubted the legitimacy of the overseas customer's source of funds. XRP II failed to file a suspicious activity report for this transaction; and

c) In January 2014, a Malaysian-based customer sought to purchase XRP from XRP II, indicating that he wanted to use a personal bank account for a business purpose. Because of these concerns, XRP II declined the transaction but again failed to file a suspicious activity report for the transaction.

Exhibit 4

# Regulation of Cryptocurrency Around the World

June 2018



The Law Library of Congress, Global Legal Research Center
(202) 707-5080 (phone) • (866) 550-0442 (fax) • law@loc.gov • http://www.law.gov

This report is provided for reference purposes only.
It does not constitute legal advice and does not represent the official
opinion of the United States Government. The information provided
reflects research undertaken as of the date of writing.
It has not been updated.

# Contents

**Comparative Summary** ................................................................................................... 1

**The Americas** ........................................................................................................... 7

Argentina ........................................................................................................................ 7
Belize ............................................................................................................................. 8
Bermuda ......................................................................................................................... 8
Bolivia ............................................................................................................................ 9
Brazil .............................................................................................................................. 9
Canada ......................................................................................................................... 10
Chile ............................................................................................................................. 12
Colombia ...................................................................................................................... 12
Costa Rica .................................................................................................................... 13
Ecuador ........................................................................................................................ 14
El Salvador ................................................................................................................... 14
Guatemala .................................................................................................................... 15
Honduras ...................................................................................................................... 16
Mexico .......................................................................................................................... 16
Venezuela ..................................................................................................................... 17

**The Caribbean** ....................................................................................................... 19

**I.  Eastern Caribbean Central Bank** ................................................................... 19

**II.  Country Surveys** ............................................................................................. 20

Anguilla ........................................................................................................................ 20
Antigua and Barbuda .................................................................................................... 21
Bahamas ....................................................................................................................... 22
Barbados ...................................................................................................................... 23
British Virgin Islands .................................................................................................... 24
Cayman Islands ............................................................................................................ 24
Dominica ...................................................................................................................... 25
Dominican Republic ..................................................................................................... 25
Grenada ........................................................................................................................ 25
Jamaica ........................................................................................................................ 25
Montserrat .................................................................................................................... 26
Saint Kitts and Nevis .................................................................................................... 26
Saint Lucia ................................................................................................................... 26
Saint Vincent and the Grenadines ................................................................................ 27
Trinidad and Tobago .................................................................................................... 27

**Europe**..................................................................................................................28

**I.  EU Member States**........................................................................................28

European Union ....................................................................................................28
Austria ..................................................................................................................30
Belgium .................................................................................................................31
Bulgaria ................................................................................................................32
Croatia ..................................................................................................................33
Cyprus ...................................................................................................................33
Czech Republic .....................................................................................................33
Denmark ................................................................................................................34
Estonia ..................................................................................................................36
Finland ..................................................................................................................36
France ...................................................................................................................38
Germany ................................................................................................................40
Greece ...................................................................................................................42
Hungary .................................................................................................................42
Ireland ..................................................................................................................42
Italy .......................................................................................................................44
Latvia ....................................................................................................................45
Lithuania ...............................................................................................................45
Luxembourg ..........................................................................................................46
Malta .....................................................................................................................47
Netherlands ...........................................................................................................50
Poland ...................................................................................................................52
Portugal ................................................................................................................53
Romania ................................................................................................................53
Slovakia .................................................................................................................54
Slovenia .................................................................................................................54
Spain .....................................................................................................................55
Sweden ..................................................................................................................55
United Kingdom .....................................................................................................58

**II.  Non-EU Members** .........................................................................................59

Albania ..................................................................................................................59
Armenia .................................................................................................................60
Azerbaijan .............................................................................................................60
Belarus ..................................................................................................................60
Bosnia and Herzegovina .......................................................................................61
Georgia ..................................................................................................................61
Gibraltar ...............................................................................................................62
Guernsey ...............................................................................................................64
Iceland ..................................................................................................................65
Isle of Man ............................................................................................................66

Jersey...............................................................................................69
Kosovo.............................................................................................71
Liechtenstein...................................................................................71
Macedonia.......................................................................................72
Moldova...........................................................................................73
Montenegro......................................................................................73
Norway.............................................................................................74
Russia..............................................................................................75
Serbia...............................................................................................77
Switzerland......................................................................................77
Ukraine............................................................................................80

**Middle East and North Africa**.......................................... 82

Algeria.............................................................................................82
Bahrain............................................................................................82
Egypt................................................................................................82
Iran...................................................................................................83
Iraq...................................................................................................84
Israel................................................................................................84
Jordan..............................................................................................85
Kuwait..............................................................................................86
Lebanon...........................................................................................86
Morocco...........................................................................................87
Oman................................................................................................87
Qatar................................................................................................88
Saudi Arabia....................................................................................88
United Arab Emirates......................................................................88

**Sub-Saharan Africa**............................................................ 89

Ghana...............................................................................................89
Kenya...............................................................................................89
Lesotho............................................................................................90
Mozambique....................................................................................91
Namibia............................................................................................91
South Africa.....................................................................................92
Swaziland.........................................................................................94
Uganda.............................................................................................94
Zambia.............................................................................................95
Zimbabwe........................................................................................95

# Central Asia .................................................................................................................. 96

Kazakhstan ........................................................................................................................96
Uzbekistan .........................................................................................................................96
Kyrgyzstan .........................................................................................................................96
Tajikistan ............................................................................................................................97

# South Asia ....................................................................................................................... 98

Bangladesh .........................................................................................................................98
India ....................................................................................................................................99
Nepal .................................................................................................................................101
Pakistan .............................................................................................................................102

# East Asia and the Pacific ........................................................................................... 103

Australia ...........................................................................................................................103
Brunei ...............................................................................................................................106
China .................................................................................................................................106
Cambodia ..........................................................................................................................107
Hong Kong ........................................................................................................................108
Indonesia ..........................................................................................................................109
Japan .................................................................................................................................111
Macau ...............................................................................................................................113
Malaysia ...........................................................................................................................114
Marshall Islands ...............................................................................................................116
New Zealand .....................................................................................................................117
Philippines ........................................................................................................................119
Samoa ...............................................................................................................................119
Singapore ..........................................................................................................................120
South Korea ......................................................................................................................121
Taiwan ..............................................................................................................................122
Thailand ............................................................................................................................123
Vanuatu ............................................................................................................................124
Vietnam .............................................................................................................................124

## *Maps*

Legal Status of Cryptocurrencies ........................................................................................4
Regulatory Framework for Cryptocurrencies ......................................................................5
Countries that Have or Are Issuing National or Regional Cryptocurrencies ......................6

# Regulation of Cryptocurrency Around the World

*Prepared by the Staff of Global Legal Research Directorate*

## Comparative Summary

This report surveys the legal and policy landscape surrounding cryptocurrencies around the world. While not dissimilar in form to the 2014 Law Library of Congress report on the same subject, which covered forty foreign jurisdictions and the European Union, this report is significantly more comprehensive, covering 130 countries as well as some regional organizations that have issued laws or policies on the subject. This expansive growth is primarily attributable to the fact that over the past four years cryptocurrencies have become ubiquitous, prompting more national and regional authorities to grapple with their regulation. The resulting availability of a broader set of information regarding how various jurisdictions are handling the fast-growing cryptocurrency market makes it possible to identify emerging patterns, some of which are described below. The country surveys are also organized regionally to allow for region-specific comparisons.

One interesting aspect of the fast-growing cryptocurrency market is the fluidity of the terms used to describe the different products that fall within its ambit. While the various forms of what are broadly known as "cryptocurrencies" are similar in that they are primarily based on the same type of decentralized technology known as blockchain with inherent encryption, the terminology used to describe them varies greatly from one jurisdiction to another. Some of the terms used by countries to reference cryptocurrency include: digital currency (Argentina, Thailand, and Australia), virtual commodity (Canada, China, Taiwan), crypto-token (Germany), payment token (Switzerland), cyber currency (Italy and Lebanon), electronic currency (Colombia and Lebanon), and virtual asset (Honduras and Mexico).

One of the most common actions identified across the surveyed jurisdictions is government-issued notices about the pitfalls of investing in the cryptocurrency markets. Such warnings, mostly issued by central banks, are largely designed to educate the citizenry about the difference between actual currencies, which are issued and guaranteed by the state, and cryptocurrencies, which are not. Most government warnings note the added risk resulting from the high volatility associated with cryptocurrencies and the fact that many of the organizations that facilitate such transactions are unregulated. Most also note that citizens who invest in cryptocurrencies do so at their own personal risk and that no legal recourse is available to them in the event of loss.

Many of the warnings issued by various countries also note the opportunities that cryptocurrencies create for illegal activities, such as money laundering and terrorism. Some of the countries surveyed go beyond simply warning the public and have expanded their laws on money laundering, counterterrorism, and organized crimes to include cryptocurrency markets, and require banks and other financial institutions that facilitate such markets to conduct all the due diligence requirements imposed under such laws. For instance, Australia, Canada, and the Isle of Man recently enacted laws to bring cryptocurrency transactions and institutions that facilitate them under the ambit of money laundering and counter-terrorist financing laws.

Some jurisdictions have gone even further and imposed restrictions on investments in cryptocurrencies, the extent of which varies from one jurisdiction to another. Some (Algeria, Bolivia, Morocco, Nepal, Pakistan, and Vietnam) ban any and all activities involving cryptocurrencies. Qatar and Bahrain have a slightly different approach in that they bar their citizens from engaging in any kind of activities involving cryptocurrencies locally, but allow citizens to do so outside their borders. There are also countries that, while not banning their citizens from investing in cryptocurrencies, impose indirect restrictions by barring financial institutions within their borders from facilitating transactions involving cryptocurrencies (Bangladesh, Iran, Thailand, Lithuania, Lesotho, China, and Colombia).

A limited number of the countries surveyed regulate initial coin offerings (ICOs), which use cryptocurrencies as a mechanism to raise funds. Of the jurisdictions that address ICOs, some (mainly China, Macau, and Pakistan) ban them altogether, while most tend to focus on regulating them. In most of these latter instances, the regulation of ICOs and the relevant regulatory institutions vary depending on how an ICO is categorized. For instance, in New Zealand, particular obligations may apply depending on whether the token offered is categorized as a debt security, equity security, managed investment product, or derivative. Similarly, in the Netherlands, the rules applicable to a specific ICO depend on whether the token offered is considered a security or a unit in a collective investment, an assessment made on a case-by-case basis.

Not all countries see the advent of blockchain technology and cryptocurrencies as a threat, albeit for different reasons. Some of the jurisdiction surveyed for this report, while not recognizing cryptocurrencies as legal tender, see a potential in the technology behind it and are developing a cryptocurrency-friendly regulatory regime as a means to attract investment in technology companies that excel in this sector. In this class are countries like Spain, Belarus, the Cayman Islands, and Luxemburg.

Some jurisdictions are seeking to go even further and develop their own system of cryptocurrencies. This category includes a diverse list of countries, such as the Marshall Islands, Venezuela, the Eastern Caribbean Central Bank (ECCB) member states, and Lithuania. In addition, some countries that have issued warnings to the public about the pitfalls of investments in cryptocurrencies have also determined that the size of the cryptocurrency market is too small to be cause for sufficient concern to warrant regulation and/or a ban at this juncture (Belgium, South Africa, and the United Kingdom).

One of the many questions that arise from allowing investments in and the use of cryptocurrencies is the issue of taxation. In this regard the challenge appears to be how to categorize cryptocurrencies and the specific activities involving them for purposes of taxation. This matters primarily because whether gains made from mining or selling cryptocurrencies are categorized as income or capital gains invariably determines the applicable tax bracket. The surveyed countries have categorized cryptocurrencies differently for tax purposes, as illustrated by the following examples:

| Israel | → | taxed as asset |
| Bulgaria | → | taxed as financial asset |
| Switzerland | → | taxed as foreign currency |
| Argentina & Spain | → | subject to income tax |
| Denmark | → | subject to income tax and losses are deductible |
| United Kingdom: | → | corporations pay corporate tax, unincorporated businesses pay income tax, individuals pay capital gains tax |

Mainly due to a 2015 decision of the European Court of Justice (ECJ), gains in cryptocurrency investments are not subject to value added tax in the European Union Member States.

In most of the countries surveyed for this report that have or are in the process of devising taxation rules, the mining of cryptocurrencies is also exempt from taxation.  However, in Russia mining that exceeds a certain energy consumption threshold is taxable.

In a small number of jurisdictions surveyed cryptocurrencies are accepted as a means of payment. In the Swiss Cantons of Zug and a municipality within Ticino, cryptocurrencies are accepted as a means of payment even by government agencies.  The Isle of Man and Mexico also permit the use of cryptocurrencies as a means of payment along with their national currency.   Much like governments around the world that fund various projects by selling government bonds, the government of Antigua and Barbuda allows the funding of projects and charities through government-supported ICOs.

The following three maps visually represent findings from the report on the legal status of cryptocurrencies, the regulatory framework surrounding cryptocurrencies, and countries that have launched their own cryptocurrencies or are planning to do so.

Regulation of Cryptocurrency Around the World

# Legal Status of Cryptocurrencies

**Source:** Created by the Law Library of Congress based on information provided in this report.

Law Library of Congress
LIBRARY OF CONGRESS

The Law Library of Congress

| | Absolute Ban | |
|---|---|---|
| ISO Code | Country Name | |
| DZ | Algeria | |
| BO | Bolivia | |
| EG | Egypt | |
| IQ | Iraq | |
| MA | Morocco | |
| NP | Nepal | |
| PK | Pakistan | |
| AE | United Arab | |

| | Implicit Ban | |
|---|---|---|
| ISO Code | Country Name | |
| BH | Bahrain | |
| BD | Bangladesh | |
| CN | China | |
| CO | Colombia | |
| DO | Dominican Republic | |
| ID | Indonesia | |
| IR | Iran | |
| KW | Kuwait | |
| LS | Lesotho | |
| LT | Lithuania | |
| MO | Macau | |
| OM | Oman | |
| QA | Qatar | |
| SA | Saudi Arabia | |
| TW | Taiwan | |



Regulation of Cryptocurrency Around the World

# Regulatory Framework for Cryptocurrencies:
## Application of Tax Laws, Anti-Money Laundering/Anti-Terrorism Financing Laws, or Both

*Source:* Created by the Law Library of Congress based on information provided in this report.

The Law Library of Congress



Regulation of Cryptocurrency Around the World

# Countries that Have or Are Issuing National or Regional Cryptocurrencies

| Countries that have or are in the process of issuing their own national or regional cryptocurrency | |
|---|---|
| ISO Code | Country Name |
| AI | Anguilla (ECCB) |
| AG | Antigua and Barbuda (ECCB) |
| CN | China |
| DM | Dominica (ECCB) |
| GD | Grenada (ECCB) |
| IE | Ireland |
| LT | Lithuania |
| MH | Marshall Islands |
| MS | Montserrat (ECCB) |
| KN | Saint Kitts and Nevis (ECCB) |
| LC | Saint Lucia (ECCB) |
| VC | Saint Vincent and the Grenadines (ECCB) |
| VE | Venezuela |

**Source & Note:** Created by the Law Library of Congress based on information provided in this report. As discussed in the report, the Eastern Caribbean Central Bank (ECCB), which is the monetary authority for eight island economies in the Eastern Caribbean Currency Union, has entered into an agreement for the development of a digital currency for member states.

The Law Library of Congress

# The Americas

**Argentina**

Under the National Constitution of Argentina[1] the only authority capable of issuing legal currency is the Central Bank.[2]  Bitcoins are not legal currency strictly speaking, since they are not issued by the government monetary authority and are not legal tender.[3]  Therefore, they may be considered money but not legal currency, since they are not a mandatory means of cancelling debts or obligations.[4]  Although bitcoins are not specifically regulated, they are increasingly being used in Argentina, a country that has strict controls over foreign currencies.[5]  According to some experts[6] a bitcoin may be considered a good or a thing under the Civil Code,[7] and transactions with bitcoins may be governed by the rules of the sale of goods under the Civil Code.[8]

The latest amendment to the Income Tax Law provides that the profit derived from the sale of digital currency will be considered income and taxed as such.[9]

---

[1] CONSTITUCIÓN DE LA NACIÓN ARGENTINA [NATIONAL CONSTITUTION OF ARGENTINA] art. 75, para. 6, BOLETÍN OFICIAL [B.O.], Aug. 22, 1994, http://servicios.infoleg.gob.ar/infolegInternet/anexos/0-4999/804/norma.htm, *archived at* https://perma.cc/XN2T-C5G7.

[2] Ley No. 24.144, Carta Orgánica del Banco Central de la República Argentina [Law No. 24,144, Charter of the Central Bank of the Republic of Argentina] art. 30, B.O., Oct. 13, 1992, http://servicios.infoleg.gob.ar/infoleg Internet/anexos/0-4999/542/texact.htm, *archived at* https://perma.cc/2CVW-8VNX.

[3] *El Banco Central Argentino Considera Riesgoso Operar con Bitcoins* [*Central Bank of Argentina Considers Risky Operations with Bitcoins*], INFOTECNOLOGÍA (May 28, 2014), http://www.infotechnology.com/internet/El-Banco-Central-argentino-considera-riesgoso-operar-con-bitcoins-20140528-0003.html, *archived at* https://perma.cc/746A-JBYG.

[4] Mara Laudonia, *El Vacío Legal del Bitcoin, Es o No Es Dinero?* [*The Legal Vacuum of the Bitcoin: Is It or Is It Not Money?*], TÉLAM (Feb. 28, 2018), http://www.telam.com.ar/notas/201702/180185-el-vacio-legal-del-bitcoin-es-o-no-es-dinero.html, *archived at* https://perma.cc/P2WE-L8F9.

[5] José Crettaz, *Bitcoin: Fiebre Argentina por la Máquina de Dinero Digital* [*Bitcoin: Argentine Fever for the Digital Money Machine*], LA NACIÓN (June 30, 2013), http://www.lanacion.com.ar/1596773-bitcoin-pasion-argentina-por-la-nueva-maquina-de-hacer-billetes-digitales, *archived at* https://perma.cc/PMU9-KWB5; Diego Geddes, *Argentina es uno de los países que más usa el bitcoin* [*Argentina Is One of the Countries that Uses the Bitcoin*], CLARÍN (Dec. 31, 2013), http://www.clarin.com/sociedad/Argentina-paises-Bitcoin-moneda-virtual_0_1057694271.html, *archived at* https://perma.cc/N8SA-5H9L.

[6] *See*, *e.g.*, Andres Chomczyk, *Situación Legal del Bitcoin en Argentina*, ELBITCOIN.ORG (Oct. 10, 2013), http://elbitcoin.org/situacion-legal-de-bitcoin-en-argentina, *archived at* https://perma.cc/8GDA-CFPK.

[7] CÓDIGO CIVIL [CIVIL CODE] art. 2311, http://www.infoleg.gov.ar/infolegInternet/anexos/105000-109999/109481/texact.htm, *archived at* http://www.infoleg.gov.ar/infolegInternet/anexos/105000-109999/109481/ texact.htm.

[8] *Id.* art. 1323.

[9] Ley 27430 de Modificación del Impuesto a las Ganancias [Law 27430 Amending the Income Tax Law] art. 2, B.O., Dec. 29, 2017, http://www.telam.com.ar/notas/201702/180185-el-vacio-legal-del-bitcoin-es-o-no-es-dinero.html, *archived at* https://perma.cc/M758-JEK.

**Belize**

Belize does not appear to have any legislation that specifically regulates cryptocurrencies.[10] Trading businesses in Belize are regulated by the International Financial Services Commission of Belize.  The Commission does not appear to issue licenses for companies to engage in cryptocurrency exchanges.[11]

**Bermuda**

Bermuda does not have legislation or regulations that specifically govern cryptocurrencies.  The government is, however, in the early stages of crafting legislation and regulations that aim to establish Bermuda as an international destination for digital currencies, similar to its position in the insurance and reinsurance sectors.[12]

In late 2017, the government of Bermuda launched a task force to "advance the regulatory environment and develop Bermuda as a destination for Utility Tokens, Tokenized Securities, Cryptocurrencies and Coin Offerings."[13]  The aims of the task force are as follows:

- Creating a Crypto Currency Association with a defined Code of Conduct and Rules of Operation.  The Bermuda Crypto Association is in the process of being formed and our aim is for this Group to be self-governing.

- The Bermuda Monetary Authority in conjunction with the Ministry of Finance will work together to draft a letter or document confirming; Utility Tokens are not a security as long as there is no promise of future value.  The will allow companies from all over the world to set up in Bermuda for Crowd Funding.

  Most importantly, the Legal and Regulatory Working Group will provide confirmation that Utility Tokens are not prohibited or contravening any local legislation.[14]

The task force has two working groups, directed by the Minister of National Security.  One group is the Blockchain Legal and Regulatory Working Group and is tasked with ensuring that Bermuda's legislation and regulations are conducive for the development of cryptocurrencies.  The other is known as the Blockchain Business Development Working Group, which is tasked with aiding in the development of technology for cryptocurrencies.  The Business Development Agency

---

[10] *Legislation*, INTERNATIONAL FINANCIAL SERVICES COMMISSION BELIZE, https://www.ifsc.gov.bz/legislation/ (last visited Mar. 21, 2018), *archived at* https://perma.cc/BTB7-9ZQ4.

[11] *About IFSC*, INTERNATIONAL FINANCIAL SERVICES COMMISSION BELIZE, https://www.ifsc.gov.bz/ (last visited Mar. 21, 2018), *archived at* https://perma.cc/7BRX-2TDN.

[12] Scott Neil, *Island Spells Out Blockchain Ambitions*, THE ROYAL GAZETTE (Jan. 26, 2018), http://www.royal gazette.com/international-business/article/20180126/island-spells-out-blockchain-ambitions, *archived at* https://perma.cc/9BYN-LK5N.

[13] Press Release, The Government of Bermuda, Blockchain Working Group Members Announced (Nov. 22, 2017), https://www.gov.bm/articles/blockchain-working-group-members-announced, *archived at* https://www.gov.bm/online-services.

[14] Press Statement, Government of Bermuda, Cryptocurrency Initiative (Nov. 24, 2017), https://www.gov.bm/articles/cryptocurrency-initiative, *archived at* https://perma.cc/ZSJ3-B5W9.

is also partnering with the government in this endeavor to help bring new business to the island, create new jobs, and boost its gross domestic product.[15]

The government is also aiming to introduce a framework to regulate distributed ledger technologies (DLT) this year, to regulate firms that operate in or from Bermuda and use DLT to "store or transmit value belonging to others, such as virtual currency exchanges, coins and securitized tokens."[16]  This would cover "the promotion and sale of utility tokens, aligned with the DLT framework."[17]  There have been no further statements on the government of Bermuda's public website that discuss the proposed regulatory framework.

On January 17, 2018, the Bermuda Monetary Authority issued a press release warning of the risks of initial coin offerings, noting that whether such offerings fall within its regulatory boundaries is determined on a case-by-case basis, but that most such offerings are "unregulated because there are no requirements with which they are required to comply at this time."[18]

## Bolivia

The use of virtual currencies is prohibited in Bolivia.[19] The Central Bank has stated that the use of currency not issued by the monetary authority is not allowed in the country.[20] Cryptocurrencies such as Bitcoin are not regulated and therefore, the Central Bank warns about the possible losses that people using them are exposed to.[21]

## Brazil

On November 16, 2017, the Brazilian Federal Reserve Bank (Banco Central do Brasil) issued Notice No. 31,379 alerting citizens to the risks arising from the custody and trading operations of virtual currencies.  The notice stated in part as follows:

> Considering the growing interest of the economic agents (society and institutions) in so-called virtual currencies, the Brazilian Federal Reserve Bank warns that these are neither issued nor guaranteed by any monetary authority, so they have no guarantee of

---

[15] *Id*.

[16] *Id*.

[17] Sujha Sundararajan, *Government of Bermuda Launches Cryptocurrency Task Force*, CoinDesk, (Nov. 24, 2017), https://www.coindesk.com/government-of-bermuda-launches-cryptocurrency-task-force/, *archived at* https://perma.cc/AL8K-VQFA.

[18] Press Release, Bermuda Monetary Authority, Risk of Initial Coin Offerings (Jan. 17, 2018), http://www.bma.bm/BMANEWS/Risks of Initial Coin Offerings.pdf, *archived at* https://perma.cc/8KBG-BWAD.

[19] *Banco Central de Bolivia Prohibe el Uso del Bitcoin y Otras 11 Monedas Virtuales* [*Central Bank of Bolivia Prohibits the Use of Bitcoin and Other 11 Virtual Currency*], Enlaces Bolivia (Apr. 2017), http://www.enlaces bolivia.net/9263-Banco-Central-de-Bolivia-prohibe-el-uso-de-bitcoins-y-otras-11-monedas-virtuales, *archived at* https://perma.cc/GFR6-7JSK.

[20] Comunicado, Banco Central Bolivia (Apr. 2017), https://www.bcb.gob.bo/webdocs/11_comunicados/04_2017_COMUNICADO_Uso_monedas.pdf, *archived at* https://perma.cc/YW8G-2Z73.

[21] *Id*.

*Regulation of Cryptocurrency Around the World*

conversion to sovereign currencies, nor are they backed in real assets of any kind, being the entire risk of the holders.

. . .

4. Companies that negotiate or keep so-called virtual currencies on behalf of users, natural persons or legal entities are not regulated, authorized, or supervised by the Brazilian Federal Reserve Bank. There is no specific regulation on virtual currencies in the legal and regulatory framework related to the National Financial System. The Brazilian Federal Reserve Bank, in particular, does not regulate or supervise operations with virtual currencies.

5. So-called virtual currency is not to be confused with the definition of electronic money referred to in Law 12,865 of October 9, 2013, and its regulation by means of normative acts issued by the Brazilian Federal Reserve Bank, according to the guidelines of the National Monetary Council. . . . .[22]

## Canada

Canada allows the use of cryptocurrencies, including Bitcoin. According to a Financial Consumer Agency of Canada webpage on digital currencies, "[y]ou can use digital currencies to buy goods and services on the Internet and in stores that accept digital currencies. You may also buy and sell digital currency on open exchanges, called digital currency or cryptocurrency exchanges."[23] However, cryptocurrencies, including Bitcoin, are not considered legal tender in Canada; "[o]nly the Canadian dollar is considered official currency in Canada."[24] The Currency Act defines legal tender as

- bank notes issued by the Bank of Canada under the Bank of Canada Act
- coins issued under the Royal Canadian Mint Act[.][25]

Canada's tax laws and rules also apply to digital currency transactions, including those made with cryptocurrencies, and digital currencies are subject to the Income Tax Act.[26] The Canada Revenue Agency (CRA) "has characterized cryptocurrency as a commodity and not a government-issued

---

[22] Banco Central do Brasil, Comunicado No. 31.379, de 16 de Novembro de 2017, http://www.bcb.gov.br/pre/normativos/busca/normativo.asp?numero=31379&tipo=Comunicado&data=16/11/2017, *archived at* https://perma.cc/G4GM-8HV6 (translation by author).

[23] *Digital Currency*, FINANCIAL CONSUMER AGENCY OF CANADA, https://www.canada.ca/en/financial-consumer-agency/services/payment/digital-currency.html (last modified Jan. 19, 2018), *archived at* https://perma.cc/G3PY-H8NR.

[24] *Id.*

[25] Currency Act, R.S.C., 1985, c. C-52, § 8, http://laws-lois.justice.gc.ca/eng/acts/c-52/page-1.html, *archived at* https://perma.cc/4A4E-3XBH.

[26] *Digital Currency*, *supra* note 23.

currency."[27] Accordingly, the use of cryptocurrency to pay for goods or services is "treated as a barter transaction."[28] According to the Financial Consumer Agency,

> [g]oods purchased using digital currency must be included in the seller's income for tax purposes. GST/HST also applies on the fair market value of any goods or services you buy using digital currency.
>
> . . .
>
> When you file your taxes you must report any gains or losses from selling or buying digital currencies.[29]

On the issue of taxation, the Canada Revenue Agency adds that,

> [w]here digital currency is used to pay for goods or services, the rules for barter transactions apply. A barter transaction occurs when any two persons agree to exchange goods or services and carry out that exchange without using legal currency. For example, paying for movies with digital currency is a barter transaction. The value of the movies purchased using digital currency must be included in the seller's income for tax purposes. The amount to be included would be the value of the movies in Canadian dollars.[30]

On June 19, 2014, the Governor General of Canada gave his assent to Bill C-31 (An Act to Implement Certain Provisions of the Budget Tabled in Parliament on February 11, 2014, and Other Measures),[31] which includes amendments to Canada's Proceeds of Crime (Money Laundering) and Terrorist Financing Act. The new law treats virtual currencies, including Bitcoin, as "money service businesses" for the purposes of the anti-money laundering law.[32] The Act is regarded as the "world's first national law on digital currencies, and certainly the world's first treatment in law of digital currency financial transactions under national anti-money laundering law."[33]

---

[27] Mariam Al-Shikarchy et al., Gowling WLG, *Canadian Taxation of Cryptocurrency ... So Far*, Lexology.com (Nov. 14, 2017), https://www.lexology.com/library/detail.aspx?g=6283077e-9d32-4531-81a5-56355fa54f47, *archived at* https://perma.cc/H9ZW-47KB.

[28] *Id.*

[29] *Id.*

[30] *What You Should Know About Digital Currency*, Canada Revenue Agency, https://www.canada.ca/en/revenue-agency/news/newsroom/fact-sheets/fact-sheets-2015/what-you-should-know-about-digital-currency.html (last updated Mar. 17, 2015), *archived at* https://perma.cc/CYV2-236S.

[31] Bill C-31, An Act to Implement Certain Provisions of the Budget Tabled in Parliament on February 11, 2014 and Other Measures, Second Session, Forty-first Parliament, 62-63 Elizabeth II, 2013-2014, Statutes of Canada 2014 Ch. 20, http://www.parl.ca/DocumentViewer/en/41-2/bill/C-31/royal-assent, *archived at* https://perma.cc/2N7Q-E68C.

[32] Tariq Ahmad, *Canada: Canada Passes Law Regulating Virtual Currencies as "Money Service Businesses"* Global Legal Monitor (July 9, 2014), http://www.loc.gov/law/foreign-news/article/canada-canada-passes-law-regulating-virtual-currencies-as-money-service-businesses/, *archived at* https://perma.cc/BQA6-K7MV.

[33] Christine Duhaime, *Canada Implements World's First National Bitcoin Law*, Duhaime Law (June 22, 2014), https://www.duhaimelaw.com/2014/06/22/canada-implements-worlds-first-national-bitcoin-law/, *archived at* https://perma.cc/Z3AQ-SKME.

On August 24, 2017, the Canadian Securities Administrators (CSA) published CSA Staff Notice 46-307 on Cryptocurrency Offerings,[34] "which outlines how securities law requirements may apply to initial coin offerings (ICOs), initial token offerings (ITOs), cryptocurrency investment funds and the cryptocurrency exchanges trading these products."[35] On February 1, 2018, *The Globe and Mail* reported that the Ontario Securities Commission had approved the country's first blockchain fund—Blockchain Technologies ETF.[36]

The Bank of Canada, Payments Canada, and R3, a distributed database technology company, are involved in a research initiative called Project Jasper "to understand how distributed ledger technology (DLT) could transform the wholesale payments system."[37] Phases 1 and 2 of the project are "focused on exploring the clearing and settlement of high-value interbank payments using DLT." Phase 3 explores "the potential benefits from integrating this "cash on ledger" with other assets such as foreign exchange and securities."[38]

## Chile

According to an unofficial statement from the Central Bank of Chile virtual currencies have no specific legal recognition in the country and trade and transactions involving cryptocurrency are not subject to the regulation or supervision of the monetary authority.[39]

## Colombia

The Superintendencia Financiera (SF) (Financial Superintendency) of Colombia warned in a June 2017 circular that bitcoin is not currency in Colombia and therefore may not be considered legal tender susceptible of cancelling debts.[40] The SF further emphasized that the Colombian peso is the

---

[34] *CSA Staff Notice 46-307 Cryptocurrency Offerings*, ONTARIO SECURITIES COMMISSION (Aug. 24, 2017), http://www.osc.gov.on.ca/en/SecuritiesLaw_csa_20170824_cryptocurrency-offerings.htm, *archived at* https://perma.cc/7XF6-3T3E.

[35] Press Release, Canadian Securities Administrators, Canadian Securities Regulators Outline Securities Law Requirements That May Apply to Cryptocurrency Offerings (Aug. 24, 2017), https://www.securities-administrators.ca/aboutcsa.aspx?id=1606, *archived at* https://perma.cc/4KL4-YSEV.

[36] Clare O'Hara, *OSC Approves Canada's First Blockchain ETF*, THE GLOBE AND MAIL (Feb. 1, 2018), https://www.theglobeandmail.com/globe-investor/funds-and-etfs/etfs/osc-approves-canadas-first-blockchain-etf/article37828183/, *archived at* https://perma.cc/V6TD-KZ5C.

[37] *Fintech Experiments and Projects*, BANK OF CANADA, https://www.bankofcanada.ca/research/digital-currencies-and-fintech/fintech-experiments-and-projects/ (last visited Apr. 6, 2018), *archived at* https://perma.cc/9F77-QHFN.

[38] *Id.*

[39] Claudia Ramírez, *El Avance de las Monedas Virtuales en Chile: Cuatro Empresas Transan Más de US$ 7 Millones Mensuales y Suman Casi 20 Mil Clientes* [*The Advance of Virtual Currency in Chile: Four Companies Transact More than US$ 7 Million Monthly and Adds Almost 20 Thousand Clients*], ECONOMÍA Y NEGOCIOS (July 2, 2017), http://www.economiaynegocios.cl/noticias/noticias.asp?id=375043, *archived at* https://perma.cc/VGM6-725C.

[40] Superintendencia Financiera de Colombia, Carta Circular 52 de 2017, Riesgos Potenciales Asociados a las Operaciones Realizadas con "Monedas Electronicas-Criptomonedas o MonedasVirtuales" [Potential Risks Associated with Operations Related to "Electronic Currency-Cryptocurrencies or Virtual Money"] (June 22, 2017),

only legal currency, and that the Banco de la República has the exclusive authority to issue money in Colombia.[41] According to the SF, cryptocurrencies have no value under capital market laws and therefore are also not recognized as a security.[42] The SF warned controlled financial institutions that they are not authorized to protect, invest, broker, or manage virtual money operations.[43] The SF called on persons to become informed and assume the risks related to virtual currencies if they choose to trade them, since these currencies do not have any private or state guarantee.[44]

## Costa Rica

The Central Bank of Costa Rica and its decentralized agencies (*órganos de desconcentración máxima*) issued a statement in October 2017 to participants in the financial, stock, securities, insurance, and pension markets, and to exchange houses, remittance agencies, the economic sector, and the general public, warning them about the risks associated with the acquisition of cryptocurrencies with the intention of using them either as financial savings or as a means of payment in Costa Rica.  The statement explained that articles 42-51 of the Organic Law of the Central Bank establishes the colón as the monetary currency in Cost Rica. The statement also asserted that the Law designates the Central Bank as the sole issuer of bills and coins and establishes the unlimited power of the colón to liquidate all kinds of pecuniary obligations, both public and private.  Due to this, the statement said, Bitcoin and similar cryptocurrencies are not recognized as legal tender in the country and do not have the backing of the Central Bank or the state of Costa Rica.  Moreover, cryptocurrencies' effectiveness or use as a means of payment in the economy of the country cannot be guaranteed, nor can any person be forced to accept them as a means of payment for the transaction of goods and services.

The statement also asserted that because cryptocurrencies are not issued by a foreign central bank, they cannot be considered a foreign currency under the monetary exchange regime, and for this reason they do not have the security offered by the free currency convertibility provisions of articles 48 and 49 of the Organic Law of the Central Bank.

In the statement, the Central Bank and its decentralized agencies emphasized that they do not in any way regulate or supervise cryptocurrencies as a means of payment; moreover, they emphasized that transactions with cryptocurrencies cannot be made through the National System of Electronic Payment (SINPE) used in Costa Rica.

The statement warned that if any financial entity becomes directly or indirectly involved with its customers in the commercialization or use of any of these digital assets, such operation are undertaken at the financial entity's own risk and responsibility, as well as that of its customers. The statement added that the foregoing is in accordance with the obligation established by

---

*available at* https://actualicese.com/normatividad/2017/06/22/carta-circular-52-de-22-06-2017/, *archived at* https://perma.cc/V4MW-TNUD.

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

prudential regulations on the prevention of money laundering and the financing of terrorism, which imposes a duty on financial entities to carry out the necessary risk analysis with respect to new technologies.

The statement reiterated that any person who acquires digital currencies, either as a form of savings or with the interest of using them as means of payment, and those who accept them with this function in commercial transactions, also do so at their own risk and responsibility, warning that they will be participating in operations not contemplated by the banking regulations or the payment mechanisms authorized by the Central Bank of Costa Rica.  The statement concluded by saying that the warnings it contains are not limiting and do not exclude other risks inherent in the use of digital currency, and that the Central Bank will continue to study the issue.[45]

### Ecuador

The Central Bank of Ecuador has stated that Bitcoin is not an authorized payment method in Ecuador.[46] It further clarified that the bitcoin, as a cryptocurrency, is not backed by any authority, because its value is based merely on speculation.[47] Furthermore, financial transactions with bitcoins are not controlled, supervised, or regulated by any Ecuadoran entity, and therefore they represent a financial risk for those who invest in them.[48]

The Central Bank also stated, however, that the purchase and sale of cryptocurrencies such as bitcoin through the internet are not forbidden,[49] but it reiterated that bitcoin is not legal tender and is not an authorized payment method for goods and services according to the Código Orgánico Monetario y Financiero (Organic Monetary and Financial Code).[50]

### El Salvador

The Central Reserve Bank of El Salvador issued a statement on November 6, 2017, expressing its position on cryptocurrencies, which can be summarized as follows:

---

[45] Press Release, Banco Central de Costa Rica, Posición del Banco Central de Costa Rica (BCCR) y sus Órganos de Desconentración Máxima (ODM) con Respecto a las Criptomonedas (Oct. 9, 2017), http://www.bccr.fi.cr/noticias/historico/2017/Posicion_bccr_criptomonedas.html, *archived at* https://perma.cc/KD4P-WXX8.

[46] *Comunicado Oficial a la Ciudadanía*, BANCO CENTRAL DEL ECUADOR (Jan. 8, 2018), https://www.bce.fin.ec/index.php/boletines-de-prensa-archivo/item/1028-comunicado-oficial-sobre-el-uso-del-bitcoin, *archived at* https://perma.cc/9AVZ-9H3V.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] CÓDIGO MONETARIO Y FINANCIERO [MONETARY AND FINANCE CODE] art. 94, REGISTRO OFICIAL [R.O.], Sept. 12, 2014, http://www.asambleanacional.gob.ec/es/system/files/ro_codigo_organico_monetario_y_financiero.pdf, *archived at* https://perma.cc/M63F-4ZRG.

- At the international and national level there is a discussion about the use of cryptocurrencies.

- Cryptocurrencies are not legal tender in any jurisdiction; they, unlike the conventional currencies issued by a monetary authority, are not controlled or regulated and their price is determined by the supply and demand of their market.

- In accordance with articles 36–37 of the Organic Law of the Central Reserve Bank of El Salvador, and articles 3 and 6 of the Monetary Integration Law of El Salvador, the colón and the United States dollar are the only unrestricted legal tender that can be used for the payment of monetary obligations in the national territory.

- Any transaction that is made with virtual currency is the responsibility and risk of the person who carries it out.

- Fundraising using digital currencies is prohibited.  According to article 184 of the Banking Law, all public fundraising with or without advertising, and in any form, is prohibited by those who are not authorized in accordance with the Banking Law, or other laws in force that regulate fundraising.

- According to the Central Reserve Bank, as the monetary authority, regulator of the financial system, and watchdog of payment systems, there is currently no legal or regulatory framework applicable to cryptocurrencies or their equivalents.

- The Central Reserve Bank will remain vigilant on this and other related issues.[51]

## Guatemala

In December 2017 the acting President of the Bank of Guatemala, Sergio Recinos, confirmed that both Bitcoin and other types of cryptocurrencies are not legal tender in the country and do not have regulatory backing. He stated that according to Guatemalan legislation, the quetzal is the national currency and the Bank of Guatemala is the only issuer of bills and coins within the national territory, in accordance with articles 1 and 2 of the Monetary Law (Ley Monetaria).  In this sense, virtual currencies are not recognized as a currency in Guatemala and neither are they recognized as foreign currency; therefore, they do not constitute a means of legal payment.  Recinos added that due to their anonymous origin, cryptocurrencies can easily be used for illicit activities, such as money laundering, terrorism, drug purchases, and tax evasion, among others, to a degree that could be higher than with cash. Moreover, he said that cryptocurrencies are exposed to cyberattacks or hacking, which could lead to irreversible loss for the user.  Lastly, Recinos warned that cryptocurrencies are not backed by any government and do not depend on a central bank issuer; therefore, no one is trying to maintain their value over time.  He recommended that persons carefully examine the issue before deciding to invest in cryptocurrencies.[52]

---

[51] *Aviso sobre el Uso de Criptomonedas y Similares*, BANCO CENTRAL DE RESERVA DE EL SALVADOR (Nov. 6, 2017), http://www.bcr.gob.sv/esp/index.php?option=com_k2&view=item&id=1067:aviso-sobre-el-uso-de-criptomonedas-o-similares&Itemid=168, *archived at* https://perma.cc/JDR7-EHYK.

[52] Rosa María Bolaños, *Banguat Refiere que Criptomonedas no son un Medio de Pago Legal*, PRENSA LIBRE (Dec. 19, 2017), http://www.prensalibre.com/economia/banguat-refiere-que-criptomonedas-no-son-un-medio-de-pago-legal, *archived at* https://perma.cc/5TWQ-8Q7B.

## Honduras

In January 2018, the Honduran Central Bank issued a statement in response to inquiries made by economic and financial agents in relation to the use of cryptocurrencies within the national territory, either as an investment or as a means of payment for goods and services.  The response stated that cryptocurrencies such as bitcoin, ethereum, litecoin, and other similar cryptocurrencies do not have the backing of the Central Bank of Honduras. Therefore, the Central Bank does not regulate or guarantee their use and such cryptocurrencies do not enjoy the legal protection granted by the laws of the country in terms of the payment system.  As a result, any transaction that is made with this type of currency or virtual assets is the responsibility and risk of the person who conducts the transaction, the statement said.[53]

## Mexico

Mexico's Law to Regulate Financial Technology Companies, enacted in March 2018, includes a chapter on operations with "virtual assets," commonly known as cryptocurrencies.[54] This chapter defines virtual assets as representations of value electronically registered and utilized by the public as a means of payment for all types of legal transactions, which may only be transferred electronically.[55]

In addition, Mexico has enacted a law extending the application of its laws regarding money laundering to virtual assets, thereby requiring financial institutions that provide services relating to such assets to report transactions exceeding certain amounts.[56]

Mexico's Central Bank is granted broad powers under the Law to regulate virtual assets, including

- specifying those virtual assets that financial companies are allowed to operate with in the country, defining their particular characteristics, and establishing the conditions and restrictions applicable to transactions with such assets; and

- authorizing financial companies to perform transactions with virtual assets.[57]

---

[53] Banco Central de Honduras, Comunicado (Jan. 19, 2018), http://www.bch.hn/download/boletines_prensa/2018/boletin_otro_01_18.pdf, *archived at* https://perma.cc/JN2B-PSC8.

[54] Ley para Regular las Instituciones de Tecnología Financiera [Law to Regulate Financial Technology Companies] arts. 30–34, DIARIO OFICIAL DE LA FEDERACIÓN [D.O.F], Mar. 9, 2018, available as originally enacted on the website of Mexico's House of Representatives *at* http://www.diputados.gob.mx/LeyesBiblio/pdf/LRITF_090318.pdf, *archived at* https://perma.cc/SB6N-RQY7.

[55] *Id.* art. 30.

[56] Ley Federal para la Prevención e Identificación de Operaciones con Recursos de Procedencia Ilícita [Federal Law for the Prevention and Identification of Transactions with Resources of Illicit Origin] art. 17(XVI), Nota de vigencia, D.O.F., Oct. 17, 2012, available as amended through March 2018 on the website of Mexico's House of Representatives *at* http://www.diputados.gob.mx/LeyesBiblio/pdf/LFPIORPI_090318.pdf, *archived at* https://perma.cc/4UVN-GM98. .

[57] Ley para Regular las Instituciones de Tecnología Financiera [Law to Regulate Financial Technology Companies] arts. 30–32, 88.

Pertinent regulations applicable to these assets must be issued by Mexico's Central Bank within a year from the enactment of the Law.[58]

Financial companies that carry out transactions with virtual assets must disclose to their clients the risks applicable to these assets.[59] At a minimum, these companies must inform their clients, in a clear and accessible manner on their respective websites or through the means that they utilize to provide services, of the following:

- A virtual asset is not a legal currency and is not backed by the federal government nor by Mexico's Central Bank;

- Once executed, transactions with virtual assets may be irreversible;

- The value of virtual assets is volatile; and

- Technological, cybernetic, and fraud risks are inherent in virtual assets.[60]

**Venezuela**

Under Decree 3196 of December 8, 2017,[61] the government of Venezuela was authorized to create its own cryptocurrency, the petro, which would be physically backed by Venezuelan barrels of oil.[62] One petro would be backed by a purchase-sale contract for one barrel of Venezuelan oil as quoted in the OPEC Reference Basket, as well as other commodities, including gold, diamond, coltan, and gas.[63]

Decree 3196 mainly provides for the operational details of the petro, including its issuance, mining, and trading in Venezuela according to the rules on purchase and sale contained in the Civil Code.[64] According to a legal expert on information technology law, all cryptocurrencies are considered a financial asset subject to the rules applicable to such assets under Decree 3196 and none of its provisions declare them illegal.[65] The Decree also creates the Superintendencia de los

---

[58] *Id.* sexta disposicion transitoria (II).

[59] *Id.* art. 34.

[60] *Id.*

[61] Decreto 3196 Mediante el cual se Autoriza la Creación de la Superintendencia de los Criptoactivos y Actividades Conexas Venezolana [Decree 3196 Authorizing the Creation of the Venezuelan Superintendency of Cryptoassets and Related Activities], GACETA OFICIAL [G.O.], Dec. 8, 2017, http://gacetaoficial.tuabogado.com/gaceta-oficial/decada-2010/2017/gaceta-oficial-6346-del-8-diciembre-2017, *archived at* https://perma.cc/CSC3-BKBV.

[62] *Id.* art. 4.

[63] *Id.*

[64] *Id.* art. 3.

[65] Raymond Orta, *Efectos sobre el Bitcoin y otras Criptomonedas del Decreto sobre Creación del PETRO y la Superintendencia de los Criptoactivos* [*Effects of Decree Creating the PETRO and the Superintendency of Crypto Assets on Bitcoin and other Cryptocurrencies*], TUABOGADO.COM ( Dec. 28, 2017), http://www.tuabogado.com/venezuela/secciones/derecho/informatico/efectos-sobre-el-bitcoin-y-otras-criptomonedas-del-decreto-sobre-creacion-del-petro-y-la-superintendencia-de-los-criptoactivos-raymondorta, *archived at* https://perma.cc/3RU6-ANVU.

Criptoactivos y Actividades Conexas Venezolana (Superintendency of Venezuelan Crypto-Assets and Related Activities) as the supervisory authority of cryptocurrencies.[66]

Decree 3196 states that the holder of petro will be able to exchange the market value of the cryptoasset for the equivalent in another cryptocurrency or in bolívares (the traditional currency of Venezuela) at the market exchange rate published by a national cryptoasset exchange house.[67] The holder of each petro would also own a virtual wallet, which was to be his/her own responsibility, along with the risks related to its custody and management.[68]

According to Decree 3196, an initial coin offering will be made through auction or direct assignment by the Superintendence of Cryptoassets and Related Venezuelan Activities.[69]

On March 8, the Asamblea Nacional (National Assembly, the Venezuelan Congress), declared that the issuance of a domestic cryptocurrency such as the petro is illegal, because in order to enter into a public debt and borrow on behalf of the Venezuelan government, congressional approval and a special law is required under the National Constitution.[70]  In addition, only the Central Bank of Venezuela may issue national currency.[71]  The Asamblea National further stated that oil reserves are public national assets that belong to the Republic and are non-transferrable assets, and therefore cannot be used as guarantee for any debt.[72]

Despite these declarations by the Asamblea National, the Government has said the petro will become legal tender for all transactions involving government institutions within 120 days of April 9, 2018.[73]

---

[66] *Id.* art. 1.

[67] Decreto 3196, art. 5.

[68] *Id*.

[69] *Id*. art. 8.

[70] Asamblea Nacional de la República Bolivariana de Venezuela, Acuerdo sobre la Implementación del Petro [Accord on the Implementation of Petro] (Mar. 6, 2018), http://www.asambleanacional.gob.ve/documentos_archivos/acuerdo-sobre-la-implementacion-del-petro-191.pdf, *archived at* https://perma.cc/L6GQ-QUXV (citing CONSTITUCION DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA [CRBV] art. 312, G.O., Mar. 24, 2000, http://www.cne.gov.ve/web/normativa_electoral/constitucion/titulo2.php#art12, *archived at* https://perma.cc/3BLG-R5P4).

[71] *Id*. (citing CRBV art. 318).

[72] *Id*. (citing CRBV art. 12).

[73] Decreto Constituyente sobre Criptoactivos y la Criptomoneda Soberana Petro [Constitutional Decree on Cryptocurrency and the Sovereign Cryptocurrency Petro], G.O., Apr. 9, 2018, pp. 3–7, *available at* http://pandectasdigital.blogspot.com/2018/04/decreto-constituyente-sobre.html, *archived at*

# The Caribbean

## I. Eastern Caribbean Central Bank

The Eastern Caribbean Central Bank (ECCB) is the monetary authority for eight island economies in the Eastern Caribbean Currency Union that use a common currency known as the Eastern Caribbean dollar[74]—Anguilla, Antigua and Barbuda, the Commonwealth of Dominica, Grenada, Montserrat, Saint Kitts and Nevis, Saint Lucia, and Saint Vincent and the Grenadines.[75]  On March 9, 2018, the ECCB signed a memorandum of understanding with the Barbados-based financial technology company Bitt Inc. agreeing to participate in a pilot program that will enable it to issue a digital currency.  Expected to start at the end of 2018, the pilot will specifically involve

> the development of a digital Eastern Caribbean Dollar using distributed ledger technology with a blockchain platform specifically designed for a safe and secure digital financial ecosystem. Essentially, [it] would be a proof of concept, designed to demonstrate the viability and functionality of the ECCB issuing Digital Eastern Caribbean Dollars.[76]

The ECCB will work closely with Bitt Inc. to

> develop, deploy and test technology which focuses on data management, compliance and transaction monitoring system for Know Your Customer, Anti-Money Laundering, and Combating the Financing of Terrorism. . . . The pilot will also focus on developing a secure, resilient digital payment and settlement platform with embedded regional and global compliance; and the issuance of a digital EC [Eastern Caribbean] currency which will operate alongside physical EC currency.[77]

While this summarizes the regional effort to adopt a common digital currency, national efforts by ECCB member states to deal with emerging cryptocurrencies are discussed below, along with the efforts of other Caribbean countries that are not participating in the ECCB pilot.

---

[74] TREVOR O.B. BRATHWAITE, ECCB, MONETARY UNIONS IN THE CARIBBEAN CONTEXT – THE CHALLENGES FACED BY THE EASTERN CARIBBEAN CURRENCY UNION SINCE THE CRISIS (Mar. 2016), http://www.centralbank.cw/uploads/files/Monetary Unions in the Caribbean Context II.pdf, *archived at* https://perma.cc/VMQ2-V8HP.

[75] Eastern Caribbean Central Bank Agreement Act 1983, http://eccb.slu.lc/files/documents/legal_regulatory/bank_agreement1983.pdf, *archived at* https://perma.cc/5YHT-3T7Y.

[76] ECCB STRATEGIC PLAN 2017–2021, at 58, https://www.eccb-centralbank.org/files/documents/Stategic_Plan/ECCB_Stategic_Plan_2017%20Revised%202.2.18.pdf, *archived at* https://perma.cc/GL38-SSJP; Press Release, ECCB, ECCB to Embark on Blockchain Pilot Initiative With Bitt Inc. (Mar. 13, 2018), https://www.eccb-centralbank.org/news/view/eccb-to-embark-on-blockchain-pilot-initiative-with-bitt-inc, *archived at* https://perma.cc/UD6D-AT44.

[77] *Id.*

## II.  Country Surveys

### Anguilla

The Anguillan government announced at the end of 2017 that it would introduce legislation, known as the Anguilla Utility Token Offering Act (the AUTO Act), to regulate initial offerings of certain types of cryptocurrencies (ICOs).[78]   The government has noted that some types of tokens are considered to be securities, and thus are already regulated under the existing securities framework,[79] but that

> there remained a large swath of non-security tokens with no clear guidance as to where they would fit in the emerging blockchain economy.  Therefore, we focused our efforts on creating a safe and effective regulatory framework for non-security token offerings, which appear to represent a majority of the current capital raising activity within the blockchain community.[80]

The new legislation will serve to provide a regime for Anguillan entities to register in order to conduct an offering of non-security tokens, which are tokens that do not have the same features securities do, but that "have one or more 'utility' features within the issuer's current or proposed blockchain platform."[81]

The AUTO Act is structured in a way to regulate utility tokens, while avoiding the burden imposed by securities regulations and the "higher levels of regulatory scrutiny that would have to take place were the tokens to fall under securities laws."[82]   As such, utility tokens are categorized as those that may be redeemed for consumer goods or services, rather than a share in profits or an interest in technology connected to the offering.[83]

---

[78] Lonnie Hobson, *The Government of Anguilla Announces World's First Cryptocurrency Registration Process for "Utility Token Offerings"*, LINKEDIN (Nov. 15, 2017), https://www.linkedin.com/pulse/government-anguilla-announces-worlds-first-process-utility-hobson/.

[79] Securities Act, cap. S13, REVISED STATUTES OF ANGUILLA, at 3, http://www.gov.ai/laws/S013-00-Securities%20Act/. Section 1 of the Securities Act defines "securities" as "shares and stock in the share capital of a company; (b) any instrument creating or acknowledging indebtedness which is issued or proposed to be issued by a company including, in particular, debentures, debenture stock, loan stock, bonds and notes; (c) bonds and other instruments creating or acknowledging indebtedness issued by or on behalf of any Participating Government; (d) any right (whether conferred by warrant or otherwise) to subscribe for shares or debt securities (e) any option to acquire or dispose of any other security; (f) units in a collective investment scheme, including shares in or securities of an investment company; and (g) any other instruments prescribed to be securities for the purposes of this Act."

[80] *Government of Anguilla Announces Regulatory Framework for Non-Security Token Offerings*, ECONOTIMES (Nov. 14, 2017), https://www.econotimes.com/Government-of-Anguilla-announces-regulatory-framework-for-non-security-token-offerings-1005960, *archived at* https://perma.cc/P87S-AC86.

[81] Hobson, *supra* note 78.

[82] Michaela Ross & Lydia Beyoud, *A Tiny Caribbean Island Looks to Lead in ICO Regulation*, BLOOMBERG LAW (Dec. 19, 2017), https://www.bna.com/tiny-caribbean-island-n73014473343/, *archived at* https://perma.cc/WG8M-PVVQ.

[83] *Id.*

In order to become registered, the entity must put together a "white paper," along with its disclosure documents, which must undergo a technical and legal review that must include information about the companies structure, location, business status, description of the project, a technical and legal description of the tokens that will be offered, how any proceeds made will be used, and anti-money laundering provisions along with any risk factors present for purchasing the tokens.[84]  The Anguillan government will financially benefit from the legislation by collecting a registration fee, along with a "1.5 percent levy on the total amount raised by a token offering."[85]

The government of Anguilla has stated as follows:

> We believe this new AUTO Act will help Anguilla become the leader in establishing best practices for cryptocurrency offerings, to protect the people of Anguilla and the participating public. . . . We believe the AUTO Act would be a significant step in the right direction, to provide clearly defined rules and increased safety for the blockchain community.[86]

On December 13, 2017, the Executive Council of Anguilla stated that officials should formulate a regulatory regime for Utility Token Offerings that would be submitted to the Governor.[87]  No further information about the status of this bill has been located.

Anguilla has also signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

## Antigua and Barbuda

Antigua and Barbuda currently does not have any legislation that specifically regulates the use of cryptocurrency.  Newspapers on Antigua and Barbuda have reported that the government of Antigua has instructed its Attorney General to "draft laws for the implementation of bitcoin."[88] No specifics or further information on this reported proposed legislation was located.

The government of Antigua and Barbuda has reportedly permitted the funding of projects and charities in the country through an Initial Coin Offering for Development[89] by selling a state-

---

[84] Hobson, *supra* note 78.

[85] Ross & Beyoud, *supra* note 82.

[86] Hobson, *supra* note 78.

[87] *Minutes of the 123rd Meeting of the Eleventh Anguilla Executive Council Held on Wednesday 13th December 2017*, Ex Min. 17/574, http://www.gov.ai/documents/exco/171213%20Mn17-123.pdf, *archived at* https://perma.cc/N7DL-VYQB.

[88] Jima Augustin, *A&B Looking to Embrace Bitcoin*, THE DAILY OBSERVER (Apr. 28, 2017), https://antiguaobserver.com/ab-looking-to-embrace-bitcoin/, *archived at* https://perma.cc/KLV5-8VXM.

[89] Press Release, CNET Antigua, The Government of Antigua and Barbuda Supports CNET's Investment Development Projects and Charities Funded by the Initial Coin Offering for Development (Apr. 28, 2018), https://www.prnewswire.com/news-releases/the-government-of-antigua-and-barbuda-supports-cnets-investment-development-projects-and-charities-funded-by-the-initial-coin-offering-for-development-300605628.html, *archived at* https://perma.cc/NA4Q-VX6S.

supported (not state-sponsored) Antigua and Barbuda Development Coin, based on the Ethereum cryptocurrency.[90]  No further information on this offering via a government source was located.

Antigua and Barbuda has signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

**Bahamas**

The Bahamas does not have any legislation that specifically applies to cryptocurrencies. Regulation of cryptocurrencies in the Bahamas currently varies according to whether the currency is considered to be a security, currency, or commodity.[91]  Despite not having legislation specifically designed to addresses cryptocurrencies, the Central Bank of the Bahamas has stated that regulations it issued in 2017, which provide a framework for a system of national electronic payments services, also apply to cryptocurrencies.[92]  The regulations "apply best international standards for the provision of local payments services" and define "electronic money" as

> electronically stored monetary value as represented by a claim on the issuer, which is issued on receipt of funds for the purpose of making payment transactions and which is accepted as a means of payment by persons other than the issuer, and includes monetary value stored magnetically or in any other tangible or intangible device (such as a SIM card or software).[93]

The Central Bank further stated that converting instruments in and out of the Bahamian currency would be governed by Exchange Control Regulations, and that "[t]he Securities Commission of The Bahamas would reserve the right to supervise any non-payments aspect of crypto currency operations domiciled in The Bahamas."[94]

The Bahamas is actively looking at developing blockchain technology to use on the Island to help create efficient and simplified transactions.  Specifically, the government has noted that "[t]he

---

[90] Adam Reese, *Antigua and Barbuda to Support Ethereum-based 'ICO For Development'*, ETHNEWS (Feb. 28, 2018; updated Mar. 1, 2018), https://www.ethnews.com/antigua-and-barbuda-to-support-ico-for-development, *archived at* https://perma.cc/DD5P-6994.

[91] Aliya Allen & Graham Thompson*, The Bahamas' Place in a Cryptographic World: A Whitepaper*, GRAHAMTHOMPSON (Mar. 2018), http://www.grahamthompson.com/uploads/1609/doc/Crypto_Article,_AAllen,_March_2018,_IBFS.pdf, *archived at* https://perma.cc/Y7SS-P7VL.

[92] Remarks by John Rolle, Governor of the Central Bank of the Bahamas, at Blockchain Seminar, Digital Currency – Extending the Payments System Modernisation Initiative (Mar. 1, 2018), http://www.centralbankbahamas.com/download/031486300.pdf, *archived at* https://perma.cc/XUH7-3C83.

[93] Payment Instruments Oversight Regulations 2017, SI 53/2017, art. 2, EXTRAORDINARY OFFICIAL GAZETTE OF THE BAHAMAS (July 26, 2017), http://laws.bahamas.gov.bs/cms/images/LEGISLATION/SUBORDINATE/2017/2017-0053/PaymentInstrumentsOversightRegulations2017_1.pdf, *archived at* https://perma.cc/B5VG-5222.

[94] Remarks by John Rolle, *supra* note 92.

Bahamas is also currently developing programs for block chain-based solutions, fin-tech and crypto-currency companies, and we intend to promote block chain as a sub-industry within ICT."[95]

The Bahamas is in the process of considering a bill that would bring virtual currencies within the ambit of the proceeds of crime legislation.[96]  Clause 2 of the bill defines "virtual currency" as

> a digital representation of value which can be digitally traded and functions as – (a) a medium of exchange; (b) a unit of account; or (c) a store of value, that does not have legal tender status or carry any security or guarantee in any jurisdiction.[97]

If enacted, the bill's provisions on money laundering and counterterrorism financing would apply to cryptocurrencies.[98]

It also appears that the Bahamas might act to both bring cryptocurrency exchanges within the remit of the Central Bank of the Bahamas and introduce a "digital version of the Bahamian dollar."[99]

## Barbados

Barbados does not appear to have any laws that specifically regulate cryptocurrencies.  In 2015, the Central Bank of Barbados (CBB) issued a paper that discussed whether cryptocurrencies should be included in its portfolio of international reserves, but it does not appear to have acted to do this.[100]

Barbados is home to Bitt Inc., the financial technology startup that has signed a Memorandum of Understanding with the ECCB to launch a pilot of blockchain technology, which will enable eight Caribbean countries to test the use of cryptocurrencies alongside their national currencies (see ECCB discussion, *supra*). While Barbados is not a party to this Memorandum of Understanding, there have been reports that Bitt Inc. is to create a digital Barbadian dollar that would be tied to the value of the country's physical currency, but the government has not yet issued a statement on this subject.[101]

---

[95] Press Release, Bahamas Information Services, Small Business License Fees in the GB Port Area May Soon Change (Jan. 26, 2018), https://www.bahamas.gov.bs/wps/portal/public/gov/government/news/ (search by title, then select from list), *archived at* https://perma.cc/7EHL-XSAQ.

[96] Proceeds of Crime Bill 2018, https://www.bahamas.gov.bs/wps/wcm/connect/200c0a64-83a6-4f69-b115-405396e05b8e/DOC16_39_1302_02_18.pdf?MOD=AJPERES, *archived at* https://perma.cc/NW5Z-ZMLG.

[97] *Id*. § 2.

[98] *Id.*, Objects and Reasons.

[99] Remarks by John Rolle, *supra* note 92.

[100] Winston Moore & Jeremy Stephen, *Should Cryptocurrencies be Included in Portfolio of International Reserves Held by the Central Bank of Barbados?* (CBB Working Paper No. WP/15/16), http://www.centralbank.org.bb/Portals/0/Files/Working_Papers/2015/Should Cryptocurrencies be included in the Portfolio of International Reserves held by the Central Bank of Barbados.pdf (last visited Mar. 26, 2018), *archived at* https://perma.cc/VGF3-T75Q.

[101] Noelle Acheson, *How a Tiny Island Could Give Cryptocurrency a Big Boost*, COINDESK (May 30, 2017), https://www.coindesk.com/how-a-tiny-island-could-give-cryptocurrency-a-big-boost/, *archived at* https://perma.cc/HB7Y-H4B8.

**British Virgin Islands**

The British Virgin Islands has yet to issue any guidance that applies to cryptocurrency and does not appear to have legislation or regulations that specifically apply to this area,[102] with the government instead appearing to opt for a wait-and-see approach.[103]  One commentator has noted that its existing laws appeal to companies that wish to do initial coin offerings (ICOs), and a number of companies have already registered under the country's company laws and then conducted ICOs.[104]

**Cayman Islands**

The Cayman Islands appear to have a fairly flexible regulatory environment for cryptocurrencies and blockchain technologies. While there appears to be no specific legislation geared towards regulating cryptocurrencies, there are laws that in certain circumstances may be applicable. These include the Securities Investment Business Law (2015 Revision),[105] Anti-Money Laundering (AML) Laws and regulations,[106] Money Services Law (2010 Revision),[107] and Electronic Transactions Law (2003 Revision). Lawyers Chris Humphries and James Smith predict that

> more-specific legislation will eventually be created although, for the time being, the regulators and lawmakers in the Cayman Islands are keen to avoid rushing through any legislation before the potential benefits and pitfalls of blockchain technology, cryptocurrencies and ICOs are properly understood.[108]

On January 29, 2018, Cayman Islands' Premier, Alden McLaughlin, reportedly spoke at a leading blockchain conference called "d10e" where he encouraged blockchain companies to establish themselves at Cayman Enterprise City, a "special economic zone that caters to tech-related

---

[102] *Home*, GOVERNMENT OF THE VIRGIN ISLANDS, http://www.bvi.gov.vg/ (last visited Mar. 26, 2018), *archived at* https://perma.cc/WTT9-7E3M.

[103] Michael Killourhy, *Crypto-currency and ICOs in the British Virgin Islands*, OGIER (Feb. 2, 2018), http://www.ogier.com/publications/crypto-currency-and-icos-in-the-british-virgin-islands?utm_source=Mondaq&utm_medium=syndication&utm_campaign=View-Original, *archived at* https://perma.cc/RA4T-T2SV.

[104] *Id*.

[105] Securities Investment Business Law (2015 Revision), EXTRAORDINARY GAZETTE No. 53 (July 17, 2015), https://www.cima.ky/upimages/commonfiles/1499349906SecuritiesInvestmentBusinessLaw2015Revision.pdf, *archived at* https://perma.cc/356F-5DBD.

[106] Proceeds of Crime Law (2017 Revision), Anti-Money Laundering Regulations, 2017, EXTRAORDINARY GAZETTE No. 79 (Sept. 20, 2017), https://www.cima.ky/upimages/commonfiles/1507843083Anti-MoneyLauderingRegulations2017.pdf, *archived at* https://perma.cc/F5MN-XM5K.

[107] Money Services Law (2010 Revision), EXTRAORDINARY GAZETTE No. 23 (Nov. 8, 2010), https://www.cima.ky/upimages/commonfiles/1499348940MoneyServicesLaw2010Revision.pdf, *archived at* https://perma.cc/Q7UC-DB5G.

[108] Chris A. Humphries & James Smith, Stuarts Walker Hersant Humphries, *Cayman Islands: Initial Coin Offerings (ICO) in The Cayman Islands*, MONDAQ (Feb. 19, 2018), http://www.mondaq.com/caymanislands/x/667952/Commodities+Derivatives+Stock+Exchanges/Initial+Coin+Offerings+ICO+In+The+Cayman+Islands, *archived at* https://perma.cc/5XPY-LXGQ.

entities."[109] Cayman Enterprise City CEO Charlie Kirkconnell stated at the conference that some fifty blockchain companies have established or are in the process of establishing themselves in the zone.[110]

## Dominica

On March 14, 2015, Dominica was reportedly scheduled to host an event, officially titled "The Bit Drop," which was meant to put bitcoins into the hands of Dominica's entire population, reported to be 70,000 people, but the project was cancelled.[111] According to *Dominica News Online*, organizers indicated that they did not receive enough support from the government on the event, and an election cycle may have "complicated matters."[112]

More recently, Dominica signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

## Dominican Republic

The Dominican Central Bank has indicated that virtual currencies are not backed by the Bank and are not legal currency under Dominican law.[113] Thus, financial institutions authorized to operate in the country may not engage in transactions that use these currencies, and individuals who acquire them or accept them as payment do so at their own risk.[114]

## Grenada

Grenada does not have any specific legislation to regulate cryptocurrencies. It has, however, signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

## Jamaica

In a press release issued on February 5, 2018, the Bank of Jamaica warned the public to "exercise caution in the use of virtual currencies (cryptocurrencies) given the associated risks and the absence of appropriate governance and consumer protection arrangements," according to the

---

[109] Ken Silva, *Cayman Courting Blockchain Companies*, CAYMAN COMPASS (Jan. 30, 2018), https://www.cayman compass.com/2018/01/30/cayman-courting-blockchain-companies/, *archived at* https://perma.cc/T79T-TCYH.

[110] *Id.*

[111] Pete Rizzo, *Plan to Distribute Bitcoin in Dominica Shelved*, COIN DESK (Feb. 10, 2015), https://www.coindesk.com/plan-distribute-bitcoin-dominica-shelved/, *archived at* https://perma.cc/ZV5K-6NQP.

[112] *Bitcoin Event in Dominica Cancelled*, DOMINICA NEWS ONLINE (Feb. 11, 2015), http://dominicanewsonline.com/news/homepage/news/business/bitcoin-event-in-dominica-cancelled/, *archived at* https://perma.cc/6T86-CC65.

[113] Banco Central de la Republica Dominicana, Comunicado (June 29, 2017), https://www.bancentral.gov.do/noticias/avisos/archivos/aviso20170628.pdf, *archived at* https://perma.cc/C2Y6-FD4G.

[114] *Id.*

*Jamaica Observer*.[115]  While noting the advantages of virtual currencies in potentially promoting "financial inclusion," the Bank warned that

> . . . the following risks need to be taken into consideration:
>
> 1.  Virtual currencies are not legal tender in Jamaica.
> 2.  Bank of Jamaica neither issues nor backs virtual currencies.
> 3.  Virtual currencies are not foreign currencies as there is no monetary authority that issues or backs them.
> 4.  Bank of Jamaica does not regulate or supervise virtual currencies.
> 5.  Bank of Jamaica has not authorised any entity to operate a virtual currency platform.
> 6.  Transactions in virtual currencies, such as bitcoin, are susceptible to abuse by criminals and may facilitate money laundering and the financing of terrorism.[116]

## Montserrat

Montserrat does not have any specific legislation to regulate cryptocurrencies. It has, however, has signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside its national currency (see ECCB discussion, *supra*).

## Saint Kitts and Nevis

Saint Kitts and Nevis does not have specific legislation to regulate cryptocurrencies.  However, it has signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

While the country has no specific legislation on the subject, the Saint Kitts and Nevis Citizenship by Investment Unit (CIU) reportedly issued a statement in June 2014 that it would not accept digital currency as a means by which applicants for citizenship through the Citizenship by Investment Program could participate in the program. "We further emphasize that we do not accept Bitcoins, have never accepted Bitcoins, and will not accept Bitcoins," the CIU was quoted as saying.[117]

## Saint Lucia

Saint Lucia does not have specific legislation to regulate cryptocurrencies. However, it has signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside the country's national currency (see ECCB discussion, *supra*).

---

[115] *BOJ Warns against Use of Virtual Currencies for Economic Transactions*, JAMAICA OBSERVER (Feb. 5, 2018), http://www.jamaicaobserver.com/latestnews/BOJ_warns_against_use_of_virtual_currencies_for_economic_transactions_?profile=1228, *archived at* https://perma.cc/2NEA-LAHE.

[116] *Id*.

[117] Shiva Bissessar, ECLAC, *Opportunities and Risks Associated with the Advent of Digital Currency in the Caribbean*, ECLAC– STUDIES AND PERSPECTIVES SERIES– THE CARIBBEAN No. 46, at 32 (Jan. 2016), http://repositorio.cepal.org/bitstream/handle/11362/39860/S1501234_en.pdf;sequence=1, *archived at* https://perma.cc/F69E-MRTB.

## Saint Vincent and the Grenadines

Saint Vincent and the Grenadines does not have any specific legislation to regulate cryptocurrencies. It has, however, signed up to participate in the ECCB pilot, which will test the use of cryptocurrencies alongside its current national currency (see ECCB discussion, *supra*).

## Trinidad and Tobago

A February 24, 2018, news article reported that the Trinidad and Tobago Finance Ministry has distanced itself from a recent digital currency offering, and in clarifying its position emphasized in a statement that "[t]he Commission, has not as of this date approved any Initial Coin Offering."[118]   According to the article, the Commission's statement also identified the following risks and urged the public to exercise caution:

> 1) Heightened potential for fraud – the fact that the products and those selling them may in some cases not be subject to regulation, [may] expose the investors to fraud;

> 2) Cross-border distribution risks – the issuer may be operating the ICO from outside of the investor's jurisdiction, therefore, following the money in the event of a collapse of the ICO as well as recovering invested funds, may prove extremely difficult [for the investor];

> 3) Information asymmetry – investors may not be able to understand the risks, costs and expired returns . . . arising from their investment;

> 4) Liquidity risks – In some jurisdictions, cryptocurrency exchanges may also be unregulated and operate without oversight.  Thus leaving investors vulnerable to dramatic price changes and possibility that they may not be able to exit their holdings (funds invested) . . . .

> Based on the foregoing, the Ministry of Finance advises members of the public to exercise caution when engaging in any form of investment and when in doubt, seek the advice of the Regulatory Bodies – The Securities and Exchange Commission and/or the Central Bank of Trinidad and Tobago.[119]

---

[118] Laura Dowrich-Phillips, *Finance Ministry Distances Itself from Digital Currency Offering*, LOOP (Feb. 24, 2018), http://www.looptt.com/content/finance-ministry-distances-itself-digital-currency-offering, *archived at* https://perma.cc/86BF-FSK8.

[119] *Id.*

# Europe

## I. EU Member States

### European Union

On July 5, 2016, the European Commission presented a legislative proposal to amend the Fourth Anti-Money Laundering Directive (AMLD).[120] It suggested, inter alia, bringing custodian wallet providers and virtual currency exchange platforms within the scope of the AMLD, meaning they would be obligated to fulfill due diligence requirements and have in place policies and procedures to detect, prevent, and report money laundering and terrorist financing. The proposal contains a definition of virtual currencies, which are described as "a digital representation of value that is neither issued by a central bank or a public authority, nor necessarily attached to a fiat currency, but is accepted by natural or legal persons as a means of payment and can be transferred, stored or traded electronically."[121] On January 29, 2018, the text agreed at the interinstitutional negotiations of the European Parliament and the Council was approved in committee. The European Parliament adopted the text in plenary session on April 19, 2018.[122] The updated Directive will enter into force three days after its publication in the Official Journal of the European Union.

Furthermore, on March 8, 2018, the European Commission presented an Action Plan on how to take advantage of the opportunities presented by technology-enabled innovation in financial services (FinTech), like blockchain, artificial intelligence, and cloud services.[123] The FinTech Action Plan includes the recently launched EU Blockchain Observatory and Forum, which will report on the challenges and opportunities of crypto assets later in 2018 and is working on a comprehensive strategy on distributed ledger technology and blockchain addressing all sectors of the economy.[124]

On October 22, 2015, the European Court of Justice (ECJ) held in its decision *Hedqvist* that transactions to exchange a traditional currency for bitcoin or other virtual currencies and vice versa

---

[120] *Proposal for a Directive of the European Parliament and of the Council Amending Directive (EU) 2015/849 on the Prevention of the Use of the Financial System for the Purposes of Money Laundering or Terrorist Financing and Amending Directive 2009/101/EC*, COM (2016) 450 final (July 5, 2016), https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52016PC0450&from=EN, *archived at* http://perma.cc/D4NP-V5UA.

[121] *Id.* at 30.

[122] Press Release, European Parliament, Anti-money Laundering: MEPs Vote to Shed Light on the True Owners of Companies (Apr. 19, 2018), http://www.europarl.europa.eu/news/en/press-room/20180411IPR01527/anti-money-laundering-meps-vote-to-shed-light-on-the-true-owners-of-companies, *archived at* https://perma.cc/ZZQ4-HQ36.

[123] *Communication From the Commission to the European Parliament, the Council, the European Central Bank, the European Economic and Social Committee and the Committee of the Regions. FinTech Action Plan: For a More Competitive and Innovative European Financial Sector*, COM (2018) 109 final (Mar. 8, 2018), http://eur-lex.europa.eu/resource.html?uri=cellar:6793c578-22e6-11e8-ac73-01aa75ed71a1.0001.02/DOC_1&format=PDF, *archived at* http://perma.cc/F7NP-YPCP.

[124] *Id.*; Press Release, European Commission, European Commission Launches the EU Blockchain Observatory and Forum (Feb. 1, 2018), http://europa.eu/rapid/press-release_IP-18-521_en.htm, *archived at* http://perma.cc/Q4GD-LX6P.

constitute the supply of services for consideration, but fall under the exemption from value-added-tax (VAT).[125] Buying or selling bitcoin is therefore exempt from VAT in all EU Member States.

On February 12, 2018, the European Supervisory Authorities for securities (ESMA), banking (EBA), and insurance and pensions (EIOPA) jointly issued a warning to consumers regarding virtual currencies, stating that they are "highly risky and unregulated products and are unsuitable as investment, savings or retirement planning products."[126] The warning complements the earlier two statements by ESMA on initial coin offerings (ICOs) in November 2017[127] and a warning to consumers and two opinions on virtual currencies by EBA in December 2013, July 2014, and August 2016, respectively.[128] EBA welcomes the decision of the European Commission to bring custodian wallet providers and virtual currency exchange platforms within the scope of the Fourth AMLD and not to extend the EU Payment Services Directive 2015/2366 to virtual currency transactions for the time being.[129] EBA suggests a separate regulatory regime to mitigate all the risks arising from virtual currencies.[130]

The President of the European Central Bank (ECB), Mario Draghi, warned that bitcoin and other digital currencies are "very risky assets" due to their high volatility and speculative prices.[131] He stated that "digital currencies are not subject to a specific supervisory approach," but that "[w]ork is under way in the Single Supervisory Mechanism[132] to identify potential prudential risks that

---

[125] Case C-264/14, Skatteverket v. David Hedqvist, ECLI:EU:C:2015:718, http://curia.europa.eu/juris/celex.jsf?celex=62014CJ0264&lang1=en&type=TXT&ancre, *archived at* http://perma.cc/7Q6Q-MM9V.

[126] European Supervisory Authorities, WARNING. ESMA, EBA and EIOPA Warn Consumers on the Risks of Virtual Currencies (Feb. 12, 2018), https://www.eba.europa.eu/documents/10180/2139750/Joint+ESAs+Warning+on+Virtual+Currencies.pdf, *archived at* http://perma.cc/EAH5-XTZE.

[127] ESMA, STATEMENT. ESMA Alerts Firms Involved in Initial Coin Offerings (ICOs) to the Need to Meet Relevant Regulatory Requirements (Nov. 2017), https://www.esma.europa.eu/sites/default/files/library/esma50-157-828_ico_statement_firms.pdf, *archived at* http://perma.cc/5PL8-WZ4K; ESMA, STATEMENT. ESMA Alerts Investors to the High Risks of Initial Coin Offerings (ICOs), Nov. 2017, https://www.esma.europa.eu/sites/default/files/library/esma50-157-829_ico_statement_investors.pdf, *archived at* http://perma.cc/3KXT-FNFD.

[128] EBA, Warning to Consumers on Virtual Currencies (Dec. 2013), https://www.eba.europa.eu/documents/10180/598344/EBA+Warning+on+Virtual+Currencies.pdf, *archived at* http://perma.cc/QL4M-ZLXW; EBA, EBA Opinion on 'Virtual Currencies', July 4, 2014, http://www.eba.europa.eu/documents/10180/657547/EBA-Op-2014-08+Opinion+on+Virtual+Currencies.pdf, *archived at* http://perma.cc/9P9W-A3KT; EBA, Opinion of the European Banking Authority on the EU Commission's Proposal to Bring Virtual Currencies into the Scope of Directive (EU) 2015/849 (4AMLD), Aug. 11, 2016, https://www.eba.europa.eu/documents/10180/1547217/EBA+Opinion+on+the+Commission%E2%80%99s+proposal+to+bring+virtual+currency+entities+into+the+scope+of+4AMLD, *archived at* http://perma.cc/SF65-HA37.

[129] EBA, Opinion of the European Banking Authority on the EU Commission's Proposal to Bring Virtual Currencies into the Scope of Directive (EU) 2015/849 (4AMLD), *supra* note 128, nos. 8 & 16.

[130] *Id.* no. 19.

[131] Mario Draghi, President of the ECB, Introductory Statement and Closing Remarks at the European Parliament Plenary Debate on the ECB Annual Report for 2016 (Feb. 5, 2018), https://www.ecb.europa.eu/press/key/date/2018/html/ecb.sp180205.en.html, *archived at* http://perma.cc/M6WX-T3RR.

[132] The Single Supervisory Mechanism refers to the system of banking supervision that comprises the ECB and the national supervisory authorities of the participating countries, *see Single Supervisory Mechanism*, ECB, https://www.bankingsupervision.europa.eu/about/thessm/html/index.en.html (last visited Mar. 20, 2018), *archived at* http://perma.cc/M2ST-SE3H.

these digital assets could pose to supervised institutions."[133]  In addition, in December 2016, the ECB and the Bank of Japan (BOJ) launched a joint research project named "Stella," which looks at the possible use of distributed ledger technology for financial market infrastructures.[134]

## Austria

The Austrian Ministry of Finance (Bundesministerium der Finanzen, BMF) does not qualify cryptocurrencies as legal tender or as financial instruments. Instead, it classifies them as other (intangible) commodities.[135] It stated that cryptocurrencies are treated like other business assets for income tax purposes. According to the Ministry, "mining" generally is a commercial activity and is therefore treated like any other production of goods. The same applies to the operation of online trading platforms and cryptocurrency ATMs.[136]

With regard to VAT, the BMF follows the jurisprudence of the ECJ in *Hedqvist*.[137] Transactions to exchange a traditional currency for bitcoin or other virtual currencies and vice versa are therefore exempt from VAT. Bitcoin or other virtual currencies that are used as a means of payment for services or goods are treated the same as traditional means of payment. Mining is not subject to VAT, because there is no identifiable recipient.[138]

The Austrian National Bank (Oesterreichische Nationalbank, OeNB) does not qualify bitcoin as a currency, because it does not fulfill the typical functions of money due to a strict limitation on quantity and no stabilizing central authority.[139] Bitcoin is currently not covered by the E-Money Act or the Payment Services Act.[140] Ewald Nowotny, governor of the OeNB, has pointed out the risks of cryptocurrencies.[141] He stated that "[b]itcoin & Co. . . . are highly speculative investments which entail high risks for individuals." He therefore welcomed the initiative of the Federal Minister of Finance, Hartwig Löger, to establish a Fintech Regulation Council to regulate cryptocurrencies. In addition, he voiced support for the amendment of the EU Money Laundering

---

[133] Draghi, *supra* note 131131.

[134] *BOJ/ECB Joint Research Project on Distributed Ledger Technology*, ECB & BOJ (Sept. 6, 2017), https://www.ecb.europa.eu/paym/intro/news/shared/20170906_stella_report_leaflet.pdf, *archived at* http://perma.cc/27QZ-ST83.

[135] *Steuerliche Behandlung von Kryptowährungen (virtuelle Währungen)* [*Tax Treatment of Cryptocurrencies (Virtual Currencies)*], BMF, https://www.bmf.gv.at/steuern/kryptowaehrung_Besteuerung.html (last updated July 25, 2017), *archived at* http://perma.cc/BU4Z-3BFY.

[136] *Id.*

[137] Case C-264/14, Skatteverket v. David Hedqvist, ECLI:EU:C:2015:718, http://curia.europa.eu/juris/celex.jsf?celex=62014CJ0264&lang1=en&type=TXT&ancre, *archived at* http://perma.cc/7Q6Q-MM9V.

[138] *Steuerliche Behandlung von Kryptowährungen (virtuelle Währungen)*, *supra* note 135.

[139] *Sind virtuelle Währungen wie Bitcoin eine Alternative zu klassischen Währungen wie dem Euro?* [*Are Virtual Currencies Like Bitcoin an Alternative to Traditional Currencies Like the Euro?*], OeNB, https://www.oenb.at/FAQ/sonstiges.html (last visited Mar. 20, 2018), *archived at* http://perma.cc/AN2L-WHS5.

[140] *Id.*

[141] Press Release, *OeNB begrüßt Regulierungsinitiative von BM Löger zu Kryptowährungen* [*OeNB Welcomes Regulation Initiative of Federal Minister Löger on Cryptocurrencies*], OeNB (Mar. 2, 2018), https://www.oenb.at/Presse/20180302.html, *archived at* https://www.oenb.at/Presse/20180302.html.

Directives, as well as the proposal of the Austrian Ministry of Finance to require prospectuses for ICOs and introduce licensing by the Financial Market Authority (FMA).[142] Finally he added that any regulatory initiative should be complemented by improving the financial education of the public.

Like the OeNB, the FMA has warned investors of the risks of cryptocurrencies.[143] It stated that virtual currencies like bitcoin and trading platforms are neither regulated nor supervised by the FMA. The FMA does not qualify them as legal tender payment instruments or as tradable foreign currencies. However, it pointed out that certain business models might require authorization from the FMA.[144] The FMA decides on a case-by-case basis whether an ICO requires authorization.[145]

## Belgium

Cryptocurrencies remain unregulated in Belgium, and there appear to have been very few official pronouncements on the subject.

In January 2014, the Belgian National Bank (Banque nationale de Belgique, BNB) and the Financial Services and Markets Authority (Autorité des services et marchés financiers, FSMA) issued a joint press release warning consumers about the risks of cryptocurrencies.[146] Their main points were that cryptocurrencies are not legal tender, and that they are completely unregulated and do not fall within the purview of any monitoring or regulatory authority.[147] More recently, in December 2017, the governor of the BNB, Jan Smets, repeated in an interview that bitcoin is not an actual currency, as it is not guaranteed by a central bank or a government as a means of payment.[148]

The Belgian Finance Minister, in response to a question by a Belgian senator, stated in July 2013 that while bitcoin seems to be somewhat problematic as a tool for money laundering and other

---

[142] *Id.*

[143] *Bitcoins*, FMA, https://www.fma.gv.at/en/fma-thematic-focuses/bitcoins/ (last visited Mar. 20, 2018), *archived at* http://perma.cc/C3QF-N7NU. FMA, *Focus on Virtual Currencies. Bitcoin, Ethereum, Ripple & Co from the Perspective of Investor Protection*, https://www.fma.gv.at/download.php?d=3090 (last visited Apr. 5, 2018), *archived at* http://perma.cc/K7WF-HBAY.

[144] *Id.*

[145] *Focus on Initial Coin Offerings*, FMA, https://www.fma.gv.at/en/fma-thematic-focuses/fma-focus-on-initial-coin-offerings/ (last visited Mar. 20, 2018), *archived at* http://perma.cc/3HT8-HES7; *FinTech Navigator*, FMA, https://www.fma.gv.at/en/cross-sectoral-topics/fintech/fintech-navigator/ (last visited Mar. 20, 2018), *archived at* http://perma.cc/9MVT-QA9M.

[146] *Attention à l'argent virtuel, comme Bitcoin* [*Beware of Virtual Currencies, Such as Bitcoin*], BNB, FSMA (Jan. 15, 2014), https://www.nbb.be/fr/articles/attention-largent-virtuel-comme-bitcoin, *archived at* https://perma.cc/H457-2T49.

[147] *Id.*

[148] Joseph Young, *Belgium Central Bank Governor: Bitcoin Is Not a Threat Because Its Not "Stable,"* CNN (Dec. 23, 2017), https://www.ccn.com/belgium-central-bank-governor-bitcoin-is-not-a-threat-because-its-not-stable/, *archived at* https://perma.cc/G6Y8-CC4N.

illegal activities, such problems should not be overstated.[149]  He also said that, based on studies by the BNB and the European Central Bank, bitcoin does not present any significant risks to price stability, to the financial system in general, or to its individual users.  Finally, in this same statement, the Minister of Finance indicated that government intervention with regard to bitcoin does not appear necessary given how small the bitcoin market was at the time.[150]

In April 2017, Belgian Minister of Justice Koen Geens announced that he plans to establish a legal framework for cryptocurrencies.[151]  One of the Minister's main objectives is to set up a mechanism to verify the conversion and exchange rates of cryptocurrencies, similarly to what exists for traditional financial circuits.[152]  He also would like to better monitor those who promise unrealistic returns and conversion rates, as well as find ways around the anonymity of cryptocurrency payments so as to curtail their use as vehicles for money laundering.  Additionally, Geens would like to establish a mechanism for the courts to properly evaluate cryptocurrencies when they are seized as part of criminal investigations.[153]  This plan seems to be mostly aspirational, and no action appears to have been taken in furtherance of it so far.

### Bulgaria

On February 14, 2018, the National Bank of Bulgaria announced that it joins the position of the European supervisory authorities on the risks inherent in buying virtual currencies. The Bank noted that such currencies show extreme price volatility and signs of a pricing bubble.[154] According to the Bank, consumers buying virtual currencies should be aware that there is a high risk that they will lose a large amount, or even all, of the money invested.[155]

---

[149] Sénat de Belgique [Senate of Belgium], Question écrite n° 5-8723 de Martine Taelman du 16 avril 2013 au ministre des Finances [Written Question No. 5-8723 of Martine Taelman of 16 April 2013 to the Minister of Finance], July 31, 2013, http://www.senate.be/www/?MIval=/Vragen/SVPrint&LEG=5&NR=8723&LANG=fr, *archived at* https://perma.cc/3YK4-M2WY.

[150] *Id.*

[151] *Comment mieux contrôler le bitcoin? Koen Geens a un plan* [*How to Better Control Bitcoin? Koen Geens Has a Plan*], RTBF.BE (Apr. 15, 2017), https://www.rtbf.be/info/economie/detail_comment-mieux-controler-le-bitcoin-koen-geens-a-un-plan?id=9581709&utm_source=dlvr.it&utm_medium=twitter, *archived at* https://perma.cc/3VNZ-CA5W.

[152] *Id.*

[153] *Id.*

[154] Press Release, National Bank of Bulgaria, European Supervisors Warn Consumers About the Risks of Buying Virtual Currencies (Feb. 14, 2018), http://www.bnb.bg/PressOffice/POPressReleases/POPRDate/PR_20180214_BG (in Bulgarian), *archived at* https://perma.cc/Z3S7-KCMM.

[155] *Bulgaria Central Bank Warns Consumers of Cryptocurrency Risks*, REUTERS (Feb. 14, 2018), https://www.reuters.com/article/crypto-currency-bulgaria/bulgaria-central-bank-warns-consumers-of-cryptocurrency-risks-idUSL8N1Q45KW, *archived at* https://perma.cc/YKZ9-9F6R.

Bulgarian tax authorities reportedly issued rulings in 2014 requiring individuals to pay taxes on gains from selling cryptocurrencies, similar to the sale of financial assets.[156]

In 2015 a Bulgarian court reportedly concluded that activities associated with buying, selling, and paying with cryptocurrencies are not subject to licensing requirements.[157]

## Croatia

On December 18, 2017, Croatia's Financial Stability Council warned that individuals investing in virtual currencies bear sole responsibility for their losses and should be aware of possible taxation.[158] It stated that Croatian regulators are not responsible for the oversight of the individuals who issue virtual currencies or trade in them. The Council noted that virtual currencies are associated with considerable risks, such as those of digital wallet theft and transaction misuse, fraud, etc. A similar warning was issued by the National Bank of Croatia on September 22, 2017.[159]

## Cyprus

The Central Bank of Cyprus has issued a warning stating that virtual currencies are not legal tender, that there are no specific regulatory protection measures to cover losses from their use, and that their prices are subject to volatility.[160]

## Czech Republic

On February 27, 2018, Mojmír Hampl, the Vice-Governor of the Czech National Bank (CNB) made the following statement:

> The fact that cryptocurrencies are . . . commodities [rather than currencies] also shapes our light-touch, liberal approach to regulation at the CNB. We do not want to ban them and we are not hindering their development, but we are also not actively helping or promoting them and we are not protecting them or the customers that use them. Like in a casino, everyone investing in a cryptocurrency must be prepared to lose the entire bet. And central banks do not regulate casino visits.[161]

---

[156] Marin Marinov, Legal and Tax Treatment of Bitcoin in Bulgaria, RUSKOV & COLLEAGUES (Nov. 20, 2017), https://www.ruskov-law.eu/bulgaria/article/legal-tax-treatment-bitcoin.html, *archived at* https://perma.cc/ZA9H-4RGF.

[157] *Id.*

[158] Press Release, Financial Stability Council, 9th Session of the Financial Stability Council (Dec. 18, 2017), http://www.vfs.hr/dokumenti/priopcenja/2017/e-priopcenje-18122017.pdf, *archived at* https://perma.cc/29MV-2XP2.

[159] Press Release, National Bank of Croatia, Possible Risks Associated with Investing in Virtual Currency (Sept. 22, 2017), https://www.hnb.hr/-/moguci-rizici-povezani-s-ulaganjima-u-virtualne-valute (in Croatian), *archived at* https://perma.cc/L2NC-NPZ3.

[160] Press Release, Central Bank of Cyprus, Attention to the Risks Associated With Virtual Currencies (Feb. 7, 2014), https://www.centralbank.cy/en//announcements/07022014, *archived at* https://perma.cc/3AP9-9DKC.

[161] Majomir Hampl, Czech National Bank, A Digital Currency Useful for Central Banks?, Address before the 7th BBVA Seminar for Public Sector Investors and Issuers, Bilbao (Feb. 27, 2018), https://www.cnb.cz/en/

Amendments have been made to the Czech Republic's anti-money laundering legislation, making it also applicable to persons providing services related to virtual currencies—i.e., those who buy, sell, store, manage, or mediate the purchase or sale of virtual currencies or provide other services related to such currencies as a business.[162]

**Denmark**

Denmark has no laws specifically addressing cryptocurrencies, and no regulatory proposals on cryptocurrencies are pending in the Danish Parliament. However, government agencies have issued a number of statements on cryptocurrencies.[163]

Denmark's Finanstilsynet (Financial Supervisory Authority) issued a statement in 2013 rejecting the bitcoin as a currency and stating that it will not regulate bitcoin use.[164] In its statement the Financial Supervisory Authority emphasized that it has evaluated the use of the bitcoin system and found that it does not fall under any of the financial services categories, including the issuing of electronic money, payment for services, currency exchanges, or the issuing of mortgages; thus, bitcoin activity is not covered under current financial regulations.[165] In 2017 the Financial Supervisory Authority released a report on ICOs (Initial Coin Offerings) in which it stated that cryptocurrencies that are solely used as a means of payment continue to not be regulated by the Authority.[166] However, ICOs may be conducted in such a way as to fall under the purview of the Authority[167] and thus would be subject to Danish regulation—for example, "legislation on alternative investment funds, prospectuses, and money laundering."[168]

The Danish Central Bank has been critical of cryptocurrencies. In 2014, it issued an initial statement declaring that bitcoin is not a currency.[169] According to the statement, "[b]itcoin does not have any real trading value compared to gold and silver, and thus is more similar to glass

---

public/media_service/conferences/speeches/hampl_20180227_bbva.html, *archived at* https://perma.cc/N97Z-NQCW.

[162] Law No. 368/2016 Coll., Nov. 14, 2016, Sʙɪʀᴋᴀ Zᴀᴋᴏɴᴜ No. 147/2016, https://www.zakonyprolidi.cz/cs/2016-368 (in Czech), *archived at* https://perma.cc/MFX9-42H2.

[163] *See* Elin Hofverberg, *Denmark, in* Lᴀᴡ Lɪʙʀᴀʀʏ ᴏꜰ Cᴏɴɢʀᴇss, Rᴇɢᴜʟᴀᴛɪᴏɴ ᴏꜰ Bɪᴛᴄᴏɪɴ ɪɴ Sᴇʟᴇᴄᴛᴇᴅ Jᴜʀɪsᴅɪᴄᴛɪᴏɴs (Jan. 2014), https://www.loc.gov/law/help/bitcoin-survey/regulation-of-bitcoin.pdf, *archived at* https://perma.cc/Z7EQ-L988.

[164] Press Release, Finanstilsynet, Advarsel mod virtuelle valutaer (bitcoin m.fl.) [Warnings Regarding Digital Currencies (Bitcoins etc.)] (Dec. 17, 2013), https://www.finanstilsynet.dk/da/Nyheder-og-Presse/Presse meddelelser/Arkiv/Presse-2013/Advarsel-mod-virtuelle-valutaer-bitcom-mfl-2013, *archived at* https://perma.cc/UZ2E-G7S7.

[165] *Id.*

[166] Press Release, Finanstilsynet, Orientering om ICO'er [Orientation on ICOs] (Nov. 13, 2017), https://finanstil synet.dk/da/Nyheder-og-Presse/Sektornyt/2017/Orientering-om-ICO, *archived at* https://perma.cc/3A5Y-W4PS.

[167] *Id.*

[168] *Id.*

[169] Press Release, Danish Central Bank [Nationalbanken], Bitcoin er ikke penge [Bitcoin Is Not Money] (Mar. 18, 2104), http://www.nationalbanken.dk/da/presse/Documents/2014/03/PH_bitcoin.pdf#search=Bitcoin, *archived at* https://perma.cc/D3C6-ND34.

beads."[170] The Danish Central Bank went on to point out that bitcoins are not protected by any national laws or guarantees, such as a deposit guarantee.[171] Similarly, in a 2014 document the Danish Central Bank discussed virtual currencies, determining that virtual currencies are not regulated and therefore associated with high risks to consumers.[172] In 2017 the Director of the Danish Central Bank issued warnings against the use of bitcoin.[173] His critique of cryptocurrencies was reiterated in 2018.[174] In addition, the Danish Central Bank has made it clear that it is not in favor of the creation of an official Danish e-currency (issued by the Central Bank), unlike neighboring Sweden.[175]

SKAT (the Danish Tax Authority) has issued a number of statements on virtual and cryptocurrencies. For example in 2014 it published a binding reply (a response to a public question from a taxpayer that is binding on the interpretation of the Tax Authority) in which it declared that an invoice amount cannot be issued in bitcoins, but must be issued in Danish kroner or another recognized currency.[176] The Authority went on to state that any bitcoin losses cannot be deducted as a cost of doing business when bitcoins are used as a means of payment.[177] In 2016 the Authority discussed cryptocurrencies in relation to value-added tax (VAT) and found that cryptocurrencies are exempt from VAT.[178] The determination is consistent with the decision of the Court of Justice of the European Union in 2015.[179] The Authority has also commented on how the mining of

---

[170] *Id.*

[171] *Id.*

[172] Anders Laursen & Jon Hasling Kyed, *Virtuelle Valutaer* [*Virtual Currencies*], *in* DANMARKS NATIONALBANK KVARTALSOVERSIGT, 1. KVARTAL, 2014 [DENMARK NATIONAL BANK QUARTERLY BULLETIN, Q1, 2014] at 85, http://www.nationalbanken.dk/da/publikationer/Documents/2014/03/Virtuelle_KVO1_2014.pdf, *archived at* https://perma.cc/8FTD-DPXF.

[173] Stine Jacobsen, *Danish Central Bank Head Issues Stark Warning on "Deadly" Bitcoin*, REUTERS (Dec. 2017), https://in.reuters.com/article/bitcoin-denmark/danish-central-bank-head-issues-stark-warning-on-deadly-bitcoin-idINKBN1EC19R, *archived at* https://perma.cc/QSM3-QGJZ.

[174] LARS ROHDE, DANMARKS NATIONALBANK, BITCOIN AND BLOCKCHAINS: PERSPECTIVES OF THE DANISH CENTRAL BANK (Apr. 4, 2018), http://www.nationalbanken.dk/da/presse/taler/Documents/2018/04/LRO_tale_FCCA_040418.pdf#search=bitcoin, *archived at* https://perma.cc/3AL3-WCW7.

[175] Digitale centralbankpenge giver ikke bedre betalnings-løsninger [Digital Central Bank Currency Does Not Create Better Payment Solutions], NYT (Dec. 15, 2017), https://www.nationalbanken.dk/da/publikationer/Documents/2017/12/Nyt - Digitale centralbankpenge giver ikke bedre betalningsløsninger.pdf, *archived at* https://perma.cc/C7MK-UMXU; *compare* Swedish report, *infra*.

[176] Bitcoins, ikke erhvervsmæssig begrundet, anset for særkilt virksomhed [Bitcoins, Not Commercially Justified, Considered Special Activity], SKAT (Apr. 1, 2014), https://www.skat.dk/SKAT.aspx?oId=2156173, *archived at* https://perma.cc/6B89-6WQ2.

[177] *Id.*

[178] Momsfritagelse og lønsumsafgift - Køb og salg af Bitcoins [VAT Exemption and Payroll Taxes – Purchase and Sale of Bitcoins], SKAT (Jan. 26, 2016), http://skat.dk/skat.aspx?oid=2225268, *archived at* https://perma.cc/XZG2-WB6J.

[179] Case C‑264/14. Skatteverket v. David Hedqvist, 2015 CURIA EUROPA, ECLI:EU:C:2015:718 (Oct. 22, 2015), http://curia.europa.eu/juris/document/document.jsf?docid=170305&doclang=EN, *archived at* https://perma.cc/LU2G-U6VD.

bitcoins should be treated from a VAT tax perspective.[180] The case involved a Danish person who wanted to sell hashing capacity on the electrical grid, an activity that was subject to VAT.[181]

The Danish Tax Council in 2018 declared that losses on sales of bitcoins purchased as an investment are tax deductible and that profits are subject to income taxation.[182]

### Estonia

On November 27, 2017, Estonia enacted amendments to its anti-money laundering legislation[183] that define cryptocurrencies (virtual currencies) as value represented in digital form that is digitally transferable, preservable, or tradable and that natural persons or legal persons accept as a payment instrument, but that is not the legal tender of any country or funds (banknotes or coins, scriptural money held by banks, or electronic money). The anti-money laundering legislation now also applies to providers of a service for exchanging virtual currency with fiat currency and providers of a virtual currency wallet service, which is defined as a service in which keys are generated for customers or customers' encrypted keys are kept, which can then be used for the purpose of keeping, storing, and transferring virtual currencies.[184] Virtual currency service providers are required to have a license.[185]

### Finland

Finland does not have specific regulations that deal with cryptocurrencies and there is no proposed legislation on cryptocurrencies pending in the Finnish Parliament. However, a number of agencies have issued advisory statements on how they view cryptocurrencies.

The Finnish Financial Supervisory Authority issued an advisory in 2017 that cryptocurrencies are risk-filled investment alternatives.[186] It also noted that, depending on the initial coin offering (ICO), there may be regulatory effects of the purchase—for instance, EU rules on alternative

---

[180] Bitcoin mining og tilrådighedsstillelse af datakapacitet - moms og godtgørelse af elafgifter [Bitcoin Mining and Supply of Data Capacity – VAT and Payment of Electricity Fees], SKAT (June 27, 2017), http://skat.dk/skat.aspx?oid=2249418, archived at https://perma.cc/N772-UTZQ.

[181] *Id.*

[182] Gevinst og tab ved afståelse af bitcoins [Profit and Loss of Realized Bitcoins], SKM2018.104.SR, Case No. 17-1369067, SKAT (Feb. 27, 2018), http://skat.dk/skat.aspx?oid=2271294, *archived at* https://perma.cc/PT9E-BZ3R (emphasis added).

[183] Rahapesu Ja Terrorismi Rahastamise Tõkestamise Seadus [Money Laundering and Terrorist Financing Prevention Act], RIIGI TEATAJA [OFFICIAL GAZETTE] RT I Nov. 17, 2017, § 3, *available at* https://www.riigiteataja.ee/akt/117112017002 (in Estonian), *archived at* https://perma.cc/5UVE-RJ4B, English translation *available at* https://www.riigiteataja.ee/en/eli/517112017003/consolide, *archived at* https://perma.cc/TFF7-Z9FU.

[184] *Id.* § 2.

[185] *Id.* § 70.

[186] Press Release, Finansinspektionen, Finansinspektionens varning: kryptovalutor och ICO:s (Initial Coin Offering) är riskfyllda investeringsobjekt [Financial Supervisory Authority's Warning: Cryptocurrencies and ICOs Are Risk Filled Investment Objects] (Nov. 22, 2017), http://www.finanssivalvonta.fi/se/Publicerat/pressmeddelanden/Pages/17_2017.aspx, *archived at* https://perma.cc/V3WG-CBAW.

investment funds.[187] In 2017 the Finnish Supervisory Authority also discussed the future of ICOs in a blog post.[188]

The Central Bank of Finland issued a statement in 2014 declaring that cryptocurrencies, especially bitcoin, are inherently associated with risks, noting that "[t]he use of Bitcoin is not currently supervised or regulated in any way,"[189] nor does it not amount to a payment service as defined in the Payment Services Act.[190] In a 2017 report published by the Central Bank, Central Bank affiliates were more positive, reportedly calling bitcoin "revolutionary" and "apparent[ly] functio[nal] and useful."[191]

The Finnish Tax Authority (Vero Skatt) issued instructions for the income taxation of virtual currencies, including bitcoin, in 2013.[192]  When transferred to another currency, the rules on taxation of capital gains apply, the Tax Authority said. When the currency is used as a form of payment for goods and services it is treated as a trade and the increase in value that the currency might have gained after it was obtained is taxable.[193] The sale of bitcoins at a loss in value compared to the original purchase price is not deductible under the Finish Income Taxation Act, because such a loss in value is not specifically described as deductible in the Act.[194] In 2017 the Tax Authority issued additional recommendations, stating that the exchange rate is determined at the time of realization of the bitcoin (i.e., when it becomes cash), and that cryptocurrency records should be kept for six years.[195]

---

[187] Id.

[188] Hanna Heiskanen, *Kryptovaluutat ja ICO (Initial Coin Offering) sijoituskohteina, onko kyse kuplasta?* [*Cryptocurrencies and ICOs, Is It a Bubble?*], FINANSINSPEKTIONEN (Nov. 22, 2017), https://helda.helsinki.fi/bof/bitstream/handle/123456789/14961/Fiva_blogi_kryptovaluutat.pdf?sequence=1&isAllowed=y, *archived at* https://perma.cc/6FZ7-ACTH.

[189] Press Release, Finlands Bank, Bitcoin Involves Risk (Jan. 14, 2014), https://www.suomenpankki.fi/en/media-and-publications/news/2014/bitcoin-involves-risks/, *archived at* https://perma.cc/T634-EMZM.

[190] Id.

[191] Gur Huberman et al., *Monopoly without a Monopolist: An Economic Analysis of the Bitcoin Payment System* 36 (Bank of Finland Research Discussion Papers 27, Sept. 5, 2017), https://helda.helsinki.fi/bof/bitstream/handle/123456789/14912/BoF_DP_1727.pdf, *archived at* https://perma.cc/2GAN-W8ZM; *see also* Rachel Rose O'Leary, *"Revolutionary": Finnish Central Bank Paper Heaps Praise of Bitcoin*, COINDESK (Sept. 11, 2017), https://www.coindesk.com/revolutionary-finland-central-bank-paper-heaps-praises-bitcoin/, *archived at* https://perma.cc/5QD3-PUF3.

[192] Press Release, Vero Skatt, Inkomstbeskattning av virtuella valutor [Income Taxation of Virtual Currencies] (Aug. 28, 2013), https://www.vero.fi/sv/Detaljerade_skatteanvisningar/anvisningar/48411/inkomstbeskattning_av_virtuella_valuto/, *archived at* https://perma.cc/JEU5-BKLW.

[193] Id.

[194] Id.

[195] Press Release, Vero, Har du använt virtuella valutor? [Have You Used Virtual Currencies?] (Apr. 10, 2017), https://www.vero.fi/sv/skatteforvaltningen/skatteforvaltningen/nyheter/uutiset/2017/har_du_anvant_virtuella_valuto, *archived at* https://perma.cc/ZT5Z-34EL.

Sales of bitcoins have reportedly resulted in millions in revenue for the Finnish Tax Authority.[196] The Tax Authority has monitored both those who trade and those who use cryptocurrencies.[197]

The Åbo Appeals Court is reported to have found that Finnish Customs may auction off bitcoins it has confiscated in relation to drug crimes, and as of February 2018 such bitcoins were estimated to be worth €19 million (approximately US$23.5 million).[198] The Finnish government is said to have issued guidelines on how to store confiscated bitcoins.[199]

**France**

Cryptocurrencies remain largely unregulated in France, with two ordinances on blockchain technology being the only legislative action taken so far.  However, the French government is actively moving towards establishing a regulatory regime.

A 2016 ordinance included two provisions that allowed the use of blockchain technology for a specific type of zero-coupon bond called a "mini-bond" (*minibon*).[200]  The main impact of this ordinance was to provide the first definition of blockchain in French law, but otherwise these provisions only had a very narrow application.  Another ordinance, from December 2017, went further and will make it possible to use blockchain technology for a broader range of financial instruments.[201]  This ordinance will come into force when the application decree is published, or on July 1, 2018, at the latest.[202]

The French Financial Market Authority (Autorité des marchés financiers, AMF) and Prudential Supervisory Authority (Autorité de contrôle prudentiel et de resolution, ACPR) recently issued a

---

[196] Patrik Skön, *Skatteförvaltningen: Bitcoin ger miljoner i skatteintäkter* [*Tax Authority: Bitcoin Results in Millions in Tax Revenue*], YLE (Sept. 24, 2017), https://svenska.yle.fi/artikel/2017/09/24/skatteforvaltningen-bitcoin-ger-miljoner-i-skatteintakter, *archived at* https://perma.cc/2VSH-ZQ3V.

[197] *Id.*

[198] TT, *Finska tullen auktionerar ut bitcoin* [*Finnish Customs Auctions Off Bitcoins*], NYTEKNIK (Feb. 21, 2018), https://www.nyteknik.se/digitalisering/finska-tullen-auktionerar-ut-bitcoin-6900140, *archived at* https://perma.cc/GD4Q-B6DA; *see also* TULLI, FINNISH CUSTOMS ENFORCEMENT 2017, http://tulli.fi/documents/2912305/4898005/Finnish%20Customs%20Enforcement%202017/9f35b47e-6ff0-4a54-af9d-776b270da7aa, *archived at* https://perma.cc/CR4C-7XMU.

[199] Daniel Palmer, *Finland Mandates Cold Storage, Public Auctions of Seized Bitcoins*, COINDESK (Feb. 20, 2018), https://www.coindesk.com/finland-releases-new-guidelines-for-storage-of-confiscated-bitcoins/, *archived at* https://perma.cc/GT87-C7EF.

[200] Ordonnance n° 2016-520 du 28 avril 2016 relative aux bons de caisse [Ordinance No. 2016-520 of 28 April 2016 Regarding Zero Coupon Bonds] art. 2, https://www.legifrance.gouv.fr/affichTexte.do?cidTexte=JORFTEXT000032465520&categorieLien=id, *archived at* https://perma.cc/K3UP-AJ9D.

[201] Ordonnance n° 2017-1674 du 8 décembre 2017 relative à l'utilisation d'un dispositif d'enregistrement électronique partagé pour la représentation et la transmission de titres financiers [Ordinance No. 2017-1674 of 8 December 2017 Regarding the Use of a Shared Electronic Registration Method for the Representation and Conveyance of Financial Instruments], https://www.legifrance.gouv.fr/affichTexte.do?cidTexte=JORFTEXT000036171908&categorie Lien=id, *archived at* https://perma.cc/ESA7-89E6.

[202] *Id.* art. 8.

joint notice to investors, warning about the current unregulated nature of cryptocurrencies.[203] This document notes that bitcoin and other cryptocurrencies are not considered financial instruments under French law, and therefore do not fall under the regulatory framework of actual currencies or under the AMF's supervision.[204]   The AMF and ACPR recognize the potential benefits that blockchain technology can hold for companies, but warn that cryptocurrencies are unregulated and particularly volatile investments.[205] This document is reminiscent of a slightly longer report that the French Central Bank (Banque de France) published in December 2013.[206]   That report explained that bitcoin cannot be considered a real currency or means of payment under current French law,[207] and criticized it as a vehicle for speculation as well as an instrument for money laundering and other illegal activities.[208]   The 2013 report also suggested that the conversion between bitcoin and real currencies should be considered a payment service, which therefore could only be performed by payment service providers authorized and supervised by the ACPR.[209]   The ACPR acknowledged this position in a 2014 document in which it stated that entities that habitually engage in the activity of purchasing or selling cryptocurrencies in exchange for actual legal tender must be licensed as payment services providers by the ACPR.[210] However, the AMF and ACPR's 2017 joint notice recognizes that "the purchase/sale of and investments in bitcoin currently operate outside of any regulated market."[211]

In parallel to the independent regulatory institutions mentioned above, the French legislative and executive branches are actively investigating how best to regulate cryptocurrencies.   To that purpose, the National Assembly (Assemblée nationale, one of the two houses of the French Parliament) has initiated a fact-finding mission on cryptocurrencies,[212] and a separate fact-finding mission on "blockchains and other technologies for the certification of ledgers."[213]   Additionally,

---

[203] *Achats de Bitcoin: l'AMF et l'ACPR mettent en garde les épargnants* [*Bitcoin Purchases: The AMF and ACPR Warn Savers*], AMF, ACPR (Dec. 4, 2017), https://acpr.banque-france.fr/sites/default/files/medias/documents/20171204-cp-bitcoin.pdf, *archived at* https://perma.cc/CM6Q-EGUH.

[204] *Id.*

[205] *Id.*

[206] Banque de France, *Les dangers liés au développement des monnaies virtuelles: l'exemple du bitcoin* [*The Dangers of the Development of Virtual Currencies: The Bitcoin Example*], Focus No. 10 (Dec. 5, 2013), https://publications.banque-france.fr/sites/default/files/medias/documents/focus-10_2013-12-05_fr.pdf, *archived at* https://perma.cc/K93L-HLAC.

[207] *Id.* at 1.

[208] *Id.* at 2–3.

[209] *Id.* at 6.

[210] ACPR, *Position de l'ACPR relative aux opérations sur Bitcoins en France* [*Position of the ACPR Regarding Bitcoin Operations in France*] (Jan. 29, 2014), https://acpr.banque-france.fr/sites/default/files/20140101_acpr_position_bitcoin.pdf, *archived at* https://perma.cc/M6YT-EG6J.

[211] *Achats de Bitcoin, supra* note 203.

[212] *Mission d'information sur les monnaies virtuelles* [*Information Mission on Cryptocurrencies*], ASSEMBLÉE NATIONALE [NATIONAL ASSEMBLY], http://www2.assemblee-nationale.fr/15/commissions-permanentes/commission-des-finances/missions-d-information/monnaies-virtuelles (last visited Mar. 19, 2018), *archived at* https://perma.cc/JNU5-4MRG.

[213] *Mission d'information commune sur les usages des bloc-chaînes (blockchains) et autres technologies de certification de registres* [*Joint Information Mission on the Uses of Blockchains and Other Technologies for the*

the Minister of the Economy has recently tasked a former deputy governor of the Banque de France with researching how to best regulate cryptocurrencies to "better control their development and to prevent their use for tax evasion, money laundering, or the financing of criminal or terrorist activities."[214]

It is also worth noting that France and Germany have jointly requested that cryptocurrencies be discussed by the G-20, so that coordinated initiatives may be taken at the international level.[215]

## Germany

The German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, BaFin) qualifies virtual currencies/cryptocurrencies as units of account and therefore financial instruments.[216] Undertakings and persons that arrange the acquisition of tokens, sell or purchase tokens on a commercial basis, or carry out principal broking services in tokens via online trading platforms, among others, are generally required to obtain authorization from BaFin in advance.[217]

In February 2018, the German BaFin published information on the regulatory assessment of ICOs and the tokens, coins, and cryptocurrencies they are based on.[218] It stated that firms involved in ICOs need to assess on a case-by-case basis whether the ICOs qualify as financial instruments (transferable securities, units in collective investment undertakings, or investments) or as securities and therefore trigger the need to comply with the relevant financial legislation.

---

*Certification of Ledgers*], ASSEMBLÉE NATIONALE, http://www2.assemblee-nationale.fr/15/commissions-permanent es/commission-des-finances/missions-d-information/chaines-de-blocs/(block)/47252 (last visited Mar. 19, 2018), *archived at* https://perma.cc/3TKA-Y7L7.

[214] *Un ancien de la Banque de France chargé d'une mission sur le bitcoin* [*Former Banque de France Official Tasked with a Mission on Bitcoin*], AFP / LE POINT (Jan. 15, 2018), http://www.lepoint.fr/economie/un-ancien-de-la-banque-de-france-charge-d-une-mission-sur-le-bitcoin-15-01-2018-2186834_28.php, *archived at* https://perma.cc/R6CD-GCV9.

[215] *Berlin et Paris veulent mobiliser le G20 sur les cryptomonnaies* [*Berlin and Paris Want to Mobilize the G20 on Cryptocurrencies*], REUTERS (Feb. 9, 2018), https://fr.reuters.com/article/technologyNews/idFRKBN1FT19L-OFRIN, *archived at* https://perma.cc/RF3M-ZVZM.

[216] Gesetz über das Kreditwesen [KWG] [Banking Act], Sept. 9, 1998, BUNDESGESETZBLATT [BGBL.] [FEDERAL LAW GAZETTE] I at 2776, § 1, para. 11, sentence 1, no. 7, http://www.gesetze-im-internet.de/kredwg/KWG.pdf, *archived at* http://perma.cc/WTA6-DYS7, unofficial English translation *available at* https://www.bafin.de/Shared Docs/Downloads/EN/Aufsichtsrecht/dl_kwg_en.pdf (updated through July 15, 2014), *archived at* http://perma.cc/8M5A-7WYR; *Virtual Currency (VC)*, BAFIN, https://www.bafin.de/EN/Aufsicht/ FinTech/VirtualCurrency/virtual_currency_node_en.html (last visited Mar. 16, 2018), *archived at* http://perma.cc/K29E-WRGL.

[217] Banking Act, § 32; *Virtual Currency (VC)*, *supra* note 216.

[218] BaFin, Hinweisschreiben (WA). Aufsichtsrechtliche Einordnung von sog. Initial Coin Offerings (ICOs) zugrunde liegenden Token bzw. Kryptowährungen als Finanzinstrumente im Bereich der Wertpapieraufsicht [Information Letter (WA). Regulatory Qualification of Tokens or Cryptocurrencies on Which So-Called Initial Coin Offerings (ICOs) are Based as Financial Instruments for Purposes of Securities Regulation], reference no. WA 11-QB 4100-2017/0010, https://www.bafin.de/SharedDocs/Downloads/DE/Merkblatt/WA/dl_hinweisschreiben_einordnung_ ICOs.pdf?__blob=publicationFile&v=2, *archived at* http://perma.cc/583S-GGV3.

Also in February 2018, the German Federal Ministry of Finance published guidance on value-added-tax (VAT) treatment of bitcoin and other virtual currencies. It determined that transactions to exchange a traditional currency for bitcoin or other virtual currencies and vice versa constitute the taxable supply of other services for consideration, but fall under the exemption from VAT. It stated that bitcoin or other virtual currencies that are used simply as a means of payment are treated the same as traditional means of payment. Using bitcoin or other virtual currencies for no other purpose than as a means of payment is therefore not taxable. This guidance is in line with the European Court of Justice (ECJ) decision *Hedqvist* from October 22, 2015.[219] Virtual gaming money, meaning in-game currencies, particularly in online games, is not exempt, because it does not constitute a means of payment within the meaning of VAT law.[220] The Ministry also addressed several follow-up questions regarding the taxation of mining, digital wallets, and online trading platforms.[221]

The German Bundesbank stated that bitcoin cannot be qualified as a virtual currency. According to Dirk Schrade, Bundesbank expert in the area of payments, bitcoin is neither a virtual currency nor digital money, because it does not fulfill the typical functions of a currency, nor is it part of the national monetary system. The Bundesbank recommends using the term "crypto token."[222]

In an article published in the newspaper *Frankfurter Allgemeine Zeitung* (FAZ), Carl-Ludwig Thiele, a member of the executive board of the German Bundesbank, warned investors in bitcoin and other cryptocurrencies to beware of their riskiness, fluctuations in value, costliness, and high-energy-need for mining, among other concerns.[223] However, he also pointed out that blockchain technology promises great potential for innovation and mentioned a joint project with the German stock exchange group (Deutsche Börse Gruppe) that tests the application and performance of blockchain technology in the settlement of securities transactions between banks.[224]

---

[219] Bundesministerium der Finanzen [BMF] [Federal Ministry of Finance], BMF-Schreiben. Umsatzsteuerliche Behandlung von Bitcoin und anderen sog. virtuellen Währungen; EuGH-Urteil vom 22. Oktober 2015, C-264/14, Hedqvist [BMF-Letter. VAT Treatment of Bitcoin and Other So-Called Virtual Currencies; ECJ Decision of October, 2015, C-264/14, Hedqvist] (BMF Letter), Feb. 27, 2018, at 1 & 2, http://www.bundesfinanzministerium. de/Content/DE/Downloads/BMF_Schreiben/Steuerarten/Umsatzsteuer/Umsatzsteuer-Anwendungserlass/2018-02-27-umsatzsteuerliche-behandlung-von-bitcoin-und-anderen-sog-virtuellen-waehrungen.pdf?__blob=publication File&v=1, *archived at* http://perma.cc/56TQ-9RJJ; Case C-264/14, Skatteverket v. David Hedqvist, ECLI:EU:C:2015:718, http://curia.europa.eu/juris/celex.jsf?celex=62014CJ0264&lang1=en&type=TXT&ancre, *archived at* http://perma.cc/7Q6Q-MM9V.

[220] BMF Letter, *supra* note 219, at 3.

[221] *Id*. at 2 & 3; Jenny Gesley, *Germany: Federal Ministry of Finance Publishes Guidance on VAT Treatment of Virtual Currencies*, GLOBAL LEGAL MONITOR (Mar. 13, 2018), http://www.loc.gov/law/foreign-news/article/germany-federal-ministry-of-finance-publishes-guidance-on-vat-treatment-of-virtual-currencies/, *archived at* http://perma.cc/2FEA-UJFE.

[222] *"Bitcoin Is Not a Virtual Currency,"* GERMAN BUNDESBANK (Feb. 20, 2018), https://www.bundesbank.de/Redaktion/EN/Topics/2018/2018_02_19_diskussion_bitcoin.html?https=1, *archived at* http://perma.cc/K8EK-VZJM.

[223] Carl-Ludwig Thiele, *Beware Bitcoin*, FAZ (Feb. 4, 2018), https://www.bundesbank.de/Redaktion/EN/Standardartikel/Press/Contributions/2018_02_04_thiele_fas.html, *archived at* http://perma.cc/X9UM-GYPE.

[224] *Id*.; Press Release, Joint Deutsche Bundesbank and Deutsche Börse Blockchain Prototype (Nov. 28, 2016), https://www.bundesbank.de/Redaktion/EN/Pressemitteilungen/BBK/2016/2016_11_28_blockchain_prototype.html?https=1, *archived at* http://perma.cc/GD77-79FN.

## Greece

The Bank of Greece on two occasions has issued announcements adopting the views of European supervisory authorities warning consumers of the risks of virtual currencies.[225]

## Hungary

On December 20, 2016, the National Bank of Hungary warned[226] consumers that using virtual currencies have many risks as they operate in a legally unregulated virtual system and there are no proper rules on liability, guarantee, and compensation that would protect the interests of consumers in the event of abuse.[227] The Bank had made similar statements in 2014[228] and 2015.[229]

## Ireland

Ireland does not appear to have any laws that specifically regulate cryptocurrencies.[230]  The Central Bank of Ireland noted in March 2018 that in cases of initial coin offerings (ICOs), if the token issued can be deemed a "transferable security," which is determined on a case-by-case basis, then the existing financial services legislation in Ireland will apply to it.[231]  The Central Bank of Ireland also stated,

---

[225] Bank of Greece, Ενημέρωση για τη χρήση εικονικών νομισμάτων [Information on the Use of Virtual Currencies] (Feb. 11, 2014), https://www.bankofgreece.gr/Pages/el/Bank/News/Announcements/DispItem.aspx?Item_ID=4517&List_ID=1af869f3-57fb-4de6-b9ae-bdfd83c66c95, *archived at* https://perma.cc/W9NN-3HDH; Bank of Greece, Ενημέρωση για τη χρήση εικονικών νομισμάτων [Information on the Use of Virtual Currencies] (Feb. 12, 2018), https://www.bankofgreece.gr/Pages/el/Bank/News/Announcements/DispItem.aspx?Item_ID=5981&List_ID=1af869f3-57fb-4de6-b9ae-bdfd83c66c95, *archived at* https://perma.cc/VT22-F9R2.

[226] Press Release, National Bank of Hungary, Virtual Money Available on the World Wide Web Carries Increased Risks (Dec. 20, 2016), http://www.mnb.hu/sajtoszoba/sajtokozlemenyek/2016-evi-sajtokozlemenyek/fokozott-kockazatot-hordoznak-a-vilaghalon-elerheto-virtualis-fizetoeszkozok (in Hungarian), *archived at* https://perma.cc/27DT-J7GZ; *see also* Christian Keszthelyi, *MNB Again Warns about Cryptocurrency Risks*, BUDAPEST BUSINESS JOURNAL (Dec. 20, 2016), https://bbj.hu/economy/mnb-again-warns-about-cryptocurrency-risks_126505, *archived at* https://perma.cc/Q9SL-SYN6.

[227] *Id.*

[228] Press Release, National Bank of Hungary, Warning: It Is Extremely Risky for Consumers to Use Bitcoin (Sept. 11, 2014), https://www.mnb.hu/fogyasztovedelem/sajtoszoba/figyelemfelhivas-rendkivul-kockazatos-a-fogyasztoknak-a-bitcoin (in Hungarian), *archived at* https://perma.cc/GY27-A73N.

[229] Press Release, National Bank of Hungary, New Risks for Virtual Payment Tools (June 10, 2015), http://www.mnb.hu/felugyelet/felugyeleti-keretrendszer/felugyeleti-hirek/hirek-ujdonsagok/sajtokozlemeny-ujabb-kockazatok-a-fizetesre-hasznalhato-virtualis-eszkozok-koreben (in Hungarian), *archived at* https://perma.cc/SZQ4-UC5L.

[230] DEPARTMENT OF FINANCE & DEPARTMENT OF JUSTICE AND EQUALITY, NATIONAL RISK ASSESSMENT FOR IRELAND: MONEY LAUNDERING AND TERRORIST FINANCING 85, *available at* http://www.inis.gov.ie/en/JELR/National_Risk_Assessment_Money_Laundering_and_Terrorist_Financing_Oct16.pdf/Files/National_Risk_Assessment_Money_Laundering_and_Terrorist_Financing_Oct16.pdf (last visited Mar. 20, 2018), *archived at* https://perma.cc/W8BV-GGKU.

[231] Speech by Gerry Cross, Director of Policy and Risk, Central Bank of Ireland, at Joint Session: Banknotes / Identity High Meeting 2018 Security Printers, International Conference & Exhibition Hosted by Intergraf, Tomorrow's Yesterday: Financial Regulation and Technological Change (Mar. 20, 2018), https://www.centralbank.

where the features of any given ICO match those of financial instrument issuance, then financial regulation applies, as of this moment, and issuers and others must, subject to legal penalty, ensure that they comply with the relevant rules.[232]

Capital gains tax law applies to transactions involving cryptocurrencies,[233] and this tax is chargeable if an individual makes a profit from buying and selling such currencies.[234]

The Central Bank of Ireland has endorsed a statement by the European Banking Authority, warning consumers of risks when undertaking transactions with virtual currencies,[235] and of the high risks of ICOs.[236]

The Irish government continues to take a wait-and-see approach to the regulation of cryptocurrencies:

> To the extent that virtual currencies, ICOs, or those involved in their issuance or trading, are not subject to existing regulation, then the question arises: has the regulation fallen behind developments and needs updating. Or is it the case that these activities are just new examples of old types of activity and there is no need for further regulatory intervention, beyond making consumers properly aware of the significant risks through consumer warnings? Or might it simply be too early to say? . . .At the Central Bank, we are actively engaged with other European and international policy makers as we all try to figure out a way forward, including for example, work at the ESAs [European Supervisory Authorities]. Given the cross-jurisdictional nature of virtual currencies and ICOs, we at the Central Bank welcome these efforts by the ESAs.[237]

---

ie/news/article/financial-regulation-and-technological-change-gerry-cross, *archived at* https://perma.cc/C9LH-EGCN.

[232] *Id.*

[233] *Capital Gains Tax (CGT) on the Sale, Gift or Exchange of an Asset*, IRISH TAX AND CUSTOMS (Nov. 21, 2017), https://www.revenue.ie/en/gains-gifts-and-inheritance/transfering-an-asset/index.aspx, *archived at* https://perma.cc/3B4L-LW7N.

[234] *Irish Tax Guide to Cryptocurrency Trading & Investing*, LIAM BURNS & CO. ACCOUNTANTS AND TAX ADVISERS, https://liamburnsandco.ie/cryptocurrency-tax-guide/ (last visited Apr. 18, 2018), *archived at* https://perma.cc/LH8P-E3GD.

[235] *EBA Warning and Opinion on Virtual Currencies*, CENTRAL BANK OF IRELAND, https://www.centralbank.ie/consumer-hub/consumer-notices/eba-opinion-on-virtual-currencies (last visited Mar. 20, 2018), *archived at* https://perma.cc/2ZCW-8SZ9.

[236] *Alert on Initial Coin Offerings*, *Information Notice December 2017*, CENTRAL BANK OF IRELAND, https://www.centralbank.ie/consumer-hub/consumer-notices/alert-on-initial-coin-offerings, *archived at* https://perma.cc/JR3C-NJX4.

[237] Speech by Gerry Cross, *supra* note 231.

Ireland has harnessed the use of cryptocurrency to help its tourism industry, adopting the "Irishcoin,"[238] a currency aimed predominantly at the tourism market that is accepted in some locations across Ireland.[239]

## Italy

A Ministerial Resolution of September 2016 issued by the Revenue Agency (Agenzia delle Entrate)[240] addressed aspects of the tax treatment of bitcoin and other cybercurrencies. This Resolution implemented the decision issued by the European Court of Justice (ECJ) in the case of *Skatteverket v. David Hedqvist*,[241] which held that the value added tax (VAT) does not apply to transactions in which cybercurrencies are exchanged for traditional currencies or vice versa.[242]

In addition, the Resolution of 2016 indicates that for purposes of the corporate income tax (Imposta sul Reddito sulle Società, IRES) and the Italian regional production tax (Imposta Regionale sulle Attività Produttive, IRAP), profits and losses on such transactions constitute corporate income and losses subject to taxation.[243] The Resolution contains specific requirements for the registration of cybercurrency operations, including names, amounts, dates, and other information on transactions.[244] Bitcoin operations performed by individuals who hold bitcoin for other than commercial or corporate purposes do not generate taxable income, according to the Resolution.[245]

---

[238] *Home*, IRISHCOIN, http://irishcoin.org (last visited Mar. 20, 2018), *archived at* https://perma.cc/XYM3-UE9E.

[239] Barry Flanagan, *Cryptocurrencies: 'Lack of Regulation Means Investors Can Make a Lot of Money Fast'*, THE JOURNAL.IE (July 2, 2017), http://www.thejournal.ie/readme/cryptocurrencies-lack-of-regulation-means-investors-can-make-a-lot-of-money-fast-3470179-Jul2017/, *archived at* https://perma.cc/69UV-S86N.

[240] Risoluzione Ministeriale 72/E del 2 settembre 2016, Interpello ai sensi dell'art. 11, legge 27 luglio 2000, n. 212, Trattamento Fiscale Applicabile alle Societa che Svolgono Attivita di Servizi Relativi a Monete Virtuali [Ministerial Resolution 72/E of September 2, 2016, Rule Issued According to Art. 11 of Law No. 212 of July 27, 2000, Fiscal Treatment Applicable to Companies that Develop Service Activities Related to Virtual Currencies] (Agenzia Entrate), https://www.finaria.it/pdf/bitcoin-tasse-agenzia-entrate.pdf, *archived at* https://perma.cc/9EAZ-LS79.

[241] Skatteverket v. David Hedqvist, ECLI:EU:C:2015:718 (ECJ Oct. 22, 2015), http://curia.europa.eu/juris/document/document.jsf?text=&docid=170305&pageIndex=0&doclang=en&mode=lst&dir=&occ=first&part=1&cid=302749, *archived at* https://perma.cc/JYH8-Q6AL.

[242] Paolo Luigi Burlone, *Dichiarazione dei Redditi e Bitcoin* [*Declaration of Income and Bitcoin*], COINLEX, https://coinlexit.wordpress.com/2016/04/26/dichiarazione-dei-redditi-e-bitcoin/ (last visited Mar. 16, 2018), *archived at* https://perma.cc/QSN8-XSHV.

[243] *Id.*

[244] Margherita Pignatelli, *Servizi Relativi a Monete Virtuali: il Trattamento Fiscale da Applicare* [*Services Related to Virtual Currencies: Fiscal Treatment to Apply*], FISCOOGGI (Sept. 2, 2016), http://www.fiscooggi.it/normativa-e-prassi/articolo/servizi-relativi-monete-virtualiil-trattamento-fiscale-applicare, *archived at* https://perma.cc/4E6Z-YWK8.

[245] *Bitcoin e Tasse: Come Fare per la Dichiarazione dei Redditi?* [*Bitcoin and Taxes: How to Make the Declaration of Income?*], MERCATI 24, https://www.mercati24.com/bitcoin-tasse/ (last visited Mar. 21, 2018), *archived at* https://perma.cc/S3W4-5BP5.

Legislative Decree No. 90 of 2017 subjected virtual currency providers to the regulations established for traditional money exchange operators.[246] To that effect, Legislative Decree No. 90 charged the Ministry of the Economy and Finance to issue a ministerial decree setting forth the modalities and timelines for the legal performance of such activities throughout the country.[247] Accordingly, the Ministry of Economy and Finance's Treasury Department published a public notice requesting comments before February 17, 2018, on the proposed text of the ministerial decree.[248] It is expected that the ministerial decree will be issued during the upcoming months.

## Latvia

The position of the Bank of Latvia and the State Revenue Service is that cryptocurrency is a contractual, not statutory, means of payment that can be used in transactions of exchange. Cryptocurrency cannot be considered as official currency or legal tender because the issuance and use of these instruments remains unregulated and they are not linked to any national currency.[249]

In November of 2017 Latvia amended its anti-money laundering legislation and introduced monitoring requirements for virtual currency service providers, including providers of virtual currency exchange services. Virtual currency is now defined as the digital representation of a value that may be digitally transmitted, stored, or traded, and acts as an exchange instrument without being legal tender.[250]

## Lithuania

On October 11, 2017, the Bank of Lithuania stated that financial services must be clearly dissociated from activities related to virtual currencies and that financial market participants should not provide services associated with virtual currencies. In particular, they should not engage

---

[246] Decreto Legislativo 25 maggio 2017, n. 90 Attuazione della Direttiva (UE) 2015/849 Relativa alla Prevenzione dell'Uso del Sistema Finanziario a Scopo di Riciclaggio dei Proventi di Attivita Criminose e di Finanziamento del Terrorismo [Legislative Decree No. 90 of May 25, 2017, Implementing Directive (EU) 2015/849 of the European Parliament and of the Council of 20 May 2015 on the Prevention of the Use of the Financial System for the Purposes of Money Laundering or Terrorist Financing. . .] (L.D. No. 90), art. 8, ¶ 1, G.U. June 19, 2017, n. 140, http://www.normattiva.it/uri-res/N2Ls?urn:nir:stato:decreto.legislativo:2017-05-25;90!vig=2018-03-14, *archived at* https://perma.cc/YQX5-BJWK.

[247] *Id.*

[248] *Valuta Virtuale: Consultazione Pubblica sul Decreto Ministeriale di cui all'Articolo 17-bis, Comma 8-ter del Decreto Legislativo 13 Agosto 2010, n.141 e Successive Modificazioni* [*Virtual Currency: Public Consultation on the Ministerial Decree referred to by Article 17-bis, Paragraph 8-ter of Legislative Decree No. 141 of August 13, 2010, and Successive Amendments*], DIPARTIMENTO DEL TESORO [TREASURY DEPARTMENT], http://www.dt.tesoro.it/it/consultazioni_pubbliche/prestatori_virtuale.html (last visited May 9, 2018), *archived at* https://perma.cc/XC9W-J924.

[249] *Global Cryptocurrency Boom: Latvian Tax Treatment (1)*, PRICEWATERHOUSECOOPERS (Jan. 25, 2018), https://www.mindlink.lv/en/topical/cryptocurrency_1_en/, *archived at* https://perma.cc/5JG2-88RF.

[250] Amendments to the Law on Prevention of Money Laundering and Terrorist Financing, No. 222 (6049) of Nov. 8, 2017, OFFICIAL GAZETTE No. 2017/222.7, https://www.vestnesis.lv/op/2017/222.7 (in Latvian), *archived at* https://perma.cc/8GEV-DSF2; *see also* Dmitriy Kolesnikov, *Regulation of Virtual Currencies Came into Existence in Latvia*, NJORD LAW FIRM (Nov. 10, 2017), https://www.njordlaw.com/ru/latvia-introduces-regulation-crypto/ (in Russian), *archived at* https://perma.cc/8T7M-JE5U.

in the sale of virtual currencies, provide conditions for customers to pay in payment instruments issued by them (debit or credit cards), or exchange or execute any other operations in virtual currencies.[251]

As to initial coin offerings (ICOs), the Bank clarified that depending on the nature of the offering, legal acts regulating crowdfunding, collective investment, provision of investment services, etc. must be applied.[252]

On March 6, 2018, the Bank of Lithuania announced that it plans to issue the world's first digital collector coin using blockchain or other equivalent technologies.[253]

## Luxembourg

Cryptocurrencies remain largely unregulated in Luxembourg, although the Duchy's government appears to display a more welcoming attitude towards the phenomenon than some of its European counterparts.

On March 14, 2018, the Financial Sector Monitoring Commission (Commission de Surveillance du Secteur Financier, CSSF) of Luxembourg issued a statement warning about the risks of investing in cryptocurrencies.[254] The CSSF's main objections are that cryptocurrencies are very volatile, offer no protection against theft and hacking, lack liquidity, are often the subject of misleading information, lack transparency, and are often used for fraud and money laundering.[255] The statement also warned against the risks of Initial Coin Offerings.[256] The CSSF, however, recognized the value of blockchain technology, noting that it could be used advantageously by the financial sector.[257] Furthermore, the CSSF's letter stated that while there is no legal framework that specifically applies to cryptocurrencies, the provision of any financial services—including those involving cryptocurrencies—requires an authorization from the Minister of Finance.[258]

---

[251] Press Release, Bank of Lithuania, Bank of Lithuania Announces Its Position on Virtual Currencies and ICO (Oct. 11, 2017), https://www.lb.lt/en/news/bank-of-lithuania-announces-its-position-on-virtual-currencies-and-ico, *archived at* https://perma.cc/B7C8-CPMN.

[252] Position of the Bank of Lithuania on Virtual Currencies and Initial Coin Offering, Approved by the Board of the Bank of Lithuania on Oct. 10, 2017, https://www.lb.lt/uploads/documents/files/Pozicijos del virtualiu valiutu ir VV zetonu platinimo EN.pdf, *archived at* https://perma.cc/V85N-PG47.

[253] Press Release, Bank of Lithuania, Lithuania's Central Bank to Issue the World's First Digital Collector Coin (Mar. 6, 2018), https://www.lb.lt/en/news/lithuania-s-central-bank-to-issue-the-world-s-first-digital-collector-coin, *archived at* https://perma.cc/574C-LU3P.

[254] CSSF, *Avertissement sur les monnaies virtuelles* [*Warning About Cryptocurrencies*] (Mar. 14, 2018), http://www.cssf.lu/fileadmin/files/Protection_consommateurs/Avertissements/A_monnaies_virtuelles_140318.pdf, *archived at* https://perma.cc/7B3F-QLKY.

[255] *Id.* at 2–3.

[256] *Id.* at 3–4.

[257] *Id.* at 1.

[258] *Id.* at 4.

Despite this warning from its main financial services regulator, Luxembourg appears to see the development of cryptocurrencies in a positive light.  In June 2017, the Luxembourger Minister of Finance, Pierre Gramegna, recognized before Parliament that cryptocurrencies are actual currencies, as "they are accepted as a means of payment for goods and services by a sufficiently large circle of people."[259]  He also stated that there was currently no regulation "from a monetary perspective" regarding cryptocurrencies, but that cryptocurrency dealers in Luxembourg are bound by the same rules as any other financial service providers with regards to the fight against money laundering and the financing of terrorism.[260]  More recently, Gramegna publicly welcomed the establishment of BitFlyer, a major bitcoin trading platform, as a fully licensed payment service provider in Luxembourg.[261]  In an interview shortly thereafter, Gramegna stated that cryptocurrencies and blockchain technology were both an "unavoidable phenomenon that brings added value and efficient services to consumers."[262]  Much work remains to be done to provide a legislative and regulatory framework for cryptocurrencies, however, as such a framework is largely inexistent at this time.  During the welcoming ceremony for BitFlyer, the company's founder noted that it had taken them two years to obtain their license and that "the regulation is unclear.  There is no specific law and one must nevertheless protect the consumer."[263]

**Malta**

Malta currently does not have any legislation that specifically applies to cryptocurrency, but this will soon change.  The Maltese government has actively encouraged the development of cryptocurrency and issuing many consultations and papers that discuss its regulation and development.  The aim of these regulations is "[t]o provide the necessary legal certainty to allow this industry to flourish."[264]

In October 2017, the government issued a consultation document that proposed a regulatory framework for collective investment schemes and investment in cryptocurrencies.  As a result of

---

[259] *L'État garde un œil sur la monnaie virtuelle* [*The Government Keeps an Eye on Cryptocurrencies*], L'ESSENTIEL (June 26, 2017), http://www.lessentiel.lu/fr/luxembourg/story/L-tat-garde-un-oeil-sur-la-monnaie-virtuelle-29561059, *archived at* https://perma.cc/U2DS-ZUGJ.

[260] *Id.*

[261] Pierre Sorlut, *Monnaies virtuelles: Pierre Gramegna se félicite de l'arrivée de BitFlyer* [*Cryptocurrencies: Pierre Gramegna Satisfied by the Arrival of BitFlyer*], LUXEMBURGER WORT (Jan. 27, 2018), https://www.wort.lu/fr/ economie/monnaies-virtuelles-pierre-gramegna-se-felicite-de-l-arrivee-de-bitflyer-5a6c3646c1097cee25b7c821, *archived at* https://perma.cc/Q4QS-YWAK.

[262] Pierre Sorlut, *Ce qu'en pense le ministre des Finances: Les monnaies virtuelles, «un phénomène incontournable»* [*What the Minister of Finances Thinks of It: Cryptocurrencies, an "Unavoidable Phenomenon"*], LUXEMBURGER WORT (Jan. 31, 2018), https://www.wort.lu/fr/economie/ce-qu-en-pense-le-ministre-des-finances-les-monnaies-virtuelles-un-phenomene-incontournable-5a70269ac1097cee25b7ca3b, *archived at* https://perma.cc/TD7M-EQL4.

[263] Sorlut, *Monnaies virtuelles*, *supra* note 261.

[264] Ivan Martin, *Malta Digital Innovation Authority Unveiled: Government Working on Green Paper on AI and Internet of Things*, TIMES OF MALTA (Feb. 16, 2018), https://www.timesofmalta.com/articles/view/20180216/local/malta-digital-innovation-authority-unveiled.670847, *archived at* https://perma.cc/7P7W-7V3R.

the consultation, Malta Financial Services Authority (MFSA) published conditions that apply to professional investor funds that invest in cryptocurrencies on January 22 and 29, 2018.[265]

In November 2017, the government published the *Discussion Paper on Initial Coin Offerings, Virtual Currencies and Related Service Providers*, which noted that while some cryptocurrencies might fall within the scope of existing financial services legislation, others would be outside the scope and thus unregulated.[266]  In January 2018, the government issued a further discussion paper that "present[ed]a conceptual framework through which DLT Platforms can be subject to certification in Malta."[267]  The government has issued a statement that it intends to facilitate a regulatory framework for cryptocurrency-related activities and initial coin offerings (ICOs).[268]

Malta is currently considering three bills that would provide a regulatory framework for cryptocurrency and is following a principles-oriented approach to this legislation to help prevent the laws from becoming rapidly obsolete, or from stifling technological development.[269]  The three bills are as follows:

- The Malta Digital Innovation Authority Bill (MDIA Bill) would establish the Malta Digital Innovation Authority (MDIA), which would "focus on innovative technology arrangements and their uses such that Malta can take the greatest advantage of new technology arrangements while at the same time protect[ing] the public interest."[270]  One of the first objectives for the MDIA would be to promote government policies that favor technical innovation, particularly with reference to digital ledger technology and its adoption by the government in systems of public administration.[271]  Other objectives would include maintaining Malta's reputation and protecting consumers.[272]  The MDIA would also bear responsibility for certifying technology arrangements and registering technology services providers under the "TAS Bill."[273]

- The "TAS Bill" would establish a regime for the registration of technology service providers and provide for the certification of certain technology arrangements.  This regime will initially

---

[265] PARLIAMENTARY SECRETARIAT FOR FINANCIAL SERVICES ET AL., MALTA: A LEADER IN DLT REGULATION 9 (2018), *available at* https://meae.gov.mt/en/Public_Consultations/OPM/Documents/PS FSDEI - DLT Regulation Document OUTPUT.PDF, *archived at* https://perma.cc/29US-4V9D.

[266] MFSA, *Discussion Paper on Initial Coin Offerings, Virtual Currencies and Related Service Providers*, MFSA Ref: 08-2017 (Nov. 30, 2017; closing date Jan. 11, 2018), http://act.com.mt/media/images/active/downloads/ DiscussionPaperVCs.pdf, *archived at* https://perma.cc/2M25-K9SF.

[267] *Id.*

[268] Press Release, Parliamentary Secretariat for Financial Services, Digital Economy and Innovation, PR172729 (Nov. 29, 2017), https://www.gov.mt/en/Government/Press%20Releases/Pages/2017/November/29/pr172729.aspx, *archived at* https://perma.cc/FW37-K2WX.

[269] PARLIAMENTARY SECRETARIAT FOR FINANCIAL SERVICES ET AL., *supra* note 265, at 265.

[270] *Id.* at 11.

[271] *Id.* at 12.

[272] *Id.*

[273] *Id.*

cover distributed ledger technology platforms and related contracts.[274]  The proposals would require technology service providers that provide services for any distributed ledger technology platform in or from Malta be certified by the MDIA. Those who provide these services in other specified cases may voluntary register with the MDIA.[275]

- The Virtual Currency Bill would establish a framework for ICOs and a regulatory regime that would apply to certain services relating to cryptocurrencies, such as brokers, wallet providers, and virtual currency exchanges.[276] The *Times of Malta* has reported that the government is considering introducing its own cryptocurrency "within a 'controlled framework,' which would enable regulators to test possible controls and legislation for the technology."[277]  The Virtual Currency Bill aims to regulate ICOs that relate to virtual currency not falling within the existing legislation.  The bill will ensure that the offerings meet transparency requirements and will incorporate obligations that apply to initial public offerings that the issuer must follow.[278]

The MFSA has also proposed a "financial instrument test" that would enable individuals to determine,

> with regulatory certainty[,] . . . whether, based on its specific features, an ICO or a VC [virtual currency] falls within the scope of the existing legislative framework, reflecting EU law on the subject, or if not, whether this will be required to comply with the new regulatory framework being proposed by the MFSA.[279]

The test proposed would be a two-stage test, the first of which would determine whether a cryptocurrency is a financial instrument within existing Maltese or European Union legislation. The second stage would determine if the cryptocurrency was an asset under the proposed Virtual Currency Bill.[280]

The MFSA would be the regulator for the financial services contained in the Virtual Currency Bill, and would have regulatory and investigatory powers that reflect those contained in the country's other financial services laws, including the authority to suspend an ICO or trading of a cryptocurrency.[281]

---

[274] *Id*. at 13.

[275] *Id*. at 14.

[276] *Id.*

[277] *Id.*

[278] *Id.* at 26.

[279] *Id.* at 24.

[280] *Id.*

[281] *Id.* at 26.

The government has also established a National Blockchain Strategy Taskforce to advise the government on a framework for distributed ledger technologies.[282]

After one of Malta's largest banks, the Bank of Valletta, blocked cryptocurrency transfers,[283] the government of Malta stated that it does not "interfere with individual banks' operational policies, which are dictated by circumstances which they are best placed to assess."[284]   Many residents of Malta expressed surprise at the actions of the Bank, particularly as the government of Malta is its largest shareholder, owning approximately 25% of the Bank's shares.[285]

The Malta Gaming Authority has also stated that it is "committed to allow[ing] the use of crypto-currencies by its licensees in the immediate future,"[286] and a new Gaming Bill is currently being considered that includes virtual currencies under the definition of "money and, or money's worth."[287]

**Netherlands**[288]

The Central Bank of the Netherlands (De Nederlandsche Bank, DNB) has stated that it is studying the opportunities offered by blockchain and virtual currencies, but acknowledged that there are certain risks and drawbacks involved.[289] Furthermore, in January 2018, it published a position paper on cryptocurrencies and ICOs in which it highlighted that cryptocurrencies "do not currently fulfill the role of money—in fact, they are hardly ever used for payment, and they are not a universally accepted and stable medium of exchange, a suitable unit of account or a reliable store of value. Accordingly, they do not have any implications in terms of monetary policy."[290]

---

[282] *Id.* at 9.

[283] Bertaind Borg, *BOV Turns Against Cryptocurrencies*, TIMES OF MALTA (Nov. 28, 2017), https://www.timesof malta.com/articles/view/20171128/local/bov-turns-against-cryptocurrencies.664322, *archived at* https://perma.cc/KR2K-FN68.

[284] Press Release, Parliamentary Secretariat for Financial Services, Digital Economy and Innovation, *supra* note 268.

[285] Borg, *supra* note 283.

[286] MALTA GAMING AUTHORITY, A WHITE PAPER TO FUTURE PROOF MALTA'S GAMING LEGAL FRAMEWORK 28 (July 2017), https://meae.gov.mt/en/Public_Consultations/OPM/Documents/Legal Overhaul Consultation with Annexes.pdf, *archived at* https://perma.cc/25QQ-8YZV.

[287] Gaming Bill 2018, cl. 2(1), http://justiceservices.gov.mt/DownloadDocument.aspx?app=lp&itemid=28971&l=1, *archived at* https://perma.cc/NV7F-VCD5.

[288] At present there are no Law Library of Congress research staff members versed in Dutch. This survey of the law of the Netherlands has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[289] *Virtual Currencies*, DNB, https://www.dnb.nl/en/payments/virtuele-valuta/index.jsp (last visited Mar. 20, 2018), *archived at* http://perma.cc/N3KY-MSLJ.

[290] DNB, POSITION PAPER BY DE NEDERLANDSCHE BANK. ROUNDTABLE CRYPTOCURRENCIES/ICO'S 1 (Jan. 22, 2018), https://www.dnb.nl/en/binaries/TR17025%20Position%20paper%20Cryptocurrencies_tcm47-371493.pdf?2018032021, *archived at* http://perma.cc/6C3N-GF4B.

The DNB supports the decision of the EU to extend the scope of the Fourth AMLD to include crypto exchanges and issuers of crypto wallets.[291] It is looking into whether converting cryptocurrencies into euros or other currencies, and vice versa, qualifies as issuing electronic money or as providing a payment service. It does not currently support a ban on cryptocurrencies.[292]

As a pilot project, the DNB has started the "DNBCoin" experiment for internal test purposes and focused on the blockchain as a vehicle for a virtual currency. They have developed several prototypes to study the way the bitcoin software can be adapted and used for financial market infrastructures.[293]

The Dutch Authority for the Financial Markets (Autoriteit Financiële Markten, AFM) has issued a warning regarding serious risks associated with ICOs.[294] It has advised consumers to avoid investing in ICOs, because they are vulnerable to misrepresentation, fraud, and manipulation and may also be structured in such a way that they are not subject to supervision by the AFM. The AFM assesses on a case-by-case basis whether the tokens in an ICO qualify as a security or a unit in a collective investment scheme as defined in the Financial Supervision Act and are therefore subject to authorization by the AFM.[295]

The Dutch Minister of Finance, Wopke Hoekstra, stated in a letter to parliament that the Netherlands does not want to ban the cryptocurrency trade, but that it should be regulated on a European or international level.[296] Any regulation, however, should not jeopardize the potential of the technique.[297] He also supports the application of anti-money laundering legislation to custodian wallet providers and virtual currency exchange platforms.[298]

---

[291] *Id.* at 3.

[292] *Id.*

[293] Ron Berndsen, De Nederlandsche Bank, Speech at the Dutch Blockchain Conference, If Blockchain is the Answer, What is the Question? (June 20, 2016), https://www.dnb.nl/binaries/Speech%20Ron%20Berndsen_tcm46-342846.pdf, *archived at* http://perma.cc/SM4V-K99L.

[294] *Initial Coin Offerings (ICO's): Serious Risks*, AFM, https://www.afm.nl/en/professionals/onderwerpen/ico (last visited Apr. 5, 2018), *archived at* http://perma.cc/7LGR-W95Y.

[295] *Id.*; Wet op het financieel toezicht [Wft] [Financial Supervision Act], Sept. 28, 2006, STAATSBLAD VAN HET KONINKRIJK DER NEDERLANDEN [STB.] [OFFICIAL GAZETTE OF THE KINGDOM OF THE NETHERLANDS] 2006, no. 475, as in force on Feb. 9, 2018, art. 1:1, http://wetten.overheid.nl/BWBR0020368/2018-02-09, *archived at* http://perma.cc/CA3G-Y5ZK.

[296] Brief van de Minister van Financiën Aan de Voorzitter van de Tweede Kamer der Staten-Generaal [Letter of the Minister of Finance to the Chairman of the House of Representatives], Mar. 8, 2018, https://1848.nl/static/pdf/43/a5/43a59ddec48a8119409c4d021cedecd22ac9162a.pdf, *archived at* http://perma.cc/2J54-H8QC.

[297] *Id.*

[298] *Id.*

## Poland

On July 7, 2017, the Polish National Bank and the Financial Supervision Commission jointly issued a warning against investing in virtual currencies, citing price volatility and the risk of fraud. The regulators clarified that virtual currencies are not considered legal tender in Poland. At the same time they noted that trading in virtual currencies is not an infringement of Polish or European law. The regulators consider that buying, holding, and selling of virtual currencies by financial institutions is not in line with the principles of stable and prudent management, and that having established relations with virtual currency traders could pose legal and reputational risk.[299]

On January 24, 2018, Prime Minister Morawiecki stated that Poland will either ban cryptocurrency or introduce regulations to ensure that it does not turn into a pyramid scheme.[300]

On April 4, 2018, the Ministry of Finance published guidance on the tax effects of trading in cryptocurrencies.[301] Income from transactions on cryptocurrencies is subject to income tax with two brackets of 18% and 32%, while the act of selling or purchasing digital currencies is considered a transfer of property rights, which is subject to a 1% levy on the value of the transaction.[302]

---

[299] Statement by Narodowy Bank Polski (NBP) and the Polish Financial Supervision Authority (KNF) on "Virtual Currencies" (July 7, 2017), https://www.knf.gov.pl/en/news?articleId=57368&p_id=19, *archived at* https://perma.cc/4T6N-VBT8; *see also* Wolfie Zhao, *Polish Regulators Warn Banks and Consumers on Cryptocurrency Risks*, COINDESK (July 7, 2017), https://www.coindesk.com/polish-regulators-warn-banks-consumers-cryptocurrency-risks/, *archived at* https://perma.cc/G9X5-7SPU.

[300] Michał Żuławiński, *Morawiecki: We Will Ban Cryptocurrencies or Regulate Them. "We Do Not Want Another Amber Gold"*, BANKIER.PL (Jan. 25, 2018), https://www.bankier.pl/wiadomosc/Morawiecki-Zakazemy-kryptowalut-lub-je-uregulujemy-Nie-chcemy-kolejnego-Amber-Gold-7568737.html (in Polish), *archived at* https://perma.cc/6UWU-AKBQ.

[301] Press Release, Ministry of Finances, Tax Consequences of Trading in Cryptocurrencies for Individual Income Tax, Value-Added Tax and Tax on Civil Law Transactions, https://www.mf.gov.pl/ministerstwo-finansow/wiadomosci/aktualnosci/ministerstwo-finansow2/-/asset_publisher/M1vU/content/skutki-podatkowe-obrotu-kryptowalutami-w-pit-vat-i-pcc (in Polish), *archived at* https://perma.cc/37N9-TS6C.

[302] Konrad Krasuski, *Crypto Traders Protest Poland's Tax Decision*, BLOOMBERG (Apr. 9, 2018), https://www.bloomberg.com/news/articles/2018-04-09/crypto-traders-protest-as-poland-wants-tax-from-all-transactions, *archived at* https://perma.cc/2EUZ-GQM9.

## Portugal

According to the Federal Reserve Bank of Portugal (Banco de Portugal), the activity of issuing and trading virtual currencies is neither regulated nor supervised by the Federal Reserve Bank of Portugal or any other authority of the financial system, national or European, in particular by the European Central Bank.[303]  The absence of regulations on operations with virtual currencies does not make these activities illegal or prohibited, the Bank noted.  However, entities that issue and sell virtual currencies are not subject to any obligation of authorization or registration with the Federal Reserve Bank of Portugal, so their activity is not subject to any kind of prudential or behavioral supervision.[304]

## Romania

On February 6, 2018, Romania's National Bank announced that it discourages any involvement of local credit institutions in the cryptocurrency sector because of reputational risks.[305] The Bank reminded of its earlier warning issued in March of 2015[306] on the high risks of losing the money invested in cryptocurrencies. Following this announcement the local banks closed the accounts of several cryptocurrency exchanges.[307]

In March of 2018 the National Agency for Fiscal Administration reportedly declared that income from transactions with cryptocurrencies are taxable.[308]

---

[303] *Moedas Virtuais*, BANCO DE PORTUGAL, https://www.bportugal.pt/page/moedas-virtuais (last visited Mar. 19, 2018), *archived at* https://perma.cc/YR5Q-9DWV.  For further discussion of the European Central Bank's position on digital currencies, see the EU survey, *supra*.

[304] *Id.*

[305] Press Release, National Bank of Romania, The Position of the National Bank of Romania in Relation to the Virtual Currencies (Feb. 6, 2018), http://www.bnr.ro/page.aspx?prid=14338 (in Romanian), *archived at* https://perma.cc/G9T9-CF3K; *see also Romania's Central Bank Warns Local Lenders Not to Get Involved with Bitcoin*, ROMANIA-INSIDER.COM (Feb. 7, 2018), https://www.romania-insider.com/bnr-warning-bitcoin/, *archived at* https://perma.cc/Y65Q-KLW2.

[306] Press Release, National Bank of Romania, Commentary on Virtual Currency Schemes (Mar. 11, 2015), http://www.bnr.ro/page.aspx?prid=10016 (in Romanian), *archived at* https://perma.cc/S8T2-DGRG.

[307] *Romanian Banks Stop Working with Cryptocurrency Platforms*, ROMANIA-INSIDER.COM (Feb. 19, 2018), https://www.romania-insider.com/banks-stop-working-cryptocurrency-platforms/, *archived at* https://perma.cc/Z5HE-SA2G.

[308] *Romanians with Bitcoin Must Pay Tax and Social Contributions Despite Virtual Currency Not Being Regulated in Romania*, LIBERTATEA (Mar. 4, 2018), https://www.libertatea.ro/stiri/exclusiv-romanii-cu-bitcoin-datori-la-fisc-trebuie-platit-impozit-pe-venit-si-contributii-sociale-desi-monedele-virtuale-nu-sunt-reglementate-in-romania-2163395 (in Romanian), *archived at* https://perma.cc/H966-59E4.

## Slovakia

On March 23, 2018, the Ministry of Finance published guidance explaining that revenues stemming from cryptocurrencies must be taxed, and that any type of exchange, such as an exchange of a virtual currency for an asset or a service rendered or for another virtual currency, must be considered to be a taxable transfer.[309] The guidance says that virtual currencies must be treated as "short-term financial assets other than money" and priced at market value at the time of transaction, and that cryptocurrencies directly obtain from mining shall be kept off-balance sheet until they are sold or traded.[310] Earlier the Finance Minister had noted that trade in cryptocurrencies, which is unregulated and anonymous, involves risks of terrorism and organized crime.[311]

In 2013 the National Bank of Slovakia issued a warning to inform the general public that virtual currencies are not national currencies and that unauthorized currency production constitutes a criminal offense.[312]

## Slovenia

On January 18, 2018, the Bank of Slovenia warned citizens that virtual currencies are not a digital replacement for banknotes and coins, and are not regulated.[313] The Bank explained that entities purchasing, depositing, or trading virtual currencies in Slovenia are not systematically regulated and supervised. It advised citizens to inform themselves about virtual currencies before buying them and to be aware that they could lose their investments in those currencies.[314] Following the Bank's warning commercial banks reportedly stopped selling cryptocurrencies via ATMs.[315]

Earlier on October 9, 2017, the Financial Stability Board recommended that investors in virtual currencies consider whether the risks are in line with their personal preferences and investment

---

[309] Methodological Guideline of the Ministry of Finance of the Slovak Republic No. MF/10386/2018-721 for the Procedure of Taxing Virtual Currency, *available at* http://src.bna.com/xod (in Slovak), *archived at* https://perma.cc/C897-ZS9T; *see also* Jan Sojaspal, *Slovakia to Tax Cryptocurrency Income*, BLOOMBERG (Mar. 28, 2018), https://www.bna.com/slovakia-tax-cryptocurrency-n57982090526/, *archived at* https://perma.cc/F34Q-U9V5.

[310] Methodological Guideline, *supra* note 309.

[311] *Finance Minister Plans to Start Taxing Bitcoin*, THE SLOVAK SPECTATOR (Jan. 8, 2018), https://spectator.sme.sk/c/20733083/financial-minister-plans-to-start-taxing-bitcoin.html, *archived at* https://perma.cc/NN5W-JEJY.

[312] Press Release, National Bank of Slovakia, Národná Banka Slovenska's Warning to the Public on Bitcoin (Nov. 26, 2013), https://www.nbs.sk/en/press/all-press-releases/press-release/_narodna-banka-slovenska-s-warning-to-the-public-on-bitcoin, *archived at* https://perma.cc/9A5B-3PCR.

[313] Press Release, Bank of Slovenia, Questions and Answers on Virtual Currencies (Jan. 18, 2018), https://www.bsi.si/en/media/1180/questions-and-answers-on-virtual-currencies, *archived at* https://perma.cc/C3XV-HR2A.

[314] *Slovenia Cbank Warns about Virtual Currency Risks*, REUTERS (Jan. 18, 2018), https://www.reuters.com/article/slovenia-cenbank/update-1-slovenia-cbank-warns-about-virtual-currency-risks-idUSL8N1PD4II, *archived at* https://perma.cc/TK6R-ZW4D.

[315] *Slovenian Regulator Bans Sale of Cryptocurrency on ATMs*, TOTAL-SLOVENIA-NEWS (Feb. 8, 2018), http://www.total-slovenia-news.com/business/602-slovenian-regulator-bans-sale-of-cryptocurrency-on-atms, *archived at* https://perma.cc/DT4N-W3X7.

goals,[316] and that investors in ICOs should invest in amounts that would not leave them too exposed.[317]

## Spain

Spain's Comisión Nacional de Valores (National Securities Commission) and the Banco de España (Bank of Spain) issued a joint statement regarding the use of bitcoin in February 2018[318] noting that cryptocurrency is not issued, registered, authorized, or verified by any regulatory agency in Spain. Therefore, cryptocurrencies purchased or held in Spain are not backed by any of the guarantees or safeguards provided by regulations applicable to banking or investment products.[319] The statement aimed to alert investors of the inherent risk of loss or fraud associated with these types of transactions.[320]

Notwithstanding this warning, the government is considering the adoption of legislation friendly towards cryptocurrencies, which would include possible tax breaks to attract companies in the blockchain technology sector.[321]

Profits derived from transactions with cryptocurrencies are taxable under the Law on Income Tax of Individuals.[322] However, the Dirección General de Tributos (General Directorate on Taxation) has established that transactions with bitcoins are exempt from value added tax.[323]

## Sweden

Sweden does not have any specific regulation that deals with cryptocurrencies. A number of agencies have issued statements, reports, and preliminary judgements on how they interpret cryptocurrencies and how such currencies relate to Swedish law.

---

[316] Press Release, Bank of Slovenia, Financial Stability Board (Sept. 10, 2017), https://www.bsi.si/en/media/1138/opozorilo-glede-virtualnih-valut, *archived at* https://perma.cc/GLK6-XB9X.

[317] *Slovenia's Financial Watchdog Warns about Virtual Currency Risks*, REUTERS (Oct. 9, 2017), https://www.reuters.com/article/us-slovenia-watchdog/slovenias-financial-watchdog-warns-about-virtual-currency-risks-idUSKBN1CE1ZE, *archived at* https://perma.cc/J7DF-LJMC.

[318] Comunicado Conjunto de la Comisión Nacional del Mercado de Valores (CNMV) y Banco de España [Joint Press Statement by CNMV and Banco de España on "Cryptocurrencies" and "Initial Coin Offerings" (ICOs)] (Feb. 8, 2018), https://www.cnmv.es/loultimo/NOTACONJUNTAriptoES%20final.pdf, *archived at* https://perma.cc/K5J4-WJM4.

[319] *Id.*

[320] *Id.*

[321] *España Busca Aprobar una Legislación Amistosa para las Criptomoneda* [*Spain Seeks to Approve Friendly Legislation Towards Cryptocurrencies*], HARWAREATE (Feb. 18, 2018), https://hardwareate.com/espana-busca-aprobar-una-legislacion-amistosas-las-criptomonedas, *archived at* https://perma.cc/6VTJ-NRRV.

[322] José Trecet, *Declaración de Impuesto a la Renta: Cómo Tributan los Bitcoins en la Renta* [*Income Tax Reporting: How Are Bitcoins Taxed*], BOLSAMANÍA (Mar. 1, 2018), http://www.bolsamania.com/declaracion-impuestos-renta/como-tributan-los-bitcoins-en-la-renta/, *archived at* https://perma.cc/G4Y7-A59M.

[323] *Id.*

The Swedish Financial Supervisory Authority (Finansinspektionen) has made the determination that bitcoins are subject to its authority, as trade in bitcoins (i.e., offering a site where bitcoins can be bought and sold similar to an exchange) is a financial service (*annan finansiell verksamhet*) and thus subject to mandatory reporting requirements.[324] In 2017, the Authority issued a report titled *The Authority's Role in Innovation*, which among other things described its role in relation to novel concepts such as bitcoin.[325] The report described ICOs as investment projects and means of securing capital.[326] The Authority has also issued warnings against the use of ICOs, noting that they are unregulated and not subject to its review.[327] It referred to the European Supervisory Authority for its interpretation that ICOs may be regulated by the Prospectus Directive, the Markets in Financial Instruments Directive (MiFID), the Alternative Investment Fund Managers Directive (AIFMD), and the Fourth Anti-Money Laundering Directive.[328] The Authority's 2017 report stated that it is unaware of any Swedish corporation that secures funding through ICOs.[329]

In March of 2018 the Swedish Central Bank announced that "[b]itcoins are not money."[330] The announcement explained that cryptocurrencies are not seen as currencies, referencing a new financial report on cryptocurrencies written by the Central Bank of Sweden staff.[331] The Central Bank of Sweden is considering launching an e-currency, but the project is still in the review stage.[332]

---

[324] Press Release, Finansinspektionen, Valutaväxlare och annan finansiell verksamhet [Currency Exchanges and Other Financial Activity] (updated Jan. 24, 2017), https://www.fi.se/sv/bank/sok-tillstand/valutavaxlare-och-annan-finansiell-verksamhet/, *archived at* https://perma.cc/K7DH-T2NN.

[325] Finansinspektionen, Myndighetens roll kring innovationer [The Authority's Role Regarding Innovation] 12 (Dec. 1, 2018), https://www.finansinspektionen.se/contentassets/d3cd30fe473d4a7995f0c38209ddb7f1/myndighetens-roll-kring-innovationer.pdf, *archived at* https://perma.cc/Y229-M3A7.

[326] *Id*.

[327] Press Release, Finansinspektionen, Varning för risker med Initial Coin Offerings (ICO) [Warning of Risks Associated with Initial Coin Offerings] (Nov. 7, 2017), http://www.fi.se/sv/publicerat/nyheter/2017/varning-for-risker-med-initial-coin-offerings/, *archived at* https://perma.cc/D9BS-K8C6.

[328] *Id*.; *see also* Press Release, European Securities and Market Authority, ESMA Highlights ICO Risks for Investors and Firms (Nov. 13, 2017), https://www.esma.europa.eu/press-news/esma-news/esma-highlights-ico-risks-investors-and-firms, *archived at* https://perma.cc/XGT3-T3QW.

[329] Finansinspektionen, *supra* note 63, at 325.

[330] Press Release, Sveriges Riksbank, Bitcoin är inte pengar [Bitcoins Are Not Money] (Mar. 14, 2018), https://www.riksbank.se/sv/press-och-publicerat/nyheter-och-pressmeddelanden/nyheter/2018/bitcoin-ar-inte-pengar/, *archived at* https://perma.cc/KXK7-PPW8.

[331] Gabriel Söderberg, Ekonomiska kommentarer, Är Bitcoin och andra kryptotillgångar pengar? [Financial Commentary: Are Bitcoin and Other Cryptocurrencies Money?], Sveriges Riksbank (Mar. 14, 2018), https://www.riksbank.se/globalassets/media/rapporter/ekonomiska-kommentarer/svenska/2018/ar-bitcoin-och-andra-kryptotillgangar-pengar, archived at https://perma.cc/PDP4-X2HU.

[332] *See Behöver Sverige en e-krona?*[*Does Sweden Need a E-Currency?*], Sveriges Riksbank (Apr. 9, 2018), https://www.riksbank.se/sv/finansiell-stabilitet/det-finansiella-systemet/betalningar/behover-sverige-en-e-krona/?, *archived at* https://perma.cc/KKD8-WBJE.

In 2015 the Swedish Tax Authority published a guideline on how it will view and tax mined bitcoins for the 2014 tax year.[333] Unless specific conditions are met the digital currency mined is considered income from a hobby, and generally tax exempt.[334] The Tax Authority has not issued a determination on the applicability of the Income Tax Act with respect to potential capital gains from bitcoins.

The Swedish Skatterättsnämnden (Swedish Tax Board) issued a preliminary ruling in 2013 on value-added tax (VAT) and bitcoins, stating that trade in bitcoins is not subject to Swedish VAT, but is instead subject to Financial Supervisory Authority regulations and treated as a currency. The decision was appealed by the Swedish Tax Authority.[335] The Swedish Administrative Supreme Court ruled that bitcoins and similar cryptocurrencies are not subject to VAT.[336] That decision was rendered following a preliminary judgment from the Court of Justice of the European Union holding that cryptocurrencies are exempt from VAT.[337]

In 2014 representatives of the Swedish Enforcement Authority announced to Swedish media outlets that it would start to investigate and seize bitcoin holdings when collecting funds from indebted individuals.[338] The first seized bitcoins were auctioned off online in 2017.[339]

---

[333] Guidelines available at Skatteverket Dnr: 131 191846-15/111 Beskattning vid mining av bitcoin och andra virtuella valutor m.m. [Guidelines on the Taxation of Mining of Bitcoins and Other Virtual Currencies] (Apr. 24, 2015), https://www4.skatteverket.se/rattsligvagledning/338713.html?q=131+191846-15%2F111, *archived at* https://perma.cc/QVH3-H8AL; *see also* Elin Hofverberg, *Sweden: Tax Authority Publishes Guidelines for Income Tax on Bitcoin Mining, Suggests Prohibition of Bitcoin Use in Waste and Scrap Metal Transactions*, GLOBAL LEGAL MONITOR (May 20, 2015), http://www.loc.gov/law/foreign-news/article/sweden-tax-authority-publishes-guidelines-for-income-tax-on-bitcoin-mining-suggests-prohibition-of-bitcoin-use-in-waste-and-scrap-metal-transactions/, *archived at* https://perma.cc/ZR8B-UP8X (emphasis added).

[334] Skatteverket, *supra* note 333.

[335] Skatterättsnämnden, Förhandsbesked [Preliminary Ruling], Mervärdesskatt: Handel med bitcoins [VAT: Trade with Bitcoins] (Oct. 14, 2013), http://skatterattsnamnden.se/skatterattsnamnden/forhandsbesked/2013/forhandsbesked2013/mervardesskatthandelmedbitcoins.5.46ae6b26141980f1e2d29d9.html, *archived at* https://perma.cc/AET4-3T4N.

[336] Högsta förvaltningsdomstolens dom [Supreme Administrative Court's Judgment] (SAC Judgment), Nr. 7101-13 (Feb. 2, 2016), http://www.hogstaforvaltningsdomstolen.se/Domstolar/regeringsratten/Avg%C3%B6randen/2016/Februari/7101-13.pdf, *archived at* https://perma.cc/JU5G-KLWE; *see also* Elin Hofverberg, *Sweden: Supreme Administrative Court Rules Trade in Bitcoins Not Subject to VAT*, GLOBAL LEGAL MONITOR (Feb. 4, 2016), http://www.loc.gov/law/foreign-news/article/sweden-supreme-administrative-court-rules-trade-in-bitcoins-not-subject-to-vat/, *archived at* https://perma.cc/82P2-CBBA.

[337] Case C‑264/14. Skatteverket v. David Hedqvist, 2015 CURIA EUROPA, ECLI:EU:C:2015:718 (Oct. 22, 2015), http://curia.europa.eu/juris/document/document.jsf?docid=170305&doclang=EN, *archived at* https://perma.cc/LU2G-U6VD.

[338] *Kronofogden ska leta Bitcoins hos skuldsatta* [*Swedish Enforcement Authority to Look for Bitcoins from Indebted Individuals*], SVERIGES RADIO (Oct. 6, 2014), http://sverigesradio.se/sida/artikel.aspx?programid=1646&artikel=5983956, *archived at* https://perma.cc/AR5S-V7G2; *see also* Elin Hofverberg, *Sweden: Enforcement Authority to Collect Bitcoins*, GLOBAL LEGAL MONITOR (Oct. 23, 2014), http://www.loc.gov/law/foreign-news/article/sweden-enforcement-authority-to-collect-bitcoins/, *archived at* https://perma.cc/6YVP-CLNX.

[339] Press Release, Kronofogden, Nu kan du köpa bitcoin hos Kronofogden [Now You Can Purchase Bitcoins from the Swedish Enforcement Authority] (Oct. 12, 2017), https://www.kronofogden.se/66713.html, *archived at* https://perma.cc/ZT5P-VWDS; *see also* Elin Hofverberg, *Sweden: Bitcoins Seized During Asset Seizure*, GLOBAL

In a response to a question from a member of Parliament the Swedish government has advised caution in the use of cryptocurrencies by citizens, as it is unregulated and carries risk.[340]

On July 23, 2017, the Nasdaq Stockholm Disciplinary Committee rendered a decision that ordered the bitcoin company XBT Provider AB to pay a fine of SEK1,000,000 (approximately US$120,000) for failing to publish annual reports and make its prospectus available online.[341]

## United Kingdom

The United Kingdom does not have any laws that specifically regulate cryptocurrencies, such as bitcoin, ethereum, litecoin, etc.  The governor of the Bank of England reportedly stated that regulation of cryptocurrencies is necessary:

> A better path would be to regulate elements of the crypto-asset ecosystem to combat illicit activities, promote market integrity, and protect the safety and soundness of the financial system[.][342]

Section 2A of the Bank of England Act 1998 specifies that the Bank of England has responsibility to both protect and enhance the stability of the financial system of the UK.[343]  Pursuant to this objective, the Bank has considered the risk cryptocurrencies pose to the stability of the UK's financial markets and determined that the size of the cryptocurrency market is currently not large enough to pose a "material risk to monetary or financial stability in the UK."[344]

Other concerns raised by the use of cryptocurrencies include ensuring consumers are protected when using this form of payment, money laundering, taxation, and the use of these systems to finance terrorism and other crimes.[345]

---

LEGAL MONITOR (Nov. 7, 2017), http://www.loc.gov/law/foreign-news/article/sweden-bitcoins-seized-during-asset-seizure/, *archived at* https://perma.cc/8QBR-V887.

[340] Statsrådet Per Bolund (MP), Kryptovalutor på svenska marknaden, Svar på skriftlig fråga 2017/18:484 [Cryptocurrencies on the Swedish Market, Answer to Written Question 2017/18:484] (Jan. 10, 2018), http://www.riksdagen.se/sv/dokument-lagar/dokument/svar-pa-skriftlig-fraga/kryptovalutor-pa-svenska-marknaden_H512484, *archived at* https://perma.cc/959K-AWSY.

[341] Nasdaq Stockholm Disciplinary Committee, Decision 2017:07 (July 23, 2017), http://www.nasdaqomx.com/digitalAssets/106/106081_decision.pdf, *archived at* https://perma.cc/B3U3-PS6R.

[342] Arjun Kharpal, *Bank of England's Carney Calls for More Regulation around the 'Speculative Mania' of Cryptocurrencies*, CNBC (Mar. 2, 2018), https://www.cnbc.com/2018/03/02/bank-of-england-mark-carney-cryptocurrency-regulation.html, *archived at* https://perma.cc/G8G9-Y32W.

[343] Bank of England Act 1998, c. 11, § 2A, http://www.legislation.gov.uk/ukpga/1998/11, *archived at* https://perma.cc/A3KP-XSF9.

[344] Robleh Ali et al., *The Economics of Digital Currencies*, 54(3) BANK OF ENGLAND QUARTERLY BULLETIN 262, 276 (2014), https://www.bankofengland.co.uk/-/media/boe/files/digital-currencies/the-economics-of-digital-currencies.pdf?la=en&hash=BE28BE59F18E79CCE705643CF14F36DF8897E56D, *archived at* https://perma.cc/XH6S-NHJX; *Digital Currencies*, BANK OF ENGLAND, https://www.bankofengland.co.uk/research/digital-currencies (last visited Mar. 12, 2018), *archived at* https://perma.cc/TAM8-2E5P.

[345] Ali, *supra* note 344, at 344.

With regard to taxation, Her Majesty's Revenue and Customs notes that "[c]ryptocurrencies have a unique identity and cannot therefore be directly compared to any other form of investment activity or payment mechanism."[346]  The taxability of income received from cryptocurrencies is dependent upon the "activities and parties involved."[347]  Value added tax (VAT) (approximately equivalent to US sales tax) is only chargeable from suppliers for any goods or services sold in the UK in exchange for cryptocurrency.[348]

Corporate tax rules apply to businesses for the profits or losses in currency exchanges, which includes cryptocurrencies.  HM Revenue and Customs has stated, "[f]or the tax treatment of virtual currencies, the general rules on foreign exchange and loan relationships apply. We have not at this stage identified any need to consider bespoke rules."[349]  Any company that enters into transactions that involves cryptocurrencies are thus treated in the same manner as regular transactions under the current corporate tax rules, and any gains made are taxed accordingly.

For unincorporated businesses, income tax is chargeable to the profits and losses that can be attributed to cryptocurrency transactions.[350]  The UK also taxes the earnings of transactions in which a gain is realized after a transaction with cryptocurrencies if an individual user buys and sells coins as an investor.[351]  Such gains fall within capital gains tax, and this tax is chargeable to any gain made that involves a cryptocurrency.

## II.  Non-EU Members

### Albania

On July 13, 2017, the Bank of Albania declared that the legal and regulatory framework then in place did not envisage carrying out operations with cryptocurrency in Albania and users were exposed to certain risks. The Bank noted that because of the high degree of anonymity, transactions in such currency may be misused for criminal activities, including money laundering, terrorism financing, or the smuggling of goods. The Bank urged the Albanian public to be mature and responsible in the administration of the savings or liquidity they possess, while national and international stakeholders intensively work to adequately regulate and supervise cryptocurrency.[352]

---

[346] HM Revenue & Customs, *Revenue and Customs Brief 9 (2014): Bitcoin and Other Cryptocurrencies* (Mar. 3, 2014), https://www.gov.uk/government/publications/revenue-and-customs-brief-9-2014-bitcoin-and-other-cryptocurrencies/revenue-and-customs-brief-9-2014-bitcoin-and-other-cryptocurrencies, *archived at* https://perma.cc/MP2E-GQKV.

[347] *Id.*

[348] *Id.*

[349] *Id.*

[350] *Id.*

[351] *Id.*

[352] Press Release, Bank of Albania, Risks Associated with the Use of Virtual Currency (July 13, 2017), https://www.bankofalbania.org/Press/On_the_risks_associated_with_the_use_of_virtual_currency.html, *archived at* https://perma.cc/86NT-2FQZ.

## Armenia

On March 1, 2018, the government of Armenia published a document stating that adoption of a proposed law on cryptocurrencies is not advisable given that the majority of the leading countries urge people to refrain from operations with cryptocurrencies.[353] The document was prepared in response to a draft law on the development of digital technologies introduced by an opposition political party that would provide for the liberalization of mining activities and their exemption from taxes until the end of 2023.[354]

## Azerbaijan

On February 12, 2018, the chairman of the board of Azerbaijan's Central Bank, Elman Rustamov, stated that cryptocurrency is a very volatile instrument and urged the population to be more careful in dealing with cryptocurrencies.[355] Earlier in January it was reported that a working group has been established to develop a draft law on the regulation of trade in cryptocurrencies.[356]

## Belarus

In Belarus the Presidential Decree on the development of the digital economy[357] came into effect on March 28, 2018. It permits buying, selling, exchanging, and mining cryptocurrency. Most of the tax and currency regulations in the decree extend only to legal entities operating on the territory of the High Technologies Park, a special economic zone. However, individuals are permitted to engage in mining; acquire tokens; and exchange, sell, donate, bequeath, and otherwise dispose of cryptocurrency.  Income generated by mining and operations in cryptocurrencies is exempt from taxation until 2023. The Decree also provides for the possibility of the creation of ICO operators in the High Technologies Park. The Park will also host a crypto-exchange and mining operators.

---

[353] Government of Armenia, Recommendations on the Draft Law on Development of Digital Technologies (Mar. 1, 2018), http://parliament.am/draft_history.php?id=9504&Suggestion=687&do=showSuggestion (in Armenian), *archived at* https://perma.cc/4AX3-DMWC; *see also The Armenian Government Rejected the Bill on the Development of Digital Technologies*, GOLOS ARMENII (Mar. 1, 2018), http://golosarmenii.am/article/63337/pravitelstvo-armenii-otverglo-zakonoproekt-%C2%ABo-razvitii-cifrovyx-texnologij%C2%BB (in Russian), *archived at* https://perma.cc/R9AP-2RMC.

[354] Artem Yerkanyan, *Bitcoin of Armenian Origin*, NEW TIME (Feb. 10, 2018), http://nv.am/bitkoin-armyanskogo-proishozhdeniya/ (in Russian), *archived at* https://perma.cc/C6T9-ZFBX.

[355] *Head of the Central Bank of Azerbaijan Urged Population to Be More Careful with Cryptocurrencies*, SPUTNIK AZERBAIJAN (Jan. 15, 2018), https://ru.sputnik.az/economy/20180212/414014374/azerbajdzhan-centrobank-kriptovaluta-preduprezhdenie.html (in Russian), *archived at* https://perma.cc/9GWW-RUST.

[356] Lada Yevgrashina, *Azerbaijan Took Up Cryptocurrencies, A Bill Is Being Prepared, The Country Will Be Visited by Ethereum Cofounder*, 1NEWS.AZ (Jan. 29, 2018), http://www.1news.az/news/azerbaydzhan-vzyalsya-za-kriptovalyuty-gotovitsya-zakonoproekt-stranu-posetit-so-osnovatel-ethereum (in Russian), *archived at* https://perma.cc/GC8Y-HBJD.

[357] Decree of the President of the Republic of Belarus No. 8 of Dec. 21, 2017, http://president.gov.by/ru/official_documents_ru/view/dekret-8-ot-21-dekabrja-2017-g-17716/, *archived at* https://perma.cc/S9UM-CKRG (in Russian).

The Decree has not established rules for the operation of ICO operators and the crypto-exchange; these areas will be left to self-regulation. The exchange of cryptocurrency for fiat money must be approved by the National Bank. Operators of cryptocurrency exchanges will be treated as high-risk clients similar to operators of lottery games and casinos.[358]

Businesses operating in the Park are exempt from taxes and only have to pay 1% of their turnover to the government. This arrangement is guaranteed by the government to last until 2049.  The minimum capital requirements are 1 million Belarusian rubles (approximately, US$505,000) for the operator of a crypto-platform and 200,000 rubles (approximately US$101,000) for the operator of a cryptocurrency exchange office.[359]

### Bosnia and Herzegovina

On January 9, 2018, the Central Bank of Bosnia and Herzegovina announced that the convertible mark (the currency of Bosnia and Herzegovina) is the only legal means of payment in the country, and it is not possible to exchange bitcoins and other cryptocurrencies for convertible mark. At the same time, the Bank stated that there were no plans to limit or prevent the purchase of and trading in virtual currencies.[360]

### Georgia

On December 20, 2017, the National Bank of Georgia confirmed that cryptocurrency is not legal tender in Georgia and is not regulated by Georgian law.[361] The Bank urged Georgian citizens to be careful in dealing with cryptocurrencies.[362]

---

[358] *Premiere of Digits, Belarus is the First in the World to Comprehensively Legalize Cryptocurrencies*, RG.RU (Mar. 26, 2018), https://rg.ru/2018/03/26/belarus-pervoj-v-mire-kompleksno-vvedet-kriptovaliuty-v-zakon.html (in Russian), *archived at* https://perma.cc/X258-2T5A.

[359] *Mining Is Allowed, Bitcoin Mining Has Been Legalized in Belarus*, RG.RU (Dec. 27, 2017), https://rg.ru/2017/12/27/v-belarusi-legalizovali-dobychu-bitkoina.html (in Russian), *archived at* https://perma.cc/9DLQ-EMGX.

[360] *It Is Required to Be Informed in Detail about Cryptocurrencies, The Money Invested Is Not Secured*, VIJESTI.BA (Jan. 9, 2018), https://vijesti.ba/clanak/389130/o-kriptovalutama-se-potrebno-detaljno-informirati-ulozeni-novac-nije-osiguran (in Bosnian), *archived at* https://perma.cc/BJ7Y-Q5SJ.

[361] Press Release, National Bank of Georgia, Warning of the National Bank of Georgia (Dec. 20, 2017), https://www.nbg.gov.ge/index.php?m=340&newsid=3247 (in Georgian), *archived at* https://perma.cc/JC64-3JLP.

[362] *Cryptocurrencies Outlawed in Georgia*, SPUTNIK GEORGIA (Dec. 21, 2017), https://sputnik-georgia.ru/economy/20171221/238633463/Kriptovaljuty-v-Gruzii-objavleny-vne-zakona.html (in Russian), *archived at* https://perma.cc/N4UC-EDFP.

## Gibraltar

The government of Gibraltar recently introduced regulations governing the provision of Distributed Ledger Technology (DLT)[363] and is currently in the process of introducing draft legislation to regulate initial coin offerings (ICOs). It is also considering a further regulatory framework that would address the sale and promotion of tokens to complement the DLT regulations.[364]

On October 12, 2017, the government of Gibraltar introduced the Financial Services (Distributed Ledger Technology Providers) Regulations 2017[365] under the Financial Services (Investment and Fiduciary Services) Act.[366]  These Regulations entered into force on January 1, 2018.[367]  The regulatory framework covers firms that operate in or from Gibraltar and provide DLT services, defined in the Financial Services (Investment and Fiduciary Services) Act as "[c]arrying on by way of business, in or from Gibraltar, the use of distributed ledger technology for storing or transmitting value belonging to others."[368]  The regulations require these firms to apply for a license from the Gibraltar Financial Services Commission to become a DLT provider.[369]

DLT license holders are also required to pay an annual fee, charged at a flat rate of £10,000 (approximately US$14,000), although an additional fee of up to £20,000 (approximately US$28,000) may be charged "depending upon the complexity of regulating the DLT Provider."[370] Companies that are currently licensed under the existing financial legislation in Gibraltar and use DLT to

---

[363] Distributed ledger technology (DLT) is defined in the Financial Services (Investment and Fiduciary Services) Act 1989, Act No. 49-1989, sched. 3 ¶ 10(2), http://www.gibraltarlaws.gov.gi/articles/1989-47o.pdf, *archived at* https://perma.cc/MUK3-5Q3T, as "a database system in which – (a) information is recorded and consensually shared and synchronised across a network of multiple nodes; and (b) all copies of the database are regarded as equally authentic; and 'Value' includes assets, holdings and other forms of ownership, rights or interests, with or without related information, such as agreements or transactions for the transfer of value or its payment, clearing or settlement."

[364] Statement on Initial Coin Offerings, Gibraltar Financial Services Commission (Sept. 22, 2017), http://www.gfsc.gi/news/statement-on-initial-coin-offerings-250, *archived at* https://perma.cc/CN3Z-A9AS.

[365] Financial Services (Distributed Ledger Technology Providers) Regulations 2017, Legal Notice No. 204/2017, GIBRALTAR GAZETTE No. 4401 (Oct. 12, 2017), http://www.gfsc.gi/uploads/DLT regulations 121017 (2).pdf, *archived at* https://perma.cc/QG2W-8TQ6.

[366] Financial Services (Investment and Fiduciary Services) Act 1989, §§ 5, 7, 53, 56.

[367] Financial Services (Distributed Ledger Technology Providers) Regulations 2017, reg 1(2).  *See also* Press Release, Gibraltar Financial Services Commission, Distributed Ledger Technology (DLT) Regulatory Framework (Jan. 2, 2018), http://www.gfsc.gi/news/distributed-ledger-technology-dlt-regulatory-framework-270, *archived at* https://perma.cc/7DPW-ANKK.

[368] Financial Services (Investment and Fiduciary Services) Act 1989, sched. 3, ¶ 10.

[369] *Distributed Ledger Technology Regulatory Framework (DLT Framework)*, GIBRALTAR FINANCIAL SERVICES COMMISSION (Jan. 2, 2018), http://www.gfsc.gi/dlt, *archived at* https://perma.cc/L753-37RN.

[370] Financial Services Commission (Fees) Regulations 2016, LN 2016/071, sched. 1, http://www.gibraltarlaws. gov.gi/articles/2016s071.pdf, *archived at* https://perma.cc/7KHF-LXNJ.

> improve their controls, procedures and processes will not need to obtain a separate licence under the DLT framework, unless the activities are not currently caught within the scope of the licence they hold . . . . However, if [they] are licensed as a bank, but intend to provide virtual currency wallets and/or services [they] will be required to obtain a licence under the DLT regime.[371]

DLT providers must comply with Gibraltar's requirements concerning anti-money laundering and combatting the financing of terrorism, as well as those of any jurisdiction in which they also operate.[372]

Under the Regulations the provision of DLT services without a license is an offense, punishable with a fine of up to £10,000 (approximately US$14,000).[373]  The government of Gibraltar claims that the Gibraltar Financial Services Commission is the first regulator to introduce a framework regulating Distributed Ledger Technology (DLT).[374]  The aim of introducing the legislation is to protect consumers and the reputation of Gibraltar as a well-regulated and safe environment for firms that use DLT, and enable Gibraltar to prosper from the use and growth of new financial technology.

The government of Gibraltar has expressed concern over the use of tokenized digital assets (tokens) and cryptocurrency given by companies to raise capital and bypass the traditional, regulated, capital-raising process required by financial institutions or venture capitalists.[375]  It is currently working to develop legislation to regulate the use of tokens, "essentially those created and traded using [DLT]"[376] that will align with the DLT regulations,[377] and expects a bill to be before Parliament by the second quarter of 2018.[378]

---

[371] *Distributed Ledger Technology Regulatory Framework (DLT Framework)*, *Frequently Asked Questions*, GIBRALTAR FINANCIAL SERVICES COMMISSION, *supra* note 369.

[372] *Id*.

[373] Financial Services (Penalty Fees) Regulations 1993, LN 1993/147, sched., http://www.gibraltarlaws.gov.gi/articles/1993s147.pdf, *archived at* https://perma.cc/A58V-PQ2C.

[374] Press Release, Gibraltar Financial Services Commission, Distributed Ledger Technology (DLT) Regulatory Framework (Jan. 2, 2018), http://www.gfsc.gi/news/distributed-ledger-technology-dlt-regulatory-framework-270, *archived at* https://perma.cc/7DPW-ANKK.

[375] Gibraltar Financial Services Commission, Statement on Initial Coin Offerings (Sept. 22, 2017), http://www.fsc.gi/ news/statement-on-initial-coin-offerings-250, *archived at* https://perma.cc/HD3M-N6UB.

[376] Press Release, HM Government of Gibraltar and Ministry of Commerce, HM Government of Gibraltar and the Gibraltar Financial Services Commission Announce Plans for Token Legislation (Feb. 12, 2018), http://www.gfsc.gi/news/hm-government-of-gibraltar-and-the-gibraltar-financial-services-commission-announce-plans-for-token-legislation-272, *archived at* https://perma.cc/9FVC-L4Z8.

[377] *Distributed Ledger Technology Regulatory Framework (DLT Framework)*, GIBRALTAR FINANCIAL SERVICES COMMISSION, *supra* note 369.

[378] Press Release, HM Government of Gibraltar and Ministry of Commerce, *supra* note 376.

**Guernsey**

Guernsey is a Crown Dependency of the United Kingdom and is a low-tax jurisdiction with a large financial sector. In 2014, the Guernsey Financial Services Commission, which is responsible for supervising and regulating licensees from the banking, fiduciary, insurance, and investment sectors,[379] issued a statement that the Commission was adopting a cautionary approach towards "virtual currencies" and may refuse application to register financial service businesses if virtual currency is involved.[380]  Specifically,

> [t]he Commission has a policy of encouraging innovation. Virtual currencies are an area of innovation which the Commission continues to monitor closely while recognising that there are currently significant risks associated with them. In the light of those risks, the Commission will adopt a cautious approach and may well refuse applications to register financial services business where the use of virtual currency is involved. However, this approach will be regularly reviewed in the light of international developments.[381]

In 2015, a report commissioned by the Guernsey government noted that the major drawback for cryptocurrencies was the difficulty in complying with international anti-money laundering standards.[382]  Three years after the issuance of the first statement, on February 27, 2018, the Guernsey Financial Services Commission issued a further statement that it believes there are "significant risks in the use of virtual or crypto currencies especially for retail customers. Nevertheless, we understand that professional investors with a high risk appetite may wish to invest in this developing sector."[383]

The Financial Services Commission has stated that it will assess any application on its individual merits against the criteria used for asset types or structures, as cryptocurrencies "could interact with [the countries] regulatory laws[384] in a number of ways."[385]  Applicants must demonstrate how they will comply with the laws and rules to counter financial crime and terrorist financing, with

---

[379] *About Us*, GUERNSEY FINANCIAL SERVICES COMMISSION, https://www.gfsc.gg/commission/about-us (last visited Mar. 20, 2018), *archived at* https://perma.cc/C9FR-KUTK.

[380] *Virtual Currencies*, GUERNSEY FINANCIAL SERVICES COMMISSION (Feb. 11, 2014), https://www.gfsc.gg/news/article/virtual-currencies, *archived at* https://perma.cc/JT8Q-7PMS.

[381] *Id*.

[382] PRICEWATERHOUSECOOPERS, GUERNSEY COMMERCE AND EMPLOYMENT, STATES OF GUERNSEY: A STRATEGIC VISION FOR FINTECH 28, (July 2015), https://www.gov.gg/CHttpHandler.ashx?id=96797&p=0, *archived at* https://perma.cc/9CRX-ESAC.

[383] *Virtual Currencies, Crypto Currencies and Initial Coin Offerings ("ICO")*, GUERNSEY FINANCIAL SERVICES COMMISSION (Feb. 27, 2014), https://www.gfsc.gg/news/article/virtual-currencies-crypto-currencies-and-initial-coin-offerings-ico, *archived at* https://perma.cc/3WTX-QGQJ.

[384] Laws, regulations, and codes that govern the financial sector and could have an impact on a business using or offering cryptocurrencies are available at: *Legislation and Guidance*, GUERNSEY FINANCIAL SERVICES COMMISSION, https://www.gfsc.gg/commission/legislation-and-guidance (last visited Mar. 20, 2018), *archived at* https://perma.cc/3VKH-HXWN.

[385] *Virtual Currencies, Crypto Currencies and Initial Coin Offerings ("ICO")*, GUERNSEY FINANCIAL SERVICES COMMISSION, *supra* note 383383.

particularly regard to establishing the identity of both investors and beneficial owners.[386]   The Commission has stated that it would continue to be cautious to approve applications for initial coin offerings that could later be traded on the secondary market due to the risk of fraud and money laundering, along with applications for any kinds of digital currency exchanges.

## Iceland

The legality of cryptocurrencies in Iceland is unclear. In 2014, the Central Bank of Iceland, in anticipation of the launch of the Icelandic peer-to-peer cryptocurrency Auroracoin,[387] announced that bitcoin was not a recognized currency and even if it was, purchases of bitcoins would still be illegal as such purchases would have violated the foreign transactions restrictions then in place.[388] The Icelandic Foreign Exchange Act then specified that Icelandic currency could not leave the country.[389] A purchase of an overseas-based cryptocurrency would have been a violation of the Act, as the cryptocurrency would have been considered purchased from abroad.[390]

Since then, however, Iceland has eased its foreign exchange and asset control rules and now allows for cross-border transactions of Icelandic krónur.[391] However, according to the Icelandic Central Bank, restrictions on so-called offshore króna assets and special reserve requirements for specified investments in connection with new inflows of foreign currency will remain in place.[392]   For example, there is still a requirement to notify the Icelandic Central Bank of international purchases of Icelandic krónur and derivative transactions, and rules also require a special reserve when there is an inflow of a foreign currency into Iceland.[393]   Restrictions will also remain in place on "i)

---

[386] *Id.*

[387] *See* Elin Hofverberg, *Iceland: National Digital Currency Auroracoin Launched*, GLOBAL LEGAL MONITOR (Aug. 12, 2014), http://www.loc.gov/law/foreign-news/article/iceland-national-digital-currency-auroracoin-launched/, *archived at* https://perma.cc/DSJ3-XUF7.

[388] Press Release, Central Bank of Iceland, Significant Risk Attached to Use of Virtual Currency (Mar. 19, 2014), https://www.cb.is/publications-news-and-speeches/news-and-speeches/news/2014/03/19/Significant-risk-attached-to-use-of-virtual-currency/, *archived at* https://perma.cc/H5BR-TJSC.

[389] Act No. 87/1992 on Foreign Exchange, as in force in 2014.

[390] *See* Press Release, Central Bank of Iceland (2014), *supra* note 388.

[391] Lög um gjaldeyrismál (1992 nr. 87 17. Nóvember) [Foreign Exchange Act (no. 87/1992 )], *as amended through* 105/2016, http://www.althingi.is/lagas/148a/1992087.html, *archived at* https://perma.cc/9DXZ-9WVD, unofficial translation *available at* https://www.government.is/media/fjarmalaraduneyti-media/media//frettatengt2016/English-translation-of-the-Foreign-Exchange-Act---Nov-2016.pdf, *archived at* https://perma.cc/YXV2-YKGL; *see also* Press Release, Central Bank of Iceland, Central Bank of Iceland Concludes Agreement with Owners of Offshore Króna Assets (Mar. 12, 2017), https://www.cb.is/publications/news/news/2017/03/12/Central-Bank-of-Iceland-concludes-agreement-with-owners-of-offshore-krona-assets/, *archived at* https://perma.cc/J34F-4K7K; Elin Hofverberg, *Iceland: Central Bank Eases Currency Restrictions, Ends Financial Crisis Capital Controls*, GLOBAL LEGAL MONITOR (May 16, 2017), http://www.loc.gov/law/foreign-news/article/iceland-central-bank-eases-currency-restrictions-ends-financial-crisis-capital-controls/, *archived at* https://perma.cc/WWA6-CVNR.

[392] Press Release, Central Bank of Iceland, New Rules on Foreign Exchange (Mar. 12, 2017), https://www.cb.is/publications/news/news/2017/03/12/New-Rules-on-Foreign-Exchange-/, *archived at* https://perma.cc/6Y8E-G5TP.

[393] Central Bank of Iceland, Rules on Foreign Exchange arts. 3, 8, 12, 14 & 17; Central Bank of Iceland, Rules Amending the Central Bank of Iceland Rules No. 490/2016 on Special Reserve Requirements for New Foreign Currency Inflows, with Subsequent Amendments (Mar. 12, 2017), https://cb.is/library/Skraarsafn---EN/Capital-

derivatives trading for purposes other than hedging; ii) foreign exchange transactions carried out between residents and non-residents without the intermediation of a financial undertaking; and iii) in certain instances, foreign-denominated lending by residents to non-residents."[394] It is possible that trade and investments in cryptocurrencies would be limited by these regulations. Because cross-border transactions with Icelandic krónur are allowed, however, bitcoins would not be limited for this reason alone.[395]

The Central Bank of Iceland has not commented on whether cryptocurrency transactions are transactions "carried out between residents and nonresidents without the intermediation of a financial undertaking."[396]

The Icelandic Tax Authority has issued guidelines for filing income taxes for the tax year 2017, requiring that bitcoins be included under section 4.4, "*Aðrar eignir áður ótaldar*" (Other Assets).[397] The value of cryptocurrency holdings is based on the prevailing exchange rate on December 31 of the tax year.[398]

Reportedly, members of Parliament are considering adopting legislation that would tax companies that mine cryptocurrencies in Iceland, based on their usage of natural resources (electricity).[399]

**Isle of Man**

The Isle of Man is a Crown Dependency of the United Kingdom and is a low-tax jurisdiction with a robust online gambling industry and burgeoning financial sector.  Referred to in some reports as "Bitcoin Island," many establishments across the Island already accept bitcoins as payment alongside its national currency.[400]

---

surveillance/Enska_Reglur um breytingu á reglum um bindingu reiðufjár 11032017-2 enACB_Final.pdf, *archived at* https://perma.cc/U55Y-FXLF.

[394] Press Release, Central Bank of Iceland (2017), *supra* note 392.

[395] *Compare* Press Release, Central Bank of Iceland (2014), *supra* note 388.

[396] For an update on capital controls regulation see *Progress of the Plan for Removal of Capital Controls*, GOVERNMENT.IS (Oct. 25, 2017), https://www.government.is/library/Files/greinargerd_okt17-2_enska.pdf, *archived at* https://perma.cc/3SMS-QB2Z.

[397] Ríkisskattstjóri (RSK), *Leiðbeiningar Skattframtal einstaklinga* [*Guidelines on Tax Return for Individuals*] 15 (2018), https://www.rsk.is/media/baeklingar/rsk_0801_2018.is.pdf, *archived at* https://perma.cc/65VK-7N2K.

[398] *Id*.

[399] Stan Higgins, *Icelandic Lawmaker Floats Bitcoin Mining Tax*, COINDESK (Feb. 12, 2018), https://www.coindesk.com/icelandic-lawmaker-floats-bitcoin-mining-tax/, *archived at* https://perma.cc/WZ2B-BTXD.

[400] Cahal Milmo, *Bitcoin: How The Isle of Man is Leading a Cryptocurrency Revolution*, INDEPENDENT (London) (Jan. 3, 2016), https://www.independent.co.uk/news/uk/home-news/bitcoin-how-the-isle-of-man-is-sparking-a-cryptocurrency-revolution-a6794756.html, *archived at* https://perma.cc/NUY8-XTS4.

The Isle of Man was an early adopter of legislation to regulate cryptocurrencies within its jurisdiction. The Proceeds of Crime Act 2008 was amended in 2015 to include virtual currency businesses within its regulated sector as a "designated business,"[401] specifically those that are in

> the business of issuing, transmitting, transferring, providing safe custody or storage of, administering, managing, lending, buying, selling, exchanging or otherwise trading or intermediating convertible virtual currencies, including crypto-currencies or similar concepts where the concept is accepted by persons as a means of payment for goods.[402]

This amendment brought businesses that engaged in these activities, including those that wish to offer initial coin offerings (ICO),[403] within the ambit of its anti-money laundering laws,[404] requiring the use of know-your-customer practices, such as collecting identifying information, knowing the beneficial owner of any currency, and record keeping and reporting requirements for certain transactions.[405]   These businesses are overseen by the Isle of Man Financial Services Authority to ensure compliance with these laws.[406]

The Isle of Man distinguishes between four different types of online currencies:

> Digital currency refers to any electronic representation of a fiat currency and this can include representations of virtual currency.
>
> Virtual currency is a narrower asset and is a digital representation of value which can be traded digitally. The nature of a virtual currency means that it does not need to be centrally controlled or administered. Virtual currency can be either convertible or non-convertible.
>
> Convertible virtual currency, which includes crypto-currency, can be converted into a fiat currency, either directly, or through an exchange. For a currency to be convertible, there does not need to be set rate or an established benchmark, but that merely a market exists and the ownership rights can be transferred from one person to another, whether for consideration or not.
>
> Non-convertible virtual currency, once purchased, cannot be transferred to another person and cannot be redeemed for fiat currency, either directly or through an exchange. (Note

---

[401] Isle of Man Financial Services Authority, *Questions & Answers in Respect of Persons Seeking to Launch an Initial Coin Offering in or from The Island*, at 1, https://www.iomfsa.im/media/2365/icoguidanceforapplicants.pdf (last visited Apr. 18, 2018), *archived at* https://perma.cc/PUQ3-ZLNM.

[402] Proceeds of Crime (Business in the Regulated Sector) Order 2015, 2015/0073, Sched., art. 1(1)(mm), https://www.gov.im/media/470633/proceedsofcrime-businessintheregulatedsector-order2015-final.pdf, *archived at* https://perma.cc/M83K-C2JM, *amending* Proceeds of Crime Act 2008, No. 13 of 2008, Sched. 4, http://www.legislation.gov.im/cms/images/LEGISLATION/PRINCIPAL/2008/2008-0013/ProceedsofCrimeAct2008_6.pdf, *archived at* https://perma.cc/JX8R-EHNY.

[403] Isle of Man Financial Services Authority, *Questions & Answers*, *supra* note 401.

[404] *Designated Businesses (Registration and Oversight) Act 2015 – AML/CFT Handbook* (last updated Jan. 2018), ISLE OF MAN FINANCIAL SERVICES AUTHORITY, https://www.iomfsa.im/amlcft/amlcft-requirements-and-guidance/designated-businesses/, *archived at* https://perma.cc/S3X6-T58G.

[405] Isle of Man Financial Services Authority, *Virtual Currency Business: Sector Specific AML/CFT Guidance Notes* (Oct. 2016), *available at* https://www.iomfsa.im/media/1606/virtualcurrencyguidance.pdf, *archived at* https://perma.cc/4UWC-S4BK.

[406] *Designated Businesses (Registration and Oversight) Act 2015 – AML/CFT Handbook*, *supra* note 404.

that the Schedule 4 to POCA [Proceeds of Crime Act] definition does not extend to non-convertible currency businesses).[407]

The Designated Business (Registration and Oversight) Act 2015[408] provides that virtual currency businesses are designated businesses, requiring such businesses to register with, and be overseen by, the Isle of Man Financial Services Authority.[409]  Virtual currency businesses are defined in the Act as those that are in

> the business of issuing, transmitting, transferring, providing safe custody or storage of, administering, managing, lending, buying, selling, exchanging or otherwise trading or intermediating convertible virtual currencies, including crypto-currencies or similar concepts where the concept is accepted by persons as a means of payment for goods or services, a unit of account, a store of value or a commodity[.][410]

Businesses registered under this Act are required to submit annual returns that show compliance with anti-money laundering laws.  The register of companies that engage in cryptocurrencies and operate from the Island has been created using blockchain technology to store the data, making the Isle of Man the first government to use this type of technology to store official data, according to Bloomberg.[411]

For ICOs, the FSA has stated that it will not register an applicant if the ICO provides tokens that do not offer any benefit to the purchaser other than the token itself, because

> [s]uch characteristics are generally considered by the FSA to pose an unacceptably high risk that the money raised from the ICO could be used for unanticipated and illegal purposes, as well as posing a risk to consumers. It is because of these risks that it is the policy of the FSA to refuse to register this type of business.[412]

The Isle of Man recently amended its online gambling laws to enable operators to accept virtual currencies.[413]

---

[407] Isle of Man Financial Services Authority, *Virtual Currency Business: Sector Specific AML/CFT Guidance Notes*, *supra* note 405, at 4.

[408] Designated Business (Registration and Oversight) Act 2015, No. 9 of 2015, https://legislation.gov.im/cms/images/LEGISLATION/PRINCIPAL/2015/2015-0009/DesignatedBusinessesRegistrationandOversight Act2015_6.pdf, *archived at* https://perma.cc/SMR3-LYKL.

[409] *Designated Businesses (Registration and Oversight) Act 2015 – AML/CFT Handbook*, *supra* note 404.

[410] Designated Business (Registration and Oversight) Act 2015, No. 9 of 2015, sched. 1(1), https://legislation.gov. m/ cms/images/LEGISLATION/PRINCIPAL/2015/2015-0009/DesignatedBusinessesRegistrationandOversight Act2015_6.pdf, *archived at* https://perma.cc/SMR3-LYKL.

[411] Jeremy Kahn, *Greetings From Bitcoin Island*, BLOOMBERG MARKETS (Sept. 7, 2015), https://www.bloomberg. com/news/features/2015-09-07/isle-of-man-tax-haven-with-tailless-cats-becomes-bitcoin-hub, *archived at* https://perma.cc/4MMD-C3CH.

[412] Isle of Man Financial Services Authority, *Questions & Answers*, *supra* note 401.

[413] Online Gambling (Amendments) Regulations 2016, SD 2016/0341, reg. 11(1)–(2), https://www.gov.im/media/1354648/online-gambling-amendments-regulations-2016.pdf, *archived at* https://perma.cc/TJ24-UKYF.  *See also* Isle of Man Gambling Supervision Commission, *AML/CFT Guidance for Virtual Currencies* (May 2017), *available*

**Jersey**

Jersey is a Crown Dependency of the United Kingdom and is a low-tax jurisdiction with a large financial sector.  The jurisdiction issued a consultation on the regulation of cryptocurrencies in 2015, noting "[t]he creation of a business-friendly framework that encourages innovation, jobs and growth in both the financial services and digital sectors is a priority for the Government of Jersey."[414]  The majority response to the consultation was that cryptocurrencies should be regulated only to the extent of ensuring compliance with anti-money laundering laws and to counter the financing of terrorism.[415]  The government or Jersey rejected "a full prudential and conduct of business regime" for cryptocurrencies, as it considered it was too early to issue such regulations given that cryptocurrencies are in the early stages of development and that doing so could be over-burdensome, and restrict development and innovation.[416]

The result of the consultation was the issuance of a document by the Chief Minister's Department explaining Jersey's policy position regarding the regulation of virtual currencies.  According to the document,

> [u]ltimately, the aim of this policy is to further enhance Jersey's proposition as a world leading Fintech jurisdiction . . . [and] to outline Jersey's commitment to creating an environment that encourages confidence and innovation in the digital sector whilst protecting the Island from the most prominent money laundering and terrorist financing risks that are presented by virtual currencies in their current form.[417]

Jersey's anti-money laundering laws and counterterrorism financing laws were extended to cover cryptocurrencies through measures that entered into force on September 26, 2016.[418]  "Virtual currencies" are defined in the Proceeds of Crime Act as a currency rather than a commodity, thus enabling it to fall within the current regulatory framework and be regulated by the Jersey Financial Services Commission.[419]  Specifically, the Act defines "virtual currency" as

---

*at* https://www.gov.im/media/1356960/aml-guidance-notes-virtual-currencies.pdf, *archived at* https://perma.cc/9856-6MJ2.

[414] Chief Minister's Department, *Regulation of Virtual Currency: Consultation Paper* (July 9, 2015; presented to the States July 10, 2015), *available at* http://www.statesassembly.gov.je/assemblyreports/2015/r.80-2015.pdf, *archived at* https://perma.cc/K5PY-GZRP.

[415] Chief Minister's Department, *Regulation of Virtual Currency Policy Document* ¶ 1.1 (Oct. 21, 2015), *available at* https://www.gov.je/SiteCollectionDocuments/Government and administration/P Regulation of Virtual Currency 20151021 GP.PDF, *archived at* https://perma.cc/9QBL-YQNT.

[416] *Id*. ¶ 1.2.

[417] *Id*. at 2.

[418] Proceeds of Crime (Miscellaneous Amendments) (Jersey) Regulations 2016, R&O 63/2016, https://www.jerseylaw.je/laws/enacted/PDFs/RO-063-2016.pdf, *archived at* https://perma.cc/F2H5-2KNV; Proceeds of Crime (Supervisory Bodies) (Virtual Currency Exchange Business) (Exemption) (Jersey) Order 2016, Revised Laws of Jersey, https://www.jerseylaw.je/laws/revised/PDFs/08.785.80.pdf, *archived at* https://perma.cc/A8W9-7753.

[419] Proceeds of Crime Act 1999, Sched. 2, Part B, ¶ 9, https://www.jerseylaw.je/laws/revised/Pages/08.780.aspx#_Toc468266188, *archived at* https://perma.cc/K2YU-7KA4.

(4)   . . . any currency which (whilst not itself being issued by, or legal tender in, any jurisdiction) –

   (a)   digitally represents value;

   (b)   is a unit of account;

   (c)   functions as a medium of exchange; and

   (d)   is capable of being digitally exchanged for money in any form.[420]

The term "virtual currency exchange" is defined in the Act as "the exchange of virtual currency for money in any form, or vice versa," with the clarification that "a reference to providing a service to third parties shall not include a company's providing that service to a connected company."[421]

Virtual currencies were also brought within the ambit of the Money Laundering (Jersey) Order 2008,[422] which requires individuals operating a "Money Service Business" to register with the Jersey Financial Services Commission and comply with the jurisdiction's anti-money laundering and counterterrorism financing laws if they have an annual turnover greater than £150,000 (approximately US$210,000).[423]   Subject to certain exemptions, these laws require such businesses to adopt policies and procedures to prevent and detect money laundering and terrorist financing and appoint a money laundering compliance officer and reporting officer, along with ensuring that record keeping and customer due diligence measures are implemented,[424] such as know-your-customer measures to one-off transactions greater than €1,000 (approximately US$1,220).[425]

Businesses that trade in goods and receive payments of €15,000 (approximately US$18,500) and above per transaction in cryptocurrency are classed as "high value dealers" under the Proceeds of Crime Act 1999.[426]   Such dealers must be registered and supervised by the Jersey Financial Services Commission and comply with Jersey's money laundering and counter terrorist financing laws.[427]

---

[420] *Id*. Sched. 2, Part B, ¶ 4(4).

[421] *Id*. Sched. 2, Part B, ¶ 9(2)(a)–(b).

[422] Money Laundering (Jersey) Order 2008, REVISED LAWS OF JERSEY, https://www.jerseylaw.je/laws/revised/Pages/08.780.30.aspx, *archived at* https://perma.cc/6YXY-JJW6.

[423] Proceeds of Crime (Supervisory Bodies) (Jersey) Law 2008, REVISED LAWS OF JERSEY, https://www.jersey law.je/laws/revised/PDFs/08.785.pdf, *archived at* https://perma.cc/U5CQ-EQGY; Money Laundering (Jersey) Order 2008, REVISED LAWS OF JERSEY, https://www.jerseylaw.je/laws/revised/Pages/08.780.30.aspx, *archived at* https://perma.cc/PT5L-A4X6.

[424] Proceeds of Crime Act 1999, Sched. 2, Part B, ¶ 3 (defining customer due diligence measures).

[425] Chief Minister's Department, *Regulation of Virtual Currency Policy Document*, *supra* note 415, ¶ 1.14.  *See also* Money Laundering (Jersey) Order 2008, REVISED LAWS OF JERSEY, https://www.jerseylaw.je/laws/revised/Pages/08.780.30.aspx, *archived at* https://perma.cc/5QDP-PE8Y.

[426] Proceeds of Crime (Jersey) Law 1999, Sched. 2, Part B, ¶ 4, https://www.jerseylaw.je/laws/revised/Pages/08.780.aspx#_Toc468266188, *archived at* https://perma.cc/K2YU-7KA4.

[427] *Id*. Sched. 2, Part B, ¶ 4.

At the time of the consultation, the government considered the regulation of distributed ledger and blockchain technology, but considered that this area was evolving too quickly to regulate effectively.[428]  It opted to actively monitor these areas for development and consideration of regulation in the future.[429]

**Kosovo**

The Central Bank of Kosovo has issued several warnings about the use of cryptocurrencies. The latest, published on January 31, 2018, reminded persons that virtual money is not recognized as legal tender and that financial losses may result from investing in cryptocurrencies. The Bank also noted the unreliability of virtual platforms for trading in cryptocurrencies and their susceptibility to cybertheft. The Bank said it is considering adapting recommendations made internationally to limit the anonymous use of cryptocurrencies and to enact rules to combat money laundering and terrorist financing via such currencies.[430]

On February 27, 2018, the Bank announced the establishment of a permanent advisory group for evaluating and addressing regulatory challenges related to virtual money.[431]

**Liechtenstein**

Liechtenstein has included "virtual currencies" in the latest amendment of its Due Diligence Act.[432] The due diligence obligations codified in the Act serve to combat money laundering, organized crime, and terrorist financing and apply to providers of exchange services, among others. An "exchange office (bureau de change)" is defined as any "natural or legal person whose activities consist in the exchange of legal tender at the official exchange rate or of virtual currencies against legal tender and vice versa."[433] "Virtual currencies" are defined as "digital monetary units, which can be exchanged for legal tender, used to purchase goods or services or to preserve value and thus assume the function of legal tender."[434]

---

[428] Chief Minister's Department, *Regulation of Virtual Currency Policy Document*, *supra* note 415, ¶ 1.34.

[429] *Id.* ¶ 1.36.

[430] Press Release, Central Bank of the Republic of Kosovo, Warning on the Use of Virtual Money (Jan. 31, 2018), https://bqk-kos.org/index.php?id=104&l=1487 (in Albanian), *archived at* https://perma.cc/HG65-TT9E.

[431] Press Release, Central Bank of the Republic of Kosovo, The CBK Executive Board Established a Permanent Body for Evaluating and Addressing Regulatory Challenges Related to Virtual Money (Feb. 27, 2018), https://bqk-kos.org/index.php?id=104&l=1496 (in Albanian), *archived at* https://perma.cc/P5HM-E36F.

[432] Gesetz über berufliche Sorgfaltspflichten zur Bekämpfung von Geldwäscherei, organisierter Kriminalität und Terrorismusfinanzierung [Sorgfaltspflichtgesetz] [SPG] [Act on Professional Due Diligence to Combat Money Laundering, Organized Crime, and Terrorist Financing [Due Diligence Act] [DDA]], Dec. 11, 2008, Landesgesetzblatt Nummer [LGBl.-Nr.] [Official Law Gazette No.] 2009.047, as amended, art. 2, para. 1(l), https://www.gesetze.li/konso/pdf/2009047000?version=19, *archived at* http://perma.cc/LT2C-3BNS, unofficial English translation *available at* http://www.regierung.li/media/medienarchiv/952_1_17_11_2017_en_636524807784985165.pdf?t=5, *archived at* http://perma.cc/ND5C-4G8T.

[433] *Id*. art. 2, para. 1(l).

[434] *Id*.

The Financial Market Authority of Liechtenstein (Finanzmarktaufsicht, FMA) has issued a factsheet on virtual currencies like bitcoin.[435] It stated that virtual currencies are generally defined as a "digital representation of a (cash equivalent) value that is neither issued by a central bank or a public authority" and do not constitute fiat currency (legal tender). However, it is pointed out that virtual currencies are similar to fiat currencies when they are used as a means of payment or traded on an exchange. The production and the use of virtual currencies as a means of payment are currently not subject to any licensing requirement governed by specialized legislation. However, the FMA states that depending on the specific design of the business model, licensing requirements might apply. Business models are assessed on a case-by-case basis.[436] In particular, due diligence requirements according to the Due Diligence Act may apply.

The FMA has also issued a factsheet on ICOs.[437] Depending on the specific design and the function of the tokens, tokens may constitute financial instruments if they have characteristics of equity securities or other investments. Activities relating to financial instruments are subject to licensing by the FMA.[438] The FMA assesses ICOs on a case-by-case basis.[439]

**Macedonia**

On September 28, 2016, the National Bank of Macedonia issued a warning against cryptocurrencies.[440] The Bank reminded Macedonian residents that they are not allowed to have bank accounts or securities abroad, with certain exceptions, and therefore, investments by residents in cryptocurrencies are also not allowed. The Bank also underscored the possibility of losing money on cryptocurrency investments due to devaluation, theft, the poor functioning of cryptocurrency exchanges, and possible links to criminal activities.[441]

---

[435] Finanzmarktaufsicht [FMA] [Financial Market Authority], Fact Sheet on Virtual Currencies (Feb. 16, 2018), https://www.fma-li.li/files/fma/fma-fact-sheet-virtual-currencies.pdf, *archived at* http://perma.cc/X87T-3KT9.

[436] *Id.*

[437] FMA, Fact Sheet on Initial Coin Offerings (Sept. 10, 2017), https://www.fma-li.li/files/fma/fma-factsheet-ico.pdf, *archived at* http://perma.cc/Z3L3-B3D5.

[438] *Id.* at 2.

[439] *What Needs to Be Observed*, FMA, https://www.fma-li.li/en/regulation/fintech-in-liechtenstein/what-needs-to-be-observed.html (last visited Mar. 19, 2018), *archived at* http://perma.cc/KC3S-U8H7.

[440] Announcement of the National Bank of the Republic of Macedonia (NBRM) (Sept. 28, 2016), http://nbrm.mk/ns-newsarticle-soopshtieniie_na_nbrm_28_9_2016.nspx (in Macedonian), *archived at* https://perma.cc/A2TD-BGY8.

[441] *NBRM: Macedonian Regulations Do Not Allow Investment in Cryptocurrencies*, Vecer (Sept. 28, 2016), https://vecer.mk/ekonomija/nbrm-makedonskata-regulativa-ne-dozvoluva-investiranje-vo-kripto-valuti (in Macedonian), *archived at* https://perma.cc/QUV5-KYFW.

## Moldova

On February 15, 2018, the National Bank of Moldova issued a statement[442] recommending that Moldovans be as cautious as possible in deciding whether to invest in crypto-assets, given the technical characteristics of cryptocurrency, its high volatility, and the absence of any regulation that would protect investors.[443]

In Transnistria, a breakaway territory of Moldova, a law was passed on January 31, 2018, to legalize mining activities.[444] It provides for creation of free economic zones for mining purposes. The authorities of the self-proclaimed republic promise exemption from taxes, duty-free import and export of mining equipment, and assistance with energy supply.[445]

## Montenegro

In November 2014 the Central Bank of Montenegro reportedly issued a warning saying that individuals may own bitcoins at their own risk, although virtual currencies are not legal tender in Montenegro.[446]

---

[442] Press Release, National Bank of Moldova, NBM Warns about High Risks of Investing in Cryptocurrencies (Feb. 15, 2018), http://www.bnm.md/ru/content/nbm-preduprezhdaet-chto-investicii-v-kriptovalyuty-predpolagayut-vysokie-riski (in Russian), *archived at* https://perma.cc/ZT9T-5X4Z.

[443] *National Bank Warns Moldovans of Reckless Risks*, Sᴘᴜᴛɴɪᴋ Mᴏʟᴅᴏᴠᴀ (Feb. 15, 2018), https://ru.sputnik.md/economics/20180215/17319739/Nacbank-Moldova-preduprezhdaet-opasnosti-riski.html (in Russian), *archived at* https://perma.cc/F5QW-4Q6C.

[444] Law of the Pridenstrovskaia Moldavskaia Respublika No. 39-3-VI of Feb. 9, 2018, on the Development of Information Blockchain Technologies in the Pridenstrovskaia Moldavskaia Respublika, *available at* http://www.minjust.org/oo/Publication.nsf/805c7c76d1c2ddb8c2258213005be80f/1607b43c42a8b926c225822f00350545!OpenDocument (in Russian), *archived at* https://perma.cc/L4MA-T7S9.

[445] *Will There Be a Circulation of Cryptocurrency in Transnistria?*, Sᴘᴜᴛɴɪᴋ Mᴏʟᴅᴏᴠᴀ (Jan. 31, 2018), https://ru.sputnik.md/economics/20180215/17319739/Nacbank-Moldova-preduprezhdaet-opasnosti-riski.html (in Russian), *archived at* https://perma.cc/FQ64-54WD.

[446] *CBCG: You Can Possess Bitcoins but at Your Own Risk*, Vɪᴊᴇsᴛɪ (Nov. 30, 2014), http://www.vijesti.me/vijesti/cbcg-mozete-posjedovaati-bitkoine-ali-na-sopstveni-rizik-807566 (in Montenegrin), *archived at* https://perma.cc/SNH7-6MKK.

## Norway

The Norwegian Financial Supervisory Authority issued warnings against cryptocurrencies both in 2013 and 2018.[447] It has also warned against initial coin offerings (ICOs).[448] Both warnings came as a result of warnings by the European Supervisory Authority, ESMA.[449]

The Central Bank of Norway has not recognized cryptocurrencies, but it also does not prohibit its staff from owning or investing in them as per ethical guidelines from November 23, 2012.[450]

The Norwegian Tax Authority has issued a principle statement that bitcoins will be treated as capital property, at least for tax purposes.[451] Capital property legislation allows deductions for losses and taxes winnings.[452] Although travel currencies are exempted from the capital gains tax, bitcoins are not as the bitcoin and other virtual currencies are not recognized as travel currencies.[453]

---

[447] Press Release, Finanstilsynet, Advarsel til forbrukere - informasjon om virtuelle valutaer [Warnings to Users – Information on Virtual Currencies] (Dec. 13, 2013), https://www.finanstilsynet.no/nyhetsarkiv/nyheter/2013/advarsel-til-forbrukere---informasjon-om-virtuelle-valutaer/, *archived at* https://perma.cc/Z2MK-EGWD; Press Release, Finanstilsynet, Finanstilsynet advarer forbrukere om kryptovaluta [Financial Supervisory Authority Warns Users on Cryptocurrencies] (Feb. 28, 2018), https://www.finanstilsynet.no/markedsadvarsler/2018/finanstilsynet-advarer-forbrukere-om-kryptovaluta/, *archived at* https://perma.cc/9N75-VE5Y.

[448] Press Release, Finanstilsynet, Initial Coin Offerings (ICO-er) – advarsel til investorer og foretak [Initial Coin Offerings – Warnings to Investors and Companies] (Nov. 20, 2017), https://www.finanstilsynet.no/markeds advarsler/2017/initial-coin-offerings-icoer---advarsel-til-investorer-og-foretak/, *archived at* https://perma.cc/9ZRM-RSJB.

[449] Press Release, Finanstilsynet (2018), *supra* note 447; Press Release, Finanstilsynet (2017), *supra* note 448.

[450] Central Bank ethical guidelines are available at Norges Bank, Utfyllende Etiske Regler fo Ansatte i Norges sentralbankvirksomhet [Additional Ethical Rules for Employees of Norway's Central Bank] (Sept. 10, 2014), https://www.norges-bank.no/Om-Norges-Bank/Mandat-og-oppgaver/Lover-og-regelverk-i-tilknytning-til-Norges-Banks-virksomhetsomrade/Utfyllende-etiske-regler/, *archived at* https://perma.cc/7J56-Y6RT.

[451] *Bruk av bitcoins – skatte- og avgiftsmessige konsekvenser* [*Use of Bitcoins – Tax Effects*], SKATTEETATEN (Nov. 11, 2013), https://www.skatteetaten.no/rettskilder/type/uttalelser/prinsipputtalelser/bruk-av-bitcoins--skatte--og-avgiftsmessige-konsekvenser/, *archived at* https://perma.cc/5223-NKR4; *see also* Elin Hofverberg, *Norway: Bitcoins Are Capital Property, Not Currency, Says Norwegian Tax Authority*, GLOBAL LEGAL MONITOR (Dec. 11, 2013), http://www.loc.gov/law/foreign-news/article/norway-bitcoins-are-capital-*property*-not-currency-says-norwegian-tax-authority/, *archived at* https://perma.cc/QVF6-BBFQ.

[452] §§ 5-1; 5-20; 6-1 LOV OM SKATT AV FORMUE OG INNTEKT (SKATTELOVEN) [ACT ON TAXATION OF INCOME (TAX ACT)] (LOV-1999-03-26-14), https://lovdata.no/dokument/NL/lov/1999-03-26-14, *archived at* https://perma.cc/S8Y6-8RPR.

[453] SKATTEETATEN, *supra* note 451.

All Norwegian residents are required to report taxable income (including from capital gains such as those from cryptocurrencies) in accordance with the Norwegian Income Tax Act.[454] Such income derived from cryptocurrencies should be filed as "other income."[455]

Sales of cryptocurrencies are exempt from Norwegian value-added tax (VAT). In a 2013 statement the Norwegian Tax Authority determined that the sale of bitcoins by a commercial actor was subject to a 25% VAT as the trade in bitcoins on a web-based site is an electronic service subject to VAT and not a VAT-exempt financial service.[456] However, in 2015 the Court of Justice of the European Union ruled that cryptocurrencies are exempt from VAT.[457] This caused Norway to start a process whereby the Finance Department was to determine how bitcoins (and other cryptocurrencies) should be treated in relation to VAT.[458] Final guidance was issued in 2017, establishing that the sale of cryptocurrencies is exempt from VAT.[459]

**Russia**

A draft law on digital financial assets was published by the Ministry of Finances on January 20, 2018, and introduced in the State Duma on March 20, 2018. The bill defines "mining" as activities aimed at the creation of cryptocurrency with the purpose of receiving compensation in the form of cryptocurrency. Mining is treated as an entrepreneurial activity subject to taxation if the miner exceeds the energy consumption limits established by the government for three months in a row.[460] As to initial coin offerings (ICO), only qualified investors are allowed to participate in them, except

---

[454] § 2-1 skatteloven.

[455] As per income tax guidelines at *3.1.12 Annen inntekt* [*Other Income*], SKATTEETATEN, https://www.skatteetaten. no/person/skatt/skattemelding/finn-post/3/1/12/ (last visited Apr. 6, 2018), *archived at* https://perma.cc/96P3-QXNK.

[456] SKATTEETATEN, *supra* note 451; *see also* Hofverberg, *supra* note 451.

[457] Case C‑264/14, Skatteverket v. David Hedqvist, 2015 CURIA EUROPA ECLI:EU:C:2015:718 (Oct. 22, 2015), http://curia.europa.eu/juris/document/document.jsf?docid=170305&doclang=EN, *archived at* https://perma.cc/LU2G-U6VD.

[458] Skriftlig spørsmål fra Sveinung Rotevatn (V) til finansministeren [Written Question from Sveinung Rotevatn (V) to the Minister of Finance], Dokument nr. 15:1436 (2015-2016) (Aug. 10, 2016), https://www.stortinget.no/no/ Saker-og-publikasjoner/Sporsmal/Skriftlige-sporsmal-og-svar/Skriftlig-sporsmal/?qid=66127, *archived at* https://perma.cc/SBC3-9M7Q.

[459] Letter from the Finance Department to the Norwegian Tax Authority, Merverdiavgift – unntaket for finansielle tjenester [VAT Fees – Exemption for Financial Services] (Feb. 6, 2017), https://www.regjeringen.no/no/ dokumenter/merverdiavgift---unntaket-for-finansielle-tjenester/id2538129/, *archived at* https://perma.cc/8GV3-TU4Q.

[460] Bill No. 419059-7, Federal Law of the Russian Federation on Digital Financial Assets, http://asozd2c.duma. gov.ru/addwork/scans.nsf/ID/E426461949B66ACC4325825600217475/$FILE/419059-7_20032018_419059-7.PDF?OpenElement (in Russian), *archived at* https://perma.cc/UM68-PKN8; *see also The Ministry of Telecom and Mass Communications Has Proposed a Regulatory Moratorium for Industrial Miners*, RBC (Mar. 22, 2018), https://www.rbc.ru/ins/economics/22/03/2018/5ab36c129a79477b7bc615b7 (in Russian), *archived at* https://perma.cc/4DFX-M58U.

for cases to be defined by the Central Bank, according to news reports.[461] Tokens and coins are classified in the bill as property and are not considered legal tender. The bill does not authorize the exchange of cryptocurrency for rubles or foreign currency. The exchange of tokens for rubles and foreign currency is allowed but only through licensed operators.[462] The bill also provides a definition of a "smart contract."[463]

The Ministry of Telecom and Mass Communications has presented its own concept of the draft law on digital financial assets. It recommends introducing the term "industrial mining," registering miners with the tax office, and setting forth requirements for energy consumption. It also recommends exempting miners from taxation for a period of two years to stimulate their activities. Earlier the Ministry had offered to create a special exchange platform for the miners to ensure the transparency of cryptocurrency exchange.[464]

Separately, amendments were introduced to the Civil Code[465] in order to protect the rights of the owners of cryptocurrency coins and tokens. The document defines "digital money" and "digital rights," and provides for their judicial protection. The authors say that these regulations will allow coins and tokens to be included in a bankruptcy estate or a deceased person's estate.[466]

It is expected that the legislative framework for cryptocurrency regulation will be enacted by July 1, 2018, after which the rules on the taxation of cryptocurrency operations will be introduced.[467]

---

[461] Lyudmila Petukhova, *Passion for Bitcoin: How Cryptocurrencies and ICO Will Be Regulated in Russia*, RBC (Mar. 20, 2018), https://www.rbc.ru/finances/20/03/2018/5ab125e69a79474518a5c2a1 (in Russian), *archived at* https://perma.cc/JZT9-5N48.

[462] *Id*.

[463] *Id*.

[464] *The Ministry of Telecom and Mass Communications Has Proposed a Regulatory Moratorium for Industrial Miners*, RBC, *supra* note 460.

[465] Bill No. 424632-7, Federal Law of the Russian Federation on Amending Parts One, Two and Four of the Civil Code of the Russian Federation, http://asozd2c.duma.gov.ru/addwork/scans.nsf/ID/B91DEDFBCF19B4E04325825C0032641E/$FILE/424632-7_26032018_424632-7.PDF?OpenElement (in Russian), *archived at* https://perma.cc/HV5Z-DXRJ.

[466] Tatyana Zamakhina, *Money in the Web, A Bill on Digital Economy Has Been Submitted to the State Duma*, RG.RU (Mar. 26, 2018), https://rg.ru/2018/03/26/v-gosdumu-vnesen-zakonoproekt-o-cifrovom-prave.html?utm_source=rg.ru&utm_medium=offline&utm_campaign=back_to_online (in Russian), *archived at* https://perma.cc/9GH7-LDTR.

[467] Yevgueniy Gayva, *Cryptocurrency Transactions Will Be Taxed*, RG.RU (Jan. 25, 2018), https://rg.ru/2018/01/25/operacii-s-kriptovaliutami-oblozhat-nalogami.html (in Russian), *archived at* https://perma.cc/53VR-YLTG.

## Serbia

The National Bank of Serbia made two announcements, one on October 2, 2014,[468] and the other on May 4, 2016,[469] to clarify that "anyone investing in bitcoins or engaging in any other activity involving virtual currencies shall do so at their own liability, bearing all financial risks and risks in terms of noncompliance with regulations governing foreign exchange operations, taxation, trade, etc."[470] The Bank explained that bitcoin is not legal tender in Serbia and cannot be subject to sale and purchase by banks or licensed exchange dealers. The Bank said that a particular issue is the use of virtual currency to acquire other goods and services, adding that the law requires prices to be expressed in Serbian dinars and that expressing the prices of goods or services in virtual currency would be against the provisions of the law.[471] The Bank said it would consider, in cooperation with other state authorities, whether there is any need for designing a regulatory or other response in relation to cryptocurrencies.[472]

## Switzerland

The Swiss Canton of Zug is trying to establish itself as a hub for cryptocurrencies and Fintech start-ups. On November 2, 2017, the Commercial Register Office in the Canton of Zug started accepting bitcoin and ether as payment for administrative costs.[473] Furthermore, the Commercial Register accepts cryptocurrencies as a contribution in kind for purposes of forming a company.[474] In the city of Zug, municipal services (resident registration) of up to CHF200 (about US$210) can be paid with bitcoin.[475]

---

[468] Press Release, National Bank of Serbia (NBS), NBS Warns that Bitcoin Is Not Legal Tender in Serbia (Oct. 2, 2014), http://www.nbs.rs/internet/english/scripts/showContent.html?id=7607&konverzija=no, *archived at* https://perma.cc/DK4U-ZEUL.

[469] Press Release, NBS, Bitcoin Will Not Replace Euro or Any Other Currency (May 4, 2016), http://www.nbs.rs/internet/latinica/scripts/showContent.html?id=9612&konverzija=yes, *archived at* https://perma.cc/VL7X-PF4E.

[470] *Id.*

[471] Maja Zivanovic, *Serbian Bank Advises Caution Over Bitcoin Fever*, BALKANINSIGHT (Dec. 26, 2017), http://www.balkaninsight.com/en/article/serbian-national-bank-advise-caution-with-bitcoin-12-25-2017, *archived at* https://perma.cc/5RM3-ZUWU.

[472] Press Release, NBS, Bitcoin Will Not Replace Euro or Any Other Currency, *supra* note 469.

[473] Press Release, Kanton Zug [Canton Zug], Handelsregisteramt Zug akzeptiert Kryptowährungen Bitcoin und Ether als Zahlungsmittel [Commercial Register Office Zug Accepts Cryptocurrencies Bitcoin and Ether as Means of Payment] (Nov. 2, 2017), https://www.zg.ch/behoerden/volkswirtschaftsdirektion/handelsregisteramt/aktuell/handelsregisteramt-zug-akzeptiert-kryptowaehrungen-bitcoin-und-ether-als-zahlungsmittel, *archived at* http://perma.cc/384H-BEUE.

[474] Press Release, Kanton Zug, HR Zug lässt Kryptowährungen als Sacheinlage zu [Commercial Register Office in Zug Accepts Crytocurrencies as a Contribution in Kind] (Sept. 4, 2017), https://www.zg.ch/behoerden/volkswirtschaftsdirektion/handelsregisteramt/aktuell/bitcoin-als-sacheinlage?searchterm=bitcoin, *archived at* http://perma.cc/H5A7-AUJH.

[475] Press Release, Stadt Zug [City of Zug], Von Bitcoin zu Blockchain-Anwendungen [From Bitcoin to Blockchain Applications] (Nov. 15, 2016), http://www.stadtzug.ch/de/ueberzug/ueberzugrubrik/aktuelles/aktuelles informationen/welcome.php?action=showinfo&info_id=351680&ls=0&sq=&kategorie_id=&date_from=&date_to=, *archived at* http://perma.cc/LZL9-CNHR.

On January 1, 2018, the municipality of Chiasso, in the Swiss Canton of Ticino, started accepting bitcoin as tax payments for amounts of up to CHF250 (around US$263).[476]

On February 16, 2018, the Swiss Financial Market Supervisory Authority (Eidgenössische Finanzmarktaufsicht, FINMA) published guidelines on the regulatory treatment of ICOs,[477] which complement its earlier FINMA Guidance from September 2017.[478] Currently, there is no ICO-specific regulation, nor is there relevant case law or consistent legal doctrine.[479] FINMA stated that due to the fact that each ICO is designed in a different way, it must be decided on a case-by-case basis whether and which financial regulations are applicable.

In an ICO, investors receive blockchain-based coins or tokens in exchange for the funds they transfer. The tokens are created and stored either on a blockchain specifically created for the ICO or on a pre-existing blockchain.[480] FINMA differentiates between payment tokens (cryptocurrencies), utility tokens, and asset tokens. Payment tokens (cryptocurrencies) are defined as tokens that are used as a means of payment or as a means of money or value transfer. Utility tokens are those that provide digital access to an application or service by means of a blockchain-based infrastructure. Asset tokes represent assets such as a debt or an equity claim against the issuer. According to FINMA, asset tokens are analogous to equities, bonds, and derivatives.[481]

Operators of financial market infrastructures are subject to authorization by FINMA.[482] If the tokens received in an ICO qualify as securities, trading will require authorization. Securities are defined as "standardised certificated or uncertificated securities, derivatives and intermediated securities which are suitable for mass standardised trading,"[483] meaning they are "publicly offered for sale in the same structure and denomination or are placed with more than 20 clients, insofar as

---

[476] *Possibilità di pagamento imposte in Bitcoin* [*Possibility to Pay Taxes in Bitcoin*], COMUNE DI CHIASSO [MUNICIPALITY OF CHIASSO] (Feb. 1, 2018), https://www.chiasso.ch/possibilita-pagamento-imposte-bitcoin/, *archived at* http://perma.cc/2VR9-STWR.

[477] FINMA, Guidelines for Enquiries Regarding the Regulatory Framework for Initial Coin Offerings (ICOs) (FINMA ICO Guidelines) (Feb. 16, 2018), https://www.finma.ch/en/~/media/finma/dokumente/dokumenten center/myfinma/1bewilligung/fintech/wegleitung-ico.pdf?la=en, *archived at* http://perma.cc/PV9L-5AEK.

[478] FINMA Guidance 04/2017. Regulatory Treatment of Initial Coin Offerings (FINMA Guidance) (Sept. 29, 2017), https://www.finma.ch/en/~/media/finma/dokumente/dokumentencenter/myfinma/4dokumentation/ finma-aufsichtsmitteilungen/20170929-finma-aufsichtsmitteilung-04-2017.pdf?la=en&hash=9DCC5C1FF8F61C9 AA9412FAD2D7C70533F341EF2, *archived at* http://perma.cc/6YGB-LSCP.

[479] FINMA ICO Guidelines, *supra* note 477, at 2, no. 3.

[480] *Id*. at 1, no. 1.

[481] *Id*. at 3, no. 3.1.

[482] Finanzmarktinfrastrukturgesetz [FinfraG] [Financial Market Infrastructure Act] [FMIA], June 19, 2015, SYSTEMATISCHE RECHTSSAMMLUNG [SR] [SYSTEMATIC COLLECTION OF LAWS] 958.1, art. 4, https://www.admin.ch/ opc/de/classified-compilation/20141779/201708010000/958.1.pdf, *archived at* http://perma.cc/5F64-2WFF, unofficial English translation available *at* https://www.admin.ch/opc/en/classified-compilation/20141779/ 201708010000/958.1.pdf, *archived at* http://perma.cc/WT73-EMWN.

[483] FMIA art. 2, let. b.

they have not been created especially for individual counterparties."[484] FINMA does not treat payment tokens or utility tokens whose sole purpose is to confer digital access rights as securities. However, utility tokens that have an additional investment purpose or a sole investment purpose at the time of issue, as well as asset tokens that are standardized and suitable for mass standardized trading, are classified as securities.[485]

Funds raised in an ICO generally do not qualify as deposits within the meaning of the Banking Act. However, if there are liabilities with debt capital character, for example a promise to return capital with a guaranteed return, then such an ICO would require the organizer to obtain a banking license.[486] When assets collected as part of the ICO are managed externally by third parties, the provisions of the Collective Investment Schemes Act apply.[487] Provisions on combating money laundering and terrorist financing, which give rise to a range of due diligence requirements, apply to the ICO of a payment token (cryptocurrency) as soon as the tokens can be technically transferred on a blockchain infrastructure.[488] In addition, the exchange of a cryptocurrency for fiat money or a different cryptocurrency as well as the offering of services to transfer tokens if the service provider maintains the private key (custody wallet provider) equally trigger the due diligence requirements according to the Anti-Money Laundering Act.[489]

In September 2017, FINMA closed down the unauthorized providers of the fake cryptocurrency "E-Coin", liquidated the companies, and issued a general warning about fake cryptocurrencies to investors.[490] Furthermore, three other companies were put on FINMA's warning list due to suspicious activity and eleven investigations were conducted into other presumably unauthorized business models relating to such coins.[491]

---

[484] Finanzmarktinfrastrukturverordnung [FinfraV] [Financial Market Infrastructure Ordinance] [FMIO], Nov. 25, 2015, SR 958.11, art. 2, para. 1, https://www.admin.ch/opc/de/classified-compilation/20152105/201708010000/958.11.pdf, *archived at* http://perma.cc/NW3S-JAGZ, unofficial English translation available *at* https://www.admin.ch/opc/en/classified-compilation/20152105/201708010000/958.11.pdf, *archived at* http://perma.cc/2423-R4HG.

[485] FINMA ICO Guidelines, *supra* note 477, at 4, no. 3.2.1-3.2.3.

[486] *Id.* at 6, no. 3.4; Bankengesetz [BankG] [Banking Act], Nov. 8, 1934, SR 952.0, arts. 1, 3, https://www.admin.ch/opc/de/classified-compilation/19340083/201601010000/952.0.pdf, *archived at* http://perma.cc/R5N5-E4KE.

[487] FINMA ICO Guidelines, *supra* note 477, at 6, no. 3.5; Kollektivanlagengesetz [KAG] [Collective Investment Schemes Act] [CISA], June 23, 2006, SR 951.31, https://www.admin.ch/opc/de/classified-compilation/20052154/201607010000/951.31.pdf, *archived at* http://perma.cc/9HHP-QTY6, unofficial English translation available *at* https://www.admin.ch/opc/en/classified-compilation/20052154/201607010000/951.31.pdf, *archived at* http://perma.cc/8NAX-442E.

[488] FINMA ICO Guidelines, *supra* note 477, at 6, no. 3.6; Geldwäschereigesetz [GwG] [Anti-Money Laundering Act] [AMLA], Oct. 10, 1997, SR 955.0, https://www.admin.ch/opc/de/classified-compilation/19970427/201601010000/955.0.pdf, *archived at* http://perma.cc/E9UX-3EBW, unofficial English translation available *at* https://www.admin.ch/opc/en/classified-compilation/19970427/201601010000/955.0.pdf, *archived at* http://perma.cc/M4M6-UW5U.

[489] FINMA ICO Guidelines, *supra* note 477, at 7, no. 3.6.

[490] Press Release, FINMA, FINMA Closes Down Coin Providers and Issues Warning About Fake Cryptocurrencies (Sept. 19, 2017), https://www.finma.ch/en/news/2017/09/20170919-mm-coin-anbieter/, *archived at* http://perma.cc/VN3C-2ZUK.

[491] *Id.*

In Switzerland, the individual cantons, the Swiss states, are obligated to levy income tax and wealth tax on the total property (assets and rights with a cash value) of taxpayers that are resident in their canton.[492] Tax rates vary between the individual cantons. Cryptocurrencies are treated like foreign currencies for tax purposes and are subject to wealth tax.[493] Holders of bitcoin or other cryptocurrencies are taxed at the rate determined by the tax authorities on December 31 of the fiscal year. As an example, the tax rate for bitcoin determined on December 31, 2017, by the Swiss Federal Tax Administration was CHF13,784.38 (about US$14,514).[494] This rate is a recommendation for the cantonal tax authorities.

In January 2018, the Swiss State Secretariat for International Finance (Staatssekretariat für internationale Finanzfragen, SIF) reported that it would set up a working group on blockchain and ICOs.[495] The working group will work together with the Federal Ministry of Justice and FINMA and involve interested businesses. It will study the legal framework for financial sector-specific use of blockchain technology with a particular focus on ICOs and report back to the Federal Council, the Swiss government, by the end of 2018.

## Ukraine

On November 30, 2017, the financial regulators of Ukraine issued a joint statement on the status of cryptocurrencies in the country. According to the statement, cryptocurrencies cannot be classified as money, foreign currency, a means of payment, electronic money, securities, or a money surrogate. The regulators also stated that they continue to work on defining the legal status of cryptocurrencies and the legislative regulation of transactions involving them. The regulators warned about the extremely high probability of losses in dealing with cryptocurrencies and said all investors in cryptocurrencies should realize that they are acting at their own peril and risk.[496]

---

[492] Bundesgesetz über die Harmonisierung der direkten Steuern der Kantone und Gemeinden [StHG] [Federal Act on the Harmonization of Direct Taxes Levied by Cantons and Municipalities], Dec. 14, 1990, SR 642.14, art. 2, para. 1, https://www.admin.ch/opc/de/classified-compilation/19900333/201801010000/642.14.pdf, *archived at* http://perma.cc/5QP8-2NXP.

[493] *See* as an example KANTON ZUG. FINANZDIREKTION. STEUERVERWALTUNG [CANTON ZUG. FINANCE DIRECTORATE. TAX ADMINISTRATION], KRYPTOWÄHRUNGEN (BITCOIN, ETHEREUM, TOKENS USW.): MERKBLATT STEUERN FÜR PRIVATPERSONEN [CRYPTOCURRENCIES (BITCOIN, ETHEREUM, TOKENS ETC.): EXPLANATORY LEAFLET FOR PRIVATE PERSONS] (Nov. 30, 2017), https://www.zg.ch/behoerden/finanzdirektion/steuerverwaltung/krypto waehrungen/download/Kryptowaehrungen%20-%20Merkblatt%20def.%20-%2030.11.2017.pdf/download, *archived at* http://perma.cc/VGX2-C5HS.

[494] *Course Listing Federal Income Tax 2018*, FEDERAL TAX ADMINISTRATION, https://www.ictax.admin.ch/extern/ en.html#/ratelist/2018 (last visited Apr. 5, 2018), *archived at* http://perma.cc/9JCD-MHSE.

[495] Press Release, *Arbeitsgruppe Blockchain/ICO wird ins Leben gerufen* [*Working Group Blockchain/ICO Set Up*], Eidgenössisches Finanzdepartement [EFD] [Swiss Federal Department of Finance], Jan. 18, 2018, https://www.admin.ch/gov/de/start/dokumentation/medienmitteilungen.msg-id-69539.html, *archived at* http://perma.cc/2WJV-XXPD.

[496] Press Release, National Bank of Ukraine, Joint Statement of Financial Regulators on the Status of Cryptoassets in Ukraine (Nov. 30, 2017), https://bank.gov.ua/control/uk/publish/printable_article;jsessionid=175FC525F862C 3D896D522CFC9CC47BB?art_id=59735329&showTitle=true (in Ukrainian), *archived at* https://perma.cc/K8WF-KS5W; *see also Cryptocurrency in the Ukraine – the Position of the Authorities*, NEXUS FINANCIAL CONSULTING (Dec. 1, 2017), https://www.nexus.ua/novosti-offshornogo-biznesa/ukraina/5218-kriptovalyuty-v-ukraine-pozitsiya-vlastej (in Russian), *archived at* https://perma.cc/V3SC-3UFL.

On January 11, 2018, the cybersecurity unit of the National Security and Defense Council issued a statement saying that Ukraine can no longer allow the uncontrolled turnover of cryptocurrency on its territory and that the Council plans to create a working group to develop the regulatory framework, determine the regulatory body and the procedures for monitoring, identifying and taxing transactions with cryptocurrency.[497] On January 30, 2018, the head of the cybercrime department of the Police stated that circulation of cryptocurrencies must be banned if its legal status is not regulated in the near future.[498] In March of 2018 the government approved supplementing the classification of economic activities with a paragraph on cryptocurrency mining.[499]

In late 2017 Ukrainian MPs introduced two alternative draft bills that would regulate cryptocurrencies, one of which would define them as goods and the other as financial assets. However, both drafts were rejected by the country's financial regulators.[500]

---

[497] Press Release, National Security and Defense Council of Ukraine, O. Turchinov: The Development of the Market of Cryptoassets Cannot Be Left Out of Government Attention (Jan. 11, 2018), http://www.rnbo.gov.ua/news/2965.html (in Ukrainian), *archived at* https://perma.cc/9R89-4967; *see also Turchinov Saw in Cryptocurrency a Threat to the Security of Ukraine*, NEWSONE (Jan. 11, 2018), https://newsone.ua/news/politics/turchinov-uvidel-v-kriptovalyute-ugrozu-dlya-bezopasnosti-ukrainy.html (in Russian), *archived at* https://perma.cc/Q5XE-BM7H.

[498] *The Head of the Ukrainian Cyberpolice Called for Defining the Status of Cryptocurrency*, GORDON (Jan. 30, 2018), http://gordonua.com/news/money/glava-kiberpolicii-ukrainy-prizval-opredelit-status-kriptovalyuty-229317.html (in Russian), *archived at* https://perma.cc/GH4Z-KSC5.

[499] Yana Largo, *The Government of Ukraine Will Equate Mining to Economic Activity*, CRYPTO.PRO (Mar. 15, 2018), https://news.crypto.pro/pravitelstvo-ukrainy-priravnjaet-majning-k-jekonomicheskoj-dejatelnosti/ (in Russian), *archived at* https://perma.cc/6CYQ-87TS.

[500] Oleksiy Shevnin, *Legalization of Cryptocurrencies, How the Government Will Lay Its Hands on Bitcoin*, DEPO.UA (Jan. 25, 2018), https://www.depo.ua/rus/money/legalizaciya-kriptovalyut-yak-derzhava-naklade-lapu-na-bitkoyn-20180124714146 (in Russian), *archived at* https://perma.cc/L88L-USG4.

Regulation of Cryptocurrency Around the World

## Middle East and North Africa

**Algeria**

The 2018 Financial Law of Algeria has prohibited the use of any cryptocurrencies.  It stipulates:

> The purchase, sale, use, and possession of so-called virtual currency are prohibited.  A virtual currency is one used by Internet users over the Internet.  It is characterized by the absence of physical support such as coins, paper money, or payments by check or credit card.

> Any violation of this provision is punishable in accordance with the laws and regulations in force.[501]

**Bahrain**

The governor of the Central Bank of Bahrain, Rasheed Al Maraj, has issued a warning against cryptocurrencies, especially bitcoin. During a parliamentary session that took place in the Shura Council, Al Maraj declared that the bitcoin is not recognized by any financial institution. He also mentioned that using bitcoin in Bahrain is illegal; however, Bharani citizens have the right to invest in cryptocurrencies outside Bahrain.[502]

**Egypt**

The Central Bank of Egypt issued a warning in January 2018 against the trading of cryptocurrencies, such as bitcoin, due to the extremely high risk associated with such currencies. The Central Bank also asserted that commerce within the Arab Republic of Egypt is confined only to the official paper currencies approved by the Bank.[503]

Egypt's Dar al-Ifta, the primary Islamic legislator in Egypt, has issued a religious decree classifying commercial transactions in bitcoin as *haram* (prohibited under Islamic law).  Dar al-Ifta has stated that cryptocurrencies could damage national security and central financial systems, and could also be used to fund terrorism and terrorists activities.[504]

---

[501] Law No. 17-11 of 1917 (Dec. 27, 2017) art. 117, Official Gazette No. 76 of 2017 (Dec. 28, 2017), https://www.joradp.dz/FTP/JO-ARABE/2017/A2017076.pdf (in Arabic), *archived at* https://perma.cc/JE65-VFFF (translation by author). French translation of the Law *available at* https://www.mfdgi.gov.dz/images/pdf/lois_de_finances/LF2018F.pdf, *archived at* https://perma.cc/XP6A-8Q4A.

[502] *Al Maraj: We Do Not Recognize Bitcoin and It is Dangerous to Deal With It*, AL-WATAN (Jan. 7, 2018), http://alwatannews.net/article/752396/Bahrain/المعراج-لا-نعترف-بالبيتكوينو التعامل-بها-خطر (in Arabic), *archived at* https://perma.cc/WDT3-7R9F.

[503] Press Release, Central Bank of Egypt, A Warning Statement (Jan. 10, 2018), http://www.cbe.org.eg/en/Pages/HighlightsPages/Bitcoin%20Press%20Release.aspx, *archived at* https://perma.cc/3X6D-WFEG.

[504] Religious Decree No. 4205, *The Status of Transactions in Bitcoins and other Cryptocurrencies under Islamic Law*, EGYPT'S DAR AL-IFTA (Dec. 28, 2017), http://www.dar-alifta.org/ar/ViewFatwa.aspx?sec=fatwa&ID=14139 (in Arabic), *archived at* https://perma.cc/432D-NHE5.

**Iran**

The Central Bank of Iran (CBI) officially announced on April 22, 2018, that it has prohibited the handling of cryptocurrencies by all Iranian financial institutions, including banks and credit institutions.  The decision also bans currency exchanges from buying and selling virtual currencies or adopting measures to facilitate or promote them.[505]

The CBI's action was in line with Iran's recent efforts to address deficiencies in its policies on anti-money laundering and combating the financing of terrorism, with the aim of complying with the action plan of the Financial Action Task Force on Money-Laundering (FATF).  The FATF, an intergovernmental organization established to combat international money-laundering and terrorist financing, will determine at its plenary meeting in June 2018 whether to remove Iran from the FATF list of Non-Cooperative Countries or Territories.[506]  Previously, the CBI had only sought to warn people of the potential risks inherent in cybercurrencies,[507] although a directive passed by the Money and Credit Council, the most important policy decision-making organ of the CBI, "[had] deemed non-physical and virtual transactions against the law, meaning that Iranian [currency exchanges could] not deal in cryptocurrencies."[508]

The Bank's decision to ban the use of cryptocurrencies by financial institutions is a blow for those in Iran who viewed virtual currencies as a means of overcoming problems related to the banking industry and international sanctions, and who see them as "currently shaping the future of banking" and, when precisely and transparently regulated, of preventing people in the country from buying and selling them secretly and using them fraudulently.[509]  Before the ban was announced, the CBI's Information Technology Chief had reported that, along with the adoption of a framework that

---

[505] *Iranian Financial Institutions Barred from Using Crypto-Currencies*, FINANCIAL TRIBUNE (Apr. 22, 2018), https://financialtribune.com/articles/business-and-markets/85114/iranian-financial-institutions-barred-from-using-crypto (available by subscription).

[506] *Id.*; Barry Lerner, *Iran: IMF Evaluates Iran's Legislative and Institutional Efforts to Combat Money Laundering and Terrorism Financing*, GLOBAL LEGAL MONITOR (Apr. 13, 2018), http://www.loc.gov/law/foreign-news/article/iran-imf-evaluates-irans-legislative-and-institutional-efforts-to-combat-money-laundering-and-terrorism-financing, *archived at* https://perma.cc/J5NX-YLWK.

[507] *No Bitcoin Trade for Moneychangers*, FINANCIAL TRIBUNE (Dec. 23, 2017), https://financialtribune.com/articles/economy-business-and-markets/78454/no-bitcoin-trade-for-moneychangers, *archived at* https://perma.cc/8EM7-XESG.  The CBI is responsible for, inter alia, "formulating the monetary and credit system of the country, formulating the regulations pertaining to outflow as well as repatriation of Iranian and foreign currency, [and] foreign exchange transactions." *Laws & Regulations*, CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, https://www.cbi.ir/section/1454.aspx (last visited Mar. 19, 2018), *archived at* https://perma.cc/38FZ-SXVC.

[508] *No Bitcoin Trade for Moneychangers*, *supra* note 507; CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, CENTRAL BANKING IN IRAN, at 12–13, https://www.cbi.ir/page/4252.aspx (last visited Mar. 19, 2018), *archived at* https://perma.cc/92DQ-CM3B.

[509] *Iran's Banks Banned from Dealing in Crypto-currencies*, BBC NEWS (Apr. 23, 2018), http://www.bbc.com/news/ technology-43865105, *archived at* https://perma.cc/TQD5-889D; *Iranian Banker Calls for Cryptocurrency Recognition*, FINANCIAL TRIBUNE (Jan. 7, 2018), https://financial tribune.com/articles/economy-business-and-markets/79459/iranian-banker-calls-for-cryptocurrency-recognition, *archived at* https://perma.cc/H9HS-AGWK; *Iranian Banker Calls for Cryptocurrency Recognition*, FINANCIAL TRIBUNE (Jan. 7, 2018), https://financial tribune.com/articles/economy-business-and-markets/79459/iranian-banker-calls-for-cryptocurrency-recognition, *archived at* https://perma.cc/H9HS-AGWK; *No Bitcoin Trade for Moneychangers*, *supra* note 507.

should be adhered to for using cryptocurrencies, the Central Bank was considering the adoption of a national virtual currency, either to be generated by the Central Bank or another entity.[510]   One of the motivations for developing such a currency was that it could potentially be used to replace the US dollar, an attractive prospect for Iran because US sanctions over Iran's nuclear program bar Iran from using the US financial system.[511]

## Iraq

The Iraqi Central Bank has issued a statement prohibiting the use of cryptocurrencies. It stated that currency traders who carry out transactions in cryptocurrencies will be punished by penalties cited in the country's anti-money laundering law.[512]

## Israel

Israel's Supervision on Financial Services (Regulated Financial Services) Law 5776-2016 requires persons engaging in providing services involving "financial assets" to obtain a license from the Supervisor of Financial Services.[513]   The definition of "financial assets" includes "virtual currency."[514]  A license will generally be issued to an Israeli citizen or a resident who has reached the age of majority, is legally competent, and has not been declared bankrupt or, in the case of a corporation, is not required to dissolve. Additional licensing requirements include that the licensee has a minimum specified amount of equity and, if an individual, has not been convicted of an offense that due to its nature makes the licensee unfit to handle financial transactions.[515]

A statement issued by Bank of Israel and several regulatory agencies on February 19, 2014, warned the public against dealing in virtual currencies. The warning laid out the dangers associated with trading in virtual currencies, including fraud, money laundering, and financing of terrorism, among others.[516]   In addition, the Bank of Israel said in a January 2018 statement that "it would not recognize virtual currencies such as bitcoin as actual currency and . . . it was difficult to devise

---

[510] *Iran's CB Issues Warning over Bitcoin and Other Cryptocurrencies*, FINANCIAL TRIBUNE (Nov. 14, 2017), https://financialtribune.com/articles/economy-business-and-markets/76148/irans-cb-issues-warning-over-bitcoin-and-other, *archived at* https://perma.cc/U8W7-VH3.

[511] *CBI Governor Urges Caution on Bitcoin Trade*, FINANCIAL TRIBUNE (Dec. 31, 2017), https://financialtribune.com/articles/economy-business-and-markets/78986/cbi-governor-urges-caution-on-bitcoin-trade, *archived at* https://perma.cc/7HZM-DFMF.

[512] Statement, Central Bank of Iraq, Bitcoin (Dec. 3, 2017), https://cbi.iq/news/view/512 (in Arabic), *archived at* https://perma.cc/JG54-PDHV.

[513] Supervision on Financial Services (Regulated Financial Services) Law 5776-2016, §§ 2 &12, SEFER HAHUKIM [BOOK OF LAWS, official gazette] 5776 No. 2570 p. 1098, *as amended* (in Hebrew).

[514] *Id*. § 11A, subsection (7) of the definition of "financial asset."

[515] *Id*. § 15.

[516] *Id*. ¶ 4, Bank of Israel Capital Market, Insurance and Saving Branch, Tax Authority, Securities Authority and the Prevention of Money Laundry and Financing of Terrorism Authority, Public Announcement Regarding Possible Risks Contained in Virtual Coins Such as Bitcoin (Feb. 19, 2014), https://taxes.gov.il/About/PublicAnnouncements/PublishingImages/190214/odaa190214.pdf (in Hebrew), *archived at* https://perma.cc/VQ7Z-GDRQ.

regulations to monitor the risks of such activity to the country's banks and their clients," according to Reuters.[517]

Although virtual currencies are not recognized as actual currency by the Bank of Israel, the Israel Tax Authority has proposed that the use of virtual currencies should be considered as a "means of virtual payment" and subject to taxation.[518]  Specifically, for the purpose of income tax and value added tax requirements, virtual currency is viewed as "an asset" and is taxed in accordance with relevant transaction classifications under the Income Tax Ordinance (New Version), 1961, and the Value Added Tax Law, 5736-1975.[519] Accordingly,

> [u]nlike a regular currency, the Israel Tax Authority will regard an increase in the value of a cryptocurrency as a capital gain rather than an exchange fluctuation, making it subject to capital gains tax. Individual investors will not be liable for value-added tax, but anyone engaging in cryptocurrency mining will be classified as a "dealer" and subject to VAT, according to the circular. Anyone trading as a business will be classified as a "financial institution" for tax purposes, meaning that they will be unable to reclaim VAT on expenses but will be subject to an extra 17 percent "profit tax" applied to financial institutions.[520]

The Israel Tax Authority requires documentation of trade transactions involving virtual currency to enable verification of their existence and scope.[521]

### Jordan

In 2014, the Central Bank of Jordan (CBJ) warned the public against the use of bitcoin and sent out a press release to the media that stated:

> Recently, a global phenomenon of trading a virtual currency called bitcoin became active around the world. CBJ seeks to protect citizens and the investors, by warning them that virtual currencies are not legal tender and there is no obligation on any central bank in the world or any government to exchange its value for real money issued by them nor backed by underlying international commodities or gold.[522]

---

[517] Steven Scheer, *Bitcoin Is an Asset, Not a Currency - Israel's Central Bank*, REUTERS (Jan. 8, 2018), https://www.reuters.com/article/uk-bitcoin-israel/bitcoin-is-an-asset-not-a-currency-israels-central-bank-idUSKBN1EX18E, *archived at* https://perma.cc/3458-ZY58.

[518] Israel Tax Authority, Taxation of Activity by Means of Virtual Payment (Known as 'Virtual Currencies'), Israel Tax Authority Circular No. 05/2018 (Jan. 17, 2018), https://taxes.gov.il/incometax/documents/hozrim/hor_acc%2015.2.18.pdf (in Hebrew), *archived at* https://perma.cc/SJ48-L77X.

[519] *Id.* §§ 3.1–3.2; Income Tax Ordinance (New Version), 1961, 1 LAWS OF THE STATE OF ISRAEL (LSI) (New Version) 1967 and the Value Added Tax Law, 5736-1975, 30 LSI 46 (1975/76), both as amended.

[520] Matthew Kalman, *Israel Taxman's Guidelines Killing Cryptocurrency Boom?*, BNA (Feb. 21, 2018), https://www.bna.com/israel-taxmans-guidelines-n57982089034/, *archived at* https://perma.cc/J8DE-6AJQ.

[521] Israel Tax Authority Circular No. 05/2018, *supra* note 518, § 3.3.

[522] Omar Obeidat, *Central Bank Warns Against Using Bitcoin,* JORDAN TIMES (Feb. 22, 2014), http://www.jordantimes.com/news/local/central-bank-warns-against-using-bitcoin, *archived at* https://perma.cc/LJ9J-7FS7.

## Kuwait

Kuwait's Ministry of Finance does not recognize cryptocurrencies for purposes of official commercial transactions. Similarly, the Central Bank of Kuwait (CBK) prohibits the banking sector and companies under its control from trading in cryptocurrencies. The prohibition includes acceptance of cryptocurrency usage in e-payment transactions, and mediation between the parties to cryptocurrency transactions.[523] The CBK has asked the Ministry of Commerce and Industry to warn consumers about the risks of cryptocurrencies such as bitcoin.[524]

In January 2018, the CBK confirmed news that it was creating an infrastructure for the financial and banking sector in the country including the issuance of an e-currency, which it distinguished from virtual currencies. The establishment of a local digital currency will fall under the umbrella of e-payments, the statement said. The Central Bank highlighted that the local digital currency will have the same characteristics as paper money, such as an issuance number. It will also be monitored by the Kuwaiti government. Furthermore, it could be exchanged with other currencies as well as used to pay for goods and services.[525]

## Lebanon

On December 19, 2013, the Banque du Liban (BDL), the Lebanese Central Bank, issued a notice to the country's banks and financial institutions warning them of the dangers of using cybercurrencies, especially bitcoin. Among other concerns, the notice stated that "the platforms and networks used for the issuance and trading in such currencies are not subject to any laws or regulations."[526]

Riad Salameh, Governor of the BDL announced in October 2017 that the institution intended to launch its own cybercurrency. He is quoted as saying:

> We understand that electronic currency will play a prominent role in the future. But BDL must first make the necessary arrangement before taking this step and develop [a] protection system from cybercrime. Both the Special Investigation Commission and Banking Control Commission are cooperating to prevent such electronic crimes.[527]

---

[523] *Ministry of Finance Says Does Not Recognize Virtual Currency Bitcoin*, ARAB TIMES (Dec. 18, 2017), https://www.arabtimesonline.com/news/ministry-finance-says-not-recognise-virtual-currency-bitcoin/, *archived at* https://perma.cc/DBZ9-E66N.

[524] Darius McQuaid, *Kuwait Refuses to Trade Cryptocurrency Amid Price Surge*, EXPRESS (Dec. 20, 2017), https://www.express.co.uk/finance/city/894639/bitcoin-banned-Kuwait-KPMG, *archived at* https://perma.cc/KX9A-VM73.

[525] Press Release, Central Bank of Kuwait (Jan. 18, 2018), http://www.cbk.gov.kw/ar/cbk-news/announcements-and-press-releases/press-releases.jsp?kcp=o8QTtSFuP5Ix5WoYWwA74iHHhdsnIQ (in Arabic), *archived at* https://perma.cc/RXB3-F447.

[526] Notice No. 900, 19 Dec. 2013, Banque du Liban, http://www.bdl.gov.lb/news/more/5/111/65 (in Arabic), *archived at* https://perma.cc/XAW8-FT7N.

[527] Brooke Anderson, *Salameh: Central Bank to Launch Digital Currency*, THE DAILY STAR (Oct. 27, 2017), http://www.dailystar.com.lb/Business/Local/2017/Oct-27/424064-salameh-central-bank-to-launch-digital-currency.ashx, *archived at* https://perma.cc/57JH-T5R8.

Salameh explained that the new currency will be monitored by the BDL and be subject to Lebanese law, but did not state how this will be done or provide a time frame.[528]

Salameh also again expressed his opposition to the use of bitcoin, explaining that its use, which is not regulated, constitutes a threat to consumers and to the payment system in Lebanon.[529]

## Morocco

In a press release posted on its official website, the Moroccan Exchange Office informed the public that the transactions effectuated through virtual currencies constitute a violation of the exchange regulations and are subject to penalties and fines provided by the texts in force.[530]

The Office called on the persons concerned to abide by the exchange regulations, which provide that financial transactions with foreign entities must be effectuated through approved intermediaries and with foreign currencies listed by the Bank Al-Maghrib.

The release also warns of the risks associated with the use of a virtual system of payment that is not backed by a financial institution.

The release finally states that the Exchange Office, in collaboration with the Bank of Al-Maghrib and the Professional Grouping of the Banks of Morocco, are following with interest the evolution of virtual currencies in Morocco.

The release does not bear a date but media reports indicate that it was issued in November 2017.[531]

## Oman

The Central Bank of Oman's board issued a press release in December 2017 declaring that there are no policies or guidelines to regulate "digital currencies" or "cryptocurrencies." It also urged Omani citizens to be cautious when dealing with cryptocurrencies, asserting that the Central Bank is not responsible for any financial consequences stemming from dealings in cryptocurrencies.[532]

---

[528] *Id.*

[529] *Id.*

[530] Press Release, Office des Changes, Mise au point au sujet del'utilisation des monnai es virtuelle [Focusing on the use of virtual currency] (undated) http://www.oc.gov.ma/portal/sites/default/files/actualites/communiqu%C3%A9%20monnaies%20virtuelles.pdf (in French) (last visited Mar. 21, 2018), *archived at* https://perma.cc/B3K7-T6Z6.

[531] Sana Elouazi, *Bye-Bye Bitcoin: Morocco Bans Cryptocurrencies*, MOROCCO WORLD NEWS (Nov. 21, 2017), https://www.moroccoworldnews.com/2017/11/234382/bitcoin-morocco-cryptocurrencies-economy/, *archived at* https://perma.cc/2SEL-XLAU.

[532] Press Release, Central Bank of Oman (Dec. 12, 2017), http://www.cbo-oman.org/news/PressRelease18Dec17.pdf (in Arabic), *archived at* https://perma.cc/CL9W-F7VC.

## Qatar

In February 2018 the Supervision and Control of Financial Institution Division at Qatar's Central Bank issued a circular to all banks operating in Qatar warning against trading in bitcoin. The circular described bitcoin as illegal and unsupported by any central bank or government. It also stated that trade in cryptocurrencies involves high risks of price volatility and the risk of being used in financial crimes.  Finally, the circular prohibited all banks operating in Qatar from dealing with cryptocurrencies, subject to penalties for violators.[533]

## Saudi Arabia

The Saudi Arabian Monetary Agency (SAMA) has issued a warning against bitcoin because it is not being monitored or supported by any legitimate financial authority.[534]

In October 2017, SAMA announced that it will implement a pilot project to issue a local digital currency (Riyal) that will only be used in transactions among banks.[535]

## United Arab Emirates

Under article D.7.3 of the Regulatory Framework for Stored Values and an Electronic Payment System, issued by the Central Bank of the United Arab Emirates in January 2017, all transactions in "virtual currencies" (encompassing cryptocurrencies in Arabic) are prohibited.[536]

In January 2018, the governor of the UAE Central Bank, Mubarak Rashid Al-Mansoori, reiterated a warning against trading in cryptocurrencies. According to news reports, when Al-Mansouri was asked about his views concerning cryptocurrencies, he said that citizens should avoid these types of currencies because they are not approved by the Central Bank. Previously, in October 2017, Al-Mansouri issued a warning pertaining to cryptocurrencies, which said that such currencies were susceptible to use in money laundering or terrorism funding. He also added that cryptocurrencies such as bitcoin cannot be monitored by any legitimate financial authority.[537]

---

[533] Circular No. 6/2018, Central Bank of Qatar (Feb. 2, 2018), http://www.qcb.gov.qa/sitelists/CircularsTo Banks/Lists/Circulars/Attachments/173/Circular%20no.%206-2018.pdf, *archived at* https://perma.cc/AKG5-TJLF.

[534] Statement, Saudi Arabian Monetary Agency (July 4, 2017), https://twitter.com/SAMA_GOV/status/882190896 967692288 (in Arabic), *archived at* https://perma.cc/V552-BSBU.

[535] *SAMA to Launch Digital Riyals for Banks*, ARAB NEWS (Oct. 5, 2017), http://www.arabnews.com/node/1172906/ business-economy, *archived at* https://perma.cc/XC72-Y8U5.

[536] Central Bank of the United Arab Emirates, Regulatory Framework for Stored Values and an Electronic Payment System art. D.7.3 (Jan. 1, 2017), https://www.centralbank.ae/en/pdf/notices/Regulatory-Framework-For-Stored-Values-And-Electronic-Payment-Systems-En.pdf, *archived at* https://perma.cc/R2GF-UF4W.

[537] Sarah Diaa, *UAE Central Bank Warns against Cryptocurrencies Again*, GULF NEWS (Feb. 10, 2018), http://gulfnews.com/business/sectors/markets/uae-central-bank-warns-against-cryptocurrencies-again-1.2171259, *archived at* https://perma.cc/7M44-9YXX.

## Sub-Saharan Africa

**Ghana**

In January 2018, the Bank of Ghana issued a brief notice to banks and the general public advising against the use of "virtual or digital currencies, also known as cryptocurrencies," mainly because such currencies and the entities that facilitate their transactions are not sanctioned by the government.[538]   The notice stated that

> [t]he Bank of Ghana wishes to notify the general public that these activities in digital currency are currently not licensed under the Payments System Act 2003 (Act 662).
>
> . . .
>
> The public is therefore strongly encouraged to do business with only institutions licensed by the Bank of Ghana to ensure that such transactions fall under our regulatory purview.[539]

**Kenya**

In December 2015, the Central Bank of Kenya issued a public notice titled "Caution to the Public on Virtual Currencies such as bitcoin."[540]   The notice stated that virtual currencies are not legal tender and remain unregulated in Kenya, which means that "no protection exists in the event that the platform that exchanges or holds the virtual currency fails or goes out of business."[541]   It outlined the risks associated with the use, holding of, and/or trading of virtual currencies as follows:

- Transactions in virtual currencies such as bitcoin are largely untraceable and anonymous making them susceptible to abuse by criminals in money laundering and financing of terrorism.

- Virtual currencies are traded in exchange platforms that tend to be unregulated all over the world. Consumers may therefore lose their money without having any legal redress in the event these exchanges collapse or close business.

- There is no underlying or backing of assets and the value of virtual currencies is speculative in nature. This may result in high volatility in value of virtual currencies thus exposing users to potential losses.[542]

---

[538] Bank of Ghana, Digital and Virtual Currencies Operations in Ghana, Notice No. BG/GOV/SEC/2018/02 (Jan. 22, 2018), https://www.bog.gov.gh/privatecontent/Public_Notices/Digital and Virtual Currencies Operations in Ghana.pdf, *archived at* https://perma.cc/4XYQ-KP7G.

[539] *Id.*

[540] *Caution to the Public on Virtual Currencies such as Bitcoin*, CENTRAL BANK OF KENYA (Dec. 2015), https://www.centralbank.go.ke/images/docs/media/Public_Notice_on_virtual_currencies_such_as_Bitcoin.pdf, *archived at* https://perma.cc/EE4P-UZ57.

[541] *Id.*

[542] *Id.*

The notice concluded with a warning to the public to "desist from transacting in Bitcoin and similar products."[543]

**Lesotho**

In November 2017, the Central Bank of Lesotho issued a press statement regarding the growing popularity of cryptocurrencies.[544]  In it the Bank warned the public of the risks associated with the use of cryptocurrencies, given the fact that the Bank "does not oversee, supervise or regulate the cryptocurrencies, their systems, promoters or intermediaries," and stated that

> [a]ny activities related to the acquisition, trading or use of cryptocurrencies is at the user's sole and independent risk. Members of the public are therefore notified that in the event of losses or similar eventualities, there shall not be recourse to the Central Bank of Lesotho.[545]

The Bank also warned the public of the risk of exposure to criminal charges that may result from the use of cryptocurrencies, stating

> it is important to highlight that cryptocurrencies expose participants to violation of:
>
> - Anti-money laundering and combating of terrorist financing laws;
>
> - Tax laws; and
>
> - Exchange control laws
>
> Which are prosecutable transgressions.[546]

The Bank issued a follow-up statement in February 2018, where in addition to providing information that reinforced the contents of the previous statement, it noted that cryptocurrencies are neither legal tender in Lesotho nor considered foreign currency.[547]  It also barred the operation of individuals and entities that promote investment in cryptocurrency because any and all investment advisors must be licensed.[548]

---

[543] *Id.*

[544] Press Statement, Central Bank of Lesotho, The Emerging and Growing Promotion of Cryptocurrencies (Nov. 9, 2017), https://www.centralbank.org.ls/images/Public_Awareness/Press_Release/Press_Release_-Bitcoin.pdf, https://perma.cc/ZK6H-JZQ3.

[545] *Id.*

[546] *Id.*

[547] Press Statement, Central Bank of Lesotho, The Emerging and Growing Promotion of Cryptocurrencies (Feb. 7, 2018), https://www.centralbank.org.ls/images/Public_Awareness/Article/CRYPTOCURRENCY_1st__2018_PRESS_RELEASE_HALF_PG.pdf, *archived at* https://perma.cc/9F7Y-7NYA.

[548] *Id.*

## Mozambique

On January 8, 2018, the Mozambican Federal Reserve Bank (Banco de Moçambique), issued a notice (Comunicado) in its role as supervisor of the financial system in the country informing citizens that a decentralized and convertible virtual currency called bitcoin is circulating in the national territory.[549]

The Bank clarified that it does not regulate or supervise any activity or transaction carried out through bitcoins and is not responsible for any impacts of transactions related to bitcoin, because this currency does not have legal support and is not issued by the national monetary authority, the Bank.

The notice further stated that companies that negotiate bitcoins are not regulated, authorized, or supervised by the Bank; that such virtual currency offers no security, being vulnerable to fraud and other crimes perpetrated using computer means; that its price is highly volatile; and that it allows for the execution of anonymous transactions, favoring criminal activities.[550]

## Namibia

In September 2017, the Bank of Namibia issued a position paper titled "Position on Distributed Ledger Technologies and Virtual Currencies in Namibia"[551] in which it noted that virtual currencies are not considered legal tender and are currently unregulated in the country.[552]   The Bank outlined the risks associated with the use of virtual currencies, including credit risks, liquidity risks, operational risks, and legal risks.[553]   It warned that individuals who hold or trade in virtual currencies do so "at their own risk and should exercise caution."[554]   The Bank further stated that because the country's relevant laws do not envisage their existence, virtual currency exchanges cannot be established or operate in Namibia.[555]

---

[549] *Alerta Sobre os Riscos Decorrentes de Transações Relacionadas com Bitcoins*, Banco de Moçambique (Jan. 9, 2018), http://www.bancomoc.mz/Noticias.aspx?search=822 (click on the Word Document icon), *archived at* https://perma.cc/3AAZ-A73V.

[550] *Id.*

[551] Bank of Namibia, *Position on Distributed Ledger Technologies and Virtual Currencies in Namibia* (Position Paper, Sept. 2017), https://www.bon.com.na/CMSTemplates/Bon/Files/bon.com.na/cd/cd7ea698-3e85-4b79-b111-c97c7fae20fc.pdf, *archived at* https://perma.cc/ZUB4-XTGN.

[552] *Id.* § 3.10.

[553] *Id.* § 3.9.

[554] *Id.* § 3.10.

[555] *Id.* §§ 3.8 & 3.10.

**South Africa**

At present, there are no specific laws or regulations governing the use or trading of virtual currencies (VCs) in South Africa.[556]  However, in December 2014 the South African Reserve Bank (SARB), the central banking institution whose responsibilities include formulating and implementing monetary policy and issuing banknotes and coins in the country, issued a position paper on virtual currencies.[557]

The position paper expressly stated that only the SARB may issue legal tender and that decentralized convertible virtual currencies (DCVCs), including bitcoin and litecoin, are not legal tender in South Africa.[558]  This means that "any merchant or beneficiary may refuse VCs as a means of payment."[559]

The SARB warned of various risks associated with the use of VCs, including issues relating to payment systems and payment service providers, price stability, money-laundering and terrorism financing, consumer risk, circumvention of exchange control regulations, and financial stability.[560] For instance, the position paper warns about risks that consumers are exposed to mainly due to the unregulated nature of VCs and the wild fluctuations in prices, which could result in heavy financial losses.[561]  This does not account for other risks such as losses incurred as the result of a security breach, fraud, and the absence of insurance mechanisms to cover losses, the SARB noted.[562]

Regarding the abovementioned risks, the SARB stated that "no legal protection or recourse is afforded to users, traders or intermediaries of VCs and such activities are performed at the end-users sole and independent risk."[563]

---

[556] *Virtual Currencies / Crypto-currencies*, SOUTH AFRICAN RESERVE BANK, https://www.resbank.co.za/ RegulationAndSupervision/FinancialSurveillanceAndExchangeControl/FAQs/Pages/VirtualCurrenciesCryptocurren cies.aspx (last visited Mar. 20, 2018), *archived at* https://perma.cc/HH8P-H4BJ.

[557] SARB, *Position Paper on Virtual Currencies* (Dec. 3, 2014), https://www.golegal.co.za/wp-content/uploads/ 2018/01/Virtual-Currencies-Position-Paper-Final_02of2014.pdf, *archived at* https://perma.cc/A8L2-4MK6; *About Us*, SARB, https://www.resbank.co.za/AboutUs/Pages/About%20Us-Home.aspx (last visited Mar. 20, 2018), *archived at* https://perma.cc/TS79-2VFE.

[558] SARB, *Position Paper on Virtual Currencies*, *supra* note 557, §§ 2.1 & 3.2.

[559] *Virtual Currencies / Crypto-currencies*, SARB, *supra* note 556.

[560] SARB, *Position Paper on Virtual Currencies*, *supra* note 557, § 4.3.

[561] *Id.*

[562] *Id.*

[563] *Virtual Currencies / Crypto-currencies*, SARB, *supra* note 556.

While the SARB's position paper warned individuals against involvement in trading or holding VCs, it also noted that it does not see VCs as posing any systemic threat at this time:

> Values ($6,25 billion) and volumes (60 000 daily average) currently traded in Bitcoin (the leading DCVC) remain insignificant when compared to the formal payment system and the larger economy. VCs are not considered legal tender in most jurisdictions. A multitude of independent variants of VCs exist and are being developed, all aimed at the same niche market. Based on the aforementioned, VCs (particularly DCs), at this stage of their development, are neither broad nor evasive enough to be classified as systemic.[564]

However, it emphasized the need for constant monitoring of DCVCs and said it "reserves the right to change its position should the landscape warrant regulatory intervention."[565]

On April 6, 2018, the South African Revenue Services (SARS) issued a clarification on the tax status of VCs.  SARS noted that it "will continue to apply normal income tax rules to cryptocurrencies and will expect affected taxpayers to declare cryptocurrency gains as part of their taxable income."[566]  Taxpayers must therefore declare all their cryptocurrency income and failure to do so could result in imposition of interest and penalties.[567]  SARS appears to have not made a determination whether gains made from trading cryptocurrency are subject to income tax or capital gains tax.[568]  It states that:

> Whilst not constituting cash, cryptocurrencies can be valued to ascertain an amount received or accrued as envisaged in the definition of "gross income" in the Act.  Following normal income tax rules, income received or accrued from cryptocurrency transactions can be taxed on revenue account under "gross income".
>
> Alternatively such gains may be regarded as capital in nature, as spelt out in the Eighth Schedule to the Act for taxation under the CGT paradigm.
>
> Determination of whether an accrual or receipt is revenue or capital in nature is tested under existing jurisprudence (of which there is no shortage).[569]

The amount of tax accrued to a person could differ a great deal depending on whether gains in VCs are taxed as income or capital gains.[570]

---

[564] SARB, *Position Paper on Virtual Currencies*, *supra* note 557, § 4.3.

[565] *Id*. §§ 4.3 & 5.3.

[566] Press Release, South Africa Revenue Services, SARS'S Stance on the Tax Treatment of Cryptocurrencies (Apr. 6, 2018), http://www.sars.gov.za/Media/MediaReleases/Pages/6-April-2018---SARS-stance-on-the-tax-treatment-of-cryptocurrencies-.aspx, *archived at* https://perma.cc/2ET9-V3KX.

[567] *Id*.

[568] *Id*.

[569] *Id*.

[570] *Capital Gains Tax (CGT)*, SOUTH AFRICAN REVENUE SERVICES, http://www.sars.gov.za/Tax-Rates/Income-Tax/Pages/Capital-Gains-Tax-(CGT).aspx, *archived at* https://perma.cc/7KRC-AKVT; *Rates of Tax for Individuals*, SOUTH AFRICAN REVENUE SERVICES, http://www.sars.gov.za/Tax-Rates/Income-Tax/Pages/Rates-of-Tax-for-Individuals.aspx, *archived at* https://perma.cc/2EVQ-GT94.

## Swaziland

In August 2017 the Central Bank of Swaziland issued a press release regarding virtual currencies.[571]   The Bank noted that cryptocurrency does not enjoy legal-tender status in Swaziland.[572]  The Bank also noted that bitcoin, a form of cryptocurrency currently being marketed and traded in Swaziland, is currently not regulated and this makes holding or trading the currency risky:

> [D]ue to its nature as a cryptocurrency, there are no restrictions, disclosures or regulatory compliance applicable to transactions executed using Bitcoin and yet, like any other currency, it can be used for illegal purposes or to facilitate fraudulent activity. In fact, the anonymity and speed of execution in transacting with cryptocurrency makes it more susceptible to abuse by unscrupulous persons.  This presents a risk to users of the currency because there is no protection or legal recourse available from any institution including the Central Bank in the event that the user suffers financial loss from the use of Bitcoin or any other cryptocurrency.[573]

## Uganda

In February 2017, the Bank of Uganda (BoU) issued a warning against the use of cryptocurrencies in general and the services of an unlicensed entity called One Coin Digital Money, citing the absence of investor protection schemes and relevant regulatory mechanisms.[574]  The Bank warned that "the entity 'ONE COIN DIGITAL MONEY' is not licensed by the BoU under the Financial Institutions Act, 2004 and is therefore conducting business outside the regulatory purview of the BoU," and that the "public is strongly encouraged to do business transactions with only licensed financial institutions."[575]

The Bank also warned that "whoever wishes to invest their hard earned savings in Cryptocurrency forms such as One-coin, Bitcoin, Ripple, Peercoin, Namecoin, Dogecoin, Litecoin, Bytecoin, Primecoin, Blackcoin or any other forms of Digital Currency is taking a risk in the financial space where there is neither investor protection nor regulatory purview."[576]

---

[571] Press Statement, Central Bank of Swaziland, Public Statement on Virtual Currencies ("Bitcoin") (Aug. 25, 2017), http://www.centralbank.org.sz/media/releases/cbsbitcoin.jpg, *archived at* https://perma.cc/GF5L-MYJ5.

[572] *Id.*

[573] *Id.*

[574] *Warning to the General Public about 'One Coin Digital Money' Operations in Uganda*, BANK OF UGANDA (Feb. 14, 2017), https://www.bou.or.ug/bou/bou-downloads/press_releases/2017/Feb/Bank-of-Uganda-warning-on-One-Coin-Digital-Money-in-Uganda.pdf, *archived at* https://perma.cc/LN6N-9HE6.

[575] *Id.*

[576] *Id.*

## Zambia

In February 2018, the Zambia Securities and Exchange Commission issued a notice on cryptocurrencies and other digital products.[577] The Commission urged "any individuals or entities that are currently investing in or intend to invest in cryptocurrencies and related products/assets to exercise restraint and caution as they do so as the products/assets are largely unregulated and not subject to the jurisdiction of the Commission."[578] While it did not ban their operation, the Commission cautioned platforms that facilitate cryptocurrency transactions "to ensure that they are not in any way abrogating any part of the [Securities] Act and that those that meet the description of securities in accordance with the Act are registered with the Commission."[579]

## Zimbabwe

In a December 2017 statement the Reserve Bank of Zimbabwe noted that virtual currencies are not legal tender in Zimbabwe and remain unregulated.[580] It issued the following warning to the public regarding the risks presented with the use of cryptocurrencies:

> [T]he use of and trading in cryptocurrencies or virtual currencies is not regulated by the country's laws and presents risks such as money laundering, terrorism financing, tax evasion and fraud. Under the existing legal and regulatory dispensation, any person who invests in virtual currencies or participates in any transaction involving virtual currencies, does so at own risk and will not have legal protection from, or recourse against, any regulatory authority.[581]

---

[577] *Notice on Cryptocurrencies and Related Digital Products/Assets*, SECURITIES AND EXCHANGE COMMISSION (Feb. 13, 2018), http://www.seczambia.org.zm/notice-on-cryptocurrencies-and-related-digital-products-assets/, *archived at* https://perma.cc/KE69-J3KR.

[578] *Id.*

[579] *Id.*

[580] Press Statement, Reserve Bank of Zimbabwe, Use of Virtual Currencies in Zimbabwe (Dec. 20, 2017), http://www.rbz.co.zw/assets/press-statement---use-of-virtual-currencies-in-zimbabwe.pdf, *archived at* https://perma.cc/66FA-Q6MV.

[581] *Id.*

## Central Asia

### Kazakhstan

On March 30, 2018, the head of the Kazakhstan National Bank, Daniyar Akishev, stated that the National Bank had a very conservative position on the issue of cryptocurrencies and welcomed only strict restrictions because of multiple issues related to consumer protection, money laundering, and tax avoidance. He added that legislative amendments had already been prepared to prohibit the purchase and sale of cryptocurrencies for national currency, ban the activity of exchanges, and ban any type of mining.[582] No information was found indicating that the proposed amendments have been enacted.

### Uzbekistan

On February 19, 2018, President Shavkat Mirziyoyev signed a decree[583] instructing the Central Bank of Uzbekistan and several other agencies to develop a legislative framework for the use of digital money on the territory of Uzbekistan by September 1, 2018.[584] In September of 2017 the Central Bank expressed the opinion that it was not advisable to allow operations with cryptocurrencies because of the possibility of terrorism financing and other criminal activities.[585]

### Kyrgyzstan

On January 17, 2018, the head of Kyrgyzstan's National Bank, Tolkunbek Abdygulov, stated that the Bank did not plan to impede the development of the cryptocurrency market in Kyrgyzstan. He noted that it is very difficult to ban something that the Central Bank does not issue and that citizens of Kyrgyzstan investing in cryptocurrency do so at their own risk and peril.[586] In October of 2017 the Central Bank reportedly stated that it was not considering introducing any prohibitive or restrictive measures regarding the mining of cryptocurrency.[587]

---

[582] *Kazakhstan Mulls Complete Ban of Every Digital Currency Operation in Country*, SPUTNIKNEWS INTERNATIONAL (Mar. 30, 2018), https://sputniknews.com/asia/201803301063085023-kazakhstan-digital-currency-mining-ban/, *archived at* https://perma.cc/SNX2-KM7V.

[583] Decree of the President of the Republic of Uzbekistan No. PP-3549 of Feb. 19, 2018, NATIONAL LEGISLATIVE DATABASE No. 07/18/3549/0790 of Feb. 20, 2018, http://lex.uz/pages/getpage.aspx?lact_id=3564641 (in Russian), *archived at* https://perma.cc/X4N9-DXGR.

[584] Daniyar Karimov, *Uzbekistan Has Revised Its Views on Virtual Currency*, RG.RU (Feb. 21, 2018), https://rg.ru/2018/02/21/uzbekistan-peresmotrel-otnoshenie-k-virtualnoj-valiute.html (in Russian), *archived at* https://perma.cc/TFH9-QHCP.

[585] Press Release, Central Bank of the Republic of Uzbekistan, On Cryptocurrency (Sept. 16, 2017), http://cbu.uz/uzc/press-tsentr/press-relizy/2017/09/93262/ (in Uzbek), *archived at* https://perma.cc/K9CS-FB9G.

[586] Maksat Elebesov, *Will the Cryptocurrency Be Banned in Kyrgyzstan?*, SPUTNIK KYRGYZSTAN (Jan. 17, 2018), https://ru.sputnik.kg/economy/20180117/1037290672/zapretyat-li-kriptovalyutu-v-kyrgyzstane-otvet-glavy-nacbanka.html (in Russian), *archived at* https://perma.cc/XA83-4NJV.

[587] Artem Petrov, *Bitcoin and Others, Monetary Authorities of the Kyrgyz Republic Warn about the Risks of Using Cryptocurrency*, RG.RU (Oct. 4, 2017), https://rg.ru/2017/10/04/nacbank-kr-predupredil-o-riskah-ispolzovaniia-kriptovaliut.html (in Russian), *archived at* https://perma.cc/BN5S-K6QL.

**Tajikistan**

On January 15, 2018, the National Bank of Tajikistan issued a statement warning the citizens of the republic about the risks associated with the use of cryptocurrency. The Bank believes that, due to their anonymity, many cryptocurrency transactions can be used for conducting doubtful operations. According to the Bank, cryptocurrency can be exposed to cyberattacks or used for money laundering and terrorist financing. The Bank also clarified that in Tajikistan cryptocurrency cannot be considered an official means of exchange or savings, or a unit of account.[588]

---

[588] Abdullo Ashurov, *The National Bank of Tajikistan Explained Its Position on Cryptocurrencies*, RADIO OZODI (Jan. 15, 2018), https://rus.ozodi.org/a/28976882.html (in Russian), *archived at* https://perma.cc/553E-8JMN.

## South Asia

**Bangladesh**

On December 24, 2017, the Central Bank of Bangladesh issued a cautionary notice that cryptocurrencies are illegal in Bangladesh.[589] According to a news report, the notice states that "[t]ransaction [sic] with this currency may cause a violation of the existing money laundering and terrorist financing regulations."[590] The notice states that bitcoin transactions "are not authorized by the Bangladesh Bank or any regulatory agencies, and do not conform with the provisions under the Foreign Exchange Regulation Act, 1947; Anti-Terrorism Act, 2009; and the Money Laundering Prevention Act, 2012."[591] Also, according to the notice,

> [o]nline transaction [sic] of virtual currencies with any unnamed or pseudo named parties may cause a violation of the above-mentioned acts. . . . .[T]ransactions through online networks involving cryptocurrency are not approved by any central payment system and as such people can be financially harmed and may face legal consequences.

> Under the circumstances, the citizens have been asked to refrain from performing, assisting, and advertising all kind of transactions through virtual currencies like Bitcoin to avoid financial and legal damages.[592]

Law enforcement agencies, including the Foreign Exchange Police Department, Bangladesh Financial Intelligence Unit (BFIU), and Bangladesh Telecommunication Regulatory Commission (BTRC), have reportedly already held four meetings on "hunting down those using cryptocurrencies."[593]

---

[589] Central Bank of Bangladesh, Cautionary Notice on Bitcoin Transactions, https://www.bb.org.bd/mediaroom/noticeboard.php (in Bangladeshi), *archived at* https://perma.cc/7VEN-LYD7; *see also* Abdur Rahim Harmachi, *Bangladesh Bank Warns Against Transaction in 'Illegal' Bitcoin, Other Cryptocurrencies*, BDNEWS24.COM (Dec. 27, 2017), https://bdnews24.com/economy/2017/12/27/bangladesh-bank-warns-against-transaction-in-illegal-bitcoin-other-cryptocurrencies, *archived at* https://perma.cc/2APB-ZSZV.

[590] Golam Mowla, *Central Bank Issues Notice Banning Bitcoin in Bangladesh*, DHAKA TRIBUNE, (Dec. 27, 2017), http://www.dhakatribune.com/business/banks/2017/12/27/bangladesh-bank-ban-bitcoin/, *archived at* https://perma.cc/T6DH-Y9G5.

[591] Central Bank of Bangladesh, Cautionary Notice on Bitcoin Transactions, *supra* note 589 (English translation from the original Bengali provided by Law Library Reference Librarian Shameema Rahman).

[592] *Id.*

[593] Golam Mowla, *Police on the Hunt for Bitcoin Users in Bangladesh*, DHAKA TRIBUNE (Feb. 19, 2018), http://www.dhakatribune.com/bangladesh/crime/2018/02/19/police-hunt-bitcoin-users-bangladesh/, *archived at* https://perma.cc/M782-EKLR.

## India

The government of India stated in early 2018 that cryptocurrencies such as bitcoin are not legal tender in India.[594] While the government has not yet enacted a regulatory framework for cryptocurrencies,[595] the Reserve Bank of India (RBI) has advised caution on their use and has issued three notifications[596] that "cautioned users, holders and traders on the risk of these currencies and clarified that it has not given any licence or authorisation to any entity or company to operate such schemes or deals."[597]

Most recently, on April 6, 2018, the RBI issued a notification prohibiting banks, lenders and other regulated financial institutions from "dealing with virtual currencies," which stipulated that "[i]n view of the associated risks, it has been decided that, with immediate effect, entities regulated by the Reserve Bank shall not deal in VCs or provide services for facilitating any person or entity in dealing with or settling VCs. Such services include maintaining accounts, registering, trading, settling, clearing, giving loans against virtual tokens, accepting them as collateral, opening accounts of exchanges dealing with them and transfer / receipt of money in accounts relating to purchase/ sale of VCs."[598] Moreover, the RBI stated that "[r]egulated entities which already provide such services shall exit the relationship within three months from the date of this circular."[599] However, Deputy Governor B.P. Kanungo, in a policy press conference, did "recognize that the blockchain technology or the distributed ledger technology that lies beneath the virtual currencies has potential benefits for financial inclusion and enhancing the efficiency of the financial system" and stated that the RBI has "constituted an inter-departmental committee in Reserve Bank of India who will produce a report and they will explore the feasibility and desirability of issuing a digital currency by the central bank."[600]

---

[594] P. Suchetana Ray, *Govt Plans to Bring in Law to Regulate Cryptocurrency Trade, Forms Panel*, HINDUSTAN TIMES (Jan. 14, 2018), https://www.hindustantimes.com/india-news/government-plans-to-bring-in-law-to-regulate-cryptocurrency-trade/story-SpAO63DDfk6Gg7lo5yNKCJ.html, *archived at* https://perma.cc/6HLK-G9LD.

[595] Seema Jhingan et al., LexCounsel Law Offices, *India: Legal Status of Virtual Currencies/Cryptocurrencies in India*, MONDAQ (Apr. 6, 2017), http://www.mondaq.com/india/x/583670/fin+tech/Legal+Status+Of+Virtual+CurrenciesCryptocurrencies+In+India, *archived at* https://perma.cc/5H4T-Y3TT.

[596] Press Release, Reserve Bank of India, RBI Cautions Users of Virtual Currencies against Risks (Dec. 24, 2013), https://www.rbi.org.in/Scripts/BS_PressReleaseDisplay.aspx?prid=30247, *archived at* https://perma.cc/KFB8-JPZ7; Press Release, Reserve Bank of India, RBI Cautions Users of Virtual Currencies (Feb. 1, 2017), https://www.rbi.org.in/Scripts/BS_PressReleaseDisplay.aspx?prid=39435, *archived at* https://perma.cc/9VTJ-UEL2; Press Release, Reserve Bank of India, Reserve Bank Cautions Regarding Risk of Virtual Currencies including Bitcoins (Dec. 5, 2017), https://rbi.org.in/scripts/BS_PressReleaseDisplay.aspx?prid=42462, *archived at* https://perma.cc/B4TK-TL5U.

[597] Vivina Vishwanathan, *Bitcoin Regulations in India*, LIVEMINT (Dec. 21 2017), http://www.livemint.com/Money/uQIHZ7521LBgHClnuP66YM/Bitcoin-regulations-in-India.html, *archived at* https://perma.cc/527R-43SG.

[598] Press Release, Reserve Bank of India, Prohibition on Dealing in Virtual Currencies (VCs) (Apr. 6, 2018), https://www.rbi.org.in/Scripts/NotificationUser.aspx?Id=11243&Mode=0, *archived at* https://perma.cc/EFW3-HCXG.

[599] *Id.*

[600] Reserve Bank of India, Edited Transcript of Reserve Bank of India's First Bi-Monthly Policy Press Conference (Apr. 5, 2018), https://www.rbi.org.in/Scripts/bs_viewcontent.aspx?Id=3465, *archived at* https://perma.cc/ZD5A-STF7.

Reports in early 2018 indicated that the government is in the process of drafting a law to regulate trade of cryptocurrencies in India and "has formed a committee to fast track the process," according to the *Hindustani Times*.[601]  The government has expressed two main concerns that the law will address: "the source of money being used to trade in [cryptocurrencies]; and regulation of exchanges of VC [virtual currency] to protect the common man," one government official was quoted as saying.[602]

An interdisciplinary committee, chaired by the Special Secretary (Economic Affairs), was established in April 2017 "to examine the existing framework with regard to Virtual Currencies."[603]  The committee has nine members including representatives from the Department of Economic Affairs, Department of Financial Services, Department of Revenue (CBDT), Ministry of Home Affairs, Ministry of Electronics and Information Technology, Reserve Bank of India, National Institution for Transforming India (NITI Aayog), and State Bank of India. The role of the committee is to

> (i) take stock of the present status of Virtual Currencies both in India and globally; (ii) examine the existing global regulatory and legal structures governing Virtual Currencies; (iii) suggest measures for dealing with such Virtual Currencies including issues relating to consumer protection, money laundering, etc.; and (iv) examine any other matter related to Virtual Currencies which may be relevant.[604]

On August 7, 2017, *Business Line* reported that the committee had submitted its report, but details of the report had not been made available to the public.[605]

On December 29, 2017, India's Ministry of Finance released a press statement that cautioned investors about the "real and heightened" risks of trading in cryptocurrencies such as bitcoin, saying virtual currency investments are similar to "Ponzi schemes."[606] According to a February 1, 2018, news report, the Minister of Finance told lawmakers in Parliament that "[t]he government does not consider cryptocurrencies legal tender or coin and will take all measures to eliminate use of these crypto-assets in financing illegitimate activities or as part of the payment system," but

---

[601] Ray, *supra* note 594.

[602] *Id.*

[603] Press Release, Government of India, Ministry of Finance, Government Constitutes an Inter-Disciplinary Committee Chaired by Special Secretary (Economic Affairs) to Examine the Existing Framework with Regard to Virtual Currencies (Apr. 12, 2017), http://pib.nic.in/newsite/PrintRelease.aspx?relid=160923, *archived at* https://perma.cc/B952-YSLS.

[604] *Id.*

[605] *Panel on Crypto-currency Submits Report to Jaitley*, BUSINESS LINE (Aug. 7, 2017), https://www.thehindu businessline.com/economy/policy/panel-on-cryptocurrency-submits-report-to-jaitley/article9805978.ece, *archived at* https://perma.cc/3N3G-352Q.

[606] Press Release, Government of India, Ministry of Finance, Government Cautions People Against Risks in Investing in Virtual 'Currencies'; Says VCs are like Ponzi Schemes (Dec. 29, 2017), http://www.pib.nic.in/PressReleseDetail.aspx?PRID=1514568, *archived at* https://perma.cc/MN8M-BWQE.

"[t]he government will explore use of blockchain technology proactively for ushering in [the] digital economy."[607]

On November 13, 2017, the Supreme Court of India admitted under article 32 of the Constitution a Public Interest Litigation writ petition against the Union of India and issued a notice[608] to the Ministry of Finance, Minister of Law and Justice, Ministry of Electronics and Information Technology, Securities and Exchange Board of India, and Reserve Bank of India. The petition seeks "a regulatory framework to be laid down on Crypto Currency and wanted that the virtual currency be made accountable to the exchequer."[609]

The Supreme Court previously heard a petition in July 2017 that sought "a similar kind of regulatory framework":

> A Public Interest Litigation [PIL] was filed (Writ Petition (Civil) no. 406 of 2017) under Article 32 of the Constitution against Union of India, Ministry of Finance and the Reserve Bank of India over the use and business of Bitcoins, Litecoins, Ethereum etc. The Supreme Court on July 14, 2017, directed the RBI and the other concerned ministries to clarify their stance and enact a bill on the same before disposing off the PIL.[610]

## Nepal

On August 13, 2017, Nepal Rastra Bank issued a notice that "all transactions related to or regarding bitcoins are illegal."[611] In early October 2017, a police team from the Central Investigation Bureau (CIB) of the Nepal Police "for the first time arrested seven persons for allegedly running bitcoin exchange business from various parts of the country," the *Kathmandu Post* reported.[612]

---

[607] *India Turns Against Bitcoin but Embraces Blockchain*, BLOOMBERG (Feb. 1, 2018), https://www.bloomberg.com/news/articles/2018-02-01/india-to-curb-cryptocurrency-use-while-embracing-blockchain, *archived at* https://perma.cc/A5QP-YPBB.

[608] Dwaipayan Bhowmick v. Union of India & Ors., Writ Petition (Civ.) No. 1076/2017 (Nov. 13, 2017), http://supremecourtofindia.nic.in/supremecourt/2017/35252/35252_2017_Order_13-Nov-2017.pdf, *archived at* https://perma.cc/52JQ-8RAB.

[609] SS Rana & Co., *India: SC Asks Govt. to Regulate Crypto Currency*, LEXOLOGY (Nov. 21 2017), https://www.lexology.com/library/detail.aspx?g=4cc566a7-048b-449a-b535-9eb7b3626f78#_ftn1, *archived at* https://perma.cc/ED6V-EK8B.

[610] *Id.*

[611] Nepal Rastra Bank (NRB), Bitcoin Notice, https://nrb.org.np/fxm/notices/BitcoinNotice.pdf (in Bangladeshi), *archived at* https://perma.cc/856B-8JQ8; *see also* Atit Babu Rijal, Op-Ed., *The Future of Cryptocurrencies*, KATHMANDU POST (Dec 27, 2017), http://kathmandupost.ekantipur.com/news/2017-12-27/the-future-of-cryptocurrencies.html, *archived at* https://perma.cc/EQG6-HMT6.

[612] *7 Nabbed for Running Bitcoin Exchange Business*, KATHMANDU POST (Dec. 27, 2017), http://kathmandupost.ekantipur.com/news/2017-10-06/7-nabbed-for-running-bitcoin-exchange-business.html, *archived at* https://perma.cc/J4BY-4Q7E.

## Pakistan

Currently there does not appear to be any specific law that regulates cryptocurrencies or the trade in cryptocurrencies in Pakistan. In May 2017, the State Bank of Pakistan (SBP) stated that it does not recognize digital currencies.[613] On April 6, 2018, the SBP issued a press release cautioning the general public on the risk of virtual currencies:

> [The] General Public is advised that Virtual Currencies/Coins/Tokens (like Bitcoin, Litecoin, Pakcoin, OneCoin, DasCoin, Pay Diamond etc.) are neither recognized as a Legal Tender nor has SBP authorized or licensed any individual or entity for the issuance, sale, purchase, exchange or investment in any such Virtual Currencies/Coins/Tokens in Pakistan. Further, Banks/ DFIs/ Microfinance Banks and Payment System Operators (PSOs)/ Payment Service Providers (PSPs) have been advised not to facilitate their customers/account holders to transact in Virtual Currencies/ Initial Coin Offerings (ICOs) /Tokens vide BPRD's Circular No. 03 of 2018.[614]

The Federal Board of Revenue (FBR) "is currently investigating the traders of digital currencies for tax evasion and money laundering," according to news sources.[615] Moreover, the Federal Investigation Agency (FIA) has "launched operations against the people dealing in the cryptocurrencies," according to a February 10, 2018, news report.[616]

---

[613] Mubarak Zeb Khan, *FBR Goes After Bitcoin Trader*, Dawn (May 25, 2017), https://www.dawn.com/news/1335184, *archived at* https://perma.cc/7VBW-LL6C.

[614] Press Release, State Bank of Pakistan (SBP), Caution Regarding Risks of Virtual Currencies (Apr. 6 2018), http://www.sbp.org.pk/press/2018/Pr-VC-06-Apr-18.pdf, *archived at* https://perma.cc/L76H-PN8U.

[615] Mubarak Zeb Khan, *supra* note 613.

[616] Nozair Hanif Mirza, *FIA Springs Into Action Against Cryptocurrencies, One Held*, Daily Pakistan (Global) (Feb. 10, 2018), https://en.dailypakistan.com.pk/pakistan/fia-swings-into-action-against-cryptocurrencies-one-held/, *archived at* https://perma.cc/P7KK-RK7G.

# East Asia and the Pacific

## Australia

In August 2015, the Australian Parliament's Senate Economic References Committee published a report titled "Digital Currency – Game Changer or Bit Player,"[617] following the completion of an inquiry into "how to develop an effective regulatory system for digital currency, the potential impact of digital currency technology on the Australian economy, and how Australia can take advantage of digital currency technology."[618] The government responded to the Committee's recommendations in May 2016.[619] This included responses regarding the tax treatment of cryptocurrencies, which noted aspects of the following actions of the Australian Taxation Office (ATO).

The ATO has published a guidance document on the tax treatment of virtual currencies.[620] The general guidance follows the finalization, in December 2014, of various rulings relating to the application of tax laws to bitcoin and other cryptocurrencies.[621] According to the guidance, transacting with cryptocurrencies is "akin to a barter arrangement, with similar tax consequences."[622] This is because, in the view of the ATO, such currencies are "neither money nor

---

[617] SENATE ECONOMIC REFERENCES COMMITTEE, DIGITAL CURRENCY – GAME CHANGE OR BIT PLAYER (Aug. 2015), https://www.aph.gov.au/Parliamentary_Business/Committees/Senate/Economics/Digital_currency/~/media/Committees/economics_ctte/Digital_currency/report.pdf, *archived at* https://perma.cc/9C8Z-L76P.

[618] *Digital Currency*, PARLIAMENT OF AUSTRALIA, https://www.aph.gov.au/Parliamentary_Business/Committees/Senate/Economics/Digital_currency (last visited Mar. 1, 2018), *archived at* https://perma.cc/T5XB-BNY2.

[619] Australian Government Response to the Senate Economic References Committee Report: Digital Currency – Game Changer or Bit Player (May 2016), https://www.aph.gov.au/DocumentStore.ashx?id=4f9bcf03-5867-449c-85ad-b8dd01d7459c, *archived at* https://perma.cc/U6WP-VYKU.

[620] *Tax Treatment of Crypto-Currencies in Australia – Specifically Bitcoin*, AUSTRALIAN TAXATION OFFICE (ATO), https://www.ato.gov.au/General/Gen/Tax-treatment-of-crypto-currencies-in-Australia---specifically-bitcoin/ (last updated Dec. 21, 2017), *archived at* https://perma.cc/UFZ7-QSUG.

[621] ATO, Income Tax: Is Bitcoin a 'Foreign Currency' for the Purposes of Division 775 of the Income Tax Assessment Act 1997 (ITAA 1997)? (TD 2014/25), https://www.ato.gov.au/law/view/document?src=hs&pit=99991231235958&arc=false&start=1&pageSize=10&total=7&num=3&docid=TXD/TD201425/NAT/ATO/00001&dc=false&tm=and-basic-TD 2014/25 (last visited Mar. 1, 2018), *archived at* https://perma.cc/DS47-Y2JW; ATO, Income Tax: Is Bitcoin a 'CGT Asset' for the Purposes of Subsection 108-5(1) of the Income Tax Assessment Act 1997? (TD 2014/26), https://www.ato.gov.au/law/view/document?src=hs&pit=99991231235958&arc=false&start=1&pageSize=10&total=7&num=2&docid=TXD/TD201426/NAT/ATO/00001&dc=false&tm=phrase-basic-TD 2014/26 (last visited Mar. 1, 2018), *archived at* https://perma.cc/B9QN-N4FM; ATO, Income Tax: Is Bitcoin Trading Stock for the Purposes of Subsection 70-10(1) of the Income Tax Assessment Act 1997 (ITAA 1997)? (TD 2014/27), https://www.ato.gov.au/General/Gen/Tax-treatment-of-crypto-currencies-in-Australia---specifically-bitcoin/ (last visited Mar. 1, 2018), *archived at* https://perma.cc/BS2E-UZKW; ATO, Fringe Benefits Tax: Is the Provision of Bitcoin by an Employer to an Employee in Respect of their Employment a Property Fringe Benefit for the Purposes of Subsection 136(1) of the Fringe Benefits Tax Assessment Act 1986? (TD 2014/28), https://www.ato.gov.au/law/view/document?src=mm&pit=99991231235958&arc=false&start=1&pageSize=10&total=7&num=0&docid=TXD/TD201428/NAT/ATO/00001&dc=true&tm=and-basic-TD 2014/25 (last visited Mar. 1, 2018), *archived at* https://perma.cc/Y5FS-VYL3.

[622] *Tax Treatment of Crypto-Currencies in Australia – Specifically Bitcoin*, *supra* note 620.

a foreign currency."[623] Individuals who engage in cryptocurrency transactions are advised to keep records of the date of transactions; the amount in Australian dollars ("which can be taken from a reputable online exchange"); what the transaction was for; and who the other party was ("even if it's just their bitcoin address").[624]

Cryptocurrencies may be considered assets for capital gains tax purposes, with the guidance stating: "Where you use bitcoin to purchase goods or services for personal use or consumption, any capital gain or loss from disposal of the bitcoin will be disregarded (as a personal use asset) provided the cost of the bitcoin is $10,000 or less."[625]

With regard to business transactions, the ATO guidance states that the Australian dollar value of bitcoins (being the fair market value) received for goods and services must be recorded as part of ordinary income, in the same way as receiving non-cash consideration under a barter transaction.[626] A business that purchases items using bitcoin is "entitled to a deduction based on the arm's length value of the item acquired."[627] Goods and services tax (GST) is also payable and is calculated on the market value of the goods or services, which is "ordinarily equal to the fair market value of the bitcoin at the time of the transaction."[628] When a business disposes of bitcoin, there may be capital gains consequences. If a business gives bitcoin to an employee this may be considered either a fringe benefit (if there is a valid salary sacrifice arrangement in order to receive the bitcoin) or normal salary and wages. If an entity is in the business of mining bitcoin, or buying and selling bitcoin as an exchange service, any income derived must be included in its assessable income, and any expenses incurred may be deducted.[629]

The ATO has also published separate guidance on the application of the goods and services tax (GST) with respect to transactions involving digital currency.[630] A previous ruling regarding GST was withdrawn in December 2017 following the passage of amendments to A New Tax System (Goods and Service Tax) Act 1999 and associated regulations, which apply to transactions after July 1, 2017.[631] Under the amendments, sales and purchases of digital currency are not subject to GST. If a person is carrying on a business in relation to digital currency, or accepting digital

---

[623] *Id.*

[624] *Id.*

[625] *Id.*

[626] *Id.*

[627] *Id.*

[628] *Id.*

[629] *Id.*

[630] *GST and Digital Currency*, ATO, https://www.ato.gov.au/business/gst/in-detail/your-industry/financial-services-and-insurance/gst-and-digital-currency/ (last updated Dec. 8, 2017), *archived at* https://perma.cc/L2MT-WHHC.

[631] *Goods and Services Tax Ruling: GSTR 2014/W*, ATO, https://www.ato.gov.au/law/view/document?DocID=GST/GSTR20143/NAT/ATO/00001 (last visited Mar. 1, 2018), *archived at* https://perma.cc/6YAU-SYF3; Treasury Laws Amendment (2017 Measures No. 6) Act 2017 (Cth), https://www.legislation.gov.au/Details/C2017A00118, *archived at* https://perma.cc/6TB9-V9QU.

currency as a payment as part of a business, then there are GST consequences.[632] The changes were aimed at removing "double taxation" of digital currencies under the GST system.[633]

According to news reports from January 2018, the ATO is consulting with tax experts "to help it identify and track cryptocurrency transactions and ensure all taxes are being paid."[634]

The Australian Securities and Investments Commission's (ASIC's) MoneySmart website provides information on virtual currencies and sets out various risks associated with buying, trading, or investing in such currencies.[635] These include the fact that there are few safeguards because the exchange platforms are generally not regulated; large fluctuations in value; possible theft by hackers; and the popularity of virtual currencies with criminals. A separate page provides information about initial coin offerings, which ASIC calls a "high-risk speculative investment."[636]

In the area of anti-money laundering and counterterrorism financing (AML/CTF), the government introduced a bill in Parliament in August 2017 in order bring digital currency exchange providers under the AML/CTF regulatory regime, as recommended by the Senate committee referred to above.[637] The bill was enacted in December 2017 and the relevant provisions came into force on April 3, 2018.[638]

Under the amendments, digital currency exchanges will be required to enroll in a register maintained by AUSTRAC (Australian Transaction Reports and Analysis Centre) and implement an AML/CTF program "to mitigate the risks of money laundering as well as identify and verify the identity of their customers."[639] They will also be required to report suspicious transactions and maintain certain records.

---

[632] *GST and Digital Currency*, *supra* note 630.

[633] *GST – Removing the Double Taxation of Digital Currency*, ATO, https://www.ato.gov.au/General/New-legislation/In-detail/Indirect-taxes/GST/GST---removing-the-double-taxation-of-digital-currency/ (last updated Dec. 18, 2017), *archived at* https://perma.cc/L7KG-NWK2.

[634] Duncan Hughes, *ATO Creates Specialist Task Force to Tackle Cryptocurrency Tax Evasion,* FINANCIAL REVIEW (Jan. 10, 2018), http://www.afr.com/news/policy/tax/ato-creates-specialist-task-force-to-tackle-cryptocurrency-tax-evasion-20180109-h0fyaz, *archived at* https://perma.cc/VNY2-R6G3.

[635] *Virtual Currencies*, ASIC'S MONEYSMART, https://www.moneysmart.gov.au/investing/investment-warnings/virtual-currencies (last updated Dec. 1, 2017), *archived at* https://perma.cc/SCJ8-2WS3.

[636] *Initial Coin Offerings (ICOs)*, ASIC'S MONEYSMART, https://www.moneysmart.gov.au/investing/investment-warnings/initial-coin-offerings-icos (last updated Nov. 10, 2017), *archived at* https://perma.cc/YYW7-SZMS.

[637] *Anti-Money Laundering and Counter-Terrorism Financing Amendment Bill 2017*, PARLIAMENT OF AUSTRALIA, https://www.aph.gov.au/Parliamentary_Business/Bills_Legislation/Bills_Search_Results/Result?bId=r5952 (last visited Mar. 26, 2018), *archived at* https://perma.cc/3LS8-TZ5L; Anti-Money Laundering and Counter-Terrorism Financing Amendment Act 2017 (Cth) sch 1 pt 2, https://www.legislation.gov.au/Details/C2017A00130, *archived at* https://perma.cc/892P-DQ5W.

[638] *Digital Currency Exchange Providers*, AUSTRAC, http://www.austrac.gov.au/digital-currency-exchange-providers (last updated Mar. 13, 2018), *archived at* https://perma.cc/X4DK-SJ8X.

[639] Rohan Pearce, *Government Cracks Down on Bitcoin Money Laundering*, COMPUTERWORLD (Aug. 17, 2017), https://www.computerworld.com.au/article/626134/government-cracks-down-bitcoin-money-laundering/, *archived at* https://perma.cc/PW5D-U3SD.

## Brunei

On December 22, 2017, the Central Bank of Brunei, Autoriti Monetari Brunei Darussalam (AMBD), released a statement reminding the public that "cryptocurrencies are not legal tender in Brunei Darussalam and are not regulated by AMBD," and advising the public "to be vigilant and exercise extreme caution when dealing with such currencies that are privately issued."[640] The press statement also added that

> AMBD would like to remind the public to be careful when participating in any investment plans or financial transactions. The public is advised not to be easily enticed by any investment or financial activity advertisements, and to conduct due diligence and understand the financial products properly before participating.[641]

## China

China's central bank, the People's Bank of China (PBOC), has been conducting a study of digital currency for over three years, and has set up an Institute of Digital Money within the PBOC.[642] Zhou Xiaochuan, the then governor of the PBOC, addressed the current regulatory status of virtual currencies in a press conference held during the annual National People's Congress session in March 2018, when he was stepping down.  According to Zhou, Chinese regulators are not recognizing virtual currencies such as bitcoin as a tool for retail payments like paper bills, coins, or credit cards.  The banking system is not accepting any existing virtual currencies or providing relevant services, he said.[643]

Previously, on September 4, 2017, seven central government regulators—the PBOC, the Cyberspace Administration of China (CAC), the Ministry of Industry and Information Technology (MIIT), the State Administration for Industry and Commerce (SAIC), the China Banking Regulatory Commission (CBRC), the China Securities Regulatory Commission (CSRC), and the China Insurance Regulatory Commission (CIRC) —jointly issued the Announcement on Preventing Financial Risks from Initial Coin Offerings, which banned initial coin offerings (ICOs) in China.[644]  According to the Announcement, ICO financing that raises "so-called 'virtual currencies' such as Bitcoin and Ethereum" through the irregular sale and circulation of tokens is essentially public financing without approval, which is illegal.[645]  The Announcement warned that

---

[640] Press Release, Autoriti Monetari Brunei Darussalam, Public to Exercise High Caution with Cryptocurrencies (Dec. 22, 2017), http://www.ambd.gov.bn/SiteAssets/Lists/News/News/AMBD Press Release - Crypto currencies.pdf, *archived at* https://perma.cc/4N9M-AL26.

[641] *Id.*

[642] *Zhou Xiaochuan: Future Regulation on Virtual Currency Will Be Dynamic, Imprudent Products Shall Be Stopped for Now*, XINHUANET (Mar. 1, 2018), http://www.xinhuanet.com/finance/2018-03/10/c_129826604.htm (in Chinese), *archived at* https://perma.cc/2CW7-8F2T.

[643] *Id.*

[644] PBOC, CAC, MIIT, SAIC, CBRC, CSRC, and CIRC Announcement on Preventing Financial Risks from Initial Coin Offerings (Sept. 4, 2017), http://www.pbc.gov.cn/goutongjiaoliu/113456/113469/3374222/index.html (in Chinese), *archived at* https://perma.cc/N88N-5CV5.

[645] *Id.* (all translations by author).

tokens or virtual currencies involved in ICO financing are not issued by monetary authorities and therefore not mandatorily-accepted legal tender, and thus do not have equal legal status with fiat currencies and "cannot and should not be circulated and used in the market as currencies."[646]

As early as December 3, 2013, the PBOC, MIIT, CBRC, CSRC, and CIRC jointly issued a notice warning the public about the risks of bitcoin, the Notice on Precautions Against the Risks of Bitcoins.[647]   The circular defined bitcoin as "by nature a special virtual commodity," which "does not have equal legal status as currencies" and "cannot and should not be circulated in the market as a currency."[648]   According to the notice, banks and payment institutions in China are prohibited from dealing in bitcoins.  Financial and payment institutions are prohibited from using bitcoin pricing for products or services or buying or selling bitcoins, nor can they provide direct or indirect bitcoin-related services, including registering, trading, settling, clearing, or other services; accept bitcoins or use bitcoins as a clearing tool; or trade bitcoins with Chinese yuan or foreign currencies.[649]

**Cambodia**[650]

The status of cryptocurrencies in Cambodia is ambiguous.  The National Bank of Cambodia (NBC) "signed an agreement with a Japanese firm . . . to develop a blockchain-based project for its own internal use, which would track interbank lending and transactions" in April 2017.[651]   However, it only addresses interbank transactions.  The NBC has "asked banks in Cambodia not to allow people to conduct transactions with cryptocurrencies."[652]

At the Fourth Annual NBC Macroeconomic Conference on December 5, 2017, NBC Director General Chea Serey stated that activities of a handful of companies operating in Cambodia that tried to persuade people to use cryptocurrencies for everyday purchases and other financial transactions were "not legal as digital currencies are not issued or backed up by any government."[653]   However, she also stated that "digital currencies are not illegal in the Kingdom"

---

[646] *Id.*

[647] PBOC, MIIT, CBRC, CSRC, and CIRC Notice on Precautions Against the Risks of Bitcoins (Dec. 3, 2013), http://www.miit.gov.cn/n1146295/n1652858/n1652930/n3757016/c3762245/content.html (in Chinese), *archived at* https://perma.cc/S4DN-DXHD.

[648] *Id.*

[649] *Id.*

[650] At present there are no Law Library of Congress research staff members versed in Khmer.  This report has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[651] Robin Spiess, *Uncertainty over Future of Cryptocurrencies in Cambodia*, PHNOM PENH POST (Mar. 9, 2018), http://www.phnompenhpost.com/business/uncertainty-over-future-cryptocurrencies-cambodia, *archived at* https://perma.cc/6KFF-NQTA.

[652] Sok Chan, *Bitcoin a Risky Business*, *NBC Warns*, KHMER TIMES (Dec. 6, 2017), http://www.khmertimeskh.com/5094114/bitcoin-risky-business-nbc-warns/, *archived at* https://perma.cc/8UC3-4HFK.

[653] *Id.*

and "asked users to be wary of them and extremely careful when using them."[654]  In a December 29, 2017, press release the NBC reaffirmed that it "never allowed the purchase-sale and circulation of any form of cryptocurrencies."[655]

## Hong Kong

On February 9, 2018, Hong Kong's Securities and Futures Commission (SFC) alerted investors to the potential risks of dealing with cryptocurrency exchanges and investing in initial coin offerings (ICOs).[656]  In the alert, the SFC said it has taken regulatory action against a number of cryptocurrency exchanges and issuers of ICOs.  The SFC has warned cryptocurrency exchanges in Hong Kong or with connections to Hong Kong that they should not trade cryptocurrencies, which it characterized as "securities" as defined in the Securities and Futures Ordinance, without a license.  The SFC also wrote to seven ICO issuers and most of them confirmed compliance with the SFC's regulatory regime or immediately ceased to offer tokens to Hong Kong investors. The SFC stated it would continue to police the market and engage in enforcement actions when necessary, and also urged market professionals to do proper gatekeeping to prevent fraud or dubious fundraising, and to assist the SFC in ensuring compliance with the law.[657]

The new alert follows a statement on ICOs issued by the SFC on September 5, 2017.[658]  That statement explained that, depending on the facts and circumstances of an ICO, digital tokens that are offered or sold may be "securities" as defined in the Securities and Futures Ordinance, and therefore subject to the securities laws of Hong Kong.[659]  According to the statement,

> [w]here the digital tokens involved in an ICO fall under the definition of "*securities*", dealing in or advising on the digital tokens, or managing or marketing a fund investing in such digital tokens, may constitute a "*regulated activity*". Parties engaging in a "*regulated activity*" are required to be licensed by or registered with the SFC irrespective of whether the parties involved are located in Hong Kong, so long as such business activities target the Hong Kong public.[660]

On January 8, 2014, in replying to a question raised at the meeting of the Legislative Council on the use of bitcoin, the Secretary for Financial Services and the Treasury said virtual currencies

---

[654] *Id.*

[655] Press Release, NBC, The National Bank of Cambodia Denies the False Information Stating that the NBC Has Cooperated with Chaintope Company (Dec. 29, 2017), https://www.nbc.org.kh/english/news_and_events/news_info.php?id=344, *archived at* https://perma.cc/QB84-FPAW.

[656] *SFC Warns of Cryptocurrency Risks*, SECURITIES AND FUTURES COMMISSION (Feb. 9, 2018), https://www.sfc.hk/edistributionWeb/gateway/EN/news-and-announcements/news/doc?refNo=18PR13, *archived at* https://perma.cc/K72W-NUTC.

[657] *Id.*

[658] Securities and Futures Commission, Statement on Initial Coin Offerings (Sept. 5, 2017), http://www.sfc.hk/web/EN/news-and-announcements/policy-statements-and-announcements/statement-on-initial-coin-offerings.html, *archived at* https://perma.cc/8VYV-W7D7.

[659] *Id.*

[660] *Id.*

such as bitcoin are not considered as legal tender but are virtual commodities in Hong Kong, and warned about the risks of using virtual currencies.[661]  According to the Secretary,

> [i]t would be quite risky to convert, trade or hold such virtual currencies as their value is not backed by any physical items, issuers or the real economy.  There are specified upper limits to the overall size of the issue of such virtual currencies, but no guarantee of their convertibility into a legal tender or commodities in the real economy.  Also, the price of virtual currencies may be susceptible to significant fluctuations due to individual speculative activities.[662]

On March 25, 2015, the Secretary responded to another question on the regulation of bitcoin trading activities raised at the meeting of the Legislative Council.[663]  In the statement, the Secretary reiterated there were no specific regulatory measures on virtual commodities such as bitcoin in Hong Kong, but existing laws provide for sanctions against unlawful acts such as money laundering, terrorist financing, fraud, pyramid schemes, and cybercrimes, with or without virtual commodities being involved.  The police will take enforcement action if they find criminal conduct involving virtual commodities by conducting patrols, including searching for relevant information via public platforms on the Internet, the Secretary said.  The Hong Kong Government and financial regulators will also keep a close watch on the development of bitcoin and other virtual commodities, he said.[664]

**Indonesia**

On January 13, 2018, Bank Indonesia (Indonesia's central bank) released a statement that warns against buying, selling, or otherwise trading in virtual currencies.[665]  The statement includes the following:

> Bank Indonesia affirms that virtual currencies, including bitcoin, are not recognized as legitimate instrument of payment, therefore not allowed to be used for payment in Indonesia. This is in line with Act No. 7/2011 on The Currency,[666] which states that currency shall be money of which issued by the Republic of Indonesia and every transaction that has the purpose of payment, or other obligations which need to be fulfilled

---

[661] Press Release, Government of Hong Kong, LCQ1: Monitoring the Use of Bitcoins (Jan. 8, 2014), http://www.info.gov.hk/gia/general/201401/08/P201401080357.htm, *archived at* https://perma.cc/AY9N-B58F.

[662] *Id.*

[663] Press Release, Government of Hong Kong, LCQ4: Regulation of Trading Activities of Bitcoins (Mar. 25, 2015), http://www.info.gov.hk/gia/general/201503/25/P201503250463.htm, *archived at* https://perma.cc/WK74-B453.

[664] *Id.*

[665] Press Release, Bank Indonesia, Bank Indonesia Warns All Parties Not to Sell, Buy, or Trade Virtual Currency (Jan. 13, 2018), http://www.bi.go.id/en/ruang-media/siaran-pers/Pages/sp_200418.aspx, *archived at* https://perma.cc/ELQ5-PHTW.

[666] Undang-Undang Nomor 7 Tahun 2011 Tentang Mata Ung [Law Number 7 of 2011 Concerning Currency], http://www.bi.go.id/id/tentang-bi/uu-bi/Documents/UU 7 Tahun 2011.pdf (in Indonesian), *archived at* https://perma.cc/DNX8-FR6Z. An unofficial English translation of this law is available at http://www.flevin.com/id/lgso/translations/Laws/Law No. 7 of 2011 on Currency (MoF).pdf, *archived at* https://perma.cc/9NQL-SHYU.

with money, or other financial transactions conducted within the territory of the Republic of Indonesia, has to be fulfilled with Rupiah.[667]

The statement goes on to say that ownership of virtual currency is "highly risky," "vulnerable to bubble risks," and "susceptible to be used for money laundering and terrorism financing." Bank Indonesia therefore considers that such currencies "can potentially impact financial system stability and cause financial harm to society."[668] It also refers to Bank Indonesia Regulation No. 18/40/PBI/2016 on Implementation of Payment Transaction Processing[669] and Bank Indonesia Regulation No. 19/12/PBI/2017 on Implementation of Financial Technology[670] in affirming that, as the payment system authority, the Bank forbids all payment system operators and financial technology operators in Indonesia from processing transactions using virtual currencies.[671]

This statement was supported by the Minister of Finance who, in a press conference on January 23, 2018, warned that virtual currencies are a high-risk and speculative investment and said that "[w]e will also continue to function as a government that conveys the view that it is not in accordance with the Law to be used as a means of transaction."[672]

The Bank's statement follows an earlier press release in 2014, in which it encouraged caution with respect to virtual currencies and stated that "[i]n view of the Act No. 7 Year 2012 [sic] concerning Currency and Act No. 23 Year 1999[673] which has been amended several times, the latest with Act No. 6 Year 2009,[674] Bank Indonesia states that bitcoin and other virtual currency are not currency or legal payment instrument in Indonesia."[675]

---

[667] Press Release, Bank Indonesia, *supra* note 665.

[668] *Id.*

[669] Peraturan Bank Indonesia Nomor 18/40/PBI/2016 Tentang Penyelenggaraan Pemrosesan Transaksi Pembayaran, http://www.bi.go.id/id/peraturan/sistem-pembayaran/Documents/PBI_184016.pdf (in Indonesian), *archived at* https://perma.cc/JBX8-44U7.

[670] Peraturan Bank Indonesia Nomor 19/12/PBI/2017 Tentang Penyelenggaraan Teknologi Finansial, http://www.bi.go.id/id/peraturan/sistem-pembayaran/Documents/PBI_191217.pdf (in Indonesian), *archived at* https://perma.cc/6XTJ-ERCQ.

[671] Press Release, Bank Indonesia, *supra* note 665.

[672] *Minister of Finance: Bitcoin is Not in Line with the Law*, KEMENTERIAN KEUANGAN [MINISTRY OF FINANCE], (Jan. 25, 2018), https://www.kemenkeu.go.id/en/publications/news/minister-of-finance-bitcoin-is-not-in-line-with-law/, *archived at* https://perma.cc/3MEJ-HHUP.

[673] Act No. 23 of 199 Concerning Bank Indonesia, http://www.bi.go.id/en/tentang-bi/uu-bi/Documents/act2399.pdf (unofficial English translation), *archived at* https://perma.cc/6S8P-FFZH.

[674] Act No. 6 of 2009 Concerning Stipulation of Government Regulation in Lieu of Act No. 2 of 2008 Concerning Second Amendment to the Act No. 23 of 1999 Concerning Bank Indonesia into Act, http://www.bi.go.id/en/tentang-bi/uu-bi/Documents/BIact_0609.pdf (unofficial English translation), *archived at* https://perma.cc/FRZ5-ZZG5.

[675] Press Release, Bank Indonesia, Statement of Bank Indonesia Related to Bitcoin and Other Virtual Currency (Feb. 6, 2014), http://www.bi.go.id/en/ruang-media/siaran-pers/Pages/SP_160614.aspx, *archived at* https://perma.cc/3MEJ-HHUP.

## Japan

In Japan, cryptocurrency exchange businesses are regulated.  The Payment Services Act was amended in June 2016 and the amendment took effect on April 1, 2017.[676]  The amended Payment Services Act defines "cryptocurrency"[677] as

- property value that can be used as payment for the purchase or rental of goods or provision of services by unspecified persons, that can be purchased from or sold to unspecified persons, and that is transferable via an electronic data processing system; or

- property value that can be mutually exchangeable for the above property value with unspecified persons and is transferable via an electronic data processing system.

The Act also states that cryptocurrency is limited to property values that are stored electronically on electronic devices; currency and currency-denominated assets are excluded.[678]

Under the Payment Services Act, only business operators registered with a competent local Finance Bureau are allowed to operate cryptocurrency exchange businesses.[679]  The operator must be a stock company or a "foreign cryptocurrency exchange business" that is a company, has a representative who is resident in Japan, and an office in Japan.[680]  A "foreign cryptocurrency exchange business" means a cryptocurrency exchange service provider that is registered with a foreign government in the foreign country under a law that provides an equivalent registration system to the system under the Japanese Payment Services Act.[681]

The Act requires cryptocurrency exchange businesses to separately manage customer's money or cryptocurrency apart from their own. The state of such management must be reviewed by certified public accountants or accounting firms.[682]  The exchange business must have a contract with a designated dispute resolution center with expertise in cryptocurrency exchanges.[683]  The exchange business must keep accounting records of its cryptocurrency transactions[684] and submit a report on the business to the Financial Services Agency (FSA) annually.[685]  The FSA is authorized to inspect

---

[676] 資金決済に関する法律 [Payment Services Act], Act No. 59 of 2009, *as amended by* Act No. 62 of 2016.

[677] In Japanese, the term 仮想通貨 ("virtual currency") is used.

[678] Payment Services Act art. 2, para. 5.

[679] *Id*. arts. 63-2 & 63-3.  *See also Details of Screening for New Registration Application as Virtual Currency Exchange Service Provider*, FSA, http://www.fsa.go.jp/en/news/2017/20170930-1/02.pdf, *archived at* https://perma.cc/M36D-7BU3.

[680] Payment Services Act art. 63-5, para. 1.

[681] *Id*. art. 2, para. 9.

[682] *Id*. art. 63-11.

[683] *Id*. art. 63-12.

[684] *Id*. art. 63-13.

[685] *Id*. art. 63-14.  Because the Cabinet delegates its authority over most of the matters under the Payment Services Act to the Financial Services Agency (FSA) (*id*. art. 104), the FSA is the regulatory agency of cryptocurrency transactions.

exchange businesses and issue orders to improve their practices.[686]  The FSA may rescind the registration of a cryptocurrency exchange business or suspend its business for up to six months in cases where

- the exchange business loses one of the requirements for registration;

- it turns out that the exchange business made the registration illegally; or

- the exchange business violates the Payment Services Act or orders based on the Act.[687]

On January 26, 2018, Coincheck, one of Japan's biggest cryptocurrency exchange businesses, lost about $400 million in NEM (cryptocurrency) tokens.  The local Finance Bureau ordered Coincheck to submit a report on the same day, examined it, and issued an order of business improvement on January 29, 2018.[688]  The following day the FSA requested all cryptocurrency exchange businesses to review their system-risk management plans and report the results to the FSA.[689]  On March 2, 2018, the FSA conducted an on-site inspection of Coincheck.  On March 8, 2018, the local Finance Bureaus issued business-improvement orders to seven exchange businesses,[690] again including Coincheck.[691]

A group of cryptocurrency exchange businesses publicized their decision to form a new self-regulating body on March 2, 2018, that all registered exchange businesses will join.[692]  The body aims to obtain authorization from the FSA under the Payment Services Act.[693]

---

[686] *Id*. arts. 63-15 & 63-16.

[687] *Id*. art. 63-17.

[688] コインチェック株式会社に対する行政処分について [*Regarding Administrative Disposition against Coincheck Company*], KANTO FINANCE BUREAU (Jan. 29, 2018), http://kantou.mof.go.jp/rizai/pagekthp 0130000001_00004.html, *archived at* https://perma.cc/6Q6W-K5XX.

[689] 仮想通貨交換業者に対するシステムリスク管理態勢の自己点検について [*Regarding Request to Cryptocurrency Service Providers to Self-check System Risk Management*], FSA (Jan. 30, 2018), http://www.fsa.go.jp/policy/virtual_currency/08.pdf, *archived at* https://perma.cc/LM5W-RC8K.

[690] Yuki Hagiwara et al., 金融庁：仮想通貨交換業者７社を行政処分、２社に業務停止命令 [*FSA: Administrative Disposition for 7 Cryptocurrency Exchange Businesses, Suspension of Business Order for 2*], BLOOMBERG (Mar. 8, 2018), https://www.bloomberg.co.jp/news/articles/2018-03-08/P58WVH6JIJUP01, *archived at* https://perma.cc/RGM9-DXCH.

[691] コインチェック株式会社に対する行政処分について [*Regarding Administrative Disposition against Coincheck Company*], KANTO FINANCE BUREAU (Mar. 8, 2018), http://kantou.mof.go.jp/rizai/pagekthp013 0000001_00013.html, *archived at* https://perma.cc/QBG7-JE6A.

[692] 仮想通貨の自主規制団体、「みなし業者も参加を」 [*Cryptocurrency Self-regulated Body, "Calling for Registration-pending Business, Too"*], NIKKEI (Mar. 5, 2018), https://www.nikkei.com/article/DGXMZO 27693400V00C18A3000000/, *archived at* https://perma.cc/Z8EQ-S4X2.

[693] Payment Services Act art. 87.

In addition, under the Act on Prevention of Transfer of Criminal Proceeds, cryptocurrency exchange businesses are obligated to check the identities of customers who open accounts, keep transaction records, and notify authorities when a suspicious transaction is recognized.[694]

According to the National Tax Agency (NTA), the profit earned by sales of cryptocurrency is, in principle, considered miscellaneous income,[695] rather than capital gains,[696] under the Income Tax Act.  The NTA compiled questions and answers regarding the tax treatment of cryptocurrency and posted it online on December 1, 2017.[697]  Miscellaneous income is added to the amount of other income, excluding specified capital gains,[698] when a person's taxable income is calculated and taxed.[699]

**Macau**

The Monetary Authority of Macau (AMCM) issued a statement on September 27, 2017, warning the financial industry and the public about the risks of virtual commodities and tokens.[700]  "Any trading of these commodities involves considerable risks, including but not limited to those relating to money laundering and terrorism financing, against which all participants should remain vigilant," the statement said.  According to the statement, the AMCM had issued a notice to banks and payment institutions in Macau to warn them not to participate in or provide, directly or indirectly, any relevant financial services, following a similar ban by Chinese authorities on the mainland on initial coin offerings (ICOs).[701]

Previously, on June 17, 2014, the AMCM issued a statement warning about the risks of bitcoin transactions.[702]  According to that statement, bitcoin is a type of virtual commodity that is neither legal tender nor a financial instrument subject to the supervision of the AMCM.  The AMCM

---

[694] 犯罪による収益の移転防止に関する法律 [Act on Prevention of Transfer of Criminal Proceeds], Act No. 22 of 2007, *amended by* Act No. 67 of 2017, art. 2 para. 2, art. 4 & arts. 7–8.

[695] 所得税法 [Income Tax Act], Act No. 33 of 1965, *amended by* Act No. 74 of 2017, art. 35.

[696] *Id.* art. 33.

[697] 仮想通貨に関する所得の計算方法等について（情報) [Regarding Calculation Method of Income Relating to Cryptocurrency (Information)], Individual Taxation Information, No. 4, NTA (Dec. 1, 2017), http://www.nta.go.jp/law/joho-zeikaishaku/shotoku/shinkoku/171127/01.pdf, *archived at* https://perma.cc/M22N-53MF.

[698] 租税特別措置法 [Act on Special Measures concerning Taxation], Act No. 26 of 1957, amended by Act No. 4 of 2017, arts. 8 through 8-5.

[699] Income Tax Act art. 89

[700] AMCM, Alert to Risks of Virtual Commodities and Tokens (Sept. 27, 2017), http://www.gcs.gov.mo/showNews.php?DataUcn=117182&PageLang=C (in Chinese), *archived at* https://perma.cc/28U9-WYPS, English translation *at* http://www.gcs.gov.mo/showNews.php?DataUcn=117184&PageLang=E, *archived at* https://perma.cc/SQD2-TW83.

[701] *Id.*

[702] AMCM, Caution Against Engagement in Bitcoin Transactions (June 17, 2014), http://www.gcs.gov.mo/showNews.php?DataUcn=79457&PageLang=C (in Chinese), *archived at* https://perma.cc/U5ET-8ZFW, English translation *at* http://www.gcs.gov.mo/showNews.php?DataUcn=79459&PageLang=E, *archived at* https://perma.cc/EWM6-GKK5.

warned the general public that trading in virtual commodities such as bitcoin "involves considerable risks, including but not limited to those relating to money laundering and terrorist financing."[703]

## Malaysia

On January 2, 2014, Bank Negara Malaysia (Malaysia's central bank) issued a statement saying that "[t]he Bitcoin is not recognised as legal tender in Malaysia. The Central Bank does not regulate the operations of Bitcoin.  The public is therefore advised to be cautious of the risks associated with the usage of such digital currency."[704]

On December 14, 2017, the Bank released, for the purposes of public consultation, a proposed policy "on the invocation of reporting obligations on digital currency exchange business as reporting institutions under the Anti-Money Laundering, Anti-Terrorism Financing and Proceeds of Unlawful Activities Act 2001 (AMLA)."[705] According to the associated press release:

> [t]he proposed policy sets out the legal obligations, requirements and standards that digital currency exchangers, which will be defined under the First Schedule of the AMLA, must carry out as reporting institutions. This includes transparency obligations which are intended to provide relevant information for the public to better understand and evaluate risks associated with the use of digital currencies. Increased transparency will also serve to prevent the use of the digital currencies for criminal or unlawful activities. A digital currency exchanger must also declare its details to the Bank as a reporting institution.

> Failure to declare its details as reporting institutions or comply with the reporting obligations may subject the digital currency exchangers to the enforcement and non-compliance actions as provided under the AMLA as well as the potential termination or denial of use of financial services in Malaysia.[706]

The press release also affirms that digital currencies are not considered legal tender in Malaysia and digital currency businesses are not regulated by the Bank; the invocation of reporting obligations on digital currency exchange businesses does not connote any form of authorization or endorsement by the Bank.[707] The statement goes on to again advise the public to "carefully evaluate the risks associated with dealings in digital currencies."[708]

---

[703] *Id.*

[704] Press Release, Bank Negara Malaysia, Statement on Bitcoin (Jan. 2, 2014), http://www.bnm.gov.my/index.php?ch=en_announcement&pg=en_announcement&ac=49&lang=en, *archived at* https://perma.cc/6ZXJ-W2ZR.

[705] Press Release, Bank Negara Malaysia, Making Digital Currencies Transparent in Malaysia (Dec. 14, 2017), http://www.bnm.gov.my/index.php?ch=en_press&pg=en_press&ac=4575&lang=en, *archived at* https://perma.cc/W4P9-Z528; Anti-Money Laundering, Anti-Terrorism Financing and Proceeds of Unlawful Activities Act 2001 (Act 612), as at Dec. 1, 2015, http://www.agc.gov.my/agcportal/uploads/files/ACT 613 diluluskan TPPUU Dis 2015.pdf, *archived at* https://perma.cc/N3ZD-FKQ3.

[706] Press Release, Making Digital Currencies Transparent in Malaysia, *supra* note 705.

[707] *Id.*

[708] *Id.*

The policy would require digital currency exchanges (being businesses that exchange digital currency for money, exchange money for digital currency, or exchange one digital currency for another[709]), to comply with regulations relating to "the identification and verification of customers and beneficial owners, on-going monitoring of customers' transactions, sanction screening, suspicious transaction reporting and record keeping"; transparency obligations; and "requirements for the submission of data and statistics to the Bank" for the purpose of managing money laundering and terrorism financing risks.[710] Public comments on the draft policy were due by January 14, 2018; no date for its finalization was located.

In addition, a news report in February 2018 states that the Bank is going to release a concept paper on cryptocurrencies within the month, and this will neither recognize cryptocurrencies as money nor ban them altogether. The governor of the Bank stated, "[b]asically, we will let the cryptocurrency promoters including bitcoin, ethereum and ripple to be more transparent, the methods to be more transparent and people behind the scene are to be more transparent too. By doing so, the public can decide on its own if they want to invest in cryptocurrencies."[711]

A further news report says that the Bank will require exchanges to "publish prices and the methodology used to determine those prices in a bid to boost transparency."[712] The report also states that the Securities Commission of Malaysia (SC) "plans to issue a cryptocurrency exchange framework and has stepped up oversight of the sector, issuing a cease-and-desist letter to a crypto start-up on January 9th for failing to follow the country's securities regulations."[713] Previously, in September 2017, the Commission issued a statement in which it cautioned investors with respect to "the emergence of digital token based fundraising activities / investment schemes in Malaysia and elsewhere, which may be referred to as 'initial coin offerings' [ICOs], 'initial token offerings', 'token pre-sale', 'token crowd-sale.' "[714] Subsequently, in a speech in November 2017, the chairman of the Commission stated that

> we continue to stand by our statement that such schemes [ICOs], in its current form poses significant risks to investors. Therefore, SC strongly encourages investors to fully understand the features of an ICO scheme, and carefully weigh the risks before parting with their monies. We are also now part of the IOSCO [International Organization of

---

[709] Bank Negara Malaysia, Anti-Money Laundering and Counter Financing of Terrorism (AML/CFT) – Digital Currencies (Sector 6): Exposure Draft, at ¶ 4.1 (Dec. 2017), http://www.bnm.gov.my/index.php?ch=57&pg=538&ac=661&bb=file, *archived at* https://perma.cc/8ERA-F7QL.

[710] *Id.* at ¶ 2.1.

[711] *Bank Negara Malaysia to Let Public Decide Fate of Cryptocurrencies*, ECONOTIMES (Feb. 14, 2018), https://www.econotimes.com/Bank-Negara-Malaysia-to-let-public-decide-fate-of-cryptocurrencies-1149475, *archived at* https://perma.cc/W2MG-Q365.

[712] *Malaysia's Central Bank Issues Cryptocurrency Regulation*, THE ECONOMIST INTELLIGENCE UNIT (Feb. 5, 2018), http://www.eiu.com/industry/article/1426386726/malaysias-central-bank-issues-cryptocurrency-regulation/2018-02-05, *archived at* https://perma.cc/E986-K2GA.

[713] *Id.*

[714] Press Release, Securities Commission Malaysia, Media Statement on Initial Coin Offerings (Sept. 7, 2017), https://www.sc.com.my/post_archive/media-statement-on-initial-coin-offerings/, *archived at* https://perma.cc/GHM3-K6EJ.

> Securities Commissions] ICO Consultation Network where participating regulators are discussing the latest developments in this space.
>
> At the same time, we note the growing interest of Malaysian investors in trading cryptocurrencies and digital assets. To facilitate such activities in our market and put in place appropriate einvestor safeguards, SC is reviewing relevant regulations and guidelines to facilitate functional and effective use cases of digital assets in the capital market, including secondary market trading of established crypto currency and digital assets.[715]

With respect to tax treatment, in January 2018 Malaysia's Inland Revenue Board (IRB) froze the Malaysian bank account of a UK-based cryptocurrency trading platform, apparently for the purpose of conducting an audit to determine whether the company has complied with the Income Tax Act 1967, which requires tax to be paid on the income of any person accruing in or derived from Malaysia.[716] A request was made under section 81 of the Act as well as section 37 of AMLA for information on all of the company's Malaysian customers. According to the IRB's chief executive, "[a]ll traders should adhere to the Malaysian tax requirement by keeping proper records for audit purposes and disclose any transactions from the cryptocurrency trading when requested by IRB."[717]

## Marshall Islands

The Marshall Islands has enacted legislation authorizing the launching of its own national cryptocurrency to serve as legal tender for citizens and businesses on the island.[718] The currency will be known as the sovereign, or SOV, and will serve as "legal tender of the Marshall Islands for all debts, public charges, taxes, and dues."[719] It will circulate as legal tender in addition to the US dollar.[720] The SOV will be introduced in a forthcoming initial currency offering (ICO), after which residents of the Marshall Islands will be provided with the means to hold, save, and conduct transactions with the SOV, and merchants in the Marshall Islands will be given access to a computer application that will enable them to receive payments made with the SOV.[721] The

---

[715] Speech, Tan Sri Ranjit Ajit Singh, Opening Address at Synergistic Collaborations by SC (SCxSC) Digital Finance Conference 2017 (Kuala Lumpur, Nov. 6, 2017), https://www.sc.com.my/post_archive/opening-remarks-by-tan-sri-ranjit-ajit-singh-chairman-of-securities-commission-malaysia-at-synergistic-collaborations-by-sc-scxsc-digital-finance-conference-2017-in-kuala-lumpur-on-6-november-2/, *archived at* https://perma.cc/4NEN-4FJY.

[716] *IRB: Cryptocurrency Not Regulated but Traders Still Subject to Malaysian Income Tax Law*, THE STAR ONLINE (Jan. 19, 2018), https://www.thestar.com.my/tech/tech-news/2018/01/19/irb-cryptocurrency-not-regulated-but-traders-still-subject-to-malaysian-income-tax/, *archived at* https://perma.cc/YG9G-FQHL; Income Tax Act 1967 (Act 53), § 3, http://www.agc.gov.my/agcportal/uploads/files/Publications/LOM/EN/Pindaan Act 53 - 23 11 2017.pdf, *archived at* https://perma.cc/AP4T-FZHX.

[717] *IRB: Cryptocurrency Not Regulated but Traders Still Subject to Malaysian Income Tax Law*, *supra* note 716.

[718] Declaration and Issuance of the Sovereign Currency Act, Pub. L. 2018-53 (2018), https://rmiparliament.org/cms/library/category/37-2018.html?download=410:p-l-2018-53-declaration-and-issuance-of-the-sovereign-currency-act,-2018, *archived at* https://perma.cc/53A9-B8S7.

[719] *Id*. §§ 103(a), 104(1).

[720] *Id*. § 104(2).

[721] *Id*. §§ 104(4), 105(5).

Minister of Finance will appoint a person or corporation to conduct the ICO.[722]   News reports indicate a financial technology company named Neema, which spearheaded the initiative, is likely to be awarded the contract to conduct the ICO.[723]

**New Zealand**

In October 2017, the Financial Markets Authority (FMA) published information on cryptocurrencies, and the risks associated with them, as part of its guidance on investment options.[724] In particular, it highlights the following three points about cryptocurrencies:

- They're high risk and highly volatile – the price can go up and down very quickly
- They're not regulated in New Zealand
- Cryptocurrencies, crypto-exchanges and the people that use them are often the targets of online fraud and scams[725]

The FMA has also published commentary on initial coin offers (ICOs) and cryptocurrency services (including exchanges, wallets, and brokering).[726]  The information relates to the application of the existing regulatory framework for financial products and services. With regard to ICOs, the guidance states that

> The extent to which an ICO is regulated depends whether a 'financial product' is being offered to retail investors in New Zealand (ie a 'regulated offer' is being made). Whether a token offered via an ICO is a financial product, and if so, what type of product, depends on the token's specific characteristics and economic substance.[727]

The FMA then explains how a token may be considered one of the four types of financial products set out in the Financial Markets Conduct Act 2013 (being debt securities, equity securities, managed investment products, and derivatives),[728] and if so, what the obligations of the issuer are. It also notes that ICOs and tokens that are not financial products "will still be subject to general

---

[722] *Id*. § 109.

[723] Jonathan Keane, *Inside the Marshall Islands' Plans to Launch Its Own Legal Tender Cryptocurrency*, THE NEXT WEB (Apr. 23, 2018), https://thenextweb.com/hardfork/2018/04/23/marshall-islands-cryptocurrency/, *archived at* https://perma.cc/3N52-H4C9.

[724] *Cryptocurrencies*, FINANCIAL MARKETS AUTHORITY (FMA), https://fma.govt.nz/investors/ways-to-invest/cryptocurrencies/ (last visited Mar. 1, 2018), *archived at* https://perma.cc/L55V-K9Z6.

[725] *Id.*

[726] Press Release, FMA, FMA Commentary on ICOs and Cryptocurrencies (Oct. 25, 2017), https://fma.govt.nz/news-and-resources/media-releases/fma-commentary-on-icos-and-cryptocurrencies/, *archived at* https://perma.cc/WD49-H7Z9.

[727] *Initial Coin Offers*, FMA, https://fma.govt.nz/compliance/cryptocurrencies/initial-coin-offers/ (last visited Mar. 5, 2018), *archived at* https://perma.cc/JV7F-DCQK.

[728] Financial Markets Conduct Act 2013, http://www.legislation.govt.nz/act/public/2013/0069/latest/whole.html, *archived at* https://perma.cc/9FFL-PNYU.

consumer protection laws in New Zealand, for example prohibitions against misleading and deceptive conduct and fraud or other criminal conduct."[729]

With regard to cryptocurrency services, the FMA guidance states that businesses based in New Zealand that provide a "financial service" related to cryptocurrencies must comply with the Financial Service Providers (Registration and Dispute Resolution) Act 2008.[730] It then explains how different types of businesses might be considered to be providing a financial service and the obligations of such businesses.

The Inland Revenue Department (IRD) has not yet issued any guidance or rulings regarding the tax treatment of cryptocurrencies. Its public rulings work program for the 2017–2018 financial year includes "GST and Income tax – Tax treatment of crypto-currencies" as being an item currently in progress, as of February 9, 2018, with "[p]reparatory work on issuing public guidance" being underway.[731]

According to a news report in January 2018, the IRD indicated that people should "treat money made buying and selling cryptocurrencies in the same, or similar, way they would money made buying and selling gold. That is, pay tax on the profit made by selling a currency, only if that currency was bought with the intention of resale."[732] It directed the author to an information sheet on gold, which explains that amounts derived from its disposal will be income if the gold was acquired for the dominant purpose of disposal.[733]

In addition, a spokesman for the Reserve Bank of New Zealand (its central bank) was quoted in a December 2017 news article as stating that cryptocurrencies would be included in the bank's major review of its currency operating model and supporting infrastructure, which is currently underway. He explained that

> This project is focused on demand drivers, distribution models, and cash substitutes. It
> includes looking into crypto-currencies, blockchain technology and distributed ledgers.

---

[729] *Initial Coin Offers*, *supra* note 727.

[730] *Cryptocurrency Services*, FMA, https://fma.govt.nz/compliance/cryptocurrencies/cryptocurrency-services/ (last visited Mar. 5, 2018), *archived at* https://perma.cc/5SY4-GAUC; Financial Service Providers (Registration and Dispute Resolution) Act 2008, http://www.legislation.govt.nz/act/public/2008/0097/latest/whole.html, *archived at* https://perma.cc/7DBK-ULCJ.

[731] Inland Revenue Department (IRD), Public Rulings Work Programme 2017–18: Monthly Update – Position as at 9 February 2018, http://www.ird.govt.nz/resources/0/e/0ed9d869-4a08-46cd-a143-da492b1b9348/2018-02-09+Public+Rulings+Work+Programme.pdf, *archived at* https://perma.cc/7QP8-KCPR.

[732] Jenée Tibshraeny, *The IRD Says People Should Consider Money Made Selling Cryptocurrencies – Bought with the Intention of Resale – As Taxable, Until it Releases Specific Guidance on the Matter*, INTEREST.CO.NZ (Jan. 11, 2018), https://www.interest.co.nz/personal-finance/91564/ird-says-people-should-consider-money-made-selling-cryptocurrencies-bought, *archived at* https://perma.cc/Q68X-WXE4.

[733] IRD, Question We've Been Asked: Are Proceeds from the Sale of Gold Bullion Income? (QB 17/18) (Sept. 20, 2017), http://www.ird.govt.nz/resources/6/e/6ec89340-3f88-446f-90da-f50aaae363c9/QB17008.pdf, *archived at* https://perma.cc/3Q72-USAT.

> The Reserve Bank doesn't regulate bitcoin. Whatever legal status bitcoin has is under ordinary law relating to contracts, tax obligations etc.[734]

An analytical note issued by the Reserve Bank in November 2017, which does not serve as an official policy position, discusses the technology involved in cryptocurrencies, their attributes and mechanics, and "the implications of cryptocurrencies for consumers, financial systems, monetary policy, and regulatory policy."[735]

## Philippines

Bangko Sentral ng Pilipinas (BSP, i.e., the Philippines Central Bank) has issued guidelines concerning virtual currencies (VCs).[736] Specifically, these Guidelines provide that since VCs are not backed by a central bank or a particular commodity and are not guaranteed by any country, they are not legal tender.[737] However, since they are used as a conduit to provide certain financial services, such as remittances and payment transactions, entities that provide such services using VCs must register with the BSP and adopt adequate measures to mitigate and manage risks associated with such currencies.[738] In addition, the Guidelines provide for penalties applicable to VC entities that conduct operations without the appropriate authorization from the BSP.[739]

## Samoa

On June 12, 2017, the Central Bank of Samoa issued a statement in which it warned the public to be "very cautious and diligent" in dealing with digital currency investments.[740] As part of a broader warning against get-rich schemes, it advised people to ensure that they fully understand how a venture works and the risks and benefits of investing, and to contact the Bank if they are uncertain.

No other government statements or regulatory actions were located.

---

[734] Jonathan Underhill, *IRD Sets its Sights on Bitcoin and Cryptocurrencies*, NEW ZEALAND HERALD (Dec. 22, 2017), http://www.nzherald.co.nz/business/news/article.cfm?c_id=3&objectid=11964722, *archived at* https://perma.cc/M8PB-J5R3.

[735] Aaron Kumar & Christie Smith, Crypto-currencies – An Introduction to Not-So-Funny Monies 2 (Reserve Bank of New Zealand Analytical Note Series, AN2017/07, Nov. 2017), https://www.rbnz.govt.nz/-/media/ReserveBank/Files/Publications/Analytical%20notes/2017/an2017-07.pdf, *archived at* https://perma.cc/TYQ7-75JQ.

[736] Bangko Sentral ng Pilipinas, Guidelines for Virtual Currency (VC) Exchanges, Circular No. 944, (Feb. 6, 2017), http://www.bsp.gov.ph/downloads/regulations/attachments/2017/c944.pdf, *archived at* https://perma.cc/Z9ZR-BYZV.

[737] *Id.*

[738] *Id.*

[739] *Id.*

[740] Press Release, Central Bank of Samoa, Beware of These Get Rich Quick Schemes and Digital Currency (June 12, 2017), https://cbs.gov.ws/index.php/media/latest-news/beware-of-getting-rick-at-these-new-article-page/, *archived at* https://perma.cc/5FC4-YCZU.

**Singapore**

In the wake of an increase in the number of initial coin offerings (ICOs) in Singapore as a means of raising funds, on August 1, 2017, the Monetary Authority of Singapore (MAS) issued a statement clarifying that the offer or issue of digital tokens in Singapore will be regulated by the MAS, if the digital tokens fall within the definition of "securities" regulated under the security laws.[741]  MAS's position is not to regulate virtual currencies.  "However, MAS has observed that the function of digital tokens has evolved beyond just being a virtual currency," the statement said.[742]

Following the August statement, the Deputy Prime Minister and Minister in Charge of MAS (DPM) responded to questions from the Parliament for its sitting on October 2, 2017, on the regulation of cryptocurrencies and ICOs.[743]  According to the DPM, although the MAS does not regulate virtual currencies per se, it regulates activities involving the use of virtual currencies that fall under MAS's regulatory ambit, such as money laundering and terrorism financing.  The MAS is working on a new regulatory framework for payments that will address the risks associated with virtual currencies, the DPM said.[744]  With respect to ICOs, the MAS has not issued specific legislation, but will continue to monitor developments and consider more targeted legislation when it becomes necessary, the DPM added.[745]

With respect to the new payment regulatory framework, the MAS issued a consultation paper proposing the Payment Services Bill in November 2017.[746]  The proposed Bill would expand the scope of regulated payment activities to include virtual currency services and other innovations. Under the new framework, entities carrying out virtual currency services including buying or selling virtual currency would be required to be licensed.[747]

---

[741] Press Release, MAS Clarifies Regulatory Position on the Offer of Digital Tokens in Singapore (Aug. 1, 2017), http://www.mas.gov.sg/News-and-Publications/Media-Releases/2017/MAS-clarifies-regulatory-position-on-the-offer-of-digital-tokens-in-Singapore.aspx, *archived at* https://perma.cc/D8V5-3NST.

[742] *Id.*

[743] MAS, Reply to Parliamentary Question on the Prevalence Use of Cryptocurrency in Singapore and Measures to Regulate Cryptocurrency and Initial Coin Offerings (for Parliament Sitting Oct. 2, 2017), http://www.mas.gov.sg/News-and-Publications/Parliamentary-Replies/2017/Prevalence-use-of-cryptocurrency-in-Singapore.aspx, *archived at* https://perma.cc/WXF6-GDPD.

[744] *Id.*

[745] *Id.*

[746] Press Release, MAS Launches Second Consultation on New Regulatory Framework for Payments (Nov. 21, 2017), http://www.mas.gov.sg/News-and-Publications/Media-Releases/2017/MAS-Launches-Second-Consultation-on-New-Regulatory-Framework-for-Payments.aspx, *archived at* https://perma.cc/W5RF-D5GP.

[747] *Id.*

## South Korea[748]

The South Korean government implemented a rule that allows trades in cryptocurrencies only from real-name bank accounts ("real-name account system") beginning January 30, 2018. Cryptocurrency dealers must have contracts with banks concerning cryptocurrency trades. The banks examine dealers' management and cyber security systems before signing such contracts. In order to make a deposit into their e-wallet at a cryptocurrency dealer, a cryptocurrency trader must have an account at a bank where the cryptocurrency dealer also has an account. The bank checks the trader's (customer's) identity when it opens an account for the trader, and the trader reports his/her bank account to the dealer. The dealer also checks the identity of the trader and applies for registration of the trader's account with the bank.[749] Anonymous cryptocurrency traders may withdraw from their cryptocurrency accounts but cannot make a new deposit. Minors, as well as foreigners, regardless of their place of residence, are prohibited from trading in cryptocurrencies.[750]

Under the Act on Reporting and Using Specified Financial Transaction Information, financial institutions are required to report financial transactions that are suspected, based on reasonable grounds, to be illegal or to involve money laundering.[751] The Korea Financial Intelligence Unit (KFIU) issued guidelines on such reporting by banks to prevent money laundering via cryptocurrency transactions.[752] The guidelines list the following examples of suspicious situations:

- When a trader deposits or withdraws 10 million won (about US$9,400) or more a day or 20 million won or more a week

- When a trader makes financial (banking) transactions five times or more a day or seven times or more a week

- When a trader is a corporation or organization

---

[748] At present there are no Law Library of Congress research staff members versed in Korean. This report has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[749] Financial Services Commission (FSC), 가상통화 투기근절을 위한 특별대책, 금융부문 대책 시행 [Special Measures for the Elimination of Virtual Currency Speculation, Enforcement of Financial Sector Measures (Dec. 28, 2017)], at 3–4 (Jan. 23, 2018), http://www.korea.kr/common/download.do?tblKey=GMN&fileId=185832583, *archived at* https://perma.cc/Z9YH-7SDM.

[750] *Id.* at 2.

[751] Act on Reporting and Specified Financial Transaction Information, Act No. 6516, Sept. 27, 2001, *amended by* Act No. 14839, July 26, 2017, art. 4, http://elaw.klri.re.kr/kor_service/lawView.do?lang=ENG&hseq=44449, *archived at* https://perma.cc/7LSF-32ZN.

[752] KFIU, 가상통화 관련 자금세탁방지 가이드라인 [Guidelines for Anti-Money Laundering with Cryptocurrency] (Jan. 23, 2018), http://m.fsc.go.kr/common/mFileDown.do?BBS=BBS0030&FILENO=123190, *archived at* https://perma.cc/3WSL-BS82.

- When a trader who does not have a record of deposit for a cryptocurrency exchange account withdraws most of the funds sent from the cryptocurrency exchange account in cash

- When there are reasonable grounds for suspecting that a trader divides the amount of transaction money or the number of transactions to avoid reporting by financial institutions.[753]

The Act and the guidelines also mandate that cryptocurrency dealers and banks verify traders' identification and other information.[754]

On February 20, 2018, the chief of South Korea's Financial Supervisory Service, Choe Heung-sik, said that the government would support "normal" cryptocurrency trading and encouraged financial institutions to facilitate transactions with cryptocurrency exchanges.[755]

It was reported in March 2018 that the Ministry of Strategy and Finance is preparing a draft cryptocurrency taxation framework for release by the end of June 2018.  The Ministry reportedly considers income from cryptocurrencies to be capital gains or miscellaneous income.[756]

**Taiwan**

On December 19, 2017, Taiwan's Financial Supervisory Commission (FSC) issued a statement warning the general public about the risks of investing in virtual commodities such as bitcoin.[757] In the statement, the FSC reiterated that in Taiwan, virtual currencies such as bitcoin are considered "highly speculative virtual commodities."  According to the statement, whether tokens involved in initial coin offerings (ICOs) are securities under the Securities and Exchange Act will be examined case by case, and illegal fundraising will be sanctioned in accordance with financial laws.[758]

Previously, on December 30, 2013, Taiwan's Central Bank and the FSC jointly issued a statement warning the public about the risks inherent in dealing with bitcoin.[759]  In the statement, the

---

[753] *Id.* at 5–6.

[754] Act on Reporting and Specified Financial Transaction Information art. 5-2.

[755] 최흥식 금감원장 "가상통화 정상적 거래 지원 [*Chief of Finance Supervisory Service Choe Heung-sik, "Support Normal Cryptocurrency Trading"*], YONHAP NEWS (Feb. 20, 2018), http://www.yonhapnews.co.kr/bulletin/2018/02/20/0200000000AKR20180220100700002.HTML, *archived at* https://perma.cc/5TUL-NSCY.

[756] Min-kwon Chang, 정부6월 중 가상화폐 과세안 발표…7월 G20 회의에 규제 시계 맞출듯 [*Government Will Announce Cryptocurrency Taxation Plan in June ... Making It in Time for G20 Meeting in July*], FINANCIAL NEWS (Mar. 25, 2018), http://www.fnnews.com/news/201803251117095693, *archived at* https://perma.cc/Y6XD-KCBZ.

[757] Press Release, Financial Supervisory Commission Warns General Public Once Again about Risks of Investing in Virtual Commodities Such as Bitcoin (Dec. 19, 2017), https://www.fsc.gov.tw/ch/home.jsp?id=96&parentpath=0,2&mcustomize=news_view.jsp&dataserno=201712190002&aplistdn=ou=news,ou=multisite,ou=chinese,ou=ap_root,o=fsc,c=tw&dtable=News (in Chinese), *archived at* https://perma.cc/R56Q-Z2KM.

[758] *Id.*

[759] Press Release, Central Bank and FSC, Bitcoin Is Not Real Currency; Accepters Please Look to the Risks (Dec. 30, 2013), http://www.cbc.gov.tw/ct.asp?xItem=43531&ctNode=302 (in Chinese), *archived at* https://perma.cc/4N82-R6GS.

regulators said bitcoin is not a real currency, but a "highly speculative virtual commodity." The general public was warned about the specific risks associated with accepting, trading, or holding bitcoin. The Central Bank and the FSC will take necessary regulatory actions at the appropriate time on the provision of bitcoin-related services by financial institutions, the statement said.[760]

Following the 2013 warning, the FSC issued a notice on January 6, 2014, that prohibited banks and financial institutions in Taiwan from accepting or exchanging bitcoin or providing bitcoin-related services at bank ATMs.[761]

### Thailand[762]

The Bank of Thailand issued a circular on February 12, 2018, asking financial institutions to refrain from doing any business involving cryptocurrencies.[763]  Bangkok Bank halted transactions involving the trading of cryptocurrencies with a private Thai company, Thai Digital Asset Exchange (TDAX), on February 24, 2018.[764]  On February 27, 2018, Krungthai Bank, a state-owned financial institution, halted transactions related to cryptocurrencies with TDAX through the bank's accounts.[765]  According to a news article, the ban will continue even after a new regulation (discussed below) is issued.[766]

Though the government expects new laws regarding cryptocurrencies will be enacted in the future, it decided to implement temporary measures to protect cryptocurrency investors.[767]  According to news articles, on March 13, 2018, the Cabinet approved the principles of the drafts of two Royal Decrees, one to regulate digital currencies, including cryptocurrencies, transactions, and initial coin offerings (ICOs), and the other to amend the Revenue Code to collect capital gains taxes on

---

[760] *Id.*

[761] Press Release, FSC, Financial Institutions Must Not Provide Bitcoin-Related Services at ATMs (Jan. 6, 2014), https://www.fsc.gov.tw/ch/home.jsp?id=96&parentpath=0,2&mcustomize=news_view.jsp&dataserno=201401060003&toolsflag=Y&dtable=News (in Chinese), *archived at* https://perma.cc/P7FK-YGVD.

[762] At present there are no Law Library of Congress research staff members versed in Thai. This report has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[763] Arnab Shome, *Thailand's Central Bank Bans Banks from Dealing with Cryptocurrencies*, FINANCE MAGNATES (Feb. 12, 2018), https://www.financemagnates.com/cryptocurrency/news/thailands-central-bank-bans-banks-deal-cryptocurrencies/, *archived at* https://perma.cc/XT6F-VKMA.  The text of the circular is not available.

[764] Darana Chudasri & Somruedi Banchongduang, *Bangkok Bank Halts TDAX Activity*, BANGKOK POST (Feb. 24, 2018), https://www.bangkokpost.com/business/news/1417355/bangkok-bank-halts-tdax-activity, *archived at* https://perma.cc/FX7W-NNAQ.

[765] Wichit Chantanusornsiri & Darana Chudasri, *KTB Shuts Down Crypto Trade Accounts*, BANGKOK POST (Feb. 27, 2018), https://www.bangkokpost.com/news/general/1418935/ktb-shuts-down-crypto-trade-accounts, *archived at* https://perma.cc/5HQA-G6Q6.

[766] Frankie Crowhurst, *Thailand to Introduce New Cryptocurrency Laws*, CRYPTO DAILY (Mar. 18, 2018), https://cryptodaily.co.uk/2018/03/thailand-introduce-new-cryptocurrency-laws/, *archived at* https://perma.cc/BX79-JJ24.

[767] Wichit Chaitrong, *New Digital Currency Regulation on Horizon*, NATION (Mar. 4, 2018), http://www.nationmultimedia.com/detail/Economy/30340107, *archived at* https://perma.cc/QNN6-LJS7.

cryptocurrencies.[768]   The Decrees would require all digital asset transactions, including those of digital asset exchanges, brokers, and dealers, to be registered with the relevant authorities.[769]

## Vanuatu

In October 2017 a number of news media outlets reported that Vanuatu would allow people to use cryptocurrency to pay the fee to obtain Vanuatu citizenship as part of its citizenship investment program.[770] However, the Citizenship Office subsequently denied this, saying that there was no legal confirmation on the use of cryptocurrencies for this purpose and all payments were required to be in US dollars.[771]

No other government statements or regulatory actions were located.

## Vietnam[772]

The State Bank of Vietnam issued a decree on cryptocurrency on October 30, 2017.  According to news reports, the Bank

> effectively determined that Bitcoin and other virtual currencies are not legal means of payment.  That effectively also outlawed the issuance, supply and use of cryptocurrencies. Those found in violation of the decree and other relevant legal principles face fines of up to 200 million dong (around US\$9,000).[773]

Some news media also reported that the government is trying to establish a legal framework for cryptocurrencies.  It was reported that the Governor of the State Bank of Vietnam (SBV) Le Minh

---

[768] Wichit Chantanusornsiri, *Cabinet OKs Digital Asset Draft Decrees*, BANGKOK POST (Mar. 14, 2018), https://www.bangkokpost.com/business/news/1427642/cabinet-oks-digital-asset-draft-decrees, *archived at* https://perma.cc/N8EN-S3YZ.

[769] *Id*.

[770] *See, e.g.,* Echo Huang & Tripti Lahiri, *A Small Pacific Island Will Now Let You Pay for Citizenship with Bitcoin*, QUARTZ (Oct. 11, 2017), https://qz.com/1099475/a-small-pacific-island-will-now-let-you-buy-citizenship-with-bitcoin/, *archived at* https://perma.cc/9G89-BXVR; *Bitcoin Can Buy You Vanuatu Citizenship*, RADIO NEW ZEALAND (Oct. 10, 2017), http://www.radionz.co.nz/international/pacific-news/341258/bitcoin-can-buy-you-vanuatu-citizenship, *archived at* https://perma.cc/MLM2-KR47.

[771] *Vanuatu Govt Steps Away from Bitcoin Payments*, RADIO NEW ZEALAND (Oct. 19, 2017), https://www.radionz.co.nz/international/pacific-news/341894/vanuatu-govt-steps-away-from-bitcoin-payments, *archived at* https://perma.cc/9K9L-RG3M; Ben Moshinsky, *Vanuatu Denies it Will Accept Bitcoin for its \$200,000 Citizenship Program*, BUSINESS INSIDER (Oct. 18, 2017), http://www.businessinsider.com/vanuatu-accepts-bitcoin-for-citizenship-payment-2017-10, *archived at* https://perma.cc/5MPC-RHWW.

[772] At present there are no Law Library of Congress research staff members versed in Vietnamese.  This report has been prepared by the author's reliance on practiced legal research methods and on the basis of relevant legal resources, chiefly in English, currently available in the Law Library and online.

[773] Nate Fischler, *Vietnam Has a Cryptocurrency Dilemma*, ASIA TIMES (Feb. 1, 2018), http://www.atimes.com/article/vietnam-cryptocurrency-dilemma/, *archived at* https://perma.cc/5VF9-MSUE.

Hung said that " 'from the perspective of treating it as an investment asset', the SBV would co-operate with the justice ministry to 'study the legal framework for managing' Bitcoin."[774]

---

[774] Dani Gas, *Cryptocurrency Legal Framework in Vietnam: Will Be Ready by End of January*, INFOCOIN (Jan. 8, 2018), http://infocoin.net/en/2018/01/08/cryptocurrency-legal-framework-in-vietnam-will-be-ready-by-end-of-january/, *archived at* https://perma.cc/UX6R-U3E3.

Exhibit 5



**Israel Securities Authority**

# The Committee to Examine the Regulation of Decentralized Cryptographic Currency Issuance to the Public
## Interim Report

**March 2018**

*The following translation is intended solely for the convenience of the reader. This translation has no legal status and although every effort has been made to ensure its accuracy, the ISA does not assume any responsibility whatsoever as to its accuracy and is not bound by its contents. Only the original Hebrew text is binding and reader is advised to consult the authoritative Hebrew text in all matters which may affect them.*

**Comments should be addressed to: <u>Crypto@isa.gov.il</u>**

**<u>Contacts</u>:**

**Guy Sabbah, Tel: 02-6594416, Fax: 02-6556416**

**Adv. Eden Lang, Tel: 026556472, Fax: 02-6513160**



**Israel Securities Authority**

# The Committee to Examine the Regulation of the Issuance of Decentralized Cryptographic Currency to the Public

## Interim Report



To                                                                27 Adar 5778
Ms. Anat Guetta                                                   19 March 2018
Chair, Securities Authority

**Re: Submission of interim report of the Committee to Examine the Regulation of the Issuance of Decentralized Cryptographic Currency to the Public**

We hereby respectfully submit to you the interim report of the Committee to Examine the Regulation of the Issuance of Decentralized Cryptographic Currency to the Public (hereinafter: the "Committee"). The Committee began its work in September 2017 and since has convened many times, conducting internal discussions and meeting with various bodies active in the sector.

The Committee's main task was to examine the application of the Securities Law for offers and issuances to the public in Israel based on Distributed Ledger Technology (DLT). The Committee was asked to study and characterize these ventures, prepare a comparative review of the law in developed countries, and recommend an outline for regulatory policy in areas related to the Securities Authority. The overarching goal was to balance the encouragement of technological innovation with the protection of the public of investors.

The Committee aimed to increase certainty concerning the application of the Securities Law to the sector, which is vital to both the development of the industry in Israel and the continuation of investors' trust in the capital market. The Committee also examined future recommendations related to the application of the Securities Law to any activities associated with that sector, with the view that this new sector is challenging the existing rules, which may require future adjustments.

Given the innovative, complex, and dynamic nature of the sector, and its early stages of regulatory treatment (in Israel and around the world), the Committee's work must be viewed in the mirror of time. The Committee also believes that dialogue and cooperation between all the regulatory bodies is essential to the creation of regulation in this developing sector.

We would like to thank the Committee members who invested their efforts and experience to complete the draft report in a short time, professionally, and comprehensively. We would also like to thank all those who submitted material to the Committee and appeared before it.

Yours faithfully,

|                          |                          |
|--------------------------|--------------------------|
| Dr. Gitit Gur Gershgoren | Adv. Motti Yamin         |
| Committee Chair          | Committee Chair          |

**Committee coordinators (in alphabetical order)**

Adv. Eden Lang – Committee coordinator

Mr. Guy Sabbah – Committee coordinator


**Committee members (in alphabetical order)**

Mr. Uri Ezreihen

Adv. Hillel Ben David

Adv. Shoham Ben Rubi

Adv. Guy Dvir

Adv. Amir Helmer

Mr. Erel Mazuz

Adv. Maya Marinov Schiffer

Mr. Matan Omer

Adv. Orit Schreiber

# Contents

Introduction ................................................................................................................ 8

    Definitions .......................................................................................................... 12

    Summary............................................................................................................ 14

Description of the phenomenon ................................................................................ 16

    Background........................................................................................................ 16

    Venture types ................................................................................................... 20

    Types of rights conferred ................................................................................. 23

    The incorporation methods ............................................................................... 27

    The venture stage – from idea to product ........................................................ 29

    The offering to investors .................................................................................. 31

    The venture's presentations and disclosure to investors ................................ 33

    Types of investors............................................................................................. 39

    Secondary market............................................................................................. 41

    Trends in the development of the phenomenon................................................ 44

Economic analysis – opportunities, challenges and risks......................................... 51

    The entrepreneurs ........................................................................................... 51

    The investors/users.......................................................................................... 54

    The economy .................................................................................................... 59

    The risks involved in investment in cryptocurrencies ...................................... 62

The obligation to publish a prospectus in an offering of securities to the public ........... 69

      The legal framework ........................................................................... 71

      Offering............................................................................................... 72

      Securities............................................................................................ 72

      Public.................................................................................................. 80

      Recommendations.............................................................................. 81

The application of an additional legal framework under the securities laws ................. 85

    Registration of a trading and clearing platform in the Securities Law.......................... 85

      Trading platform license ..................................................................... 85

      Stock exchange license ...................................................................... 88

      Clearing house license ....................................................................... 92

      Application for our purposes – ............................................................ 96

      Topics for discussion .......................................................................... 97

Application of the Joint Investment Trusts Law ............................................................. 99

    Direct investment of mutual funds and ETFs in cryptocurrencies ......................... 101

    Mutual Funds and ETFs Investing in Cryptocurrencies Derivatives...................... 103

    Topics for Discussion............................................................................................ 104

The Application of the Regulation of Investment Advice, Investment Marketing and Investment Portfolio Management ......................................................................... 106

    Application of the Investment Advice Law on Activities of Investment Advice and Decision Making with regard to Cryptocurrencies.................................................. 108

    The Implications of a decision on whether services regarding Cryptocurrencies falls under the application of the Law with regard to providing services by a Licensee 110

    Topics for Discussion............................................................................................ 111

# Introduction

We have recently witnessed the appearance of a phenomenon of raising capital from the public by issuing cryptographic currency based on distributed ledger technology (ICOs) (hereinafter: "**currencies**", "**cryptographic currencies**", "**Cryptocurrencies**" or "**tokens**"). It has been estimated that during 2017, some 6 billion dollars were raised in this way. Israeli entrepreneurs and developers are thought to be dominant in the international blockchain industry and a meager number of companies in Israel are considering making, are in the process of making, or have already made issuances of this type in the last year.[1]

Against this background, an interdepartmental committee was appointed in the Authority to examine the regulation of cryptographic currency issuances to the public. The Committee's main task was to examine the application of the Securities Law for offers and issuances to the public in Israel based on distributed ledger technology (hereinafter: "**currency offers**", "**ICOs**" or "**issuances**"). The Committee was asked to study and characterize these ventures, prepare a comparative review of the law in developed countries, and recommend an outline for regulatory policy in areas related to the Securities Authority. The overarching goal was to balance the encouragement of technological innovation with the protection of the public of investors.

The industry based on Distributed Ledger Technology (DLT) is an innovative one with the potential to shape the financial world in Israel and abroad and make it more efficient. Israel's special characteristics and its international standing in this industry can lead to this industry making a contribution to the growth of the Israeli economy. A public issuance of cryptographic currency allows innovative technological ventures, at the start of their journey, to raise funds in a relatively short time and allows them to reduce their reliance on the traditional funding bodies, such as venture capital funds. Another advantage of the issuances is, the possibility for investors to be part of the development of the product or service. They can contribute to its success by participating in the writing of the technical code or actively using the platform itself with the currencies. On the downside, cases of fraud and trade manipulation were discovered in some of the issuances as well as security breaches that led to the loss of investors' and entrepreneurs' money. There are some

---

[1] These companies are not necessarily incorporated in Israel and issuances of the currency are also made outside Israel.

who believe that the currency issuances sector is in the stages of a financial bubble, similar to the Internet industry in its initial stages, and that some of these transactions are only a way to circumvent existing regulation on the raising of capital from the public.

In the last few months, a number of regulatory authorities worldwide have published preliminary references to currency issuances, representing different approaches to the status of these currencies from the aspect of the local law. Some countries, such as Germany, Brazil, the Netherlands, Russia, Poland, Malaysia, Thailand, Nigeria, and Dubai have only published general warnings to the public. A group of countries, including the United States, Australia, Hong Kong, Singapore, New Zealand, and Canada, published parameters according to which every issuance will be examined on a case by case basis. Some countries, including France and Germany, are examining special regulation of cryptocurrencies. While countries, such as South Korea and China, have strictly prohibited any capital raising activities using this method. Conversely, the Financial  Securities Authority (FSA) in Japan has granted a license for 15 cryptocurrency trading platforms.

Against the background of these developments and considering the policy of the Securities Authority in recent years to encourage the development of innovative means of financing, while protecting investors' interests and warning of unsupervised investments, the Committee examined the subject and it hereby respectfully submits its draft of recommendations.

The Committee aimed to increase certainty concerning the application of the Securities Law to the sector, which is vital to both the development of the industry in Israel and the continuation of investors' trust in the capital market. The Committee also examined future recommendations related to the application of the Securities Law to any activities associated with that sector, with the view that this new sector is challenging the existing rules, which may require future adjustments.

In the course of its work the Committee met with many bodies, including other regulators from Israel and abroad, key figures in the industry, developers and entrepreneurs who have made or are expected to make ICOs, investment bodies active in the sector, professional associations, and professional advisory bodies, including law and accountancy offices. These meetings were held with the aim of studying all aspects of this complex subject in depth, and drawing educated conclusions to the extent possible

in a limited time. The Committee strove to hear representatives with all points of view on the sector, however the desire to provide certainty to the developing industry in the shortest time possible did not allow the Committee to hear other bodies, and we hereby appeal to all those interested in having their voice heard to write to us during the public comment stage.

Due to the fact that this is a relatively new field, there is a lack of official sources and academic and professional works examining it in depth. Therefore, the content of the document and the background work done by the Committee is based, on many occasions, on information amassed during the meeting described above, on information from unofficial sources,[2] and on work that included a case by case examination of many situations.[3]

It is important to note that since this is a new and dynamic sector on which there is no regulatory oversight in Israel and globally, the Committee's work needs to be examined in the mirror of time. It must be taken into account that due to the dynamic nature and rapid development of this sector, much may change in a short time that puts the Committee's findings in a different light.

As will be described in the body of the report, there is a variety of different types of cryptocurrencies called by different names in an effort to characterize them. In this document, the definitions and names we will use are not to be given their meanings as expressed in various sources, but only as they will be defined in this document. At this stage, we would mention that we will use the name cryptocurrencies as a general term and that when a reference is made to a specific type of cryptocurrencies it will be defined individually.

The Committee believes that cooperation between the regulating bodies is important to the design of regulation for this developing sector and will be happy to make its work available for the benefit of that cooperation. The Committee also attaches great importance to holding a joint dialogue with those active in the sector, and invites all those interested to write to us.

---

[2] These sources are not always uniform or accurate.

[3] In this document, no specific ventures will be described and no names will be mentioned (apart from known crypto currencies whose source is not in Israel).

The main question with which the Committee was concerned is the issuance of cryptocurrencies (ICOs) – When are they considered to be issuances of securities that are required to publish a prospectus and follow the provisions of the law deriving therefrom? In the case they are considered to be issuances of securities – Is the existing regulatory framework appropriate for these issuances or do any adjustments need to be made? The report will also relate to other legal frameworks in the area of securities, however less so from this aspect, and it will not include recommendations for the creation of a new regulatory framework. However, the public is invited to also comment on these aspects.

The document is structured as follows: the first part of the document will review the phenomenon of currency issuances, the characteristics of the sector and the ventures, and the developments over the last few years. In the second part, an economic analysis will be presented which examines the opportunities, the challenges, and the risks facing the entrepreneurs, the investors, and the economy as a whole. The four following sections will relate to each of the relevant aspects of the subject in the Securities Laws: the third section will deal with the question of when a cryptocurrency is a security and the application of an obligation to publish a prospectus in accordance with the Securities Law. The fourth section will deal briefly with other frameworks determined in the Securities Laws – trading and clearing platforms; joint investment trusts; investment advice, and investment portfolio management. A short review will be given in each section of the Law's objectives and the relevant definitions, followed by an examination of the application of the Law to the various types of cryptocurrencies. The last section will review the main expressions and publications on currency issuances worldwide. The appendixes will include a warning to the public and a description of the accounting treatment of cryptocurrencies in public companies. (The last section and the appendixes are not part of this transcript).

Before we delve into the topics described above, there follows a number of definitions followed by a summary of the Committee's conclusions and its recommendations.

## Definitions

For the sake of convenience and consistency only, following is a list of short generic definitions of the main terms used in this report.

"**Securities Law**" / "the Law" **–** The Securities Law **–** 1968;

"**The Consultancy Law**" **–** The Regulation of Investment Advice, Investment Marketing and Investment Portfolio Management Law, 5755-1955;

"**The Trusts Law**" **–** The Joint Investment Trust Law, 5754-1994;

"**Distributed Ledger Technology – (DLT)**" **–** Technology to manage a decentralized data bank among multiple parties with no central body;

"**Blockchain**" **–** A DLT system based on a "chain of blocks" that documents and regulates all the transactions created in the network;

"**Mining**" **–** Verifying transactions on a blockchain network using computing power in return for the creation of new currencies and/or commissions;

"**Cryptocurrency**" **–** A digital information file encrypted using DLT and transferrable between parties, Including:

(1) A cryptocurrency used exclusively as a medium of exchange

(2) "**Token**" **–** A dedicated cryptocurrency conferring rights in a specific venture;

  (a) "**Security Token**" or "**Investment Token**" **–** A token conferring ownership, participation or membership of a specific venture, or rights to future cash flows from such a venture;

  (b) "**Utility Token**" **–** A token conferring use rights in a product and/or service proposed by a specific venture;

Everywhere in this document where the term "cryptocurrency" is mentioned, its meaning is as defined in the main definition unless one of the secondary definitions is used.

"**Smart Contract**" **–** Software code capable of self-executing contractual conditions between parties;

**"Token Launch", "Token Sale", "ICO" (Initial Coin Offering), "Coinsale", "Airdrop", or "Currency Issuance"** – An initial issuance of cryptocurrencies to the public;

**"White Paper"** or **"Disclosure Paper"** – A marketing document published by the issuer in an initial issuance of cryptocurrencies to the public;

# Summary

**The Committee mainly examined the application of the provisions of the Securities Laws to the issuance of cryptocurrencies (ICOs) and these are its recommendations in brief:**

- **Whether a cryptocurrency should be considered a security will be determined according to all the circumstances and characteristics of each case, and against the background of the Law's objectives.**

- Cryptocurrencies conferring rights similar to those of traditional securities, such as stocks, bonds, or participation units, **will be deemed securities**.[4]

- In general, cryptocurrencies intended only for use as a means of payment, clearing or exchange, and are not intended to be used in a specific venture, do not confer additional rights, and are not controlled by any central entity, **will not be deemed securities**.[5]

- In general, cryptocurrencies giving entitlement to a product or service and purchased <u>only for consumption or use</u>, **will not be deemed securities**.[6] In this context, the relevant test is the actual objective of the purchase, so that the absence of any real ability to use a token at the issuance stage, or the possibility of trading it in the secondary market may be indication that its purchase was not for consumption but for investment purposes.

- It is proposed to consider the use and expansion of existing and future capital raising frameworks for ICOs, including examining: lenient regulation on small scales ICOs; raising capital through ICO using crowdfunding platforms; determining a temporary framework for experimentation with the issuance of cryptocurrencies and advising entrepreneurs in this context, in the form of a

---

[4] This category is sometimes called "Security Tokens" or "Investment Tokens".

[5] This category is sometimes called "Currency Tokens" or "Payment Tokens". The Committee members emphasize that this does not constitute any opinion on the legal status of these assets (including their definition as "currencies") from the aspect of other laws (tax, banking and prohibition of money laundering laws) of which the Authority has no authority of their interpretation or enforcement.

[6] This category is sometimes called "Utility Tokens".

regulatory sandbox; and examining the possibility of relying on foreign regulation applying to the subject of cryptocurrencies.

- If there are ICOs pursuant to a prospectus, an adjustment of the disclosure requirements under the Securities Law will be required for the special characteristics of this sector, as was done with regard to other areas of operations (real estate, gas and petroleum, biomed, etc.).

- The question of whether an ICO constitutes an offer of securities to the public **in Israel** will be examined according to the characteristics of the offer. An offer will not be considered a public offering in Israel if its characteristics clearly show that it is not intended for the public in Israel (for example, by the language of the offer, the absence of any marketing, advertising or soliciting of the public of investors in Israel). The Committee raises for discussion the question of whether it is necessary to adjust the existing tests of an offer to the decentralized and inter-territorial nature of issuances of cryptocurrencies.

- The report also related to other legal frameworks in the area of securities, however less so from this aspect, and it will not include recommendations for the creation of a new regulatory framework.

**For more details of those recommendations, see page 50 of the report.**

# Description of the phenomenon[7]
## Background

At the end of 2008, during the global financial crisis, with the undermining of trust in the traditional financial institutions, an article by Satoshi Nakamoto[8] (his real identity is unknown) was published presenting the Bitcoin, a virtual and cryptographic (protected by security measures) currency. Nakamoto's motives for creating the project and disseminating it are not entirely known. However, the evidence of people and texts published in his name indicate that he was influenced by a libertarian ideology, a perception that seeks to cancel out the influence of governments and central banks on the value of money.[9] (One characteristic of Bitcoin intended to realize this objective is a restriction on the amount of coins that go into circulation, ensuring that it will be disinflationary.)

Since then and especially since 2013, the cryptocurrencies industry has experienced a sharp takeoff in the currency prices and their distribution.

Bitcoin is essentially the first application of the Distributed Ledger Technology (henceforth: "DLT") blockchain. Distributed ledger technologies are technological infrastructures that enable decentralized actions of recording and underwriting. Distributed ledger ventures are mostly based on open-source code and allow users from different computers to share an online information bank of transactions, including encrypted data. Using blockchain technology, the computers connected in a network keep the entire transaction history and can ensure its integrity. The information is encrypted so that every computer in the network knows from which address ("public key") any amount was transferred to any address, but the entity behind each address is not known (an entity holding a "private key" connected to that public key). Blockchain technology also makes it possible to ensure the integrity of the transaction and the order in which they are executed, which prevents situations of double spending of the same currency by the same

---

[7] This section was written near the end of 2017 and consequently does not relate to changes, events or publications since then.

[8] Satoshi Nakamoto, *"Bitcoin: A Peer-to-Peer Electronic Cash System"*

[9] Professor Milton Friedman, Nobel laureate in economics, predicted the development of an internet currency that would enable anonymous trading with no go-between as far back as 1999, as the missing part of the development of the Internet as one of the key forces in the reduction of government involvement.

entity. This is done by creating a cluster of transactions in "blocks" and the network's agreement to the order of their creation and their integrity.[10]

This ability to verify transactions with no need of a central managing entity enables a relatively reliable, simple and easy management of transaction between businesses and consumers. The use of the technology is particularly relevant to the financial sector, especially to money transfers, alongside other areas such as smart contracts, decentralized information storage, etc. A central component of distributed ledger ventures is the DLT token (a token or cryptocurrency as defined above) in which transaction are executed, information is transferred and rights are assigned and transferred.

As previously stated, the Bitcoin was the first application of this technology. The Bitcoin was intended to transfer value between users in a secure and anonymous way, with no physical presence, no central body controlling the currency or its supply (there is final fixed supply of 21 million coins, and the rate of their creation is written into a protocol; there are currently close to 17 million), and with no need for an intermediary or central agency to clear the transactions.[11] The initial value of Bitcoin was close to zero, and when it entered the public consciousness it began to accelerate to the extent that at the time these lines were written, its price had reached a peak of almost 20,000$ a unit, with extreme fluctuations of up to tens of percentages in a day, and its market cap had reached more than 300 billion US dollars (more than most of the companies in the S&P 500 index). This trend has also found expression in trading volumes, which have increased in the last few years from tens of millions to billions of US dollars a day. Following the Bitcoin, many other currencies based on similar technologies are being created that strive to provide more efficient solutions for the same use or intended for other uses. It is estimated today that there are more than 1,300 cryptocurrencies or tokens[12] with a market cap that started

---

[10] With Bitcoin, for example, the clearing and creation of agreement to the order of the transactions executed in the mining process, in which many entities in the blockchain network compete to assemble blocks of transactions while solving a mathematical puzzle requiring investment of computing power ("proof of work"). There are other mechanisms for creating that agreement, such as "proof of stake".

[11] For a more extensive treatment of the way the Bitcoin works (and the blockchain in this case), see Appendix 1 – not translated to English.

[12] According to other estimates, their number exceeds 2,500.

2017 at 18$ billion and reached around 600$ billion near the end of the year (fluctuating frequently in light of the high volatility of this market).[13]

In 2013, the Colored Coins method was developed, which allowed "painting" Bitcoin currencies so that they would be able to represent ownership of assets in the real world and enable transactions in them. In the same year, a number of projects were initiated, among them Mastercoin[14] (which was considered by many to be the first currency issuance), which were intended to allow complex functions on the Bitcoin network. These were the first smart contracts, one of the most important developments in this field. These contracts enable the enforcement of various conditions automatically by computers in the network. A smart contract can, for example, ensure that there is approval from a number of entities for the transfer of coins from a certain account (multi-signature), and ensure that the action will only be performed after a certain date or after a certain amount of coins has been received in an account. This is only one example of the use of a smart contract, but the uses are many and include, among other things, the conferring of various rights in ventures (that may be embedded in the token code) and the creation of entire organizations managed automatically (Decentralized Autonomous Organizations – DAO), detailed later in this document.

2015 saw the launch of the Ethereum Protocol that created an infrastructure and relatively simple programming language (Solidity) that enables anyone custom creation of tokens and smart contracts embedded in them. The clearing and enforcement of contracts is performed on the Ethereum blockchain network.[15] Payment for this service (called GAS) is made with the Ether coin, the value of which is derived from the expectation of demand for the service. The Ether is currently the second largest currency with a market cap topping 130$ billion (at a price of more than 1,300$ a unit at its peak).

The possibilities provided by Ethereum led to the launch of many currencies based on that protocol (and other protocols enabling a similar service), which in effect brought into being an entire industry of issuing coins conferring rights in various ventures and their sale to the public in order to finance those ventures. This phenomenon is called, among

---

[13] According to CoinMarketCap data

[14] Now called OMNI

[15] Which uses a mechanism called "Ethereum Virtual Machine".

other things, Initial Coin Offering (akin to Initial Public Offering – the raising of initial capital from the public by selling stocks).

These capital raisings have accelerated in the last few years as an alternative means of financing. According to estimates, in 2017 alone the amount of capital raised reached 6$ billion[16] in hundreds of currency issuances, most of them during the last half of the year, compared with 300$ million in 2016.[17] The development of the amounts of capital raised in 2017 can be seen In Figure 1.



_**Figure 1**: Amounts raised in ICOs in 2017_

Source: ICODATA.io

This market is characterized by great variety and these ventures differ from each other in their mode of operations, the rights the tokens confer in these ventures, the extent and method of raising the capital, the extent of disclosure they provide, their business models, the location and type of incorporation (if they are incorporated at all) and in the product development level. Following is a review of these characteristics.

---

[16] According to ICO Data website data – https://www.icodata.io/stats/2017

[17] Including The DAO issuance of 150 million dollars, which was returned to its owners due to an attempted theft by hacking code (more details later)

# Venture types

As previously stated, a wide variety of ventures can be found in this market, differing from each other in their mode of operation. A considerable number of these ventures are aimed at developing DLT infrastructure (mostly blockchain), although as the sector develops, we see more and more ventures aimed at providing services or relating to products/assets, that are not part of the technology. In these ventures the cryptocurrency is used as a method of payment for the use of the service or represents ownership of assets or other rights.

The various ventures can be divided according to different characteristics. Following is only a partial list of possible distinctions:

- **DLT based ventures vs. ventures using a token for capital raising purposes only** – There are DLT based ventures that use a distributed network actively as part of the service. These can include projects developing infrastructure themselves (for various uses) or take use of a distributed network infrastructure for other services, such as sharing of disc space or computer power between personal computers managed in a distributed way. These ventures generally operate with the aim of establishing a community of users that will create an ecosystem in which all the users are involved in promoting the venture, for example by using the platform, editing the code, providing services, etc. As this community grows and contributes to the venture the value of the tokens (which are also held by the entrepreneurs themselves) increases.[18] On the other hand, there are those whose operations have no connection whatsoever with DLT, but use the tokens to present other rights, such as means of payment for their service or rights to profits deriving from the venture (as set out in detail later), and use them only for capital raising purposes. These are mostly reliant on the existing blockchain networks and principally the Ethereum network (a survey we conducted showed that 80% of the tokens issued on a network are issued on this network).

- **Consumer ventures vs. investment ventures** - There are ventures offering investors consumer services, such as financial services, purchase of computer games, or issuing tickets for performances. On the other hand, there are ventures

---

[18] Details of this model are described in the economic analysis section.

operating as joint investment ventures. These ventures can invest in other ventures (either with a capital investment or by purchasing tokens), in cryptocurrencies or in any other asset. Their objective is to achieve high returns for their token holders (conferring a right in profits or ownership of assets), in some cases using crowd wisdom (so that holders of tokens can propose opportunities and vote on the choice of investments).

- **Innovative ventures vs. ventures that improve existing products** – There are ventures that bring with them a new perspective on consumerism, such as paying the user for viewing content (attention tokens). On the other hand, there are ventures that take a service or an existing product and offer it in a more efficient or less expensive form. As previously stated, some construct the service to use tokens ("tokenization"), which may on many occasions make it more efficient (although not necessarily).

    **Providing a virtual service vs. holding a real asset** – Many ventures invest in the development of a product to be used by its customers in the virtual world, such as gambling websites or computer games. On the other hand, there are ventures in which the tokens represent rights on products or goods in the real world, such as real estate, computerization servers (used mostly for currency mining) or gold (called "off-chain" products).

- **Ventures directed at a specific community against a venture for the public at large** – There are ventures that solicit a specific community and are aimed at providing them with functions such as a currency for local use or a token given in return for contributions to the community and providing discounts on local products. A specific community can also be a community of existing users, such as users of a computer game who purchase coins for internal use in the game or members of a club of some kind. On the other hand, many ventures are aimed at the public at large.

- **Ventures with central control vs. ventures with no central control** – Some ventures are managed by the body that developed the tokens. A bold example of this is when the token permits access to a service provided by that body. In other ventures (mainly in those engaged in blockchain infrastructure) the tokens are an integral part of the system and the community built around it continues to use the

tokens and support the system. In these ventures, too, there is no uniformity with regard to central management, and the venture may reserve for itself preferred rights over those of the other holders, such as the ability to revise and change the code without the consent of the majority. But even if the entrepreneur doesn't reserve preferential rights for herself, it may be that in fact since she[19] is the entity leading the project, the consent of the majority is dependent on her.[20] An additional differentiation in this regard is whether the venture is based on a private or distributed blockchain network. As distinct from the distributed network in which all interested parties can participate and be part of the recording or clearing (permissionless), in a private network permissions are required to do so (permissioned), and is usually characterized by centralization, so that a number of parties control it and can make changes in it.

- **Ventures for an existing product/service vs. an open venture** – There are ventures that make sales of tokens for which the service already exists (or is in the advanced development stages) and that can be used at the time of sale. This sale can for example launch the platform with a desire to create a community of users as described above (see details in the economic analysis section). Raising funds in this way can be geared to supporting that community and enlarging it, to adding services and future developments and as a return to the platform developers. Such a sale can also be used for other purposes, such as representing services or assets in which the tokenization may improve efficiency (like dividing ownership into small, negotiable parts). On the other hand, many ventures distribute the tokens (or an assurance that they will provide them in the future) when all they have is an idea or a project that is in the early development stages.These can use the capital raising to fund the development and for the same purposes described above.[21]

---

[19] Throughout this document gender-specific terms may be used in order to ease the text flow. Whenever such term is used, it should be understood as referring to both genders

[20] One example of this kind of venture is the Ethereum Protocol in which all holders have an equal right and the founder directs developments only by having the majority rely on his opinion, although a change in such a network demands broad agreement and requires a hard fork (a split into two separate currencies).

[21] More details of this subject in the section on the venture stage

In addition to the difference in their character, the ventures are spread over many industrial sectors. According to CoinSchedule data, as of December 2017, 35% of the funds raised went to DLT infrastructure ventures, 14% were for projects in the trading and investments sector (these include, for example, access to algorithmic trading software or investment ventures), 10% in the financing sector ( e.g., a digital bank tailored for the blockchain age), 8% in the payments and trading sector ( e.g., interbank transfers by representing the assets in blockchain and credit cards for using cryptocurrencies), 8% in the storage and information sector ( e.g., sharing available disc space between computers using blockchain). Other sectors in which the companies are operating are computer games (4.5%), gambling (3.2%), marketing and advertising (1.9%), identity and reputation (1.2%), art and music (1.1%), real estate (1.1%) and others.



Source: Coinschedule

## Types of rights conferred

In the early stages of cryptocurrencies, the right conferred by the token was only the ability to transfer value between users ( Bitcoin is the best known example) and not a right in any specific venture. This type of cryptocurrencies is still being issued and/or distributed today. With the development of the market and mainly as a result of the development of smart contracts and protocols that allow "custom made" tokens to be issued (led by Ethereum), that is to say conferring rules or rights at the issuer's discretion, more and

more ventures began to appear issuing tokens to the public at large (or to specific audiences) and using their sale to fund their operations. These tokens for the most part give their purchasers the ability to use a service or product developed by the entrepreneur, but can confer additional rights. These rights vary and change from venture to venture.

Following is a non-exhaustive list of the main rights that tokens can confer:

- Right of access/use – as previously stated, the principal right that can be seen in many ventures is the right to use a service offered by the venture. Uses for the tokens also vary from venture to venture and depend heavily on the type of venture and the business model behind it. Thus, for example, in ventures of a consumerist nature, such as computer games, they can be used as a means of payment for the service (something that already existed before the development of that market). In ventures offering an external platform ( e.g., a trading algorithm), they can be used to provide a way to access the service or platform. In the case of a venture that has real assets, such as computer servers, the token can allow its holder to use those assets (like rent). When the service itself is blockchain based, the use can be embedded in the token (a kind of software sale), and its holder can perform actions on the network (such as sharing disc space) or can pay parties in the network with it for the computer power required to perform the desired action (such as payment transactions or the enforcement of a smart contract, similar to Ethereum).
These are only some examples of the many possibilities for using tokens.

- Profit rights – In these ventures, token holders are given rights for a share of the venture's profits. These rights are characteristic of investment ventures in which token holders are entitled to receive some of the venture's profits that will be distributed when there are any, similar to a dividend.

- Rights to royalties – Tokens can confer the right to use a platform offered by the venture to offer its services to other users (a kind of franchise or marketing license) and collect payment for them.

- Rights on assets – Tokens that confer on their holders rights for a share of the assets owned by the company. One possibility is to represent a share of the

ownership of all the company's assets (like stocks). Another example could be the representation of some real-estate asset or any other physical asset (and if so, in contrast with the use of the token as rent, it represents ownership in the asset).

A right to provide a paid service – Ventures can pay token holders for the provision of various services. Thus for example, a token can allow clearing or mining services, which in most cases will compensate the token holder with additional tokens (in the form of a commission from the party requesting the service and/or in the form of creating new tokens);can provide an incentive to extend the services offered in the venture by giving tokens to developers of additional features to the venture (the payment can also be offered by the user community with a token for improvements they need); or to allow users to provide content services and such like in return for tokens.

- Voting right – Tokens that allow their holders to vote on topics up for discussion and in this way to influence decision making in the venture. The right can be in taking administrative decisions (such as choosing investments in a fund) or only in a predefined area of activity (such as arbitration on issues arising between platform users). There are ventures in which it is also possible to trade in voting rights with no trading in the token itself.

- Rights to cash flows – Tokens can also credit their holders with undertakings from the venture to pay them fixed or variable cash flows.

- Editing rights – Tokens that give their holders the right to make changes and improvements in the code.

As previously stated, this is a non-exhaustive list, and there may be many variations of these rights and other rights. Every token can also confer more than one right.

There are a great variety of tokens, from cryptocurrencies meant to be used as a means of transferring value and that are not intended for use in a specific venture, through tokens that confer a right of access to a service or means of payment for the service or product a specific venture provides, to tokens that represent rights in assets or in a company such as representation of ownership, profits or voting rights.

Research conducted at two universities[22] examined 253 issuances up until August 2017. This research revealed that 81% of the tokens conferred use rights, 68% conferred voting rights and 26% conferred profit participation rights.[23]

An analysis of data on 53 issuances, as published on websites conducting surveys of ventures (a random sample, although predicated on the website's survey), showed that most of the tokens confer use rights (76%), 27% confer voting rights and 18% confer profit rights.[24] See Figure 3.



*Figure 3: The rights conferred to encrypted tokens, as percentage of all ICO's*

Source: The Economic Department, Securities

There are many definitions in this industry for categorization of the various tokens. Among others, it is customary to draw a distinction (that is not official or unambiguous) between three types of tokens for regulation purposes: "Digital Currency/Cryptocurrency" ("cryptographic currency"), "Security Token" and "Utility Token/"App coin".

---

[22] Saman Adhami, Giancarlo Giudici & Stefano Martinazzi, "why do businesses go crypto? An empirical analysis of Initial Coin Offerings", Università Bocconi % Politecnico di Milano

[23] It is important to remember that this study was concerned with issuances made up until August 2017 and there may have been changes in the market since then.

[24] This sample is not necessarily representative and depends on the level of detail provided by the various survey websites and the projects surveyed. Issuances for the period March-September 2017 were included in the survey.

- "Cryptographic currency" is mainly a currency intended for use as a means of transferring value and not for a specific venture (such as Bitcoin).

- Security Token applies in the main to tokens included in the definition of a security in the US Securities Law or in other countries.

- Utility Token relate mostly to tokens that provide access to a service or a right to use a service or product (DLT based or not) provided by a specific venture (for instance, as a means of payment).[25]

The categorization criteria are not always uniform and clear cut and are not necessarily accepted by the various regulators. Thus for example, the Securities Authority in the United States (SEC) takes the approach that the existence of a "Utility" is not in itself sufficient to exclude the token from being defined as a security, and announced that it would weigh additional factors for token categorization purposes.[26]

## The incorporation methods

These ventures are incorporated in various methods and operate in different countries. There are many legal ramifications of the location and method of incorporation on their mode of operations and on the obligations they are under.

There are cases in which the entity developing the venture is registered in a certain country and, for issuance purposes, an additional company is incorporated in a more "convenient" country for issuances of that type (from considerations of regulatory certainty, lenient demands, lenient tax regimes, the ability to work with the financial system, etc.).

The most common[27] incorporation methods for those companies is described below:

---

[25] This differentiation finds expression in legal opinions of law firms in the United States and other countries, made for ventures concerning the exclusion of the tokens they offer from being defined as a security.

[26] On this issue there were a number of cases about which the SEC declared that they constituted an illegal sale of securities and a number of claims were made in the United States accusing venture organizers of selling securities illegally, alongside other claims concerning their integrity. detailed on the international review (not part of this transcript)

[27] There are other incorporation styles, such as partnerships, which have not been included here since they have a very limited presence in this industry. This list also needs to be qualified since many ventures do not indicate their incorporation style.

- Non Profit Foundation (NPF) - Many ventures are incorporated as nonprofit foundations, so the return from the capital raising is received by an organization that does not profit directly from the use of a product. In that case no small amount of tokens is issued directly to the entrepreneurs, allowing them to profit from their future sale and giving them an incentive to support the venture's success.[28] Some of the models in the world may also allow income to entrepreneurs as salaries or through associated companies (when the NPF is raising the funds but the development and the provision of the services is by another company). This incorporation method is widespread in Switzerland, for example, among other reasons due to the great flexibility of the NPF laws in Switzerland and the possibility of obtaining an exemption from taxes under certain conditions. These NPFs also have various restriction imposed on them, including corporate governance and report filing rules.

- A limited company (Ltd., LLC) - Another incorporation method is of a limited liability company. This legal structure gives the entrepreneurs protection from being held personally responsible for the company's activities (providing it is not acting illegally). It is common in the United States, for example, and especially in the state of Delaware, which recognizes the option to managing shareholders' registry in a distributed registration ledger.[29]

- Non-incorporated ventures – Some ventures are not based on formal legal incorporation and for the most part a few entrepreneurs work together in them to develop the product and the service. In that case, there is a risk of being sued personally, but the costs and complexity of setting up a company are avoided.

Each of these possibilities has many implications that vary from country to country for which we will not go into details.

---

[28] For more information, see the economic analysis section.

[29] https://global.delaware.gov/2017/07/10/delaware-is-close-to-law-that-will-let-companies-trade-shares-on-a-blockchain/

# The venture stage – from idea to product

The difference between the many ventures with regard to currency issuances is also reflected in the various levels of development of the products or services the ventures want to market to the public.

There are venture that seek to raise money when all they have is an idea (in return for tokens or an assurance of tokens in the future) or when they are in the early stages of development. In contrast, ventures may offer the public tokens when they have a finished product (or in the late stages of development), and the token can already be used by their purchasers – although even when full use is made of the tokens, it is common for the entrepreneurs to continue to develop the product, with the addition of more features and with platform maintenance.

There are also ventures that are somewhere between an idea and a finished product. They may offer initial versions of a product or a service that includes only some of the services described in the venture's presentations for which the capital is being raised. In view of the practice developed in the United States, which differentiates between a utility token and a security token (as described in the section "Types of rights conferred"), there are ventures that allow use of a token that may be curtailed or different from the use intended according to the funded development.

The great difference in the product development level and the question of whether they are active when the offering is made to the public is of importance to purchasers of the tokens. The public purchasing an assurance of a future right (whether the development is at the beginning of its journey or the product does not include all the promised features) is completely dependent on the entrepreneurs' efforts, and there may be considerable gaps in information between the entrepreneur and the investor (that may be reduced by proper disclosure and appropriate conduct, or alternatively exploited by the entrepreneur). Even when the product exists, the purchasers may be dependent to a great extent on the entrepreneurs' efforts to perform current maintenance and to add features to the venture (the extent of the dependence is dependent on the venture's business model), and so even under those circumstances, there may be gaps in information, albeit fewer.

According to data published in October 2017 by a project called "Token Report", of the 226 issuances completed and surveyed, only 20 enable the actual use of a service (which

was not necessarily enabled at the time of the issuance), and all the rest enable only trading of the token.[30]

In light of the differentiation between a utility token and a security token, when attorneys submit an opinion regarding the classification of the token from that aspect, the question of whether the token enables immediate use of the product or service offered by the venture is a pivotal one, since the answer to it is likely to have a great effect on the classification of the token.[31]

In practice, in the United States and other countries, tokens that still do not have full utility are customarily regarded as a security in accordance with the US Securities Law (as part of the Howey Test, in which in this instance the conditions are met for an expectation of an increase in value due to the efforts of others).[32]

In the United States this situation led to the development of the SAFT (Simple Agreement for Future Tokens),[33] which is a standard contract for a pre-sale of tokens – before the service in return for them has been developed – for accredited investors only. The contract is defined by its developers as an investment contract categorized in the US Securities Law as a security, and for the most part uses an existing exemption in Reg D

---

[30] https://www.bloomberg.com/news/articles/2017-10-23/only-one-in-10-tokens-is-in-use-following-initial-coin-offerings

[31] Thus for example, from the SAFT white paper (detailed below in the next paragraph):

"Pre-functional Utility Token Sales Are More Likely to Pass the Howey Test Potential plaintiffs (whether private or governmental) seeking to assert that a token is a security, might argue that the "efforts of others" prong is satisfied whenever the developers sell tokens prior to the network launch and prior to genuine utility (aside from mere tradability). They might take the position that the purchasers of these pre-functional utility tokens in such a scenario necessarily rely on the managerial and technical efforts of the developers to realize value from their tokens. For many pre-functional utility tokens, there is merit to this position. As stated in the prior section, the secondary market price of an already-functional utility token is determined by a great variety of factors. Likewise, the secondary market price of a pre-functional utility token could also be determined by a great variety of factors. However, the application of the technical and managerial efforts of the seller is likely to be the predominant factor in the price of a pre-functional utility token until it transitions to being a full utility token. The purchasers of a pre-functional utility token are, by and large, reliant on the efforts of the seller to develop functionality. These sellers have not yet expended their "essential" efforts. Those efforts are still required to deliver functionality, and therefore profit."

[32] For more information see the International survey section.- Not translated

[33] Juan Batiz-Benet, Jesse Clayburg & Marco Santori, "The SAFT Project: Toward a Compliant Token Sale Framework", Cooley, Protocol Labs, October 2nd 2017.

that allows the sale to accredited investors without meeting all the regulatory demands.[34] Once the full serviced has been developed, the tokens are issued – defined as utility tokens – to contract holders (who can then sell them on the market), and the venture can make additional offerings of tokens to the public.

## The offering to investors

The fundraising process may be of great importance to the amount raised and the continuation of the venture's development. Beyond the actual money required for development, the distribution of tokens to the public may be an important element in the creation of a wide community of users and in the creation of a marketing "buzz" around the product. There are ventures that invest enormous resources in this process, and we are witnessing the development of an industry designed to support the process. The process can be divided into a number of parts.

- **Pre-ICO** – Many ventures solicit accredited investors (venture capital funds, private funds, angels [large private investors], etc.) prior to the issuance, at a stage called Pre-ICO (similar to the process called Road Show in the traditional issuance of stocks or bonds).

  A survey conducted by Luxemburg and Sydney universities[35] found that 68% of the ventures in the sample[36] raised capital prior to the issuance, and it is estimated that the true number is greater, since the disclosure is lacking. These sales are sometimes made at a lower price than the price to the public, and their amounts may be a significant portion of the entire capital raised. Moreover, the meeting with these investors is generally face to face, and they can demand a great deal of information, such as receiving the computer code used by the venture and checking it independently. There are ventures that are satisfied at this stage and do not solicit the public at large immediately thereafter, whether from considerations with regard to the amount of capital needed or because there is

---

[34] https://www.sec.gov/fast-answers/answers-regdhtm.html

[35] Dirk a. Zetzsche, Ross P. Buckley, Douglas W. Arner, Linus Föhr, "The ICO Gold Rush; It's a scam, it's a bubble, it's a super challenge for regulators", 2017.

[36] The sample included 150 ventures

concern regarding regulation (against the existing exemptions in the security laws in various countries).[37]

- **Preparing the venture for capital raising** – The preparation may include, among other things, planning the business model, engagement with consultants and obtaining opinion letters (legal and professional), preparing presentations to describe the venture and for marketing purposes (including a white paper, a website, short films, etc. as described later), advertising preliminary material in forums, and obtaining feedback from the public, development of the infrastructure and the issuance (which may include writing smart contracts to manage the distribution), writing the code for the tokens being sold, etc.

- **Marketing the capital raising offer to the public –** Ventures can turn to various channels for marketing purposes, such as spreading the word on social networks, advertising on content websites and using professional marketers to disseminate the news. Alongside the development of the industry, websites were createdfor the promotion of token issuances and including long lists of anticipated issuances (or such that have already ended). Some of them conduct surveys of various depths on the ventures and even grade them and the risk level in them. These surveys, like the promotion of the venture and giving it prominence on the website may be in return for payment.

- **The issuance –** A currency issuance, as previously stated, is the issue of cryptocurrencies. The return for it is mostly obtained in exchange for other cryptocurrencies (generally Bitcoin, Ether or any other coin used as payment on the blockchain network used by the venture). Payment may also be received in the traditional currencies (fiat[38]). The issuance process itself is by and large conducted automatically by smart contracts drawn up by the venture developers. These contracts may include many mechanisms, including automatic dispatch of a predefined quantity of tokens after receipt of the coins received from the participants, and enforcement of the vesting periods for tokens being transferred to entrepreneurs (if such are defined). These contracts can also hold the return from the issuance. The contracts can be produced by the entrepreneur using tools

---

[37] See details in the section on the venture stage.

[38] In Latin, "so it will be", in other words, their validity is derived from the law.

and codes distributed on the network and by purchasing the service from professionals.

In most cases, a specific period is determined in advance (generally a number of days) during which money can be transferred in return for tokens (or in return for the assurance of tokens) at a price known in advance (which may also vary throughout period).

As previously stated, at all stages of the issuance there are professionals providing their services to entrepreneurs, and there are also platforms providing full support for the entire process. These platforms may play an important role in the design of the industry, and they can influence the way entrepreneurs frame their offering, the disclosure they make, and the rules of conduct they adopt. In view of the importance of reputation in this sector, the platforms intending to remain active over time will likely strive to maintain high standards even in the absence of regulation, and if regulation does develop in the sector, they will be able to take a significant part in its implementation.

## The venture's presentations and disclosure to investors

The disclosure provided to investors at the time of the offering is an important element that allows an investor to learn about the nature of the capital raising, the risks involved in it, and its feasibility from the investor's point of view.

In the traditional capital market in most countries, a company choosing to offer securities to the public is required to disclose all the pertinent information and take upon itself rules of corporate governance. Among other things, a public company is required to publish a prospectus containing detailed information, such as the sector of its commercial operations, the nature of the securities offered and their quantity, the purpose to which the raised capital will be put, financial data on the company and its assets, the ability of certain people to purchase securities on special terms, etc.[39] This information is published and accessible to the public of investors, so an investor can understand the risks of in investing in the company and allows them to assess the feasibility of the investment. The company is also legally responsible for all the information provided in its publications, so that investors can rely on it. The company is later required to publish periodic financial

---

[39] See the Securities (Details, Structure and Form of Prospectus and Draft Prospectus) Regulations, 5729-1969.

statements, details of the holdings of interested parties, etc., and immediate reports on important events. Apart from the disclosure, the company is required to maintain proper corporate governance aimed at protecting the investors' interest, such as the requirements that transactions with connected parties or executive compensation will be stipulated on the consent of the majority of minority shareholders.

For capital raising by means of an ICO to the public, the situation is currently different.[40] Many issuers consider themselves exempt from regulation and the obligation to meet its requirements. Therefore, there is no uniform disclosure provided by the ventures for capital raising purposes, and every venture may publish or conceal important information about itself, such as the development level of the intended product, financial data, and business plans. Nor are there any demands for proper corporate governance.

The purchaser may have a number of key ways to obtain information on ventures intending to make an issuance of tokens, among them the white paper, the company's website, marketing websites that review the ventures, professional external audit services, and content websites and blogs in which the community is active.

The most common document to accompany an offering of tokens and provide disclosure concerning the venture and the type of investment in it is, the white paper. This is a document drafted by the entrepreneur (who does not necessarily consider it an undertaking)and  sometimes vetted by professionals. The purpose of which is to present the idea behind the venture, to market it, and to provide information about the offering. This document is not uniform and may include one or more of the following clauses at different levels of detail and clarity.[41]

- The idea and the vision behind the venture

- The business plan (likely to include an economic model, market analysis, challenges, etc.)

---

[40] There is no such difference when companies solicit accredited investors such as risk capital funds, individual funds or angels. In that case, the bargaining power of large investors and or those accredited investors allows them to demand personal reporting of any relevant information, and they generally monitor the project throughout its life.

[41] As the sector developed, standards also began to develop for the level of detail in these documents. For more information see the section "Trends in the development of the phenomenon".

- Technical details of the technology and software code (a clause that may comprise a large part of the document)

- The development stage

- Details of the entrepreneurs and consultants accompanying the venture (which may be of considerable weight for investors in this field)

- Information on the company (style and place of incorporation, etc.)

- Details of the tokens, including:

    o The rights conferred by the tokens

    o The way they are used

    o The amount issued and whether the amount is limited

    o The existence of a buy-back mechanism

    o The issuance price (fixed or variable)

- Details of the anticipated offering, including:

    o The amount of capital to be raised (occasionally unlimited, which can raise questions concerning the future use of the funds)

    o Date of the offering

    o The purpose of the offering (sometimes divided according to the different objectives, such as paying salaries, development, etc.

    o The way the tokens will be divided (in many ventures, some is transferred to the entrepreneurs, some is offered to the public, and some remains in the company for future use)

    o The vesting period for the portion issued to the entrepreneurs (if any)

    o How the funds are held (with a smart contract or by some kind of trustee)

    o Coins received during the issuance (which will for the most part include common cryptocurrencies and may also include traditional money)

- Anticipated development timetables

- How the funds will be kept and how secure they are

- Examples of possible uses for the service

- Predictions for the future, such as the number of customers or profits (quantitatively or qualitatively)

- Other assurances, such as the existence of a secondary market and increase in value

Any of these details may appear separately from that document on the company's website or on the other channels indicated above, or may not appear at all.

In the absence of oversight, any venture may present itself as it pleases. They can emphasize the potential advantages the product or the service they are developing may have and ignore any disadvantages and risks there may be. Moreover, there is a great difference in the level of disclosure appearing in this paper (and in the other presentations) – there are ventures in which the level of disclosure is meager and very little information is provided to the investor, and on the other hand there are ventures whose white paper is relatively comprehensive.

In the above mentioned survey[42] the researchers concluded that for most of the ICO ventures sampled, it was impossible to make an educated investment decision.[43] This study presents a gloomy picture of the level of disclosure provided in the white paper. From a sampling of more than 150 ventures that made an ICO, it was found, that more than 20% of them did not disclose information about the entrepreneurs behind the venture, 25% did not disclose information about the way the money raised would be used, and more than 89% did not specify whether the money could be withdrawn immediately by the entrepreneurs. It was also found that 59% of the ventures providing information about the entity did not provide their exact addresses, and in 33% of the studies the name of the entity that wrote the white paper was different from the names of the entrepreneurs or the company behind the venture.

---

[42] "The ICO Gold Rush; It's a scam, it's a bubble, it's a super challenge for regulators", Dirk a. Zetzsche, Ross P. Buckley, Douglas W. Arner, Linus Föhr, 2017.

[43] "In most ICOs in our sample, potential participants are given so little financial information that their decision to fund the ICO cannot be based on a rational calculus."

Another issue that arises due to the absence of regulation on the ventures' offerings is the legal validity of the white paper. Ventures raise capital from the public relying on these presentations but then sometimes changes are made in them at a later stage, or the ventures are not true to the nature of the development and the product components on the basis of which the money was raised. At the time of writing, a number of claims are being made in the United States against a venture that made an offering of tokens, and the question of the legal validity of the white paper is at the center of these claims. Many ventures even declare in the document itself that it is not a binding document or a solicitation for investment, and that it is not an offering to buy a security and therefore, is not subject to any regulations.[44] This disclaimer does not necessarily absolve them of responsibility.

On the venture's website, apart from some of the information described above, the progress of the capital raising is generally described along with possible current information being published about the venture. It may also be possible to write the entrepreneurs, to ask questions and obtain additional information about the venture. Many ventures also publish short explanatory videos on their websites about the venture to simplify the, sometimes complex, idea to the purchaser and to market it. The website may include important information that is sometimes absent from the white paper, whether they were removed from the document for various reasons or because it was not in existence at the time of the offering. Sometimes there are even changes and modifications to the services planned or to the company's operations. The company's website may provide updates on these subjects, as well as updates on the progress of development and the various issues affecting the venture.

---

[44] Following is a typical version of a disclaimer of this sort:

"Nothing in this White Paper shall be deemed to constitute a prospectus of any sort or a solicitation for investment, nor does it in any way pertain to an offering or a solicitation of an offer to buy any securities in any jurisdiction. This document is not compose in accordance with, and is not subject to, laws or regulations of any jurisdiction which are designed to protect investors. Certain statements, estimates and financial information contained in this White Paper constitute forward-looking statements or information. Such forward-looking statements or information involve known and unknown risks and uncertainties which may cause actual events or results to differ materially from the estimates or the results implied or expressed in such forward-looking statements."

There are independent websites that coordinate lists of ICOs and some even review these ventures and rate them according to various parameters. This service is provided, in many cases, for payment from the venture--which may be detrimental to their level of trustworthiness. Other websites also monitor the progress of the projects.

Another channel from which the investor can obtain information is content websites and blogs. The information on them may not necessarily be reliable and there is no formal information on the level of understanding or conflicts of interest the authors may have. However, there appears to be an active community of people who examine each offering made to the public, publish incisive criticism, and demand answers from the entrepreneurs. Thus, for example, even if the company has not contracted with an auditing service, various parties in the community may themselves audit the code at the basis of the venture and publish its findings to the public.

In the present reality, standards of disclosure have begun to be developed in various forms. These standards may constitute self-regulation that market participants take upon themselves from a desire to distinguish themselves from problematic ventures. Such standards can be expressed in the disclosure in the company's presentations of all the material relevant to an investor, in refraining from giving assurances without cover, and in the availability of the entrepreneurs to answer questions.

Another expression is the hiring of external audit services. The audits are conducted on various levels and to varying degrees, and there are companies that have gained a reputation in this sector. In many cases, the audit reviews the tokens' code and examines, among other things, its content, its quality, its efficacy, and the level of its security. The review may also include the code of the smart contract used to manage the distribution process. In these cases, the audit will alert, among other things, vulnerabilities allowing the venture to change the codes conditions (e.g. changing the amount issued to the developers), security breaches, etc.

The audit report will occasionally divide the shortcomings into various levels of severity and the issuer has the option to respond or correct the shortcomings found and to update the public thereon. There are also more comprehensive audits which review the entire capital raising process and which may include the company's conduct, the money management (i.e. whether all funds raised remain in the company's wallet), a legal

examination of the participants in the offering and the process of customer identification (KYC[45]), fraud, and corporate governance.

Standards have also begun to be developed in the sphere of corporate governance, although to a relatively lesser extent. For example, there are ventures that determine a vesting period which may extend to several years, during which the entrepreneur cannot sell the tokens allocated to her in the offering. This mechanism allows the purchasers to know that the entrepreneur will continue to act for the benefit of the venture since she cannot sell her holdings immediately and "abscond" with the money.

## Types of investors

In a venture making an ICO there are likely to be various types of purchasers - those who are mainly motivated by the desire to use the service or product offered by the entrepreneur, and contrariwise, those mainly motivated by the expectation of profits. It is common to make an additional division of potential purchasers into several main categories:

- Users/potential customers - Those who are interested in using the service offered by the venture, whether immediately or at a later stage (and then the purchase can be based on the assumption that they are purchasing the use right at a reduced price).

- Pioneering investors – The developers, the users, and the investors who have purchased cryptocurrencies at their early days. In light of the astounding increase in the prices of some of the cryptocurrencies since their issuance, those who purchased those currencies in the past, even for small sums of money, and held them until present days have earned returns that may be in the hundreds of thousands of percentages and have increased their capital dramatically. That capital might still be held in cryptocurrencies, granting their holders relatively convenient access to these issuances and allowing them to use the currencies without having to convert them into dollars (which may not be a simple task for

---

[45] Know your Customer – A process of customer identification, which is part of regulatory requirements worldwide

large volumes).[46] It may also be surmised that these investors are enthusiastic about the technology, are familiar with it and the sector to some extent or other, are looking for the next investment opportunity, and some would argue that they are also less cautious in light of their sudden riches.

- Miners and trading platforms – By their activities, these hold large amounts of cryptocurrencies and profits are, for the most part, made in those currencies. They are also involved in the market and have a large amount of information to hand. They can, therefore, account for a considerable part of the overall investment in that market.

- Accredited investors – As previously stated, a substantial part of the funds from capital raising comes from accredited investors, mostly at the pre-ICO stage. Included in them are venture capital funds, private funds, family offices, angels, etc. These investors are mostly recruited personally, and the investments may be relatively large. In most cases, these are experienced investors with great knowledge of the business world. These investors can, on the one hand, make many demands such as demands for information and disclosure throughout the entire life of the investment or demand to receive part (or all) of the investment as a holding in the company's shares and not only in the tokens issued. On the other hand, these investors can provide professional support for the project and advise the entrepreneurs in their sphere of expertise. Moreover, in light of their vast experience, the recruitment of accredited investors can also serve as a sign to other investors that the venture has potential. Another reason for turning to those investors, in view of the lack of certainty about the application of the securities laws on these ventures in many countries worldwide, is the fact that in many countries the offering to accredited investors (according to various definitions) gives them a broad exemption from regulatory requirements including from publishing a prospectus. If the venture chooses to avoid the requirements of the securities laws, it must limit the recruitment to accredited investors only or postpone the public offering to the stage at which the level of development provides greater certainty.

---

[46] On this issue see the part concerning liquidity risk in the section "The risks of investing in cryptographic currencies.

As the sector develops, there are more and more funds geared to investment in cryptocurrencies. Some of these funds are for hundreds of millions of dollars. Moreover, there is evidence that established funds are beginning to enter the sector.

The recruitment of these investors was a main channel in the capital raising of startups even before the development of the sector. In the last year, raising capital by issuing tokens appears to have become the main channel for companies engaged in the DLT sector, with volumes overtaking the volumes of capital raised directly from VC funds at the seed stage of startups.[47]

- Retail investors – These investors may be characterized as having less knowledge than the investors described above, in both the investment and the technological worlds. In light of the smaller volume of investment they make, they are likely to have less influence on the ventures and the disclosure required from them. The media hype and the high returns seen in the sector, in tandem with a world of low interest rates, has led to these investors being attracted to it.

## Secondary market

One of the main features of this industry is the existence of a secondary market trading in cryptocurrencies. Distinct from the primary market, which relates to the initial sale of tokens to the public by the venture, a secondary market is the opportunity for people to trade in tokens in markets or on platforms intended for such.[48]

There is currently a large number of platforms in the world that facilitate trading in cryptocurrencies. It is estimated that there are around 200 trading platforms, a large proportion of which are concentrated in the Far East and the United States. There are platforms that only facilitate trading between cryptocurrencies, and there are those that also facilitate the conversion of traditional money into those currencies (mostly against the most common currencies which are later traded against the other currencies).

The latter are more complex operationally, due to the need to manage bank accounts for the customers' money and to comply with regulatory requirements in various countries.

---

[47] As reported by a number of sources, among them SmithandCrown

[48] There may also be currencies that are not issued to the public in the form of an issuance but are traded on the secondary market.

As distinct from most platforms in the east, trading platforms in the United States (and other countries) are supervised by various bodies, mainly the authority for the prevention of money laundering and terror financing (FINCEN) and bodies supervising currency service providers, bodies mostly belonging to the local authorities.[49] The existing supervision is mainly of platforms that exchange fiat money for cryptocurrencies (in light of the transfer of money between the banking system and the anonymous system of the cryptocurrencies). These requirements include, among other things, KYC processes and a check on the source of the money as part of anti-money laundering requirements (AML).[50] On the other hand, distinct from the traditional secondary markets, there does not appear to be any official supervision of the trading conducted, and no action is being taken to identify manipulations. Another difference between the platforms is the question of whether the platform is acting as a counterparty with the customer (as a dealer or money changer) or only as an intermediary for the various customers, which matches buy and sell orders of third parties, akin to stock exchanges. This difference, too, may have operational and regulatory ramifications.

Given the regulatory uncertainty and mainly to avoid a determination by the SEC concerning a breach of the US securities laws, the large trading platforms operating in the United States enable trading in cryptocurrencies which are considered to be currencies that do not come under the current definition of a security in the United States and the issuers of which carried out all the processes required by other regulators. Therefore, for the listing purposes of any token, these platforms may make demands of the ventures, such as a legal opinion testifying that it is not a security and proof that a KYC process has been carried out during the issuance. Due to the great advantages of listing a token for trading on a stock exchange (liquidity for the holders), these platforms have become a kind of gatekeeper concerning these demands on ventures. It should be mentioned that the listing for trading can be made by the entrepreneur (or the token

---

[49] In New York, for example, a specific license was determined for platforms that enable activities associated with the provision of cryptographic currencies services, such as holding, converting and executing transactions. This license is called "BitLicense".
 http://www.dfs.ny.gov/legal/regualtions/bitlicense_reg_framework.htm

[50] https://www.fincen.gov/news/news-releases/fincen-issues-guidance-virtual-currencies-and-regulatory-responsibilities

holders) referring to the trading platform, but can also be carried out on the platform's own initiative.

There are currently two main platforms operating in Israel which facilitate the conversion of shekels into common cryptocurrencies.

The most common cryptocurrencies are traded on a great number of platforms and in volumes that provide some degree of liquidity.[51] On the other hand, many currencies are registered with a small number of platforms (if at all) and their liquidity is relatively low. There are ventures that attempt to solve this lack of liquidity by constructing internal trading mechanisms or alternative mechanisms, such as built-in reserve mechanisms that allow customers to deposit or withdraw coins.

Another fact that needs to be addressed is that there may be substantial differences between the platforms in the extent of liquidity and the price quoted for the same currency. These differences may run to hundreds or even thousands of dollars and they may testify to a certain lack of efficiency in this market. In addition, many transactions are performed outside these platforms after buyers and sellers coordinate on social media or messaging apps. They will then meet face to face and transfer payment for the cryptocurrencies between them in fiat (traditional) money.

For the most part, anyone interested in trading on such a platform is required to transfer her coins to a private key owned by the platform. This fact carries a considerable risk of these platforms being hacked, which can even lead to their collapse. A prime example of the realization of that risk is the February 2014 hacking of the Mt. Gox platform, the largest platform at the time for trading in Bitcoin. The platform collapsed after it was revealed that it had been hacked and 850,000 Bitcoin with a value in excess of 450 million dollars belonging to customers had been stolen (according to the exchange rate at that time).[52] Another example published during the writing of this report (Dec 19th, 2017) is where a trading platform in South Korea declared bankruptcy in the wake of hacking in which customers' money was stolen.

Another relevant area is the development of distributed trading platforms. Although the cryptocurrencies are an attempt to exempt those performing transactions from the need

---

[51] For information about liquidity see the economic analysis section.

[52] https://en.wikipedia.org/wiki/Mt._Gox

to rely on a third party, most of the trading is carried out today on centralized platforms that keep customers' money as part of the service (in separate wallets whose private key is retained, as previously stated, on the platform). Distributed platforms try to resolve concerns over the reliance on a third party using smart contracts operating in various mechanisms (for example, by creating a proxy token that represents a holding of another currency (cryptographic or fiat) and facilitates automatic peer-to-peer trading. This type of platform raises questions regarding needed adjustment of existing regulatory mechanisms which were constructed mainly for the traditional model of centralized exchanges.

## Trends in the development of the phenomenon

The ICO is a phenomenon that began only in the middle of the present decade. Prior to 2016, there was only a modicum of currency issuances. The phenomenon began to gain speed in 2016 and the outstanding issuance event in that year was the DAO issuance (details of which will be given later) in May 2016 with a value of 150 million dollars. That issuance was considerably larger than all the other issuances up to that time. Total issuances in 2016 were 300 million dollars. This trend continued to gain speed during 2017, and in the second half of that year there was a considerable increase in the number of offerings and the number of ventures raising money in this way. This increase was supported by a number of large issuances, amounting to more than 250 million dollars for a single venture (some were not made to the public, but only to accredited investors).

It is worth mentioning the issuances of tokens by old-established companies which integrated the use of tokens into the services they were providing.[53] It is estimated that in the whole of 2017, 6 billion dollars were raised in hundreds of currency issuances.[54]

These issuances were accompanied by strong growth in the total market cap of cryptocurrencies. As can be seen from Figures 4 and 5, the market value at the beginning of 2017 was 18 billion dollars, the Bitcoin representing 90% of that. By the end of 2017 the market cap reached more than 600 billion dollars, an increase of more than 3,000%

---

[53] Including even Estonia which announced an ICO

[54] There are a number of sources for these data, but they are not uniform and are only an estimate. See Figure 1 in the background section.

and the Bitcoin share fell to below 50%. This was despite an increase of 1,400% in the Bitcoin price. This increase in the total market value of the currencies was the result of both the issuances of many currencies, some with a significant increase in the price, and of a marked increase in the value of the older currencies, such as Ether and Ripple, which increased in value by thousands of percent  (the market segment of each of which is more than 10% of the total market value).[55]

In tandem with the increase in market value, there was also a marked increase in trading turnovers. At the beginning of 2017 and before then, trading turnovers were less than 200 million dollars a day, and towards the end of the year they reached several tens of billions.



_**Figure 4**: The market value of all the cryptocurrencies, July 2013 – January 2018_

Source: CoinMarketCap

---

[55] According to CoinMarketCap data



Source: CoinMarketCap

There is evidence of a number of other trends in the development of this industry which are worth addressing.

**Increase in public awareness –** One of the phenomena that accompanied the development of the currency issuance industry and the marked increase in the prices of cryptocurrencies in general, and of Bitcoin in particular, is their rapid entry in to public awareness, accompanied by a great media hype. During 2017, there were many articles in the economic press on cryptocurrencies, and they became a topic of everyday discussion worldwide. Many prominent public figures are also being heard on the matter and offering words of support or of caution,[56] mainly with reference to Bitcoin. Awareness also grew following the marketing efforts of a community of cryptocurrency supporters.

**Launch of traditional investment products –** In the past year, investment products have begun to be developed in the traditional financial world based on the prices of

---

[56] Among them Bill Gates and Richard Branson, Jeff Besos, the CEO of JP Morgan, Nobel laureates in economics Paul Krugman and Robert Shiller, Christine Lagarde, head of the International Monetary Fund, former head of the Fed, Alan Greenspan, and many others. As previously stated, as early as 1999, Nobel laureate in economics Milton Friedman, referred to the key role of this type of currency in the evolution of the free economy.

cryptocurrencies. The most prominent example is the launch of futures contracts on Bitcoin in the CME and CBOE stock exchanges.[57] These are cash settlement contracts on the price differences between Bitcoin and the dollar (as distinct from the actual conversion of Bitcoin on the settlement date) according to one fixing per day. Activities in them do not therefore translate into Bitcoin activities. Moreover, the trading turnover in them is currently relatively low. Despite this, their launch is seen by some as an important step in the entry of the Bitcoin into the traditional financial system.

In addition, the SEC has not allowed the launch of ETF funds that will track the prices of cryptocurrencies.[58] In other countries, and mainly in Eastern Europe, such products have already begun trading. It should also be noted that other investment funds and products already exist in the cryptocurrencies industry (as distinct from the traditional financial world), and some of them are themselves traded with tokens.

**The entry of traditional venture capital and investment funds** – As already described in the section dealing with the types of investors, as the sector develops it is possible to see, alongside the development of dedicated funds for the sector, the entry of traditional investment funds – starting with the VC and private equity funds, which also began to accept tokens for their investments in those companies (in many cases in addition to equity) and ending with large investment banks, which announced the opening cryptocurrency trading desks.[59] We would qualify this by saying that there is currently no evidence that the pension funds and large institutional investors, that manage public investments, are entering into the sector directly, whether due to their more conservative nature or because of the regulation imposed on them.

**The development of standards for proper conduct** - There is evidence that as the industry matures (as a consequence of the learning processes of investors and entrepreneurs and the entry of large and important players from both sides), some ventures are taking upon themselves conditions aimed at maintaining fairness towards

---

[57] Large and well-established stock exchanges for futures contracts and commodities in the United States, under the supervision of the competent authority on the matter there, the Commodity Futures Trading Commission - CFTC.

[58] However, there are funds that do follow the Bitcoin price to some extent.

[59] https://www.bloomberg.com/news/articles/2017-12-21/goldman-is-said-to-be-building-a-cryptocurrency-trading-desk

investors, even without any regulatory requirement. These processes may create best practice standards that will distinguish between fair ventures and those less considerate of the investor's needs or that are planning to defraud him. An example of this development is the setting of a vesting period that can extend to several years, during which the entrepreneur cannot sell the tokens allocated to her in the issuance. This mechanism allows the purchasers to know that the entrepreneur will continue to act for the benefit of the venture since she cannot sell her holdings immediately. Another example is the use of external auditors that examine the code of the token or the smart contract responsible for distribution, giving token purchasers certainty regarding their quality and trustworthiness. Yet another example is the level of detail in the white papers and the venture's presentations, the availability of the entrepreneurs to answer questions, and the use of Escrow to hold the funds raised, in addition to the use of smart contracts.

The development of standards is a welcome phenomenon that should contribute greatly to the development of the industry, to the protection of investors, and should allow them to better assess the value of their investment. However, it is doubtful if this will be sufficient to protect the investor public.

**Changes in the types of ventures** – At the beginning of the ICO phenomena and in the preceding period, the majority of issuances were for DLT infrastructure development projects. As this sector developed, companies began to enter that offered other services and used the technology as part of another service or merely for the purpose of using the token (as representatives of a service that has no connection with the technology). For example, according to Coinschedule data, in 2016 and in the first half of 2017, infrastructure projects constituted more than half of the total offerings. On the other hand, the datum for the whole of 2017 is 35%. That is to say, in the second half of 2017, there was a sharp drop in the share of infrastructure projects.[60]

**Changes in the rights conferred by the tokens** – There is evidence that the rights themselves have also undergone changes during the short period the phenomenon has been in existence. It is estimated that after the publication of the SEC report on The DAO project in July 2016, together with the declarations of many regulators during the same period, more and more ventures, which understood that regulation was on the way, began to try to distance themselves from the possibility of being defined as a security (or issue

---

[60] This datum may be greatly affected by several large issuances.

the tokens only to accredited investors). One of the consequences of this process is the issuance of tokens that confer only a use right, with no rights identified with a security such as participation in profits, ownership or voting. Another effect is the issuance of tokens once a partial utility has been developed.

**Development of supporting services** – The development of a new sector provides a great potential for supporting services providers – both the established service providers, such as professional consultants and attorneys, and new service providers developing in its wake. In light of the existing regulatory uncertainty in most countries, attorneys acting in the sector are benefiting from strong demand for project consultancy and opinions on the status of the token issued, supporting the stand that it doesn't constitute a security. The new business model and the fact that this sector is highly technological, also brings high demand for professional advisors, economists, and developers who understand the sector. We are also witnessing the development of an entire industry for ancillary services. Included in these are platforms that facilitate the capital raising and marketing of ventures, bodies that conduct external audits of the venture , platforms for trading tokens, digital wallets, content websites, blogs, etc.

**Development of the DAO model** – one of the most interesting phenomena in the industry is the development of ventures in which most of the management processes are automatically executed using smart contract that enable "democratic" management of the venture. The name normally given to such organizations in Decentralized Autonomous Organization (DAO). The smart contracts allow the various predetermined conditions to be enforced. Thus, for example, a certain contract can ensure that decisions are taken by the company only by a majority of those holding a certain voting right. A prominent example of such an organization is The DAO, which made a coin issuance in May 2016 in which 155 million dollars were raised (the largest till then). The venture was a fund for investment in cryptocurrencies, which allowed its investors to determine its investments through participation in voting.[61]

A significant proportion of the management processes were enforced with smart contracts. The failure of that venture was expressed as one of the biggest problems of organizations of this sort, which is the total reliance on predetermined roles and encoded in the smart contracts, with no ability to easily change them. This reliance led to the code

---

[61] Although the token holders' status was not uniform and they were divided into different tasks.

being hacked and Ether coins valued at 50 million dollars being stolen from investors' holdings (later returned while creating a hard fork in the Ethereum network).[62]

Ventures of this type raise questions regarding their legal status, since they do not have to be officially incorporated and subject to centralized management, and are more likely to resemble a partnership based on a wide audience.

All the trends described above are only some of the existing trends in this sector. It is also a new field that is at the beginning of its journey and it is reasonable to suppose that as it develops, there will be other important changes in it.

---

[62] For more information see the review of the report published by the SEC on The DAO affair detailed in the international review (not part of this transcript).

# Economic analysis – opportunities, challenges and risks

Raising capital with an issuance of cryptographic coins (tokens) yields many opportunities, as well as challenges and risks, for the entrepreneurs, for the investors (or customers), and for the economy as a whole. In this section we will analyze the advantages and the challenges and disadvantages of raising capital in this way from the perspective of the various entities involved in the sector. The technological nature and rapid development of the industry are leading to many changes in nature of the ventures and capital raising, and so new opportunities, challenges and risks may arise in the future while others may lessen or disappear. In light of the immense differences between the various ventures, there are also differences in the effects they have.

It should be noted that whereas the issuance of tokens is one feature of the use of distributed ledger technologies, these technologies are of much greater importance. The industry based on them is an innovative one with the potential to change many sectors and make them more efficient, including the financial world.

However, this is not the place to delve into this subject or the subject of cryptocurrencies in general, and we will concentrate only on the significance of ICO's (although it is not always possible to distinguish between them).

## The entrepreneurs

### Main opportunities:

**The capital raising channel** – ICO's provides the entrepreneur first and foremost with an additional channel for raising capital. This is an alternative to the traditional methods – which concentrate on private investors, financial institutions and the capital markets – mainly for projects engaged in distributed ledger technology,[63] since the channel provides easy access to a public of investors worldwide, whose ability to invest in projects of this type was previously limited, and as described above, makes it possible to raise considerable sums, sometimes relying solely on an idea, with relatively meager disclosure of information. This type of capital raising is considered by many to be a simple, efficient

---

[63] As presented above, the volume of capital raisings using this method for blockchain based ventures overtook the volume of capital raisings from VC funds.

and cheap process relative to the traditional ones. However, as the market matures and more ventures compete for investors' attention, the process is becoming more difficult.

**Pre-selling with no allocation of shares and with a limited undertaking –** In traditional capital raising, the entrepreneurs are required to give an investor a share of their holdings in the venture (in the case of shares) or an undertaking with regard to future cash flows (in the case of a loan or bond). As described above, some tokens do not confer these rights, but only usage rights. Thus the entrepreneur can in effect raise considerable sums without diluting her holding in the company and without any undertaking to repay the money and/or to pay interest. Questions may also be raised with regard to the existence of any true undertaking on the issuer's part in many of these issuances.

**Sharing business model (the network effect) –** The issuance of tokens allows ventures, mainly those offering platforms for the provision of additional services, to create an exceptional business model in which the investors take an active part from many aspects of the venture. First, in many cases the token is in fact a hybrid product that combines utility with an investment product. Thus a structure of incentives is created bringing  investors in the token to aspire to using the product and spreading the news, since the larger the community of users becomes and the further the network spreads, so the demand for tokens will increase and its value will rise (Net effect). Moreover, in many cases, there are disinflationary measures to ensure that as more use is made of the tokens their price will rise (like having a limited amount of tokens or the  omission of tokens on every use).

Secondly, in many ventures the same community is also responsible for making improvements in the code and for providing services as part of the venture (in return for payment), from transaction clearing services to services provided on the proposed platform. There can be a great variety of these services depending on the nature of the venture. For example, a venture proposing a platform for content services can pay those offering content on it and attracting other users (similar, non-token models also exist but these can make them considerably more efficient). In addition, since the service providers are rewarded with tokens, they are incentivized to continue to improve the system and to increase the value of the tokens (similar to options compensation). This business model can assume different forms and be expressed on different levels, depending on the structure of the venture and the rights conferred by the tokens. Thus for example, when

the tokens also confer a voting right on various decisions in the venture, that investor/customer/service provider described above can also participate in the management decision making process of the venture.

These features create a sort of ecosystem that is self-nourishing and creates value for the venture even without the entrepreneur's involvement (although insofar as she acts to increase the community so also will she benefit). In this model, a significant part of the entrepreneur's profits may come from her holding a large quantity of tokens and not only from selling services.

**Absence of full and tailored regulation** – The situation today is that many ventures are uncertain with regard to their entry into the existing legal definitions and it may be that from their point of view they are not required to comply with regulatory requirements, such as publishing a prospectus, financial statements, and corporate governance. This situation allows entrepreneurs to save many costs and sometimes even to publish presentations biased in favor of the venture (which improves the chances of the capital raising).

**Internationality** – Since the cryptocurrencies work on the network with no regard to borders, the entrepreneurs working with them are able to transfer value speedily and easily to anywhere in the world. This has a number of advantages, the main ones being the potential to solicit a wide community of customers (or investors) and making the most of global resources – such as manpower, computer power, and money – in a relatively simple way (thus for example, they will be able to transfer payment in tokens easily without converting currencies or using any third parties).

## Main challenges:

**Transfer of value to the tokens** - Along with the advantages described above, it should be kept in mind that value cannot be created from nothing. An issuance of tokens can in some cases transfer all or part of a company's value to the tokens. For example, a company choosing to sell tokens providing use of the platform it created will not benefit directly from an increase in the value with the arrival of new users who are willing to pay more for the service (than on the initial sale) since they will do this by purchasing tokens in the secondary market. This is also obviously dependent on the venture's business model. Thus for example, if the venture continues to sell tokens after the initial sale, it will

continue to benefit from that income, but will at the same time cause negative impact on their price (due to increased supply).

In this context, keep in mind that a significant amount of tokens is usually held by the enterpanuer and the venture itself, hence they also benefit from the increase in their price (or lose on a price drop). When the value is transferred to the tokens, the venture's profits may be characterized by many fluctuations due to the effect of speculative motives on trading in the secondary market. [64]

**Absence of full regulation tailored to the sector –** The situation described above as an opportunity for entrepreneurs can also be their downfall. This situation may lead to capital raisings by ventures that do not properly represent themselves and even by those whose purpose is to defraud the investors, which is liable to do great harm to the industries reputation and to the success of honest ventures in the future.

# The investors/users

## Main opportunities
**Variety of investment options –** Investment in tokens allows investors access to innovative ventures in the early stages of their life, in which there is a chance of substantial profits – n investment that until now have been accessible mainly to accredited investors. It is also an additional investment channel, not necessarily correlated with other investments of those investors, which gives them an opportunity to diverse their portfolio and distribute its risks.

**Ability to invest in small sums –** In light of the nature of the market, there is no significant restriction on the amount invested, and it can vary from extremely small sums to extremely large.. Thus small investors are also given an opportunity to reach investments that previously had by and large only been accessible to large investors.

**Secondary market and liquidity –** For the most part, an investment in innovative ventures at the beginning of their journey is made, often through VC funds and the like, for a long period and does not allow instant liquidity. The use of tokens traded in the secondary markets (or with conversion mechanisms) gives investors greater liquidity

---

[64] One way equity investors in these companies deal with this problem is to receive tokens in addition to equity.

(although it is limited according to the existing amount of liquidity in the market for those tokens), and gives them the possibility of selling their holding at any time.

The existence of a secondary market is one of the factors contributing to the investor's ability to benefit from an increase in the price of the token even when it has no rights beyond the ability to use the service offered by the venture. An investor who believes that the value of the token will rise, for example due to the expectation of an increase in demand for the service or progress with its development when the venture has yet to develop the service, purchases the token in the expectation that she will be able to sell it in the secondary market at a later stage. This is in contrast with crowdfunding of a product for example, for which there is not expected to be an active secondary market (there are obviously other differences).

**The ability to influence the project** – The advantage to an entrepreneur of the sharing business model as described above is also relevant to a great extent to investors. The investors can benefit from the contribution made by their companions in the investment and also contribute themselves, receive payment for services, vote on management decisions, etc., and thus influence the project and the value of the tokens they hold.

**Use of services/products** – The services and products offered by these ventures are usually innovative and can make many processes more efficient for the user. Thus for example, the ability to transfer value easily and without intermediaries cuts the user's costs and can make things much easier for him.

Also, for many, the mere participation in a community with shared values and objectives, such as the communities described above, itself has a great value.

## Main challenges:

**Exposure to risks** – The investment in cryptocurrencies involves risks different in their severity or nature from those known to an investor in the capital market. These risks include market risks (such as the development of price bubbles, low liquidity and high volatility), operational risks (such as the risk of fraud and manipulation in unregulated trading, cyber risks, centralization and control over currencies, and the difficulty of working with the banking system), as well as regulatory risks (including the implications of future regulation on the sector). More details of these risks will be presented later, but in the following lines we will focus on the risks involved in participation in ICOs.

A large proportion of the ventures making ICOs are innovative, technology driven projects at the beginning of their journey. Alongside the chances of large profits, an investment in these ventures is very risky. Many of these ventures are likely to fail, and the investors in them are liable to lose all their investment. Moreover, as opposed to the investment of an accredited investor, which for the most part monitors the progress of the project and invests in stages, the public's investment in ICOs is made in advance, with no stipulation or collateral provided.

Another risk involved in such an investment is the fact that the sector is open to fraud. It is not regulated, and the investor does not necessarily know who is behind the venture and where she is located. This situation is very compelling to fraudsters, and the investor might lose all her investment with no way of recouping it. One example of this is the cryptocurrency "One Coin", which proved to be a Ponzi scheme a year after being issued and many investors had lost their money. Other frauds connected with ICO's have recently been published for which indictments were issued (by the SEC for example).[65]

The investment in cryptocurrencies carries a liquidity risk that may be great relative to the investment in other assets (although it also provides liquidity in investment in ventures which previously had none, as described above), that is, the risk that selling the holding will involve high costs. This risk is even greater when the venture is new and it is unknown how much liquidity there will be in the token it is issuing. As already described, there are mechanisms that attempt to solve this problem, for example by the use of reserves, but these mechanisms, too, have their disadvantages and they will not necessarily provide the investor with a way to sell her holding without considerable cost. This shortage of liquidity may lead to even more price volatility and expose these tokens to manipulation in trading.

Another risk in investing in these issuances is the fact that it relies on computerized wallets and smart contracts which are exposed to cyber risks and hacking. There are a number of examples of this, among them the hack of The DAO (described above) or of CoinDash, in which seven million dollars were stolen during the ICO by channeling the money to an alternative address.

---

[65] detailed in the international review (not part of this transcript).

**Asymmetry in information** – As with every financial investment in ventures controlled by a central body, in this sector there are also many cases of inherent asymmetry in information between the entrepreneur and those working under her and the investor. Thus for example, the entrepreneur is aware at all times of the company's financial state, the successes or failures of key processes in the venture, such as the development of the product or the extent to which it is being used, of transactions and cooperation, and every important event in the life of the project. In many cases, the entrepreneur is also the one who moves these processes along. On the other hand, the investor is often dependent on the extent of disclosure provided to her by the entrepreneur. These differences may make it difficult, for example, for the investor to assess the company's value (whether at the time of the issuance or during the life of the investment) and expose her to insider trading by the entrepreneur or those working under him. In the traditional capital markets, these differences were resolved by applying regulation that included appropriate requirements of disclosure, rules of corporate governance, and an assurance of fair trading (described later).

**Valuing of the investment** – A number of factors are liable to make it difficult for the investor when she comes to assess the value of the tokens she is purchasing. In the first place, this is in many ways a new type of investment vehicle which is very different from the traditional vehicles and therefore it is not necessarily possible to use standard models. Secondly, every venture can use different models to create value for the tokens and each has ramifications on their pricing. Moreover, as described above, the sector is exposed to great uncertainty in a number of areas which makes it difficult to make an assessment. As described above, there are also differences in information which can derive from the absence of any obligation for the issuer to provide information and/or from the difficulty of assessing the reliability of the information accessible to the investor, as well as the technological nature of the information which demands a great deal of expertise in the area, are all liable to exert a considerable strain on the investor's ability to assess its value.

**Absence of full regulation tailored to the sector** – As previously stated, this sector is not yet regulated in most countries, and many ventures are avoiding being brought under the supervision of regulatory provisions as selling securities (or are ignoring them). This may have many repercussions. First, as already described above, it exposes investors to various risks, such as the risk that they will fall victim to fraud, the risk that trading will be

manipulated, and stability risks (such as the collapse of the trading platform or ventures following a cyber-attack with no proper safety cushion or insurance, in contrast with the traditional financial investment in which there is a partial answer to these risks with regulation). Secondly, the absence of regulation may allow companies to provide deficient, biased, and even misleading disclosure. Ventures can for example include little information on the disadvantages of the idea and of the business model, while on the other hand emphasizing the advantages. In many instances there are questions regarding the legal status of the venture's presentations, including the white paper, and there are ventures that even write in it that it is not a binding document (which does not necessarily exempt them from responsibility). Ventures may therefore change the content of these documents, renounce some of the assurances given in them, or act in ways different from those promised.

This fact is important for the investors, since there is no guarantee that their money will be used by the entrepreneur for the purposes that led to making the investment decision. Moreover, in the absence of rules of corporate governance and regulatory supervision, ventures may also change important conditions, such as the ability to issue more tokens (which will directly affect their value) or change the vesting conditions, or even allocate the money for other purposes, that might not necessarily be connected with the venture for which the money was raised.

As previously stated, another situation made possible by the absence of regulation is the fact that there are no appropriate demands for disclosure, including periodic reports on the company's condition and immediate reports on exceptional events, coupled with the lack of supervision on trading activity and insider trading (if relevant). In this situation, an insider who knows that a certain important event is expected to occur can buy or sell tokens prior to the publication of the information to the public, and thus profit from changes in its price. So, too, if the venture is on the verge of bankruptcy but the investors have no way of anticipating it. In that case an insider can sell her holdings before the collapse occurs. These extreme situations are only examples of situations that can be caused due to the absence of these reports. During the lifetime of the venture (or at the time of the issuance) the absence of reporting may also harm investors' ability to properly assess their investment. We would qualify this by saying that there are ventures that provide

proper reporting even without any regulatory demand, and are managed honestly and strive to fulfill all their obligations.[66]

# The economy

## Main opportunities:

**Encouraging innovation and growth** – The development of an additional financing channel for innovative companies at early stages may make a considerable contribution to the economy. First, these ventures, and mainly those engaged in distributed ledger technology, can lead to greater economic efficiency in many fields. The technology being developed by these entrepreneurs affects many area and can, among other things, reduce costs, save the need for intermediaries, and improve the way information is transferred between parties (and save much bureaucracy). Thus for example, in the financial industry it may save the need to rely on central bodies to clear and register transactions and thus reduce the systemic risks deriving from it and save the brokerage costs. The use of smart contracts can also bring more efficiency to many fields requiring enforcement of contracts, since it is carried out automatically by computers. These are only a small part of the advantages that can be provided by ventures striving to create DLT based solutions.

Moreover, the development of many ventures, along with the chance that some of them will become extremely successful, will contribute directly to GDP and to growth, as well as creating many sources of income (both in the companies themselves and among the service providers supporting them).

**The sharing economy** – In general, the sharing economy makes it possible to share property, products and services among people, by using resources more efficiently and the surplus in them, and they are therefore of great value to the economy. Examples known to the fields of the sharing economy are carpool services and short-term rental services of unoccupied rooms and apartments. This industry has an affinity with this concept from many aspects.

---

[66] See the section dealing with trends in the development of the phenomenon with regard to standards.

First, many ventures in this sector use the technology to allow unused resources to be shared. Thus for example, there are companies offering platforms for sharing available disc space or unused computer power.

Secondly, the sharing business model described above allows, for example, every user in the network to contribute her free time and skills to improving the venture, to receiving a reward for doing so, and to benefiting from an increase in the value of the entire network and of the tokens they hold, This is in fact better use of existing resources.

Another advantage offered by the use of tokens is the possibility of division into small units, represented by tradable tokens, products that require for the most part a large investment and that have a high entry bar, such as real estate, works of art and commodities. This division allows these smaller units to be purchased so that anyone can benefit from an investment in those products, and provides these investments with liquidity. This may improve the allocation of the capital, capitalize on the effect of crowd wisdom on the pricing of the assets, permit a fairer division of wealth, and may make other sectors with less liquidity more efficient.

**Risk spreading and improving the allocation of wealth** – Risk spreading on the economy level and variety in the sources contributing to its growth are important if the economy is to be kept stable. Expanding the supply of the existing models and structures reduces the dependency on a small number of factors. Moreover, the allocation of capital is likely to be more efficient if greater use is made of crowd wisdom.

**Social benefit** – A new sector opening new opportunities for entrepreneurs and investors is of great worth to society. This worth increases due to the availability of this means of raising capital for entrepreneurs and investors who do not have great financial resources and due to the advantages described above affecting the sharing economy. All these can contribute to a more egalitarian division of resources in society and reduce inequality.

## Main challenges:

**The economy's exposure to risks** – As previously stated, the existence of an innovative industry has many advantages, but when it is unregulated it exposes investors to many risks, and consequently also exposes the economy to risks. The fact that many projects may not be successful, together with the fact that there is a risk of fraud and concern over the development of price bubbles, may lead to vast amounts of money being lost and cause damage to the economy. Moreover, the greater the share the sector accumulates

of the economy and the more investments it withdraws, also from the traditional investment world, the more systemic risks may develop that are liable to do considerable damage to the economy.

**Reputation** – Just as Israel's reputation as a leader in this sector can attract many investments to the country and contribute to the economy and to the concept that Israel is an important player in the development of the international platforms, the risk of projects failing or fraud may put Israel's reputation in danger and diminish its international standing.

# The risks involved in investment in cryptocurrencies

By virtue of its innovative nature, an investment in cryptocurrencies is different in a number of aspects from the investments familiar from the capital market. Alongside the clearing mechanism, the way purchases and sales are made, the mining and the holding, the investment in cryptocurrencies also involves risks varying in their severity or nature from those known to investors in the capital market. In what follows we will address these risks, including market risks, operational risks, and regulation risks.

## Market risk

**Value of the currencies –** It is extremely difficult to assess the fundamental value of cryptocurrencies, and it is not clear how the known economic and financial models can be used to assess their economic value.

Like fiat currencies, the value of cryptocurrencies (such as the Bitcoin) is based on a system of trust and an expectation that that trust will continue and the network of users of a cryptocurrency will continue to exist. But as distinct from fiat currencies, this trust only exists between the users, and no coercion or undertaking by the government or any counterparty is involved.

There is a body of evidence or ramifications of the difficulty of assessing the value of cryptocurrencies. For example, the value of Bitcoin increased by a factor of more than 20 in 2017 (and by thousands of a percent in the last five years), to a market cap of over 300 billion dollars, with no clear evidence of any material change in its economic value or its adoption as a means of payment.[67] As a rule, the price of cryptocurrencies is extremely volatile and their value soars or plummets over short time periods.

There are many estimations on the future direction of the prices of cryptocurrencies with Bitcoin at their head. Many estimates maintain that the increase in the value of these currencies derives mainly from speculative purchases. Many reputable economists have made declarations of a real concern that this is a bubble with no economic basis, including Nobel laureates Paul Krugman and Robert Schiller, and former head of the FED Alan Greenspan. A survey recently conducted by the Wall Street Journal among economists

---

[67] This needs to be qualified by the fact that it was defined as a means of payment in Japan (as distinct from "legal tender"), but it can scarcely be claimed that this change is what lies behind the price jumps that occurred before and after.

from the private market revealed that 96% of them agree that we are witnessing a price bubble.[68] Senior figures in regulatory bodies worldwide also made declarations that investors should be wary of investing in cryptocurrencies. For example, the head of the FCA in Britain warned that investors need to be aware that they may lose all their money.[69] Moreover, the price quoted for these currencies is not necessarily in line with the "market price", so that the price sometimes varies considerably between the various trading platforms, and can reach differences of hundreds and even thousands of dollars (in Bitcoin for example).

**Liquidity risk –** Trading in Bitcoin, considered the most liquid cryptocurrency, may have reached substantial levels (10 billion dollars on average in the last month)[70], but the trading is spread over hundreds of trading platforms worldwide, and differences in prices between the platforms can be as much as hundreds and even thousands of dollars (which may indicate a lack of efficiency in the market). As for the other currencies, the less known the currency the less ability to trade it (for Ethereum, for example, the second largest, the average volume is less than two billion dollars and for the tenth largest it is around 200 thousand). As previously stated, most of the trading in cryptocurrencies is made on centralized or distributed trading platforms. In contrast with the regulated markets, in which there is constant study and monitoring of liquidity and the resiliency of the market in extreme conditions, very little, if anything, is known about these indexes in the crypto markets. The trading platforms are the main source of liquidity, but there have already been instances when they have ceased operations or even collapsed completely, Two examples of this are the trading platform Mt. Gox, which collapsed in 2014, and the trading platform in South Korea in December 2017, described above in the "secondary market" section.

Moreover, due to the structure of some of the blockchain networks, including Bitcoin, there are reports of possible serious delays in clearing transactions at peak traffic times, and high commissions are required in order to get priority. This risk can increase the liquidity risk in times of crisis.

---

[68] https://blogs.wsj.com/economics/2017/12/13/is-bitcoin-a-bubble-96-of-economists-say-yes/

[69] http://www.bbc.com/news/business-42360553

[70] According to Coinmarketcap data

There is also evidence of difficulties in making large sums liquid. For example, in Coinbase, one of the largest trading platforms in the United States, there is a restriction on the size of transactions permitted to a customer, and it varies according to a number of factors.[71] It may be, therefore, that when it becomes necessary to sell a large position it will not be possible to do that in a short period.

**Volatility –** The trade in cryptocurrencies is characterized by extremely high volatility, and their value is likely to change by tens or even hundreds of percent in a day. In the past year there were dozens of occurrences of tens of percent changes a day in the value of the Bitcoin, and the volatility of smaller currencies may be much greater.

## Operational risks

**Fraud –** At the time of writing, trading in cryptocurrencies is unregulated. The trading in them may therefore be liable to be significantly exposed to fraud and price manipulation. Since there is no body supervising the trading activity, it is difficult to point to cases of manipulations in trading (there are reports of companies that cheated investors and against which enforcement measures have been taken), but many in the market and among regulators estimate that there are parties with the ability to influence cryptocurrencies (the holders of large quantities) and engage in "pump and dump" practices, mainly in the less liquid currencies.[72]

Moreover, since this market is unregulated, it is likely to be extremely difficult to get money back in cases of theft or fraud.[73]

**Cyber risks –** As described above, the currencies are held in a "digital wallet" and the holding is registered according to its owner's "private key". If a foreign party obtains a certain person's private key, it is actually gaining control over all the currencies she owns. Moreover, these currencies, and all the services involved in them (such as wallets and smart contracts allowing various uses), are totally dependent on computer code. For

---

[71] https://support.coinbase.com/customer/en/portal/articles/2108820-coinbase-account-limits.

[72] The trading platform Bittrex published a warning of such practices, which are practiced, among other ways, using telegram groups that attempt to coordinate processes among their companions. http://uk.businessinsider.com/bittrex-warning-cryptocurrency-pump-and-dump-scams-market-manipulation-2017-11

[73] This was mentioned in the bulletin published by the SEC https://www.sec.gov/oiea/investor-alerts-bulletins/investoralertsia_bitcoin.html

these reasons, a holding in cryptocurrencies is considerably exposed to hacking and failures associated with their code. This is especially important in the case of trading platforms, since a person who would like to trade on such a platform is required to transfer her currencies to a private key owned by the platform. A prominent example of this risk is the hacking of Mt. Gox described above, in which currencies worth 450 billion dollars were stolen.

There are other examples of theft or trapped currencies  to the value of hundreds of millions of dollars for bugs in the software code, among them the theft of 50 million dollars of investors' money in The DAO fund (which operated with smart contracts and most of which was returned at a later stage)). Another example is the bug in Parity wallets that caused a permanent trapping of users' Ethereum currencies worth 150 million dollars.

Whereas money deposited in the traditional financial systems is insured in many cases[74] or backed up by the government, money invested in cryptocurrencies does not benefit from that insurance.

**Centralization and control –** These currencies are usually described as distributed currencies that are not controlled by any one party, but this is not an unambiguous fact. First, to make a change or update to a currency's code requires a consensus by the majority of users, although in many cases it is the currency's founding party that lays out the path.[75] Secondly, in many cases the coins are mined by a small number of parties or mining pools that wield great computer power. This leads to the likelihood that these parties have great power to influence the decisions taken in the community (disputes between various parties in the Bitcoin community influenced the existence or non-existence of hard forks), the ability to considerably restrict trading (if they cease to operate) and even the ability to carry out manipulations and double spending of currencies (they will, however, need computer power of more than 50% of the network, but there is no guarantee that this situation will not occur in the future). For the sake of

---

[74] SPIC and FDIC in the United States, and in Israel requirements  by the Stock Exchange and the Bank of Israel.

[75] This is even more obvious when the currency is used in a specific venture and not purely as a means of transferring value. In these cases, the venture's developers may have full control over the currency.

demonstration, there are currently four mining pools with more than 50% mining power in the Bitcoin network. Moreover, four of the five largest pools are located in China.[76]

Another concern is that the miners, the trading platforms, the investment funds, and the early buyers of these currencies hold considerable positions (or will hold in the future), and could have a significant influence on their prices ("cornering").

**Forks –** Splitting a currency ("hard fork") is a situation in which the community or some of it, updates the currency code and causes the creation of a new currency that acts in tandem with the old one, with a similar history. The new currency is issued to all holders of the old one. In the Bitcoin network there were a number of splits, the best known of which involved the creation of Bitcoin Cash, whose market value exceeded 30 billion dollars (the third largest currency), and according to some assessments it is controlled by entities in China. Whereas the investors who held the currency before the split will also receive the new currency, these splits may present a risk if the investor chooses to buy new coins (or continue mining) of the "less successful" currency. Another example of a risk that may derive from hard forks was the sudden cancelation of a fork in the Bitcoin network (SEGWIT2X), that led to a temporary drop of tens of percent in the value of the Bitcoin (and an increase in the value of Bitcoin cash).

**Working with the financial market –** There is evidence of banks and financial institutions in the world that are not prepared to accept money the source of which is in cryptocurrencies, whether due to anti money laundering regimes or due to other risks involved. Regulators around the world have warned that these are high-risk activities for banks.[77] Thus for example, in a judgment handed down in a claim by the company "Bits of Gold" (which provides conversion services between shekels and Bitcoin or Ethereum) against Bank Leumi, the district court decided that the bank could not be forced to accept the company's money which came from activities in Bitcoin, especially in light of the fact that the Bank of Israel (and the other authorities) indicate the risks inherent in Bitcoin

---

[76] https://blockchain.info/pools

[77] See for example the document published by the European Banking Authority (EBA) in 2014. https://www.eba.europa.eu/documents/10180/657547/EBA-Op-2014-08+Opinion+on+Virtual+Currencies.pdf

trading and have difficulty in reaching a decision on the measures that have to be taken in order to prevent that risk.[78]

## Regulatory risks

The legal status of cryptocurrencies in general and Bitcoin in particular is still unclear in many countries, and there are many regulatory and legal issues with regard to them, which may lead to changes in the future.

No country has yet defined Bitcoin or any other cryptocurrency as "legal tender". The definition in Japan is that it can be used as a means of payment, while other countries are likely to prohibit certain activities in these currencies.[79]

The use of cryptocurrencies as a money laundering tool is one of the main concerns of the world's regulators.[80] The concern arises due to the possibility of making transfers in cryptocurrencies between accounts the identity of the owners of which is unknown to any third party. Anti-money laundering authorities in various countries currently demand trading platform to conduct full identification of customers , although the off-platform trading is still not regulated. The policies adopted by anti-money laundering authorities also influence the management of banks with regard to accepting money the source of which is an investment in cryptocurrencies. A change in policy of anti-money laundering authorities may have a substantial effect on investment in those currencies.

---

[78] "It is the duty of the bank not to refuse to provide certain services, including opening a checking account and managing it, provided the account is in credit and the customer is complying with the conditions of the agreement in connection with the management of the account. The bank is entitled to refuse to provide a service if the refusal is reasonable. In the given state of affairs, in which the regulator – the Bank of Israel and the Supervisor of Banks, as well as the "tough" authorities (the Tax Authority, the Securities Authority, and the Prohibition of Money Laundering Authority) indicate the risks inherent in dealing in Bitcoin, but have difficulty in reaching a decision on the measures that need to be taken to prevent that risk and to determine what is permitted and what is prohibited, then the respondent's decision to prohibit any action associated with Bitcoin in the account managed in It is in the realm of reasonableness. Since the applicant is engaged solely in trade in Bitcoin, the respondent cannot be ordered to allow the activities in the account without applying certain restrictions" (Originating Motion 1992-06-15).

[79] In China, for example, its use as a currency by financial bodies is prohibited, and they recently ordered the closure of cryptocurrency trading platforms.

[80] http://fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html

The policy of the tax authorities is also likely to have a powerful influence, and every change in the clasification of cryptocurrencies is expected to have direct repercussions on the income from investment in cryptocurrencies.[81]

The position of the world's central banks is also likely to have considerable implication in the future. If the cryptocurrencies are used as an alternative to currencies issued by countries (a situation that is liable to pose a threat mainly to weak economies), the central banks may take a position restricting their use.

The supervisory bodies over banks may also have an influence. The banking supervision department of the bank of Israel has not published specific instructions with regard to the possibility of companies and individuals depositing money the source of which is in activities in cryptocurrencies, and its decision on the issue is likely to have a considerable effect on that industry. As a result of this uncertainty, many banks are choosing not to allow companies dealing in the sector to open an account.[82]

The supervision of trading activity and manipulations in cryptocurrencies is another area that is not yet defined in many countries, and it is not certain which body should supervise them (if at all) and with what means.[83]

---

[81] In January 2017, the Tax Authority in Israel published a draft circular defining the Bitcoin as an "asset" and imposing VAT on it and a capital gains tax of 25% (https://taxes.gov.il/incometax/documents/hozrim/hoz_x_2017_tyota.pdf), but recently announced a change in approach to avoid the payment of VAT and ease the reporting requirement.

[82] See for example the court's decision in the case of "Bits of Gold" against Bank Leumi described above (Originating Motion 1992-06-15)

[83] Another area in which dealing in cryptocurrencies has recently begun is regarding the environment. Mining that type of currencies, requiring enormous computer power, leads to a great waste of electricity, and hurts the environment. According to estimates, the consumption of electricity of Bitcoin mining is currently equal to three million homes in the United States, and as the network grows, so too does the electricity consumption.

# The obligation to publish a prospectus in an offering of securities to the public

## Introduction

The obligation to publish a prospectus for an offering of securities to the public is a basic requirement in the securities laws. Section 15 of the Securities Law, 5728-1968 (hereinafter – the "Securities Law") states that no person may make an offer or sale of securities to the public except pursuant to a prospectus or draft prospectus the publication of which has been permitted by the Securities Authority, whichever applies.

The purpose of this obligation is to determine the application of the Securities Law to the offering and selling of securities, in order to protect the public of investors. The requirement for a prospectus serves, among other things, the following purposes:

First, it provides comprehensive disclosure regarding the investment being offered to the public. The disclosure is intended to allow the public of investors to make an informed investment decision, and criminal, administrative and civil responsibility applies on the company and its managers with regard to the information included in the prospectus. This responsibility is intended to ensure that the information included in the prospectus will be complete and correct.

Secondly, after publishing the prospectus, the company whose securities have been issued to the public is defined as a reporting corporation, and is bound by the obligation of continuous disclosure as long as its securities are held by the public. These obligations are intended to give investors the ability to make an informed decision on actions to be taken in the company's securities, including buying and selling them in a secondary market, voting at the company's general meeting, estimating the value of their rights, and investment of additional sums in the company.

Thirdly, the companies laws and the securities laws provide many additional protections to holders of securities issued pursuant to a prospectus, according to the type of security offered, such as rules of corporate governance in a company offering stocks or bonds, the appointment of a trustee, rights to call bonds for immediate repayment, etc.

The courts have stressed the importance of the securities law when raising money from the public at large, as a system of rules of conduct intended to guarantee complete honesty and transparency in an issuance of securities to the public and the trade in them,

ethicality in the capital market, and lastly – the trust of the investors and their willingness to invest in that market. The various means and mechanisms set out in the law are intended to ensure, among other things, that the public will not put its money into a doubtful venture and to reduce the risk that it will fall prey to acts of fraud and deception.

In particular, the courts have stressed the importance of the principle of due disclosure in view of the special characteristics of securities, and its four main objectives: providing the public of investors with information in order to make rational decisions on their investments; deterring companies and managements from improper conduct; strengthening public trust in the securities market; and increasing market efficiency.[84] Also clear from this is the importance of the requirement to publish a prospectus, which is the entry gate to the securities laws and to the laws applying to public companies.

Sections 15A and 15B to the Securities Law determine exemptions and exceptions to the obligation to publish a prospectus. Thus for example, when the offering and sale of securities is made to a small number of investors (up to 35 investors according to the regulations)[85] or to qualified investors set out in the First Schedule,[86] when the offering is small in size and percentage and to a limited number of investors,[87] when the offering is through an offering coordinator using crowd funding,[88] in case of a general publication regarding intention to offer securities,[89] etc.

The offering and sale of cryptocurrencies to the public may fall under an obligation to publish a prospectus if it is an offering and sale of *securities*, and there are no exceptions to the obligation to publish a prospectus. The question of whether an issuance of cryptocurrencies is an offering of securities is likely to be complex and dependent on the circumstances. Cryptocurrencies are innovative instruments technologically and commercially, with special features that distinguish them from the more familiar securities that have developed over hundreds of years, like stocks, bonds and derivative

---

[84] Civil Action 218/96 **Iscar v. Discount Investments**, Supreme Court Rulings 3197(3) 513 (1997), paragraph 24: Leave for Criminal Appeal 11476/94 **State of Israel v. Discount Investments Ltd. et al.** (handed down on 21 February 2010) (published in Nevo), paragraphs 118-127.

[85] Section 15A(a))(1) of the Law

[86] Section 15A(a))(7) of the Law

[87] Section 15B(4)

[88] Section 15B(4a)

[89] Section 15A(a))(4) of the Law

instruments. The process of offering them is also different from the standard ways capital is raised in the traditional capital market. Moreover, the public participating in the allocation is not always defined territorially and it is not always easy to determine where the offering is being made. Similar to the situation in other countries, these special qualities pose a knotty challenge to regulators and players in the market who need to decide if it is a security according to existing laws, which were mostly legislated many years before the technological developments that made possible the appearance of cryptocurrencies.

In order to decide whether an offering and sale of cryptocurrencies is an offering and sale of securities to the public in Israel, and consequently subject to the provisions of the Securities Law and Securities Authority supervision, the language of the law and its purpose must be examined. In this part, a preliminary analysis will be presented with the aim of setting out guidelines on this topic.

## The legal framework

Section 15 of the Securities Law prohibits the making of an offering and sale of securities without publishing a prospectus or draft prospectus, whichever is applicable.

> *"(a)  No person* shall offer securities to the public, except by a  *a prospectus that the Authority permitted to be published or by a draft prospectus that was approved and signed as said in Section 22 and submitted to the Authority.*
>
> *(b)   No person shall make any sale to the public otherwise than by a prospectus the publication of which the Authority permitted."*

Section 1 of the Law defines the terms "securities" and "offering to the public" as follows:

> *"Securities" – Certificates issued in series by a company, a cooperative society, or any other body corporate that confer a right of membership or participation in is or claim on it, and certificates that confer a right to aquire securities, all irrespective of registered or to bearer, and exclusive of securities issued by the government or by the Bank of Israel…"*

> *"Public offering" – An act intended to induce the public to acquire securities; without derogating from the generality of the aforesaid, it also includes the following:*

> *(1)    The listing of securities for trading on the Stock Exchange*

*(2)   A call to the public to make offers for the acquisition of securities".*

In light of the aforesaid, an activity that meets all the following conditions – offering, of securities, to the public – require the publication of a prospectus which has been allowed by the Security Authority or of a draft prospectus approved and signed as stated in Section 15 of the Law. A sale to the public of securities must be made pursuant to a prospectus the publication of which has been allowed by the Authority.

## Offering

The Law is concerned with an action intended to motivate the public to purchase securities. Court judgments have determined that there are various methods of offerings [and] possibilities of offering securities, including an offering by word of mouth or an offering via the Internet or other communications network.[90]

Issuances of cryptocurrencies are made via public or encoded computer networks. In most cases the offering will contain, among other things, the following actions: (1) Publication of a Whitepaper describing the main features of the cryptocurrency being issued or the venture for which it is intended, which will be presented on the issuer's website and will be accessible to all; (2) Publication and marketing by the issuance organizers in discussion groups (forums) and in messaging applications; (3) Other publications or public notifications from the issuers of the currency presenting the digital wallet to which the proceeds of the issuance will be sent, mostly in another cryptocurrency such as Bitcoin or Ether, against the new cryptocurrencies.

All these actions or similar ones, directed to the public at large, may be considered as motivating investors to purchase cryptocurrencies.

## Securities

The cryptocurrencies issued in the last few years are not identical to each other, and are distinguished by a variety of characteristics and features. A main difference between the currencies is the various rights attached to them: apart from the right to hold or transfer the currency or participate in mining it, during the past year a growing group of

---

[90] Civil Action (T.A.) 3199/95 **Securities Authority Chair v. Mondragon Joint Association Ltd.,** District Laws, volume 33(4), 6

cryptocurrencies that confer additional rights on or off the blockchain network on which the currency is based has developed. This group is called "tokens".[91]

In order to decide which currencies are subject to the Law's application, a distinction has to be made between three super-groups of cryptocurrencies or tokens currently standard in the market: (1) Currency Tokens - tokens intended for use as means of payment, exchange or clearing; (2) Security or Investment Tokens – tokens intended to confer ownership rights, membership or participation in a specific venture, or rights to future cash flows from said venture; (3) Utility Tokens – tokens intended to confer access or use rights in a service or product offered by a certain venture. As we will see later, the decision of whether a token is a security depends on the circumstances and the true nature of the transaction, and is not based on label attached to it.[92] In general, cryptocurrencies from the first group (currency) – that is cryptocurrencies intended for use only as a means of payment, clearing or exchange,not in any specific venture, which do not confer additional rights, and which are not controlled by a central entity[93] - will not be considered securities. In general, in the opinion of Committee members, despite there being some doubt about the extent of their utility as a means of payment,[94] these currencies will not be considered

---

[91] Other names are crypto-assets, smart contracts, or colored coins (relating to coins representing rights in other off-chain assets.

[92] The distinction between currency, investment and utility is intended as a conceptual framework for discussion and analysis purposes only, and does not exhaust all the circumstances characterizing the cryptocurrencies sector. For an in-depth discussion of the application of the securities law to each of these categories, see: Hacker, Philipp and Thomale, Chris, Crypt-Securities Regulation: ICOs, Token Sales and Cryptocurrencies under EU Financial Law (November 22, 2017). Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3075820. In fact, as the authors state, the borders between the categories are likely to be blurred and tokens may frequently contain joint characteristics from two or more categories. In any event, it should be emphasized that the test of whether a currency is a security will be made according to the true nature of the transaction and not according to the name attached to it.

[93] There is disagreement on the true level of distribution of some of the currencies presented as "distributed", including Bitcoin. In practice, there are players with much influence or control over decisions in the network, for example a decision on changing or updating the software protocol. For time being, we are basing ourselves on the assumption that the currencies come under the definition "distributed".

[94] As of today, there are considerable technical limitations on the use of Bitcoin and others as an efficient and convenient means of payment. These limitations may be expressed in high charges and a long waiting time for the transaction to be approved. In light of these difficulties, there has been less reference lately to

a security, since they do not confer a right to profits, participation, or claim from whoever issued them to the public. For the removal of doubt it should be noted that this does not constitute any opinion on the legal status of these assets (specifically in regards to their definition as "currencies") from the aspect of other laws (tax, banking and anti-money laundering laws) of which the Authority is not in charge of their interpretation or enforcement.

On the other hand, tokens from the second and third groups are not intended for use as a method of exchange only but confer additional rights. These rights are mostly broader than the right of ownership in the token, and include, among other things, rights in connection with a specific venture.[95] In the last year, tokens conferring a variety of rights have been issued, from a right of ownership or membership for profit purposes to a right to use a service, product, or to use an application or platform brokering between users. Another material difference between the payment category to the securities and utility category is the personal factor behind it - in contrast with cryptocurrencies with a distributed nature, tokens and the venture for which they are intended were by and large developed by a centralized issuer, sometimes in the preliminary stage when the planning or development of the service or product had not yet been completed. As we will see later, the differences in rights embedded in tokens have legal implications that may lead to the categorization of some of them as securities. The analysis on the possible application of the definition of a security will therefore relate to the category of tokens (as previously stated, tokens of the investments and utility type) and not to the cryptocurrencies used as a means of payment only (subject to the conditions set out above).

The purpose of the discussion that follows will be to present general guidelines on the question of when cryptographic tokens will be deemed securities. This is in order to enhance regulatory certainty and make it easier for companies operating in the blockchain and DLT sector in Israel to operate according to the law's provisions. However, it should

---

Bitcoin as a means of payment and more description of it as a "digital asset" whose purpose is to maintain its worth, similar to gold. This does not at this time derogate from the conclusion that it is not a security.

[95] The token can sometimes express a right in an off-chain asset. See also Reed, Chris and Sathyanarayan Umamahesh and Ruan, Suhui and Collins, Justine, Beyond Bitcoin – Legal Impurities and Off-Chain Assets (October 25, 2017). Queen Mary School of Law Legal Studies Research Paper No. 260/2017. Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3058945. (For a discussion of the current legal problems in connection with those assets).

be clarified that every case needs to be examined on its own merit. The following discussion does not exhaust the analysis required or the Authority's position with regard to cases that may be examined in the future.

In general, and as we will explain below, cryptographic tokens can be categorized into three groups: cases which appear to come under the definition of a security; cases which do not appear to come under the definition of a security; and cases requiring more precise investigation before deciding the issue.

We will now examine whether tokens are a security according to the main elements of the definition in the Law: a. *certificates issued in series*; b. *by a company, joint association or any other corporation*; c. *conferring a right of membership or participation or claim from the corporation*.

### Certificates issued in series

The court judgments that have interpreted the definition of a security have determined that the term "certificate" should be broadly interpreted. According to these judgments, the term does not only relate to a formal document such as a share certificate, and in principle any document, i.e. a written version, is likely to be included in the definition.[96] Concerning "series", court judgments have determined that the similarity in the economic nature of the certificates must be examined. There is not necessarily any identity between the documents, and small differences in the certificates' conditions are not sufficient to remove them from the definition of a series.[97]

A cryptocurrency is a software code written in a software language and there is nothing to prevent it from being considered a certificate. Neither does the element of "series" raise any real question when a large quantity of cryptocurrencies is issued with similar (and generally identical) conditions.

---

[96] Leave for Civil Appeal 1701/93 **Teva Pharmaceutical Industries Ltd. v. Zet Economic Consulting Ltd.,** P.D. 47(5) 1993.

[97] Administrative Appeal 7313/14 **Securities Authority v. Kedem Group Building Reinforcement and Renovation Ltd.** (handed down on 12 October, 2015) (published in Nevo), paragraph 17 of Judge A. Rubinstein's opinion: "Common sense makes it difficult to accept the strict interpretation according to which the smallest difference is sufficient to determine, with regard to interpretation in the Teva case, that the conditions are not equal. This approach is liable to open a loophole in the law allowing small, formal changes to be made easily and by so doing avoid the obligation to publish a prospectus."

**Issuance by a company, joint association or any other corporation**

This condition states that an issuance of securities must be made by a corporation. Important in this regard is the distinction mentioned above between cryptocurrencies used as means of payment only behind which there is no specific entity, such as Bitcoin, and cryptographic tokens issued by a certain issuer. Cryptographic tokens are generally issued by an issuing entity – sometimes a company that is developing a product of a platform and sometimes a group of developers who are not incorporated as a separate legal entity. If the tokens are issued by a company or other registered corporation, then clearly the condition is met.

**Right of membership, participation or claim**

The determination of whether a certificate is a security depends on the package of rights it confers. Not every right conferred by a certain certificate makes it a security, but only such as contains one or more of the elements in the definition: membership, participation or claim. These elements certainly characterize the classic security, such as stocks or bonds, but the definition was made intentionally broad so that it would apply not only to a closed list of securities, but also to a variety of possible instruments. At the same time, in view of the possibilities of conferring rights in various contexts that are in no way securities (for example, for a sports club conferring a right of membership), it is important to examine the rights against the backdrop of the Law's objectives. Among other things to be examined is the purpose of the investment, the nature of the investment, the pertinence of the securities laws, the existence of alternative special regulation, and the risk potential not only in the primary market but also in the secondary one.

The characteristics of an investment in a cryptocurrency are affected by the rights embedded in it. As previously stated, the rights embedded in cryptocurrencies range between capital rights (ownership in a venture or participation in profits) or obligations (receipt of payment) akin to the rights in "classic" securities such as stocks or bonds, and functional rights (access or use of a platform, product or service). As stated, those active in the sector generally refer to the first category as "security tokens" and the second category as "utility tokens". Some of the tokens are somewhere in between those categories and include joint characteristics of rights in classic securities alongside functional rights. Whereas there is a consensus that tokens in the security category are securities, there is no clear categorization of the tokens in the utility category or in the range between the categories.

As other authorities in the world have made clear[98], a cryptocurrency conferring rights similar to those in classic securities such as a stock, bond or participation unit, comes under the definition of a security. This category includes, for example, tokens conferring rights to participate in income or profits made by the venture; tokens conferring rights to receive payments, fixed or variable, whether by way of an allocation of additional coins or by selling coins; or tokens conferring rights of ownership or membership in a venture whose object is to produce an economic yield.

A cryptographic token that does not have one or more of these characteristics, or confers only functional use rights, requires a more thorough examination. The broad phrasing of the definition of a security in the Israeli law seems to allow for tokens that confer functional rights also to be regarded as conferring a "right of claim" on the issuer. This right of claim is a right to demand receipt of the product or service from the issuer conferred by the tokens or to use the platform for which the tokens are intended. Consequently, cryptocurrencies considered utility tokens may also be included in the definition of a security in the Israeli law. However, in general, an investor seeking to purchase a product or service, now or in the future, is not investing in a security and caution should be taken against over-application of the definition to purchases that are not of a financial nature and there is no justification in applying the obligation to publish a prospectus to them.

This group includes, for example, the issuance of shopping coupons or club cards purchased for consumerism, use and leisure. Similar to other consumerist purchases currently outside the application of the definition of a security, the fact that the service or product has been "tokenized", i.e. represented by a transferrable token, should not change the conclusions of the analysis regarding it – in other words, make the token a security whenever the purchase is for consumerist purposes. Therefore, when all the facts point to them having been purchased for consumerist purposes and not for financial ones, cryptographic tokens will by and large not be considered securities.

However, experience accumulated in the last year has shown that even in the context of utility tokens, the purchase of tokens sometimes fits the characteristics of an investment in securities: the purpose of the investment may be a financial yield, in the expectation of an increase in the value of the coins, and not necessarily (or not at all) with the intention to actually use them or purchase a product or service with them to use or consume; there

---

[98] See the international review section.

are likely to be significant differences in information between the entrepreneurs and those managing the body raising the capital and the public of investors; as of today, there is no special alternative regulation to protect investors in tokens; and tokens can be traded in the secondary market (in the last few years many trading platforms have developed in the world creating a secondary market for all intents and purposes in cryptocurrencies). These tokens express a hybrid investment combining financial, consumerist and monetary aspects, in which the traditional borders are blurred between the capital market, the products market and the money market.

The main difficulty in defining a security is therefore in connection with tokens which combine hybrid elements of investment and use, i.e. that on the one hand are intended to provide the opportunity to use a service or platform, but on the other hand, are in most cases purchased with the expectation of profits by an increase in value. In tokens of that kind, the mere conferring of a functional right will not necessarily remove them from the definition of a security.[99] In light of the complexity of the subject and the absence of any decision by other authorities in the world about when a utility token will be considered a security, the categorization of these tokens, as for any other product about which there is doubt regarding the application of the Law to it, will be made according to the totality of characteristics and circumstances against the backdrop of the Law's objectives.

Without derogating from the aforesaid, Committee members consider that in the context of the examination of the definition of a security with regard to a utility token there will be room to consider, among other things, the following characteristics: (1) the object of the investment in the eyes of the purchaser of the token; (2) degree of utility (functionality) of the token at the issuance stage, i.e., the extent in which purchasers of the token can use it for the purposes for which it was intended;[100] (3) the entrepreneur's representations and undertakings, including an assurance of achieving a financial yield and creating a secondary market, and considerable efforts to create a secondary market after the issue. In the context of that examination, it has to be seen whether the nature of the service or product embedded in the token changes as a result of its issuance, i.e., from conversion of the service or product into an intangible asset that can be sold in the secondary market.

---

[99] Compare with the opinion of the SEC in the Munchee case.

[100] See the opinion of the authors of the SAFT who put great emphasis on the extent of functionality of the platform at the issuance stage.

In summary, the issuance to the public of a token that is considered a security is subject to the obligation to publish a prospectus. The determination of whether a token comes under the definition of a security will be made according to the totality of characteristics and circumstances described above. A corporation seeking to issue a token to the public must check whether the token is a security and if its issuance is subject to the obligation to publish a prospectus.

A separate issue is whether a public company listed in Israel is entitled to issue tokens to the public in light of the equal voting rights principle in a public company.[101] Section 46B of the Law prohibits the Stock Exchange from listing shares in a company that has only one class of share (apart from exceptions such as preferred stock). Therefore, a company that does not have only one class of shares that confer equal voting rights relative to their value will not be able to be listed. This arrangement may prevent a public company issuing a token if that token comes under the definition of a security, **and if that token is a share**. Until now we have discussed whether a token is a security for the purposes of the application of Section 15 of the Law, whether it is a share, or whether it comes into the category of a bond or other security. This subject merits a separate discussion according to situations that may occur in the future. However, without completely exhausting the topic, Committee members consider that for the purposes of Section 46B the term "share" should be interpreted in a restricted way so as not to apply to every token that is a security, but only to currencies conferring a voting right, right to a dividend, or residual rights if the company is liquidated.[102] The issuance of a currency that does not confer one of those

---

[101] Section 46B of the Securities Law –

(a) A stock exchange may not list for trading shares or securities that can be converted into or exercised as shares unless it has seen that these conditions have been guaranteed:

(1) For a company whose shares are being listed for the first time – there will be only one class of shares in the company's equity capital conferring equal voting rights relative to their nominal value; this condition will not apply to special government shares; this provision does not prevent the company issuing preferred shares provided that one year has passed since the date the shares were first listed;

(2) For a registered company with the meaning in Section 46(a)(4) – every additional issuance of shares will be made in the most preferred shares in voting rights; this provision does not prevent a registered company which has only the classes of share permitted under paragraph (1) in its equity capital from issuing preferred shares commencing 25 Tevet 5752 (1 January, 1992) or at the end of a year after the date on which its equity capital was only in such shares, whichever is the later.

[102] The Securities Law does not include a definition of a share. Section 1 of the Company's Law defines a share as "one of the rights in a company determined by law and in the articles of association", without

rights is not restricted pursuant to Section 46B of the Law. Alternatively, in certain circumstances, it may be possible to test whether a token that does not confer one of those rights is like a preferred stock without a voting right, whose issue does not clash with the principle of equal voting rights.

## Public

The term public has no positive definition in the Law and we can learn what it covers from exceptions determined in law. Among other things, an offering or sale to qualified investors as defined in the First Schedule, or to investors the number of which does not exceed the number determined in the Regulations, is not an offering or sale to the public.

The main question in connection with cryptocurrencies concerns the territorial application of the securities laws. In the past, Section 40 of the Law stated that the obligation to publish a prospectus would also apply when the shares of a corporation registered in Israel are offered to the public outside Israel. This section was repealed by Amendment No. 20 to the Law. Since the Amendment, Israeli law has applied to any issuance offered to the public in Israel and not to an offer made to a public outside Israel. The registration and incorporation location of the corporation is not therefore a deciding factor in the examination of whether the offer was made in Israel.

The Authority staff has previously published its position on the question of how to appoint offerees pursuant to Section 15A(a)(1) of the Law when the issuance is made in Israel and outside Israel at the same time:[103] In that context, it was determined that the nature of the characteristics of the issuance and of the offerees, and their connection with Israel should be examined.

An examination of the characteristics of an offering with a connection to Israel will include, for example, identifying the location where the marketing and sale operations are actually being carried out, either using the Internet or similiar services, or at investors' conventions or private meetings; the language of the offering or the marketing; the languages in which the issuance and sale documents are written, etc. The characteristics of an offeree with

---

explaining precisely which rights will constitute a share. The accepted opinion is that a share embodies a right of ownership in a corporation, including three main rights: the voting right, the right to a dividend and a residual right on liquidation.

[103] Senior legal staff position paper: 103-39: Questions and answers on an offering and sale of securities to the public (4 July, 2016), question 8

a connection to Israel will be examined according to its place of residence, place where most of its assets are managed, etc.

Due to the distributed and autonomous nature of the sector, issuances of distributed cryptocurrencies are not generally directed at the public in a specific country, but at investors from many countries. However, due to the desire to prevent a breach of the securities laws in a certain country, it is not rare to see offerings in which citizens or residents of a country, concerning which there is no certainty that the issuance is in compliance with the law's demands are blocked from buying tokens.

Similar to an offering of other securities, an offering of tokens that constitute securities will not be considered an offering to the public in Israel if its characteristics show that it is not intended for the public in Israel. Without derogating from the generality of the aforesaid, the main characteristics likely to show this are that the language of the issuance is not Hebrew; the language of the actual issuance and sale documents is not Hebrew; no marketing of an issuance has been made to investors in Israel (through the Internet, by telephone, or using any other means); the organizers of the issuance are not soliciting the public in Israel, including by holding investors' conventions or private meetings intended for investors in Israel.

## Recommendations

Committee members consider that the regulation of cryptocurrencies under the securities laws requires special tailoring. The concern is twofold: of **over-application and of under-application**. On the one hand, one must beware of a situation in which every issuance of currencies, even if it expresses a product or a service with real value, will be subject to the obligation to publish a prospectus – a demand that imposes considerable financial costs and broad legal liability on the issuer. It should be remembered that the ISA doesn't work in a vacuum, and a firm approach that puts it among the strictest of the world's regulatory authorities with respect to ICOs would likely lead to entrepreneurs avoiding issuances in Israel so as not to risk breaking the local law.

On the other hand, the scenario cannot be ignored in which currencies that are not considered a security according to the existing law may include some of the characteristics of a security, chief among them the existence of an unregulated tradable market in which negative phenomena are likely to cause damage to the public of investors by exploiting differences in information and deceit. Too wide a loophole is therefore to be

avoided, one that will allow financing to be raised from the public while circumventing the duties of disclosure and information, merely due to the use of a new technology.

These concerns demand a balanced approach that brings together conflicting interests of encouraging innovation and protecting the public. A number of ways must therefore be examined of designing a proper regulatory framework for the issuances of cryptocurrencies. This policy is intended to encourage ventures to offer tokens to the public in a number of supervised tracks that will provide a safe harbor against a breach of the obligation to publish a prospectus, thus ensuring sufficient disclosure and information requirements for the public of investors.

Given the early and preliminary stage of many DLT ventures, it is worth considering the integration of these issuances in special capital raisings tracks, intended for small and medium entrepreneurs or research and development companies at early stages. Some of these tracks have already been approved in law and in regulations, and some are still at a formative stage in the Authority. These tracks, which allow corporations to raise money from the public while complying with lenient regulatory demands, may provide a reasonable solution to the issuances of cryptocurrencies in Israel over the next few years. Moreover, Committee members recommend considering making certain changes in them in order to tailor them to the characteristics of this activity.

Taking this approach, Committee members recommend investigating the integration of issuances of cryptocurrencies using these tracks and examining the following changes:

* **Lenient regulation on making an offering to the public in limited quantities (similar to "Regulation A+" in the United States)** – To enshrine in legislation a framework that allows money to be raised from the public in limited quantities, subject to a adjusted regulatory regime. According to the possible framework, a company offering securities to the public in limited quantities and with each investor limited to a certain amount, without listing them on a stock exchange, will not be required to publish a standard prospectus, but will be subject to the obligations of disclosure and of corporate governance.

* **Crowdfunding** – In 2015 the Securities Law was amended with the aim of regulating the model of crowdfunding, which will enable small and medium-sized companies and research and development companies to raise financing from the public in limited amounts using special internet portals (offering coordinators). The

Finance Committee recently approved regulations regulating the activities of the platforms and the Authority's supervision A special supervisory system was set up in the Authority over the platforms' activities. As of today, the regulation limits the amount that may be raised to six million Shekels (NIS) in an issuance and limits the amount a single investor can invest. Committee members recommend imposing this limitation on recruiting investors in Israel alone and not on capital raising in general.

* **Regulatory sandbox** - A special program for financial technology companies (Fintech) at early stages, including close regulatory monitoring alongside regulatory easing for a limited period, both within the limits of its powers and by taking part in a Ministry of Finance initiative to set up this program with interdepartmental cooperation. This framework on the one hand allows ventures to make a pilot, to familiarize themselves with the regulation, and to adjust themselves to it, and on the other hand allows the regulator to investigate how the ventures are being managed during that period, to study the sector in depth and to examine the development or tailoring of regulation to allow efficient supervision of the sector. Committee members recommend allowing companies seeking to issue tokens that are securities to join this framework.

* **Mechanism for relying on foreign law on ICOs** – An examination of the possibility of implementing a reliance mechanism similar to the "dual listing" mechanism in token issuances. This will allow an issuance of tokens to the public in Israel subject to the regulatory framework of a foreign regulator in a jurisdiction whose laws ensure the protection of the public of investors in Israel.[104] This recommendation rests on the understanding that the sector has a global and cross countries nature and that issuances of currency to the public can occur simultaneously in a number of centers in the world.

* **Special disclosure regime** – Tailoring the disclosure requirements to the special characteristics of these offerings. The disclosure tailored to currency issuances will

---

[104] For example, a securities commission in other jurisdiction (whose laws sufficiently protects the interests of investors) determines that a token is not a security according to domestic law and exempts a company from the prospectus obligation, it may be possible to rely on that and determine that the token is not a security also according to Israeli law.

contain financial and consumerist information in a language accessible and understandable to the public at large, with emphasis on, among other things, cyber security threats, information on the development team, software protocol, rights embedded in the currency, future plans to upgrade the platform, and other information required for the purposes of making an educated decision on investments of that kind.

# The application of an additional legal framework under the securities laws

Apart from the question of whether the issuance of a cryptocurrency is an issuance of a security, questions arise with regard to the application of an additional legal framework under the securities laws. In this context, a short review to complete the picture will be presented below. This section does not include recommendations for the creation of a new regulatory framework from those aspects, but the public is invited to comment on this as well.

## Registration of a trading and clearing platform in the Securities Law

### Trading platform license

Chapter 7"c" of the Securities Law regulates the activities of a platform trading to its own account (hereinafter **–** "**trading platform"**). Section 44M(a) of the Law states that " **No person shall run a trading platform, unless he holds a platform license and in accordance with the conditions of the license** ". Section 44O(a) of the Law states that "No person shall make an offer to trade on a trading platform, unless the platform is run by a company that has a platform license or by whoever is allowed to run a trading platform without a license under the provisions of section 44DD. **."**

"Trading platform" is defined in Section 44L of the Law as one of the two following categories:

**(1)**

A computerized system through which a person buys from his clients financial instruments for his own account or sells financial instruments from his own account to his clients in an organized, frequent and systematic manner, other than a system in which all the bought or sold financial instruments are financial instruments, the conditions of which are determined by direct negotiations between the parties to the transaction **;**

**(2)**

computerized system that enables the client to trade by the means of a
    system said in paragraph **(1);**"

The first category in the definition concerns those platforms dealing to their own account and the second category extends the definition to entities that provide an opportunity to trade on those platforms. Thus for example, included in the second alternative are computerized systems used to provide brokerage services that allow the reception and transmission of customers' instructions to buy or sell a financial instrument on the trading platform (included in the first category of the definition) or the execution of instructions to buy or sell a financial instrument on such trading platform on behalf of customers.[105] The definitions show that the purchase or sale of financial instruments is fundamental to the definition "trading platform" and when no financial instrument is involved it is not a trading platform the operation of which requires a license as previously stated.

A financial instrument is defined in Section 44K of the Law as follows:

**"Any one of the following:**

> **(1)  Securities as defined in Section 1;**

> **2)  Securities issued by the government or the Bank of Israel;**

> **3)  Units of a closed fund as defined in the Joint Investments trust Law;**

> **4)  Agreement or arrangement the value of which derives from the value of currencies, commodities, interest rates, exchange rates, indexes, or other financial instrument;**

> **5)  Any other financial instrument determined by the Minister of Finance, on the Authority's** proposal **or** after **consultation with it and with the approval by the Knesset Finance Committee;"**

In the explanatory notes to the bill, the following was said on the topic:

**"It is therefore proposed to determine that the term 'financial instrument' should include all types of financial instruments that may customary be traded on the trading platforms. The proposed definition includes all types of financial instruments, even those who were excluded from  section 1, and the variety of options and other derivatives generally traded on the platforms, including the**

---

[105] See the answer of senior Authority staff to a preliminary communication of 02 August, 2016 concerning the representation of a foreign system in Israel published on the Authority's website.

**foreign currency derivatives in particular (such as Rolling Spot Contract, Contract for Differences Futures, and others). The proposed definition includes all the types of financial instruments currently traded on the trading platforms and is broadly worded with the expectation that it will include any new financial instrument that may be traded on the trading platforms. However, since it is impossible to predict every possible scenario, and in view of the fact that new types of financial instruments are offered from time to time, it is proposed to empower the Minister of Finance to extend the definition of a 'financial instrument', on the Securities Authority (hereinafter – the Authority) recommendation and in consultation with it and with the approval of the Knesset Finance Committee.".**

As is shown by the explanatory notes, the fourth category in the definition of a "financial instrument" is intended to apply to trading in agreements and arrangements derived from the value of currencies, commodities and other underlying assets, and not to real trading in the underlying assets themselves. Thus, the legislation is not intended to regulate money-changing services of the currencies themselves, but to trading in financial instruments derived from the currencies. The question of whether an agreement to buy or sell the underlying asset is a financial instrument derived from the value of the underlying asset is raised whenever the underlying asset is not physically transferred to the buyer immediately on closing of the transaction. Then, the agreement itself may become the object of the trading between the parties, other than the underlying asset.

The background to regulation was the global development of an Internet platform sector enabling its customers to trade in different types of financial instruments (foreign currency contracts, indexes, shares, commodities, etc.). The trading platforms sector is characterized by a serious conflict of interests between the platform and its customers. The seriousness of the conflict derives from an inherent difficulty, created from the very definition of a company as one that buys from its customers to its own account or sells to its customers from its own account. The conflict of interests is more serious when the company does not hedge its exposures. The profitability of such a company will increase in proportion to its customers' losses. The main objectives of regulating the trading platform are to reduce conflicts of

interest in the sector, maintain the honesty and trustworthiness of the trading platform, and protect retail customers.

**Territorial application –** In the explanatory notes to the bill, it is stated in the territorial context that "**the license will be required whether the platform is managed within the borders of Israel, for example by creating a representation in Israel, clearing transactions in Israel, or installing hardware in Israel, or whether a foreign platform approaches the Israeli public, for example by creating a Hebrew user interface, advertising in Israel, communicating directly with Israeli institutional bodies, etc.**"

The Authority has already made it clear that a trading platform activity directed at customers in Israel requires a license pursuant to the Securities Law, even if the trading platform does not have representation in Israel and is not installing hardware in Israel. This is because the object of the Law is to protect the public in Israel which is being invited to engage in activities on a trading platform, and it does not matter if the invitation is coming from a platform in Israel, a platform abroad, or an intermediary referring the public to one of them. On the other hand, a platform approaching customers outside Israel only, and which does not enable access to the platform to customers in Israel, is not subject to the Law's application, even if it is managed wholly or partly in Israel.[106]

## Stock exchange license

In the Amendment to the Law dealing with a change in the structure of the Stock Exchange,[107] (hereinafter – "**Amendment 63**"), changes were made with regard to the licensing requirement for a stock exchange. A stock exchange is currently defined in Section 44EE as a "**company that has obtained a license to set up and manage a securities trading system pursuant to Section 45**". Section 45(a) states that "**no person may open or manage a securities trading system except under a license given to him according to this clause (in this law – "stock exchange license")**". Therefore, the fundamental definition of an entity the setting up of which requires a

---

[106] See legal staff opinion on the territorial application of Amendment 42 to the Law dated 01 March, 2015, published on the Authority's website. With regard to binary options, an amendment to the Law was recently published which determines a prohibition also on approaching customers outside Israel only.

[107] The Securities Law (Amendment No. 63), 5777-2017.

stock-exchange license is anchored in the definition of the term "**securities trading system"** in Section 44EE, which is worded as follows:

"**A multilateral system with which trading in securities is conducted, by bringing together buy orders and sell orders of securities and facilitating transactions between buyers and sellers of securities, acting without discretion, according to pre-determined rules"**

One of the fundamental elements in the application of the definition is the definition of a "security", which includes the financial instrument previously mentioned, and in the following words:

"**'Security' – Including securities that are not included in the definition in Section 1 and which are financial instruments as defined in Section 44L".**

Concerning the transaction facilitating element, we would mention that the intention is not to the execution of the transaction in terms of clearing, which is by nature a post trade service, but to the fact that stock exchanges are characterized in that they establish an infrastructure for engaging in a binding transaction between sellers and buyers of securities, and between the parties there is a binding agreement, from a legal aspect, to buy or sell a security. Note that the clearing and settlement processes are part of the closing of a transaction, and are for the most part executed by clearing houses and not by stock exchanges.[108]

**The main objectives of the Law** in connection with the licensing requirement of stock exchange activities are to protect the public of investors and to maintain the stability of the stock exchange, and the propriety and fairness of trading in it. These objectives can be gathered from the provisions of the Law dealing with a stock exchange and with the existing comprehensive regulation in the Stock Exchange's articles of association, and with the directives issued under it. The regulation is concerned, among other things, with topics such as the requirements with regard to the management of a stock exchange, organizational requirements and rules of corporate governance, rules of approach and eligibility conditions for members, members' obligations to customers, permitted areas of activity, transparency, listing

---

[108] See the answer of Authority staff to the communication concerning a portfolio compression system (TriOptima) dated 29 September, 2016.

for trading, trading on and off the stock exchange, commissions, enforcement, and the stability of the Stock Exchange. This comprehensive regulation shows the great importance of supervising the Stock Exchange and its proper and fair conduct.[109]

Regarding this it should be mentioned that Stock Exchanges are of great importance to the capital markets by creating a secondary market that allows trading in securities and so contribute to an increase in the investments; the transparency of the information on trading, supply and demand is so important; the regulation also shows that one of the objectives concerns the considerations of opening the market to a variety of participants.

**Territorial application** – The technical developments allow for the existence of stock exchange activities in a certain place, even if physical presence in that place is marginal, and even if there is no physical presence at all. Therefore the tests for the existence of a stock exchange activity cannot be based on the physical location of the stock exchange when it is accessible to investors through Internet-based information systems. On the other hand, the application of Israeli law clearly needs to be restricted to stock exchange activities related to Israel, as distinct from stock exchange activities worldwide and essentially supervised by foreign regulators. In light of the aforesaid, in order to test the existence of a stock exchange activity according to the law's objectives, the various linkages of that activity with Israel and the investors in it must be examined. The mere existence of foreign supervision is not a substitute for the requirements of domestic law and the supervision under it, and therefore international activities of stock exchanges require in most cases licensing in every country.

An example of an activity that links a foreign stock-exchange to Israel is a stock exchange's solicitation of Israeli investors, which links the stock exchange to Israel. Another example relates to activity using Israeli stock exchange members – in a preliminary question submitted to the Authority staff in the CMEG case,[110] a group of stock exchanges wanted to approach Israeli bodies acting in Israel  and offer them to

---

[109] See the judgment of the honorable Judge Ruth Ronen in Administrative appeal 26602/01/17 G.G. Fire Trade Ltd. v. Securities Authority (district – T.A.), paragraphs 95 and 96.

[110] See the reply of Authority staff to preliminary correspondence concerning CMEG dated 01 July, 2014, published on the Authority website.

be members on them or clearing members on them and to trade on them or perform clearing and settlement using them. In reply to the preliminary question it was stated that subject to certain conditions licensing as a stock exchange in Israel is not required. Similar conditions were determined for other stock exchanges in Israel,[111] these being the main ones:

a.  The activity in Israel is limited to qualified end investors trading only for themselves; for this purpose, qualified investors – investors included in the First Schedule of the Securities Law, provided they are not individuals.

b.  Marketing activity will not include making contact or soliciting  investors not listed in paragraph a. above. The marketing activity will be directed only at those listed in paragraph a. above after they have been indetified as such, and will not include, among other things, any public marketing activity, including advertising in the media with regard to stock exchanges.;

c.  The services offered to Israeli investors will include trading in financial instruments offered and traded abroad, and will not include securities traded on a stock exchange in Israel or derivatives of these securities, apart from the securities of dual Israeli corporations traded in Israel and abroad;

d.  The activity in Israel will constitute only a small porportion of the overall activity of the stock exchanges, none of their activities will be offered to investors in Israel (for example, trading in a certain financial instrument) that is not supervised by one of the bodies supervising the stock exchange, and the stock exchange will have no activity specially directed or tailored for Israeli investors, and

e.  All the orders origintatin in Israel will be matched cleared and settled on stock exchange systems outside Israel; transactions between customers located in Israel will not be netted in Israel.

As part of Amendment 63, Section 49A was added to the Law, stating that "(a) **No one may approach a person in an offer** to provide trading services in securities using a securities trading system, unless the system is managed by a stock

---

[111] See, for example, the reply of Authority staff to preliminary correspondence concerning LSE, Montreal Exchange, BATS, Eurex Zurich, Turquoise, Euronext, and Swiss Exchange, published on the Authority website.

exchange. (b) Notwithstanding the provisions of subclause (a), the Authority chair may allow a person to approach a person in an offer to provide trading services in securities using a securities trading system managed by a stock exchange outside Israel as defined in Section 35AD, on the conditions that may be determined, if he/she has found that it does no damage to the interests of the public of investors in Israel."

## Clearing house license

As part of Amendment 63, clause C. was added to Chapter 8 dealing with a clearing house. Section 50A(a)(a1) states that "no person may open or manage a clearing system except under a license given to him pursuant to the provisions of this clause." "Clearing system" is defined in Section 44EE of the Law as one of the following:

**(1) A central system used to clear transactions in securities;**

**(2) A system providing central securities depository services for securities for which a transaction has been completed for the first time;**

**(3) A system used by a central counterparty in securities transactions;**
**For this purpose, 'central counterparty' in a securities transaction – an entity assuring the parties to a securities transaction that it will be completed, among other ways by providing a guarantee."**

"Clearing" of a transaction in securities is defined in Section 44EE as the "**transfer of a security or transfer of payment for it in accordance with a securities transaction**." The abovementioned definition of securities with regard to a stock exchange also applies in the case of the definition of a clearing system, That is, it includes a financial instrument as defined in Section 44L.

The first item in the definition of a clearing system expresses the function of the clearing system in the clearing sector, i.e. the implementation of a security deal, as distinct from making the deal itself. It also expresses the fact that this is a type of payments system that facilitated the transfer of securities or payment for them or the transfer of both of them. The second item in the definition of a clearing system expresses the standard mode of operation of a clearing system that manages central depository services and accounts at the top of the depository chain. Thus for example, a clearing system manages accounts for clearing house members, who for their part provide depository services to their customers. Ownership in securities is transferred by crediting and debiting the securities account of clearing house

members managed in the clearing systems. The third item relates to another function of some of the clearing houses that perform a function of a central counterparty (CCP), and so reduce the counterparty risk of the clearing house members. **The principle of centralization returns in all elements of the definition and serves as a general characterization of the activities that come under the definition.**

The main objective of regulating a clearing house licensing requirement is to maintain the stability of the clearing house, the reliability of the clearing process and its continuance. Clearing houses used as a CCP can be useful in reducing contagion in the event of the collapse of a financial body. The reliability of the clearing and depository service are vital to trading in securities.

In light of the broad language of the definition, broad authority is determined in Section 50A(a8) for the Authority chair, with the Ministry of finance consent, to exempt an entity that may come under the definition from the application of the licensing requirement. Thus the section states that: "**If the Authority chair considers that there is no damage to the interests of the public of investors, he/she may, with the consent of the Minister of Finance, exempt a particular company requesting a clearing house license from all or some of the provisions pursuant to this section, and stipulate the granting of said exemption on conditions."**

**The application of the licensing requirements for the trading and clearing platforms to distributed cryptocurrencies.**

The issue of the licensing requirements for a "trading platform", "securities trading system" (requiring a stock exchange license), and a "clearing system" (requiring a clearing house license) on activities in cryptocurrencies derives to great extent from the application of the definition of a "financial instrument" in Section 44L of the Law on these currencies. This is because a trading platform is defined in relation to activities in "financial instruments" and because the definition of "securities" in Section 52 of the Law, relevant to the definitions of a "securities trading system" and "clearing system", also refers to the definition of a "financial instrument" in Section 44L of the Law.

As stated in the previous sections, there is a material difference between cryptocurrencies that do not confer additional rights beyond the right to hold them, to transfer them, or to participate in mining them, and can be used principally as a

means of exchange (like Bitcoin and Litecoin), and "tokens" that confer rights additional to those.

**The first category** in the definition of a "financial instrument" deals with securities as defined in Section 1 of the Law. As for cryptocurrencies which are found to be "securities" for the purposes of Section 1 of the Law, then an activity on them that has all the other elements of a "trading platform" will require the bodies operating these platforms to have a  trading platform license; and an activity on them that has all the elements of the definition of a "securities trading system" or "clearing system" will require the bodies operating these platforms to have a stock exchange or clearing house license, whichever is applicable.

**The fourth category** in the definition of a "financial instrument" applies to "**an agreement or arrangement the value of which is derived from the value of currencies, commodities, interest rates, exchange rates, indexes, or another financial instrument**". As previously stated, it is intended to apply to trading in agreements and arrangements derived from the value of currencies, commodities and other underlying assets, and not on the real trading in the underlying assets themselves. Thus, the legislation is not intended to regulate the money changing services of the currencies themselves, but to apply to trading in financial instruments derived from the currencies. The question of whether an agreement to buy or sell the underlying asset is a financial instrument derived from the value of the underlying asset arises whenever the underlying asset is not physically transferred to the buyer immediately on closure of the transaction. In this case the agreement itself may become the object of the trade between the parties, as distinct from the underlying asset.

In general, the cryptocurrencies and the tokens will not themselves fall into the fourth category in the definition of a "financial instrument" and the key question for our purposes is whether the agreement or arrangement the value of which is derived from the value of the cryptocurrencies themselves will be deemed a "financial instrument" as defined in the law. It should be noted though, that in some cases the cryptocurrencies, through a "smart contract" mechanism, may portray by themselves an agreement or arrangement the value of which is derived from the value of other underlying assets, and sometimes derived from other cryptocurrencies. In such

circumstances these cryptocurrencies may themselves be considered to be financial instruments of the kind included in the fourth category of the definition of a "financial instrument", and this dependent on the question of whether they are derived from underlying assets included in the terms "currencies", "exchange rate", "commodities", and "indexes" listed in this category.

The terms "currencies", "exchange rate", "commodities", and "indexes" are not defined in the law.

Financial instruments whose value was derived from Bitcoin were recently launched in a number of stock exchanges in the United States. Thus, future contracts on Bitcoin were recently launched by the CME Stock Exchange in Chicago which is a large and well established stock exchange for future contracts and commodities in the United States, supervised by the competent authority in the United States, the Commodity Futures – Trading Commission (henceforth – the "**CFTC**"). The CFTC declared in 2015 that Bitcoin and other cryptocurrencies are deemed commodities as defined in the Commodity Exchange Act (1936).[112] That act enshrines, among other things, the supervisory power of the CFTC with regard to futures contracts, options, contracts derived from commodities, contracts leveraged in a foreign currency and commodities, the requirement for licensing of intermediaries providing services in respect of them, and gives the CFTC certain powers with regard to trading in commodities themselves.

From the perspective of the **purpose of regulation** - there is no reason to distinguish between an agreement whose value is derived from a cryptocurrency (including a token) and an agreement whose value is derived from other currencies, commodities, securities, or exchange rates for the purposes of the need for licensing and regulation of bodies offering trading and clearing services in it. In both cases the object of the trade between the parties is not the underlying asset itself, but a financial agreement between the parties whose value is derived from the underlying asset. Thus for example, the risks inherent in a futures contract or a contract for differences on Bitcoin are no less than the risks inherent in a futures contract on other currencies, commodities, or exchange rates, and by and large the risks are greater. There is therefore no justification for a trading platform offering trade in agreements whose

---

[112] U.S. Code §7

value is derived from Bitcoin not being subject to supervision and regulation of a platform trading on own account, whereas trading platforms offering trade in agreements whose value is derived from other currencies, commodities, or exchange rates will be subject to said licensing and regulation. Similarly, there is no justification for a securities trading system or clearing system that offers trading or clearing services in agreements whose value is derived from Bitcoin not being subject to the supervision and regulation applying to said systems that offer services in agreements the value of which is derived from other currencies, commodities, or exchange rates.

From the fact that the terms currencies, exchange rates, and commodities are not defined in the Law, and also from the explanatory notes and the legislative background to the enactment of definition of a "financial instrument" in the Law, it can be seen that the legislator's intention was to give a broad meaning to these terms and that there is no room to give these terms a strict and narrow interpretation. It seems that the term commodities needs to be given a broad meaning applying to products that are generally considered to be commodities in the financial markets, whether they are tangible or  intangible.

## Application for our purposes –

a. **If the cryptocurrencies, including tokens, are categorized as securities as defined in Section 1 of the Law, then they themselves are considered financial instruments. Moreover, it is clear that an agreement or arrangement derived from them comes within the fourth category in the definition of a "financial instrument", Including, among other things, underlying assets that are "another financial instrument".**

b. **In the Committee's opinion, from  the point of view of the purpose of the law and its wording, agreements whose value is derived from cryptocurrencies, including tokens which are not categorized as securities for the purposes of Section 1 of the Law, will generally be included in the fourth category in the definition of a "financial instrument", either because these cryptocurrencies are considered a currency or commodity or because their nominal value can be seen to derive from the value of an exchange rate. For the sake of legal clarity and certainty it is proposed to enshrine this also in the Minister of Finance's determination by virtue of the power determined in Section 44L(5) of the Securities Law.**

c.  **The categorization of a product as a security or financial instrument does not mean that it will necessarily be approved for trading on the various trading platforms, including the Stock Exchange. This will be examined under the Authority's power to determine the types of instruments that may be traded using the platform and to approve the platform's articles of association according to Sections 44M(d) and 44R of the Securities Law, and under the powers of the Stock Exchange and the Authority with regard to the Stock Exchange's articles of association, determined, among other things, in Section 48 of the Securities Law. This examination will be made according to the circumstances of each product and any developments there may be in this dynamic sector in Israel and globally.**

## Topics for discussion

As mentioned, this chapter does not include recommendations on the creation of a new regulatory framework, though the public is invited to comment also on these aspects. The Committee would like to get the public's opinion on the question of whether there is room to create a designated regulatory framework for a designated platform trading in cryptocurrencies (either as a decentralized or centralized platform), subject to an examination whether adjustment needed to the regulation.

The Committee would also like to get the public's opinion on the question of whether there is room to apply some of the regulation in the Securities Law on trading and clearing platforms that provide services in cryptocurrencies that have been deemed not to be included in the definition of a security in Section 1 of the Law according to the tests mentioned in the section dealing with an issuance to the public, or not to be included in the definition of a financial instrument. Thus for example, whether there is room to subject bodies similar in nature to trading platforms, to securities trading systems, or to clearing systems defined in the Securities Law, which provide services in these investment products, to regulation in the Securities Law subject to an examination of the need for additional tailoring of existing regulation. Additionally, whether there is room to apply future regulation on the category of a broker – dealer on the provision of services in these investment products.

It should be noted that raising the possibility of considering subjecting the activities described above to the application of the Securities Law does not testify to the Committee considering that there is room to create a regulatory framework that will

make investments affecting cryptocurrencies accessible to the public at large or will direct the public to these investments in a supervised framework. The question concerning the proper extent of exposure for the public needs to be examined in accordance with developments and insights gained in light of developments in the international arena and in Israel.

# Application of the Joint Investment Trusts Law

A mutual fund is a product intended to allow the public at large to benefit from professional management of its money at low cost through joint investments in securities and joint profit making from their holdings and from any transaction in them.[113]

The mutual fund is based on an agreement between a fund manager and a trustee. The fund is a closed collection of assets; its assets are given in trust and managed with powers of attorney by the fund manager for the benefit of the investors. The fund is composed of units each of which confers an equal right on its holder in the fund's assets and profits.

A mutual fund is subject to the provisions of the Trusts Law that deals with various aspects, such as disclosure requirements, investment rules requiring distribution of investments and a limitation on the permitted exposure, various requirements regarding equity capital and insurance, rules of corporate governance, professional qualifications of office holders and employees, etc. To act as a trust manager requires the Authority's approval, and the publication of a prospectus is also required in order to make an offering of the trust's units to the public.

Section 2 of the Trusts Law states that the provisions of the law will apply to any arrangement the purpose of which is joint investment in securities and profiting from them, and which are not regulated under any other law.

In subsection (b) of that section, an exemption from application of the provisions of the law is determined if two cumulative conditions are met:

(1)   The number of participants in said arrangement does not exceed 50;

(2)   The public has not been solicited.

The Law also allows mutual funds to invest in options and futures contracts as defined in Section 64(b) of the Trusts Law as  securities:

"Option" - is defined as an undertaking that gives its purchaser the right to buy or to sell the underlying asset at the realization price, or to receive the differential between

---

[113] Section 2 of the Trusts Law

the realization price and the value of the underlying asset, all at times and on terms specified in the option;

"Futures contract" – is defined as an undertaking to deliver or to accept in the future Stock Exchange rate differentials, index differentials, interest differentials, an asset or the price of an asset, and that in the quantity, on the date and on the terms specified in the undertaking.

The Trusts Law was recently amended to include a supervisory framework appropriate for exchange traded notes (hereinafter: "**ETN**") in Hebrew "Teudot Sal", and these will become exchange traded funds (hereinafter: "**ETF**") in Hebrew "Kranot Sal". As part of **ETF** amendment [114]**,** the application of the Law was extended to include "an arrangement of the type the Minister has determined that its object is a joint investment in currencies and joint profit making from holding them and any transaction in them", and with regard to debt instruments whose yield is derived from commodity prices (see more on this below).

The ETNs are used as a major investment instrument for investors seeking to track the asset being tracked, both investors from the public and institutional investors. An asset being tracked can be a securities index (such as the TA-125 Index), commodities (such as gold), currencies (such as the U.S. dollar), a combination of assets and such like. These days the ETNs are a type of debt instrument offered to the public pursuant to the Securities Law.

The ETNs amendment aims to change the regulatory regime applying to ETNs from regulation pursuant to the Securities Law as debt instruments to regulation pursuant to the Joint Investment Law, as mutual funds whose units are listed on the Stock Exchange and are a supervised product, basically similar to the standard ETF abroad. The Israeli ETF will be called "Keren Sal" in Hebrew (literal translation: "basket fund").

The ETFs will be trust funds that track the profit from the asset tracked, but like every fund, and unlike the ETNs which undertake to achieve the yield of the asset being tracked, the ETNs do not guarantee the yield of the index, but return the actual yield (best effort). Another important difference is that the assets in the ETNs supporting

---

[114] On 3 August 2017, the Joint Investment Trust Law (Amendment No. 28), 5777-2017 was published. In section 3 of the amendment it states that it will enter into force on the day the regulations promulgated under it enter into force.

the undertaking and their profits belong to the issuer, whereas in a ETF the assets belong to the owners of the units and are held by a trustee.

In light of the change expected in the near future, following which the ETNs sector will cease to exist, this report will not address the subject of the possibility of exposure to the cryptocurrencies through ETNs or the regulation required of the ETNs instrument in connection with cryptocurrencies.

## Direct investment of mutual funds and ETFs in cryptocurrencies

As previously stated, Section 2 of the Trusts Law states that the provisions of the law will apply to any arrangement the object of which is a joint investment in securities, including options and futures contracts and profiting from them, which is not regulated pursuant to any other law.

As set out in detail in this document, there is a wide range of types of cryptocurrencies. Some of them are securities for all intents and purposes, whereas other currencies are too complex to determine if they are a security or some other asset. The application of the Trusts Law to joint investments in cryptocurrencies can be tested in light of the following guidelines:

    a. As a rule, an arrangement the purpose of which  is a joint investment in a cryptocurrency which is a security as defined in Section 1 of the Trusts Law, comes under the application of the Trusts Law in principle, in the absence of any other law regulating that kind of joint investment.[115]

    b. An arrangement the purpose of which is a joint investment in a cryptocurrency which is **not** directly a security will not be included in the application clause, and therefore the Trusts Law in its present form does not apply to it.

Notwithstanding the aforementioned, it is not possible, in practice, for a mutual fund to directly invest in a cryptocurrency of any kind (a security or not a security) due to various restrictions imposed on the management of a fund pursuant to the law. The main restriction being the directive specifying which assets may be purchased and held in a fund. In Section 59 of the Trusts Law a closed list of assets that a fund manager may hold in a fund is defined: securities and foreign securities **listed on a**

---

[115] As long as none of the aforementioned exceptions to application listed in section 2(b) of the law apply to it.

**stock exchange** (subject to a few exceptions), options, futures contracts, foreign currency (defined as a currency that is legal tender in a certain country and is not Israeli currency), cash and any other asset the Minister of Finance has specified in the Regulations, subject to the conditions and at the rates determined. A stock exchange is defined as "a stock exchange as defined in the Securities Law" or "a stock exchange outside Israel that has been given permission by a competent authority pursuant to the law of the country in which it is operating".

According to the list, including the list set by the Minister as per his authority under the law,[116] commodities cannot be held directly. Currently, this list does not include any item in which a cryptocurrency could be included.

In the ETF amendment, expected to come into effect during 2018, the Minister of Finance was given the authority to amend regulations that extend the application of the Trusts Law to an arrangement the purpose of which is a joint investment in currencies and profiting from their holdings and from every transaction in them. In Regulation 2 in the proposed draft of the regulations by virtue of said authority,[117] it states that the provisions of the Trusts Law will apply to a debt certificate which provides its holder a right to receive payment derived from the value of currencies.[118] Along with the amendment to the Trusts Law, Section 35A1 of the Securities Law was also indirectly amended.[119] The amendment removes from the Securities Law a debt certificate whose purpose is a joint investment or joint profit-making and which

---

[116] Regulation 2 of the Joint Investment Trust Regulations (Assets that Funds Are Entitled to Buy and Hold and Their Maximum Proportion),, 5755-1994 (hereinafter – the Assets Regulations) http://www.isa.gov.il/sites/ISAEng/1485/1498/Pages/default.aspx

[117] Proposal for Joint Investment Trust Regulations Tracking Funds), 5778-2017 (hereinafter – "**Tracking Fund Regulations**"), as published on the Authority's website

http://www.isa.gov.il/%D7%92%D7%95%D7%A4%D7%99%D7%9D%20%D7%9E%D7%A4%D7%95%D7%A7%D7%97%D7%99%D7%9D/Mutual_Funds/1403/1923/hazaa%20ltikun%20hok%20hashkaot/Documents/03102017_3.pdf

[118] If the three cumulative conditions are met, the certificates tracking a currency will not pass to the Trusts Law and will remain in the regime of disclosure under the Securities Law: 1) The assets backing the undertakings are deposits in banks in Israel or abroad only; 2) The assets management does not include making discretionary investment decisions, and assets will be substituted on the dates and according to the rules determined in a prospectus; 3) Repayment will only be on dates of asset replacement as determined in the prospectus.

[119] Section 29 of the ETF Amendment

provides its owner the right to receive a return derived from the price of an index of securities, **commodities**, or futures contracts, and determines that **the provisions of the Trusts Law will apply to it.** Accordingly, Section 12 of the ETF amendment includes in the definition of a tracking fund a fund that achieves its result derived from the price change rate of an index or commodity. That said, it would seem that a debt certificate that provides its holder a yield derived from the value of cryptocurrencies (whether they are considered securities or commodities) will be later included in the application of the Law.

As explained above, Section 59 of the Trusts Law and the regulations under it, define a closed list of assets a fund manager is permitted to hold in a fund. This list does not currently include cryptocurrencies. Therefore, it is not possible to hold these assets in a fund, at this time. Secondary legislation is required in order to allow funds to hold cryptocurrencies directly.

## Mutual Funds and ETFs Investing in Cryptocurrencies Derivatives

A fund manager may not therefore invest in cryptocurrencies directly. An option or futures contract derived from the value of a cryptocurrency may be included in the relevant definitions determined in Section 64 of the Trusts Law. However, in the Joint Investment Trusts (Options, Futures and Short Sales) Regulations (5761-2001), two cumulative situations are determined in which a fund manager may buy, sell, or create an option or futures contract on behalf of a fund managed by a fund manager:

(1)  The option and the contract are traded on a stock exchange.

(2)  If the stock exchange is outside Israel, the investments committee of the fund manager must be convinced that the option or contract is sufficiently negotiable or saleable, taking into consideration: the costs of selling; the daily trading turnover; the number of purchasable futures contracts with the same asset being traded at the same time in the same stock exchange outside Israel; the ratio between the option exercise price and the base asset price; the existence of a number of market makers active in the futures contract or option.

Also determined in the Regulations are quantitative restrictions on the holding of options and contracts in a fund, the creation of options and contracts for a fund and on the exposure that may be created for a fund due to the funds holding of these instruments.

Concerning the creation of exposure in a fund to cryptocurrencies through derivatives, the position of the Israel Securities Authority staff is that a mutual fund manager should

keep well in mind the duties of trust and caution applying to her when she is considering exposing the investors to complex investment products of this sort, information about which is limited and which are characterized by extreme and random volatility. The Committee recommends that the ISA weigh the measures that need to be taken on the possibility of exposure to cryptocurrencies through derivative instruments.

## Topics for Discussion

The Committee would like to get the public's comments on the question of whether there is room to allow and to regulate joint investment trusts in the cryptocurrencies sector:

1. Is there room to amend the existing legislation and/or to consider adopting interpretations that will create a legal framework that will apply the Trusts Law to joint investment arrangements in the cryptocurrencies sector?

If the answer to the first question is positive –

2. Is there room to distinguish the regulation between various types of cryptocurrencies, such as cryptocurrencies that will be recognized as securities and cryptocurrencies that will not be recognized as securities, commodities, and currencies?

3. Is there room to amend the existing law to make it possible for a fund to invest directly in cryptocurrencies, should there be restrictions on the exposure of a fund to cryptocurrencies, and should a distinction be made between exposure through direct possession of currencies and exposure through derivatives of those assets?

It should be noted that the proposal to consider putting joint investment arrangements in these assets under the application of the Trusts Law, does not imply the Committee considers there is room to allow investments relating to cryptocurrencies to the public at large through mutual funds. This activity is in its infancy and is characterized by extreme volatility and randomness. The question regarding the proper level of exposure to these investments in a mutual fund will be examined in due course according to developments and insights gained in view of the developments in the international arena and in Israel. Today, a mutual fund manager, in view of the restrictions she is under, and in any scenario and development there may be in this issue, must keep clearly in mind the duties of trust and caution applying to her when she is considering exposing the investors to this sector.

# The Application of the Regulation of Investment Advice, Investment Marketing and Investment Portfolio Management

The Law is intended to guarantee the professional level of service of investment advisers, investment marketers, and investment portfolio managers, to supervise their work, to minimize, as much as possible, the possibility of situations of conflict of interest between the duty of trust towards the customers and their own interest or the interest of the bodies to whom they are subject – with the aim of protecting the customer. The Law regulates investment advice, the management of investment portfolios, and investment marketing. The provisions of the Law are cogent and cannot be waived in an agreement between the parties, except when the Law explicitly permits it.

Anyone managing an investment portfolio is performing transactions, at her discretion, in the accounts of others, i.e. her customers. A portfolio manager acts according to permission her customers give her, and with that permission she buys and sells securities and financial assets in their names, in accounts in their names, at her personal discretion. The extent of an investment portfolio manager's discretion depends on the agreement between her and the customer, and it varies from case to case. In contrast, an investment adviser and an investment marketer provide advice to the customer, leaving the investment decisions to be made by the customer herself.

The term "investment advice" is defined in the "Investment Advice Law": "The provision of advice to others regarding the feasibility of an investment, holding, purchase, or sale of securities or financial assets". "Investment marketing" is defined as providing advice to others on the feasibility of an investment, holding, purchase or sale of securities or of financial assets, when the advice giver has some affiliation with the financial asset. "Affiliation" of a person to a financial asset, according to the definition in the Investment Advice Law, is one of the following situations: 1. The financial asset is being managed by that person or was issued or published by her. 2. That person or someone acting for or on her behalf may be directly or indirectly entitled to a benefit (with certain exceptions) not from the purchaser or the holder of the financial asset in connection with the conduct of the transaction in the financial instrument or in connection with continuing to hold it. The principle obligations applying to investment advice also apply to investment marketing. The main difference is that the investment marketer may give preference to a product with which she is affiliated over other suitable products.

The Investment Advice Law defines the financial products to which the Law applies, and these are the relevant definitions:

"Securities" – as defined in section 1 of the Securities Law, exclusive of securities not listed for trading on an Exchange and index products, including securities issued by the Government and foreign securities (Securities listed for trading on an overseas stock exchange or on a regulated market outside of Israel), or as the Minister of Finance shall prescribe in consultation with the Authority and with approval by the Knesset Finance Committee;

"Financial assets" – units defined in the Joint Investment Trusts Law, shares or units of funds registered abroad, options, futures, structured products, index products and also study funds, or as the Minister of Finance shall prescribe in consultation with the Authority and with approval by the Knesset Finance Committee;

"Structured product" – an investment, either as a deposit or in some other way, on which the yield or the risk is determined by a formula that is based on changes in one or several of the following:

(1) one or several indexes;

(2) the price of one or of several securities;

(3) the price of one or of several commodities;

(4) the price of options or of futures;

(5) interest or differentials between different interest rates;

(6) currency exchange rates or differentials between different currency exchange rates

other than an investment that unconditionally assures payment of the capital amount with changes that stem from paragraphs (1) or (2) below, if so prescribed in the investment conditions, and that also unconditionally assures the payment said in paragraph (3) below, if such was prescribed, on condition that – if a choice is given between two or more of what is enumerated below – payment shall be assured according to the highest among them:

(1) differentials of an index that is not a securities index;

(2) currency exchange rate differentials;

(3) fixed or variable interest;

the Minister of Finance may – in consultation with the Authority and with approval by the Knesset Finance Committee – designate investments that, notwithstanding the aforesaid, are included in this category or are not included in it;

## Application of the Investment Advice Law on Activities of Investment Advice and Decision Making with regard to Cryptocurrencies

Do and to what extent do the licensing obligations pursuant to the Investment Advice Law, and along with licensing, also the duties under it, apply to giving advice regarding an investment in cryptocurrencies or to a discretionary investment decision-making service in those currencies for others?

As explained above, the licensing obligation pursuant to the Law applies to activities of providing advice and portfolio management in respect of a transaction in securities or financial assets.

The definitions "investment advice" and "financial asset" in the Law are broad and consistent with a realistic interpretation regarding the application of the Law. In order to test whether a certain service is subject to the law and must be licensed pursuant to it, two critical aspects need to be examined: the nature of the service and the asset to which it is being provided.

Do cryptocurrencies assets of the type that provide services pursuant to the law fall under its application? To provide an answer, it must be examined whether and in what circumstances a cryptocurrency is a security or a financial asset.

We will examine the various possibilities:

As previously stated, the definition of a security does not include securities that are not listed on a stock exchange. Accordingly, in circumstances in which the cryptocurrency is seen as a security, it will come under the application of the Law only if it is listed on a stock exchange (in the case of a foreign security, on a stock exchange or in a regulated market).

The definition of "financial assets" in the Law includes units of mutual funds, shares or units of a fund registered outside Israel, options, futures contracts, structured products, index products, and training funds, or as determined by the Minister of Finance, in consultation with the Authority and with the approval of the Knesset Finance Committee.

The definition of "option" and of "futures contract" in the Investment Advice Law refers to their definition in the Trusts Law. These definitions are not restricted to specific underlying assets, and so a cryptocurrency may also be used as an underlying asset for a derivative instrument which is an option or futures contract, services with regard to such an instrument will be considered "investment advice" or "investment portfolio management" pursuant to the Investment Advice Law, with all that it entails.

Apart from being derived from a cryptocurrency, it does not appear the crypto coin itself can be conceived as one of the other alternatives of a financial asset – not as an underlying asset of an option or a futures contract – and therefore, if it is not a traded security, it does not fall under the Law.

Nor does the exchange rate in itself fall under the definition of an asset requiring service which falls under the Law. However, according to the definition of a "structured product" in the Investment Advice Law, an investment, whether with a deposit or in some other way, the yield or the risk of the investment are determined according to an equation based on changes in the exchange rate, does fall under the definition of a "financial asset", as explained in full above. Providing a service with regard to such an investment comes, therefore, under the definition of a service to which the Law applies.

With regard to the aspect of the nature of the service –

As we have already said, the definition of investment advice is wide, in accordance with its objective to cover different types of advice. "Advice" can be provided "directly or indirectly, including through advertising, circulars, opinions, through the mail, by fax, or by any other means."[120]

When advice is given on a cryptocurrency and the advice also includes reference to a financial asset or security, i.e., "investment advice" as defined in the Investment Advice Law, the Law also applies when the crypto coin itself is not a security or financial asset according to the Law –according to the interpretation determined by the court.[121] This is when the service is provided by a licensee as part of her services, and also if the service provided regards assets not covered by the Law. In other words, if in certain circumstances a licensee chooses to advise her customer **only** on an asset that is not

---

[120] The definition of "investment advice" in Section 1 of the Investment Advice Law

[121] Different Civil Appeal (T.A.) 25968-03-11 **Jane Doe (confidential) v. State of Israel** (published in Nevo, 4 November, 2011).

covered by the Law, such as a non-tradable security, or some other asset that does not fall under the Law's definition, then, the law will still apply to the licensee and she will be subject to the obligations and prohibitions pursuant thereto.

In light of the complexity of the cryptocurrencies and the technology involved in their purchase, transfer and use, other questions are likely to arise regarding the nature of the services in respect to them, such as the matter of referring and assisting to purchase these assets: does a referral to places where cryptocurrencies can be purchased and providing technical assistance involved in their purchase, such as opening a digital wallet, come under the definition of investment advice (ignoring the nature of the asset). These are questions that were not discussed in depth. For the time being, it can be said that a referral to places where cryptocurrencies can be purchased should not be considered investment advice pursuant to the Investment Advice Law, if the referral ends with a technical explanation of places and ways in which cryptocurrency can be purchased, provided it is done in response to a question posed by a customer.

## The Implications of a decision on whether services regarding Cryptocurrencies falls under the application of the Law with regard to providing services by a Licensee

As has already been shown by the aforementioned, an investment advisor with a license may give advice to a customer regarding cryptocurrency, whether or not it is an asset to which the Investment Advice Law applies, and all the obligations pursuant to the Law will apply with regard to the service. The duty of caution applying to her pursuant to Section 20 of the Investment Advice Law requires her to act professionally, including while forming recommendations based on having sufficient information and understanding of the related field. Therefore, a licensee is expected not to give advice with regard to cryptocurrencies if she does not have sufficient understanding and experience. Moreover, the extent of existing information on the currencies will determine the licensee's ability to provide services with regard to it and at the same time fulfill the duty of caution applying to her.

**Regarding portfolio managers –** All the aforementioned regarding the duties of caution of an investment adviser is all the more so true for a portfolio manager who is considering exposing a customer to an investment in cryptocurrencies. However, a portfolio manager is restricted to a unique occupation. It is derived from this restriction that she cannot, at her discretion, purchase assets that do not fall under the Law's definition, for a client's portfolio. This includes a cryptocurrency that is not a listed security or a financial asset. A

portfolio manager is allowed to provide investment advice or marketing services regarding such an asset. Meaning, a portfolio manager may provide advice or marketing services regarding a cryptocurrency only as a part of portfolio management services pursuant to the Law, and alongside purchasing assets that fall under the application of the law. This shows that a portfolio manager may not manage a "portfolio of cryptocurrencies" (that are not tradable securities) for a customer.

Another question arises regarding portfolio managers, connected with the custody of the assets. Section 22(3) of the Law instructs that a portfolio manager " keep for each client a monetary account and a securities and financial assets account with a banking corporation, with a bank abroad, with a Stock Exchange member or with whoever has the right – under the Laws of the country in which she acts – to keep monetary accounts, securities accounts or financial assets accounts for clients". Meaning, the portfolio manager is permitted to perform actions in securities and financial assets for a customer only in an account in the customer's name, and if it is managed in Israel – only in a bank or with a stock exchange member.[122] If we consider a cryptocurrency in certain circumstance to be a financial asset, no action can be made with it for a customer in Israel since it will not be held in a bank account or with a stock exchange member. However, with regard to an account managed abroad - the question is if there are bodies authorized by law in their countries to hold such assets for customers.

## Topics for Discussion

The Committee would like to get the public's views on the application of the Investment Advice Law to the cryptocurrencies sector:

1. Is there room to define a cryptocurrency as an asset with regard to which only an investment advice, investment marketing, or portfolio management licensee may give advice (apart from cases in which there are exceptions to the application of the licensing requirement pursuant to the Law) subject to all the obligations applying to the licensee, as well as the duties of trust, disclosure,

---

[122] Based on this provision, a portfolio manager may not act for a customer on a trading platform in Israel, since that does not meet the requirement of managing an account for a customer only in a bank or with a stock exchange member. In a Memorandum of the Law Amending Enforcement in the Securities Laws (Legislative Amendments), 5778-2017, it is proposed to amend this section so that a portfolio manager will be permitted to invest for a customer in licensed trading platforms as well.

tailoring investments to the customer's needs, documentation, reporting, etc. will apply.

2. Should a portfolio manager be allowed to manage and directly possess cryptocurrencies in a managed portfolio?

It should be noted that the proposal to consider bringing these activities under the application of the Investment Advice Law, does not attest to the ISA considering that there is room to create a regulatory framework that will make investments related to cryptocurrencies available to the public at large, or lead to the public being directed to these investments in a regulated framework. So long as this activity is in its infancy and is characterized by extreme volatility and randomness, an investment adviser, investment marketer, portfolio manager and trust fund manager supervised by the ISA, today and in any scenario or development there may be on the issue, must keep firmly in mind their duties of trust and caution when they are considering exposing their customers to this sector. The question of the proper extent of the exposure to the public whether through investment products or through investment advice to a customer, will be examined in due time along with developments and insights gained from developments in the international arena and in Israel.

# Exhibit 6

# Thailand SEC Legalizes 7 Cryptocurrencies With Regulations

Shares

by Sheenam Khuttan | Jun 11, 2018 | Bitcoin, Cryptocurrency, Cryptocurrency News, ICO



Thai Securities and Exchange Commission (SEC) has released a new regulatory framework concerning cryptocurrencies, as well as has legalized 7 various cryptocurrencies that have complied with the regulations. The measures were approved at the regulator's June 7 meeting and are expected to go into effect later on this month.

These 7 cryptocurrencies are the fan favorites of:



Printable PDF - (Free)          Ad closed by Google
To View PDF, Download here          Stop seeing this ad    Why this ad? ▷

1. **Bitcoin (BTC)**
2. **Ethereum (ETH)**
3. **Bitcoin Cash (BCH)**
4. **Ethereum Classic (ETC)**
5. **Litecoin (LTC)**
6. **Ripple (XRP)**
7. **Stellar (XLM)**

The reasons for choosing these seven cryptocurrencies by the SEC were two: **consensus credibility** and **the liquidity of the digital assets.**

Thai SEC is expecting ten firms to apply for licensing, some of which may be crypto exchanges, and others, crypto brokers and dealers. Bear in mind, these currencies must

Advertisement



Ads by Coinzilla



Advertisement



Get Latest Bitcoin and Crypto News



Join Our Telegram Channel

t.me/**Kryptomoney**

KryptoMoney.com

register with the SEC within 90 days of the effective date and the participants must receive approval from the finance ministry. There is also an upfront fee of 5 million baht, which is the equivalent of $156,194. The funds are then separated into 2.5 million for the distribution of each token and for the operations of cryptocurrencies.

There will also be an annual fee for such crypto entities that will be calculated as 0.002% of the total trading volume for crypto exchanges and 0.001% of the total trading volume for brokerage firms. Each with a minimum fee of 500,000 Baht and 250,000 Baht respectively; and a maximum fee of 20 Million and 5 Million Baht will also be used to cap payments by both categories respectively. A publication concerning the matter stated,

Shares





> *"Registered capital for digital exchanges is stipulated at 50 million baht for a centralized exchange and 25 million for brokers, while a decentralized exchange is at 10 million and a decentralized broker is at 5 million."*

Anyone selling digital tokens without authorization will be fined. Such fines will be twice the value of the digital tokens. Interested parties within Thailand looking to engage in this business need to get in touch with the Finance Ministry for approval. Failure to comply can also result in jail time of up to two years.

**KryptoMoney.com** publishes latest news and updates about Bitcoin, Blockchain Technology ,Cryptocurrencies and upcoming ICO's.



Like us on Facebook

> KryptoMoney - It's all about Bitcoin,Blockchain and Cryptocurrencies

## Comments

comments


Ads by Coinzilla

### Pages

- About Us
- Bitcoin & Cryptocurrency Resource List (Mega List)
- Contact Us

### Categories

- Bitcoin (834)
- Blockchain (484)
- Blockchain Events (64)
- Cryptocurrency (1,335)

### RSS FEED

- Bank of America (BoA) Fiat Transfers Cost 6000 Times More Than Bitcoin
- Major Banks And Oil Giants Collaborate for a Ethereum

Disclaimer

- Get Latest Cryptocurrency And Bitcoin News
- Privacy Policy
- Write for Kryptomoney.com

Shares

Cryptocurrency Events (49)

- Cryptocurrency News (1,770)
- Digital Payments (5)
- Events (57)
- ICO (118)
- Interviews (5)
- Mining (65)
- Press Release (91)
- Uncategorized (16)

Blockchain Commodity Trading Platform

- Europol Report Clears Bitcoin Off The Charge Of Terror Funding in Europe
- Blockchain and Cloud Infrastructure Share-Welcome to the QoS Chain by Unchainet
- KuCoin Cryptocurrency Exchange Lists EdenChain (EDN) Cryptocurrency

©KRYPTOMONEY 2018 | ESS COMMERCE PRIVATE LIMITED

    

