# EXHIBIT 3

**THE BROWN LAW FIRM, P.C.**
Robert C. Moest, SBN 62166
Of Counsel
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

Counsel for Plaintiff

**FILED**
**SAN MATEO COUNTY**

MAR 2 0 2017

Clerk of the Superior Court

DEPUTY CLERK

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| CHRISTOPHER D. ZULCH, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> KITOV PHARMACEUTICALS HOLDINGS LTD., ISAAC ISRAEL, SIMCHA ROCK, JOSEPH GUNNAR & CO., LLC, and H.C. WAINWRIGHT & CO., LLC, <br><br> Defendants. | Case No.: **17CIV01173** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933** <br><br> **JURY TRIAL DEMANDED** <br><br> **BY FAX** |

17 – CIV – 01173
CMP
Complaint
422518

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    Plaintiff Christopher D. Zulch ("Plaintiff") individually and on behalf of all other persons

2    similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants

3    (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's

4    own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

5    conducted by and through Plaintiff's attorneys, which included, among other things, a review of the

6    Defendants' public documents, conference calls and announcements made by defendants, United

7    States Securities and Exchange Commission ("SEC") filings, wire and press releases published by

8    and regarding Kitov Pharmaceuticals Holdings Ltd. ("Kitov" or the "Company"), and information

9    readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist

10   for the allegations set forth herein after a reasonable opportunity for discovery.

11                                  **NATURE OF THE ACTION**

12       1.    This is a securities class action on behalf of all persons other than Defendants who

13   purchased Kitov American Depositary Shares ("ADSs") and/or Kitov warrants pursuant and/or

14   traceable to Kitov's initial public offering on or about November 20, 2015 (the "Offering"), seeking

15   to pursue remedies under the Securities Exchange Act of 1933 (the "1933 Act").

16       2.    On September 24, 2015, Kitov filed a registration statement on Form F-1 with the

17   SEC in connection with the Offering. The registration statement was subsequently amended several

18   times, with the final amended registration statement filed on Form F-1/A on November 20, 2015

19   (collectively, the "Registration Statement"). On November 20, 2015, the SEC declared the

20   Registration Statement effective.

21       3.    On November 6, 2015, Kitov filed a Form F-6 with the SEC to register its ADSs,

22   which was declared effective by the SEC on November 23, 2015.

23       4.    The Registration Statement contained a preliminary prospectus. The final prospectus

24   (the "Prospectus", and together with the Registration Statement, the "Offering Documents") was

25   filed on November 23, 2015.

26       5.    On November 25, 2015, Kitov completed the closing of the Offering, selling

27   3,158,900 ADSs, each representing 20 of Kitov's ordinary shares, and warrants to purchase up to

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   3,158,900 ADSs. The ADSs and warrants were issued in a fixed combination of one ADS and one

2   warrant to purchase one ADS for a combined price to the public of $4.13. In addition, the

3   underwriters partially exercised their option to purchase an additional 220,074 warrants to purchase

4   220,074 ADSs. The warrants have a per ADS exercise price of $4.13 and will have a term of five

5   years from the date of issuance. Kitov received gross proceeds of approximately $13 million from

6   the Offering.

7                                   **JURISDICTION AND VENUE**

8         6.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15

9   of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77(o)). This Court has jurisdiction over the

10  subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, which

11  explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and

12  brought in any State court of competent jurisdiction shall be removed to any court in the United

13  States." Section 16(c) of the Securities Act refers to "covered class actions," which are defined as

14  lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims

15  under state or common law. This is an action asserting federal law claims. Thus, it does not fall

16  within the definition of a "covered class action" under §16(c) and therefore is not removable to

17  federal court under the Securities Litigation Uniform Standards Act of 1998.

18        7.      Each Defendant has sufficient contacts with California, or otherwise purposefully

19  avails itself of benefits from California or has property in California so as to render the exercise of

20  jurisdiction over each by California courts consistent with traditional notions of fair play and

21  substantial justice.

22        8.      The amount in controversy exceeds the jurisdictional minimum of this Court, and the

23  total amount of damages sought exceeds $25,000.

24        9.      Venue is proper in this Court because Defendants' wrongful acts arose in and

25  emanated from, in part, this County. The violations of law complained of herein occurred in this

26  County, including the dissemination of materially misleading statements into this County, the

27  purchase of the Company's ADSs and/or warrants by members of the class who reside in this

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  County, and the sale of the Company's ADSs and/or warrants by H.C. Wainwright & Co., LLC and

2  Joseph Gunnar & Co., LLC in this County.

3  **PARTIES**

4       10.    Plaintiff purchased Kitov ADSs and/or warrants, pursuant and/or traceable to the

5  Offering, and was damaged thereby. Plaintiff is a citizen of California.

6       11.    Defendant Kitov, through its subsidiary, Kitov Pharmaceuticals Ltd., operates as a

7  clinical development stage biopharmaceutical company. It develops combination drugs for the

8  simultaneous treatment of pain caused by osteoarthritis and hypertension. The Company is

9  incorporated in Israel and its principal executive offices are located at One Azrieli Center, Round

10  Tower, 23rd Floor,132 Menachem Begin Road, Tel Aviv 6701101, Israel. Kitov's ADSs and

11  warrants are traded on the NASDAQ Capital Market ("NASDAQ") under the ticker symbols

12  "KTOV" and "KTOVW", respectively.

13       12.    Defendant Isaac Israel ("Israel") has been the Chief Executive Officer ("CEO") of

14  Kitov since October 2012. Defendant Israel signed the Registration Statement.

15       13.    Defendant Simcha Rock ("Rock") has been the Chief Financial Officer ("CFO") of

16  Kitov since July 2013. Defendant Rock signed the Registration Statement.

17       14.    Defendants Israel and Rock are collectively referred to hereinafter as the "Individual

18  Defendants."

19       15.    Defendant H.C. Wainwright & Co., LLC ("H.C. Wainwright") was an underwriter of

20  the Company's Offering, served as a financial advisor, and assisted in the preparation and

21  dissemination of Kitov's false and misleading Offering Documents. Defendant H.C. Wainwright

22  conducts business in California, has been registered as a broker-dealer in California since 2013,

23  maintains an office in San Francisco, California, and in October 2016 held an investor conference in

24  San Francisco soliciting investors and marketing its firm.

25       16.    Defendant Joseph Gunnar & Co., LLC ("Joseph Gunnar") was an underwriter of the

26  Company's Offering, served as a financial advisor, and assisted in the preparation and

27  dissemination of Kitov's false and misleading Offering Documents. Defendant Joseph Gunnar

28  conducts business in California and has been registered as a broker-dealer in California since 1997.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    17.    Defendants H.C. Wainwright and Joseph Gunnar are collectively referred to

2  hereinafter as the "Underwriter Defendants."

3    18.    The Individual Defendants and Defendants H.C. Wainwright and Joseph Gunnar are

4  collectively referred to hereinafter as "Defendants."

5    19.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false

6  and misleading statements in the Offering Documents. The Underwriter Defendants failure to

7  conduct adequate due diligence investigations was a substantial factor leading to the harm

8  complained of herein.

9    20.    In addition, the Underwriter Defendants met with potential investors and presented

10  highly favorable but materially incorrect and/or materially misleading information about the

11  Company, its business, products, plans, and financial prospects, and/or omitted to disclose material

12  information required to be disclosed under the federal securities laws and applicable regulations

13  promulgated thereunder.

14    21.    Representatives of the Underwriter Defendants also assisted the Company and the

15  Individual Defendants in planning the Offering. They also purported to conduct an adequate and

16  reasonable investigation into the business, operations, products, and plans of file Company, an

17  undertaking known as a "due diligence" investigation. During the course of their "due diligence,"

18  the Underwriter Defendants had continual access to confidential corporate information concerning

19  the Company's business, financial condition, products, plans, and prospects.

20    22.    In addition to having access to internal corporate documents, the Underwriter

21  Defendants and/or its agents, including its counsel, had access to the Company's lawyers,

22  management, directors, and top executives to determine: (1) the strategy to best accomplish the

23  Offering; (2) the terms of the Offering, including the price at which the Company's ADSs and

24  warrants would be sold; (3) the language to be used in the Offering Documents; (4) what

25  disclosures about the Company would be made in the Offering Documents; and (5) what responses

26  would be made to the SEC in connection with its review of the Offering Documents. As a result of

27  those constant contacts and communications between the Underwriter Defendants' representatives

28  and the Company's management and top executives, at a minimum, the Underwriter Defendants

- 4 -

1   should have known of the Company's undisclosed existing problems and plans, and the material

2   misstatements and omissions contained in the Offering Documents as detailed herein.

3       23.    The Underwriter Defendants caused the Offering Documents to be filed with the

4   SEC and to be declared effective in connection with offers and sales of the Company's ADSs and

5   warrants pursuant and/or traceable to the Offering and the Offering Documents, including to

6   Plaintiff and the Class.

7   **SUBSTANTIVE ALLEGATIONS**

8   **Background**

9       24.    Kitov's lead drug candidate is KIT-302, a fixed dosage combination product based

10   on the generic drugs celecoxib and amlodipine besylate, a drug designed to treat hypertension.

11   **Materially False and Misleading Statements**

12       25.    The Offering Documents were negligently prepared and, as a result, contained untrue

13   statements of material facts or omitted to state other facts necessary to make the statements made

14   not misleading, and was not prepared in accordance with the rules and regulations governing its

15   preparation.

16       26.    The Registration Statement touted the regulatory development and competitiveness

17   of KIT-302, stating in pertinent part:

18   *KIT-302*

19           Similar to KIT-301, KIT-302 is a fixed dosage combination product based
20   on two known active ingredients (celecoxib and amlodipine besylate), the
    effectiveness and safety of which has been separately proven for each, and which
21   is intended to enable the concurrent treatment of pain caused by osteoarthritis and
    hypertension.

22           On November 7, 2013, we filed with the FDA the final statistical plan for
23   the Phase III clinical trial protocol for KIT-302 as part of the FDA's Special
    Protocol Assessment, or SPA, procedures. On February 20, 2014, the FDA replied
24   and indicated that the proposed data analysis of the trial's results that we
    submitted to the FDA provides a suitable solution to achieve the primary endpoint
25   of the Phase III clinical trial and to support the final request for approval, which
    will be submitted. As a result of the SPA process, the FDA approved the Phase III
26   trial design for our clinical trial, and cleared our clinical trial to begin, and on
    June 18, 2014, we commenced the clinical trial, as described below. The clinical
27   trial is being performed using the Adaptive Trial Design method, or ATD, in
    accordance with the SPA. Based on the ATD format, in the first stage of the trial

28

- 5 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

150 patients are to be recruited. Then, the results of the trial will be disclosed to an independent external data monitoring committee, or DMC, which will analyze the results and determine the number of additional patients that we must recruit in order to demonstrate statistical validity and to meet the primary end point of the trial. To the extent the DMC recommends testing 200 or fewer additional patients, we will continue to recruit additional patients until reaching statistical validity and the primary end point of the trial. In the event that the DMC recommends testing more than 200 additional patients, our board will discuss the steps needed to complete such additional testing. If the trial generates the anticipated results, it would support our submission of a new drug application to FDA for KIT-302.

Below is a summary of our projected timeline for the development of KIT-302:

| Current Status | 2015 | 2016 |
|---|---|---|
| FDA Approved SPA. Ongoing Phase III clinical trial | Completion of recruitment for the Phase III clinical trial, pilot PK study and commencement of our business development activity for marketing rights in KIT-302 | Final conclusive PK study and filing NDA |

KIT-302 is based on one generic drug (amlodipine besylate) and one drug currently protected by patents held by Pfizer Inc. (Celebrex®). The U.S. Patent and Trademark Office granted Pfizer a "reissue patent" covering methods of treating osteoarthritis and other approved conditions with celecoxib, the active ingredient in Celebrex®. The reissued patent extends U.S. patent protection for Celebrex from May 30, 2014 to Dec. 2, 2015.

We currently expect to receive approval from the FDA to market KIT-302 in 2017. As a result of this timing and because KIT-302 combines the treatment of osteoarthritis by celecoxib with amlodipine besylate, which treats the side effect of hypertension, we believe that KIT-302 may be an attractive alternative to the generic versions of Celebrex® that we expect to be sold before KIT-302 enters the market.

*Research and Development*

Our strategy is to develop two drug combinations that are intended to treat hypertension and pain caused by osteoarthritis. These combinations are comprised of known and approved-for-use components, the combination of which is intended to simultaneously treat the pain caused by osteoarthritis and reduce blood pressure, thereby offsetting a side effect caused by the use of NSAIDs for osteoarthritis. Following discussions with the FDA, the FDA approved a development design in accordance with the 505(b)(2) NDA track. The FDA did not require us to perform pre-clinical trials (*i.e.*, animal studies), and therefore we are required only to conduct a single Phase III clinical trial and a single standard pharmacokinetic trial, or PK Trial, for each of our therapeutic candidates.

For the development of KIT-302, we are performing a double blind, placebo controlled, Phase III clinical trial for testing the decrease of hypertension in

- 6 -

patients receiving our KIT-302 drug product. This trial is being performed in the U.K. in four groups of thirty (30) to sixty (60) patients (and a total of 150 – 200 patients), with each patient treated over a total period of two weeks. Group One is receiving a placebo, Group Two is being treated with a standard drug available in the market for treating hypertension (amlodipine besylate, one of the components of KIT-302), Group Three is being treated with celecoxib only, and Group Four is being treated with the two components of KIT-302 (celecoxib and amlodipine besylate). The trial began in June 2014, and we expect to complete recruitment of the patients by the end of 2015 and to receive the interim results of the trial approximately eight weeks thereafter.

The purpose of the trial is to show that a combination of the two components of KIT-302, as demonstrated in Group Four, lowers blood pressure by at least 50% as compared to the reduction in blood pressure in patients in Group Two (treatment with the anti-hypertension drug only); however, we are not required to demonstrate or measure efficacy in treatment of pain caused by osteoarthritis. Group One and Group Three are for control purposes and will not be considered in evaluating the primary endpoint. The trial is being conducted with off-the-shelf drugs, and the combination drug is being developed in parallel by Dexcel. The trial is being conducted with only one dosage of amlodipine besylate (10 mg), although we expect to seek marketing approval from the FDA for three dosages (10mg, 5 mg, and 2.5 mg), each combined with 200 mg of celecoxib.

In addition, in connection with our Development Services Agreement with Dexcel, pursuant to which Dexcel is developing the formulation for KIT-302 and the subsequent stability testing and manufacturing scale-up in quantities adequate for submission of a new drug application to the FDA, Dexcel has performed a pilot clinical bioequivalence trial, or the Pilot PK Study. This Pilot PK Study was performed during April and May 2015, after completion of the formulation of two prototypes of KIT-302 to check the pharmacokinetics of the combination drug in order to show that the blood levels achieved with our combination are the same as those obtained with the individual components. On June 9, 2015, we obtained the successful results of the Pilot PK Study. See "Business – Services and License Agreements – Development Services Agreement with Dexcel" below for more information.

The Phase III clinical trial for KIT-302 is being conducted in medical centers in the United Kingdom on the basis of approvals received from the British Regulatory Authority (MHRA) and the U.K. ethics committees. It is not currently known whether the European regulatory authorities will require additional studies in order to grant their approval to market KIT-302 in Europe.

If the results of the Phase III clinical trial present clear proof of the effectiveness of KIT-302, we will consider employing a similar development strategy for our second therapeutic candidate, KIT-301.

*Competition and Market*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

The pharmaceutical market is characterized by large international pharmaceutical companies that develop a wide range of products, both generic and new chemical entities (NCEs), which operate alongside smaller companies, such as ours, that develop a specific drug or a combination of drugs. Therefore, many small companies enter into agreements with such global companies during the drug development stage in order to continue the development or marketing of the drug, taking advantage of the financial, marketing and/or other resources available to such global companies. At the same time, the global companies tend to enter into agreements with smaller companies in order to save development time and resources. The global drug sector is a highly developed market with a turnover of hundreds of billions of U.S. dollars and intense competition. Most of the drugs we intend to develop have competing drugs, developed at the same time by other companies and organizations. We are therefore exposed to competition in our field of operation. Although we believe our therapeutic candidates have advantages which our competitors lack, there is a constant risk in the drug development field that a competing party will complete the development stages before we are able to develop our therapeutic candidates intended for the same disease. Moreover, a constant threat in our market is presented by new drugs that have already completed all the development stages and have already entered the market and are competing with the treatments and drugs previously available on the market. All the drugs that we are currently developing are intended for oral use.

*Competitive Treatments for Pain Caused by Osteoarthritis*

The competition for KIT-302 and KIT-301 is expected to come from the oral anti-arthritic market, or more specifically the traditional non-selective NSAIDs (such as naproxen and diclofenac), traditional NSAID/gastroprotective agent combination products or combination product packages (such as Vimovo®, Arthrotec®, Prevacid® and NapraPAC™) and the only COX-2 inhibitor in the U.S. market, Celebrex® (including generic versions of Celebrex® that we expect to be sold following expiration of the patent). Sales of Celebrex in the U.S alone amounted to $1.7 billion in 2014.

Due to the voluntary withdrawal of Vioxx® by Merck & Co. in September 2004, the FDA ordered the withdrawal of Bextra® by Pfizer and issued a Public Health Advisory in April 2005, requiring manufacturers of all prescription products containing NSAIDs to provide warnings regarding potential adverse cardiovascular events as well as life-threatening gastrointestinal events associated with the use of NSAIDs. Moreover, subsequent to an FDA advisory committee meeting in February 2005 that addressed the safety of NSAIDs, and, in particular, the cardiovascular risks of COX-2 selective NSAIDs, the FDA has indicated that long-term studies evaluating cardiovascular risk will be required to approve new NSAID products that may be used on an intermittent or chronic basis. We believe that KIT-302 has a competitive advantage over other drugs in the market because, as a COX-2 inhibitor, it has limited gastrointestinal side effects, and due to the

- 8 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1

2

addition of amlodipine besylate it is designed to address existing hypertension and the cardiovascular side effects of NSAIDs.

3

4

5

6

7

8

9

27.     The statements contained in ¶ 26 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Kitov and its CEO, Defendant Israel, published misleading information concerning Kitov's clinical trials for its lead drug candidate KIT-302; and (2) as a result, Kitov's public statements were materially false and misleading at all relevant times.

10

**The Truth Emerges**

11

12

13

28.     On February 6, 2017, the Israeli publication *Calcalist* reported that Defendant Israel, Kitov's CEO, had been detained and questioned by the Israel Securities Authority on suspicion of publishing misleading information in connection with a clinical trial of KIT-302.

14

15

16

29.     On this news, shares of Kitov's ADSs fell $0.33 per share, or 11.46%, to close at $2.55 per share on February 6, 2017, and shares of Kitov's warrants fell $0.10 per warrant, or 10%, to close at $0.89 per warrant on February 6, 2017.

17

30.     On February 7, 2017, NASDAQ halted trading in Kitov's ADSs and warrants.

18

19

20

31.     On February 7, 2017, Kitov issued press release announcing that the Israeli Securities Authority had begun a formal investigation into the Company's public disclosures concerning its lead drug candidate, KIT-302, stating in pertinent part:

21

22

23

24

TEL AVIV, Israel, Feb. 07, 2017 (GLOBE NEWSWIRE) -- Kitov Pharmaceuticals Holdings Ltd. (NASDAQ:KTOV) (TASE:KTOV), an innovative biopharmaceutical company, announced today that the Israeli Securities Authority has begun a formal investigation into the Company's public disclosures around its lead drug candidate, KIT-302.

25

26

27

J. Paul Waymack, M.D., Sc.D., Chairman of the Board and Chief Medical Officer, stated, "Kitov stands fully behind the validity of all of its clinical trial results. The Company continues to move forward toward the filing of our New Drug Application for KIT-302 with the FDA."

28

- 9 -

32.     On February 9, 2017, NASDAQ announced that Kitov's ADSs and warrants would resume trading on February 9, 2017, at 10:45 Eastern Standard Time.

33.     On this news, shares of Kitov's ADSs fell $0.36 per share, or 14%, to close at $2.15 on February 9, 2017, and shares of Kitov's warrants fell $0.27 per warrant, or 30%, to close at $0.62 per warrant on February 9, 2017.

34.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs and warrants, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to California Code of Civil Procedure Section 382 on behalf of himself and on behalf of all purchasers of Kitov ADSs and warrants issued pursuant to and/or traceable to the Company's Offering (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class Members is unknown to Plaintiff at this time but it is believed to be in the thousands. Members of the Class may be identified by records maintained by Kitov or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

38.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

(b)     whether the Offering Documents issued by Defendants to the investing public committed and/or misrepresented material facts about the Company and its business; and

(c)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of §11 of the Securities Act Against All Defendants

41.     Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

42.     This claim is brought by Plaintiff on his own behalf and on behalf of other members of the Class who acquired Kitov ADSs and/or warrants pursuant to and/or traceable to the Company's Offering. Each Class Member acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Offering Documents. Kitov is the issuer of the ADSs and/or warrants through the Offering Documents. The Individual Defendants are signatories of the Registration Statement.

43.     The Underwriter Defendants owed to the holders of the ADS and warrants obtained through the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that

- 11 -
CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  such statements were true and correct and that there was no omission of material facts required to be

2  stated in order to make the statements contained therein not misleading. Defendants knew, or in the

3  exercise of reasonable care should have known, of the material misstatements and omissions

4  contained in or omitted from the Offering Documents as set forth herein. As such, Defendants are

5  liable to the Class.

6      44.     All Defendants owed to the purchasers of the shares obtained through the Offering

7  Documents the duty to make a reasonable and diligent investigation of the statements contained in

8  the Offering Documents at the time they became effective to ensure that such statements were true

9  and correct and that there was no omission of material facts required to be stated in order to make

10 the statements contained therein not misleading.

11     45.     None of the Defendants made a reasonable investigation or possessed reasonable

12 grounds for the belief that the statements contained in the Offering Documents were true or that

13 there was no omission of material facts necessary to make the statements made therein not

14 misleading.

15     46.     Defendants issued and disseminated, caused to be issued and disseminated, and

16 participated in the issuance and dissemination of, material misstatements and/or omissions to the

17 investing public that were contained in the Offering Documents, which misrepresented or failed to

18 disclose, among other things, the facts set forth above. By reason of the conduct alleged herein,

19 each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

20     47.     At the times they obtained their shares of Kitov, Plaintiff and members of the Class

21 did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

22     48.     This action is brought within one year after discovery of the untrue statements and

23 omissions in and from the Offering Documents that should have been made and/or corrected

24 through the exercise of reasonable diligence, and within three years of the effective date of the

25 Offering Documents.

26     49.     By reason of the foregoing, Plaintiff and the other members of the Class are entitled

27 to damages under Section 11 as measured by the provisions of the Section 11(e), from the

28 Defendants and each of them, jointly and severally.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

## COUNT II

### Violations of §12(a)(2) of the Securities Act Against the Individual Defendants and the Underwriter Defendants

50.    Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

51.    By means of the defective Prospectus, the Individual Defendants and the Underwriter Defendants promoted and sold Kitov stock to Plaintiff and other members of the Class.

52.    The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Individual Defendants the Underwriter Defendants owed Plaintiff and the other members of the Class who purchased Kitov ADSs and/or warrants pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Individual Defendants the Underwriter Defendants in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

53.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Kitov ADSs and/or warrants.

54.    By reason of the conduct alleged herein, Individual Defendants and the Underwriter Defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violation, Plaintiff and the other members of the Class who purchased Kitov ADSs and/or warrants pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

## COUNT III

- 13 -

## Violation of §15 of the Securities Act Against the Individual Defendants

55.     Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

56.     This claim is asserted against the Individual Defendants, each of whom was a control person of Kitov during the relevant time period.

57.     The Individual Defendants were control persons of Kitov by virtue of, among other things, their positions as senior officers and/or directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Offering Documents.

58.     None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

59.     This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents, and within three years after Kitov's ADSs and warrants were sold to the Class in connection with the Offering.

60.     By reason of the above conduct, for which Kitov is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as Kitov pursuant to Section 15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, certifying Plaintiff as a Class representative under California Code of Civil Procedure §382 and Rule 3.764 of the California Rules of Court and appointing Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- 14 -

1         C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

2   action, including counsel's fees and expert fees;

3         D.      Awarding rescission or a rescissory measure of damages; and

4         E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

5                                  **JURY TRIAL DEMANDED**

6        Plaintiff hereby demands a trial by jury.

7   DATED: March 20, 2017             Respectfully submitted,

8                               Timothy W. Brown

9                               THE BROWN LAW FIRM, P.C.

10                                  *-and-*

11                               Robert C. Moest, Of Counsel, SBN 62166

12                               THE BROWN LAW FIRM, P.C.

13                               By:

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933